# 24-982-cv

## United States Court of Appeals
### for the
## Second Circuit



Cavalier D. Knight

*Plaintiff-Appellant,*

-v-

CITY OF NEW YORK, and EDWARD A. CABAN, as the Statutorily Designated Handgun Licensing Officer and the POLICE COMMISSIONER OF THE CITY OF NEW YORK, and his successors in office,

*Defendants-Appellees*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX OF APPELLANT: VOL II

**EXHIBITS: 1 - 10**

Cavalier D. Knight, *Pro Se*
511 W 165th St Ste 627
New York, NY 10032-0634
T: +1 (646) 580-7801
E: info@cavalierknight.com

## <u>TABLE OF CONTENTS</u>

**(1)**   Ex 01 - <u>*NYSRPA Inc. v. Bruen*</u>, U.S. No. 20-843 (2022)...............1

**(2)**   Ex 02 - Transcript of Court Conference - 11.09.2023.................71

**(3)**   Ex 03 - Report and Recommendation...................................147

**(4)**   Ex 04 - § 5-25 Handgun Purchase Authorizations..................163

**(5)**   Ex 05 - ORDER - 22-cv-10755.............................................175

**(6)**   Ex 06 - NYPD License and Permit Types.............................180

**(7)**   Ex 07 - NYPD Renewal Processing Letter............................182

**(8)**   Ex 08 - <u>*Gibbons v. Ogden*</u>, 22 U.S. 1 (1824)............................188

**(9)**   Ex 09 - <u>*Shuttlesworth v. Birmingham*</u>, 394 U.S. 147 (1969)......214

**(10)**  Ex 10 - <u>*Murdock v. Pennsylvania*</u>, 319 U.S. 105 (1943)….........225

# EXHIBIT 01

No. 20-843

U.S. Supreme Court

# New York State Rifle & Pistol Assn., Inc. v. Bruen

Decided Jun 23, 2022

20-843

06-23-2022

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS v. KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

Thomas, Justice.

Revised date: 7/29/22.

Argued November 3, 2021

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Syllabus

The State of New York makes it a crime to possess a firearm without a license, whether inside or outside the home. An individual who wants to carry a firearm outside his home may obtain an unrestricted license to "have and carry" a concealed "pistol or revolver" if he can prove that "proper cause exists" for doing so. N.Y.Penal Law Ann. §400.00(2)(f). An applicant satisfies the "proper cause" requirement only if he can "demonstrate a special need for self-protection distinguishable from that of the general community." E.g., In re Klenosky, 75 A.D.2d 793, 428 N.Y.S.2d 256, 257.

Petitioners Brandon Koch and Robert Nash are adult, law-abiding New York residents who both applied for unrestricted licenses to carry a handgun in public based on their generalized interest in self-defense. The State denied both of their applications for unrestricted licenses, allegedly because Koch and Nash failed to satisfy the "proper cause" requirement. Petitioners then sued respondents-state officials who oversee the processing of licensing applications-for declaratory and injunctive relief, alleging that respondents violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications for failure to demonstrate a unique need for self-defense. The District Court dismissed petitioners' complaint and the Court of Appeals affirmed. Both courts relied on the Second Circuit's prior decision in *Kachalsky v. County of Westchester*, 701 F.3d 81, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important governmental interest." *Id.*, at 96. *2

2

*Held:* New York's proper-cause requirement violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms in public for self-defense. Pp. 8-63.

(a) In *District of Columbia v. Heller,* 554 U.S. 570, and *McDonald v. Chicago,* 561 U.S. 742, the Court held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense. Under *Heller,* when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and to justify a firearm regulation the government must

demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation. Pp. 8-22.

(1) Since *Heller* and *McDonald,* the Courts of Appeals have developed a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. The Court rejects that two-part approach as having one step too many. Step one is broadly consistent with *Heller,* which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller andMcDon-ald* do not support a second step that applies means-end scrutiny in the Second Amendment context. *Heller's* methodology centered on constitutional text and history. It did not invoke any means-end test such as strict or intermediate scrutiny, and it expressly rejected any interest-balancing inquiry akin to intermediate scrutiny. Pp. 9-15.

(2) Historical analysis can sometimes be difficult and nuanced, but reliance on history to inform the meaning of constitutional text is more legitimate, and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field. *McDonald,* 561 U.S., at 790-791 (plurality opinion). Federal courts tasked with making difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. While judicial deference to legislative interest balancing is understandable-and, elsewhere, appropriate-it is not deference that the Constitution demands here. The Second Amendment "is the very product of an interest balancing by the people," and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller,* 554 U.S., at 635. Pp. 15-17.

(3)The test that the Court set forth in *Heller* and applies today requires courts to assess whether modern firearms regulations are consistent with

the Second Amendment's text and historical understanding. Of course, the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. But the Constitution *3 can, and must, apply to circumstances beyond those the Founders specifically anticipated, even though its meaning is fixed according to the understandings of those who ratified it. See, *e.g., United States v. Jones,* 565 U.S. 400, 404-405. Indeed, the Court recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." 554 U.S., at 582.

To determine whether a firearm regulation is consistent with the Second Amendment, *Heller* and *McDonald* point toward at least two relevant metrics: first, whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified. Because "individual self-defense is 'the *central component'* of the Second Amendment right," these two metrics are *"'central'"* considerations when engaging in an analogical inquiry. *McDonald,* 561 U.S., at 767 (quoting *Heller,* 554 U.S., at 599).

To be clear, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. For example, courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible. *Id.,* at 626. That said, respondents' attempt to characterize New York's proper-cause requirement as a "sensitive-place" law lacks merit because there is no historical basis for New York to effectively declare the island of Manhattan a

"sensitive place" simply because it is crowded and protected generally by the New York City Police Department. Pp. 17-22.

(b) Having made the constitutional standard endorsed in *Heller* more explicit, the Court applies that standard to New York's proper-cause requirement. Pp. 23-62.

(1) It is undisputed that petitioners Koch and Nash-two ordinary, law-abiding, adult citizens-are part of "the people" whom the Second Amendment protects. See *Heller,* 554 U.S., at 580. And no party disputes that handguns are weapons "in common use" today for self-defense. See *id.,* at 627. The Court has little difficulty concluding also that the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct-carrying handguns publicly for self-defense. Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms, and the definition of "bear" naturally encompasses public carry. Moreover, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," *id.,* at 592, and confrontation can surely take place outside the home. Pp. 23-24.  *4

4

(2) The burden then falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. To do so, respondents appeal to a variety of historical sources from the late 1200s to the early 1900s. But when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller,* 554 U.S., at 634-635. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right. With these principles in mind, the Court concludes that

respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Pp. 24-62.

(i) Respondents' substantial reliance on English history and custom before the founding makes some sense given *Reliefs* statement that the Second Amendment "codified a right 'inherited from our English ancestors.'" 554 U.S., at 599. But the Court finds that history ambiguous at best and sees little reason to think that the Framers would have thought it applicable in the New World. The Court cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection. Pp. 30-37.

(ii) Respondents next direct the Court to the history of the Colonies and early Republic, but they identify only three restrictions on public carry from that time. While the Court doubts that just three colonial regulations could suffice to show a tradition of public-carry regulation, even looking at these laws on their own terms, the Court is not convinced that they regulated public carry akin to the New York law at issue. The statutes essentially prohibited bearing arms in a way that spread "fear" or "terror" among the people, including by carrying of "dangerous and unusual weapons." See 554 U.S., at 627. Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are today "the quintessential self-defense weapon." *Id.,* at 629. Thus, these colonial laws provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today. Pp. 37-42.

(iii) Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these

restrictions imposed a substantial burden on public carry analogous to that imposed by New York's restrictive licensing regime. *5

*Common-Law Offenses.* As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

*Statutory Prohibitions.* In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. But the antebellum state-court decisions upholding them evince a consensus view that States could not altogether prohibit the public carry of arms protected by the Second Amendment or state analogues.

*Surety Statutes.* In the mid-19th century, many jurisdictions began adopting laws that required certain individuals to post bond before carrying weapons in public. Contrary to respondents' position, these surety statutes in no way represented direct precursors to New York's proper-cause requirement. While New York presumes that individuals have no public carry right without a showing of heightened need, the surety statutes presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace. And, even then, proving special need simply avoided a fee.

In sum, the historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation, but none of these limitations on the right to bear arms operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose. Pp. 42-51.

(iv) Evidence from around the adoption of the Fourteenth Amendment also does not support respondents' position. The "discussion of the [right to keep and bear arms] in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves," *Heller,* 554 U.S., at 614, generally demonstrates that during Reconstruction the right to keep and bear arms had limits that were consistent with a right of the public to peaceably carry handguns for self-defense. The Court acknowledges two Texas cases-*English v. State,* 35 Tex. 473 and *State v. Duke,* 42 Tex. 455-that approved a statutory "reasonable grounds" standard for public carry analogous to New York's proper-cause requirement. But these decisions were outliers and therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public. See *Heller,* 554 U.S., at 632. Pp. 52-58. *6

(v) Finally, respondents point to the slight uptick in gun regulation during the late-19th century. As the Court suggested in *Heller,* however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence. In addition, the vast majority of the statutes that respondents invoke come from the Western Territories. The bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry. See *Heller,* 554 U.S., at 614. Moreover, these territorial laws were rarely subject to judicial scrutiny, and absent any evidence explaining why these unprecedented prohibitions on all public carry were understood to comport with the Second Amendment, they do little to inform "the origins and continuing significance of the Amendment." *Ibid.;* see also The Federalist No. 37, p. 229. Finally, these territorial restrictions deserve little weight because

they were, consistent with the transitory nature of territorial government, short lived. Some were held unconstitutional shortly after passage, and others did not survive a Territory's admission to the Union as a State. Pp. 58-62.

(vi) After reviewing the Anglo-American history of public carry, the Court concludes that respondents have not met their burden to identify an American tradition justifying New York's proper-cause requirement. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor have they generally required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" to carry arms in public. *Klenosky,* 75 A.D.2d, at 793, 428 N.Y.S. 2d, at 257. P. 62.

(c) The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald,* 561 U.S., at 780 (plurality opinion). The exercise of other constitutional rights does not require individuals to demonstrate to government officers some special need. The Second Amendment right to carry arms in public for self-defense is no different. New York's proper-cause requirement violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms in public. Pp. 62-63.

818 Fed.Appx. 99, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. ALITO, J., filed a concurring opinion. KAVANAUGH, J., filed a concurring opinion, in which ROBERTS, C. J., joined. BARRETT, J., filed a concurring opinion. BREYER, J., filed a dissenting opinion, in which SOTOMAYOR and

7   KAGAN, JJ., joined. *7

## OPINION

Thomas, Justice.

In *District of Columbia v. Heller,* 554 U.S. 570 (2008), and *McDonald v. Chicago,* 561 U.S. 742 (2010), we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald,* that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.

The parties nevertheless dispute whether New York's licensing regime respects the constitutional right to carry handguns publicly for self-defense. In 43 States, the government issues licenses to carry based on objective criteria. But in six States, including New York, the government further conditions issuance of a license to carry on a citizen's showing of some additional special need.

8   Because the State *8 of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution.

I

A

New York State has regulated the public carry of handguns at least since the early 20th century. In 1905, New York made it a misdemeanor for anyone over the age of 16 to "have or carry concealed upon his person in any city or village of [New York], any pistol, revolver or other firearm without a written license . . . issued to him by a police magistrate." 1905 N.Y.Laws ch. 92, §2, pp. 129-130; see also 1908 N.Y.Laws ch. 93, §1, pp. 242-243 (allowing justices of the peace to issue licenses). In 1911, New York's "Sullivan Law" expanded the State's criminal prohibition to the

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

possession of all handguns-concealed or otherwise-without a government-issued license. See 1911 N.Y.Laws ch. 195, §1, p. 443. New York later amended the Sullivan Law to clarify the licensing standard: Magistrates could "issue to [a] person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon" only if that person proved "good moral character" and "proper cause." 1913 N.Y.Laws ch. 608, §1, p. 1629.

Today's licensing scheme largely tracks that of the early 1900s. It is a crime in New York to possess "any firearm" without a license, whether inside or outside the home, punishable by up to four years in prison or a $5,000 fine for a felony offense, and one year in prison or a $1,000 fine for a misdemeanor. See N.Y.Penal Law Ann. §§265.01-b (West 2017), 261.01(1) (West Cum. Supp. 2022), 70.00(2)(e) and (3)(b), 80.00(1)(a) (West 2021), 70.15(1), 80.05(1). Meanwhile, possessing a loaded firearm outside one's home or place of business without a license is a felony punishable by *9 up to 15 years in prison. §§265.03(3) (West 2017), 70.00(2)(c) and (3)(b), 80.00(1)(a).

A license applicant who wants to possess a firearm *at home* (or in his place of business) must convince a "licensing officer"-usually a judge or law enforcement officer-that, among other things, he is of good moral character, has no history of crime or mental illness, and that "no good cause exists for the denial of the license." §§400.00(1)(a)-(n) (West Cum. Supp. 2022). If he wants to carry a firearm *outside* his home or place of business for self-defense, the applicant must obtain an unrestricted license to "have and carry" a concealed "pistol or revolver." §400.00(2)(f). To secure that license, the applicant must prove that "proper cause exists" to issue it. *Ibid.* If an applicant cannot make that showing, he can receive only a "restricted" license for public carry, which allows him to carry a firearm for a limited purpose, such as hunting, target shooting, or employment. See, *e.g., In re O'Brien,* 87 N.Y.2d 436, 438-439, 663 N.E.2d 316, 316-317 (1996);

*Babernitz v. Police Dept. of City of New York,* 65 A.D.2d 320, 324, 411 N.Y.S.2d 309, 311 (1978); *In re O'Connor,* 154 Misc.2d 694, 696-698, 585 N.Y.S.2d 1000, 1003 (Westchester Cty. 1992).

No New York statute defines "proper cause." But New York courts have held that an applicant shows proper cause only if he can "demonstrate a special need for self-protection distinguishable from that of the general community." *E.g., In reKlenosky,* 75 A.D.2d 793, 428 N.Y.S.2d 256, 257 (1980). This "special need" standard is demanding. For example, living or working in an area "'noted for criminal activity'" does not suffice. *In re Bernstein,* 85 A.D.2d 574, 445 N.Y.S.2d 716, 717 (1981). Rather, New York courts generally require evidence "of particular threats, attacks or other extraordinary danger to personal safety." *In re Martinek,* 294 A.D.2d 221, 222, 743 N.Y.S.2d 80, 81 (2002); see also *In re Kaplan,* 249 A.D.2d 199, 201, 673 N.Y.S.2d 66, 68 (1998) (approving the New York *10 City Police Department's requirement of "'extraordinary personal danger, documented by proof of recurrent threats to life or safety'" (quoting 38 N.Y.C. R. R. §5-03(b))).

When a licensing officer denies an application, judicial review is limited. New York courts defer to an officer's application of the proper-cause standard unless it is "arbitrary and capricious." *In re Bando,* 290 A.D.2d 691, 692, 735 N.Y.S.2d 660, 661 (2002). In other words, the decision "must be upheld if the record shows a rational basis for it." *Kaplan,* 249 A.D.2d, at 201, 673 N.Y.S. 2d, at 68. The rule leaves applicants little recourse if their local licensing officer denies a permit.

New York is not alone in requiring a permit to carry a handgun in public. But the vast majority of States-43 by our count-are "shall issue" jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

11    suitability.[1] Meanwhile, only six *11 States and the District of Columbia have "may issue" licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license. Aside from New York, then, only California, the District of Columbia, Hawaii, Maryland, Massachusetts, and

12    New *12

[1]    See Ala. Code §13A-ll-75 (Cum. Supp. 2021); Alaska Stat. §18.65.700 (2020); Ariz. Rev. Stat. Ann. §13-3112 (Cum. Supp. 2021); Ark. Code Ann. §5-73-309 (Supp. 2021); Colo. Rev. Stat. §18-12-206 (2021); Fla. Stat. §790.06 (2021); Ga. Code Ann. §16-11-129 (Supp. 2021); Idaho Code Ann. §18-3302K (Cum. Supp. 2021); Ill.Comp.Stat., ch. 430, §66/10 (West Cum. Supp. 2021); Ind. Code §35-47-2-3 (2021); Iowa Code §724.7 (2022); Kan. Stat. Ann. §75-7e03 (2021); Ky. Rev. Stat. Ann. §237.110 (Lexis Cum. Supp. 2021); La. Rev. Stat. Ann. §40:1379.3 (West Cum. Supp. 2022); Me. Rev. Stat. Ann., Tit. 25, §2003 (Cum. Supp. 2022); Mich. Comp. Laws §28.425b (2020); Minn. Stat. §624.714 (2020); Miss. Code Ann. §45-9-101 (2022); Mo. Rev. Stat. §571.101 (2016); Mont. Code Ann. §45-8-321 (2021); Neb. Rev. Stat. §69-2430 (2019); Nev. Rev. Stat. §202.3657 (2021); N. H. Rev. Stat. Ann. §159:6 (Cum. Supp. 2021); N.M. Stat. Ann. §29-19-4 (2018); N. C. Gen. Stat. Ann. §14-415.11 (2021); N. D. Cent. Code Ann. §62.1-04-03 (Supp. 2021); Ohio Rev. Code Ann. §2923.125 (2020); Okla. Stat., Tit. 21, §1290.12 (2021); Ore. Rev. Stat. §166.291 (2021); 18 Pa. Cons. Stat. §6109 (Cum. Supp. 2016); S. C. Code Ann. §23-31-215(A) (Cum. Supp. 2021); S. D. Codified Laws §23-7-7 (Cum. Supp. 2021); Tenn. Code Ann. §39-17-1366 (Supp. 2021); Tex. Govt. Code Ann. §411.177 (West Cum. Supp. 2021); Utah Code §53-5-704.5 (2022); Va. Code Ann. §18.2-308.04 (2021); Wash. Rev.

Code §9.41.070 (2021); W.Va. Code Ann. §61-7-4 (2021); Wis.Stat. §175.60 (2021); Wyo. Stat. Ann. §6-8-104 (2021). Vermont has no permitting system for the concealed carry of handguns. Three States-Connecticut, Delaware, and Rhode Island-have discretionary criteria but appear to operate like "shall issue" jurisdictions. See Conn. Gen. Stat. §29-28(b) (2021); Del. Code, Tit. 11, §1441 (2022); R. I. Gen. Laws §11-47-11 (2002). Although Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a "suitable person," see Conn. Gen. Stat. §29-28(b), the "suitable person" standard precludes permits only to those "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Dwyer v. Farrell,* 193 Conn. 7, 12, 475 A.2d 257, 260 (1984) (internal quotation marks omitted). As for Delaware, the State has thus far processed 5,680 license applications and renewals in fiscal year 2022 and has denied only 112. See Del. Courts, Super. Ct., Carrying Concealed Deadly Weapon (June 9, 2022), *https://courts.delaware.gov/* forms/download.aspx?ID=125408.

Moreover, Delaware appears to have no licensing requirement for open carry. Finally, Rhode Island has a suitability requirement, see R. I. Gen. Laws §11-47-11, but the Rhode Island Supreme Court has flatly denied that the" [demonstration of a proper showing of need" is a component of that requirement. *Gadomski v. Tavares,* 113 A. 3d 387, 392 (2015). Additionally, some "shall issue" jurisdictions have so-called "constitutional carry" protections that allow certain individuals to carry handguns in public within the State without *any* permit whatsoever. See, *e.g., A.* Sherman, More States Remove Permit Requirement To Carry a Concealed Gun, PolitiFact (Apr. 12, 2022), *https://www.politifact.com/article/2022/apr*

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

*/12/more-states-remove-per*mit-requirement-carry-concea/ ("Twenty-five states now have permitless concealed carry laws . . . The states that have approved permitless carry laws are: Alabama, Alaska, Arizona, Arkansas, Idaho, Indiana, Iowa, Georgia, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, New Hampshire, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming").

Jersey have analogues to the "proper cause" standard.[2] All of these "proper cause" analogues have been upheld by the Courts of Appeals, save for the District of Columbia's, which has been permanently enjoined since 2017. Compare *Gould v. Morgan,* 907 F.3d 659, 677 (CA1 2018); *Kachalsky v. County of Westchester,* 701 F.3d 81, 101 (CA2 2012); *Drake v. Filko,* 724 F.3d 426, 440 (CA3 2013); *United States v. Masciandaro,* 638 F.3d 458, 460 (CA4 2011); *Young v. Hawaii,* 992 F.3d 765, 773 (CA9 2021) (en banc), with *Wrenn v. District of Columbia,* 864 F.3d 650, 668 (CADC 2017).

> 2   See Cal. Penal Code Ann. §26150 (West 2021) ("Good cause"); D. C. Code §§7-2509.11(1) (2018), 22-4506(a) (Cum. Supp. 2021) ("proper reason," *i.e.,* "special need for self-protection"); Haw. Rev. Stat. §§134-2 (Cum. Supp. 2018), 134-9(a) (2011) ("exceptional case"); Md. Pub. Saf. Code Ann. §5-306(a)(6)(ii) (2018) ("good and substantial reason"); Mass. Gen. Laws, ch. 140, §131(d) (2020) ("good reason"); N.J. Stat. Ann. §2C:58-4(c) (West Cum. Supp. 2021) ("justifiable need").

B

As set forth in the pleadings below, petitioners Brandon Koch and Robert Nash are law-abiding, adult citizens of Rensselaer County, New York. Koch lives in Troy, while Nash lives in Averill Park. Petitioner New York State Rifle & Pistol Association, Inc., is a public-interest group

organized to defend the Second Amendment rights of New Yorkers. Both Koch and Nash are members.

In 2014, Nash applied for an unrestricted license to carry a handgun in public. Nash did not claim any unique danger to his personal safety; he simply wanted to carry a handgun for self-defense. In early 2015, the State denied Nash's application for an unrestricted license but granted him a restricted license for hunting and target shooting only. In late 2016, Nash asked a licensing officer to remove the restrictions, citing a string of recent robberies in his neighborhood. After an informal hearing, the licensing officer denied the request. The officer reiterated that Nash's existing license permitted him "to carry concealed for purposes of off *13 road back country, outdoor activities similar to hunting," such as "fishing, hiking & camping etc." App. 41. But, at the same time, the officer emphasized that the restrictions were "intended to *prohibit* [Nash] from carrying concealed in ANY LOCATION typically open to and frequented by the general public." *Ibid.*

Between 2008 and 2017, Koch was in the same position as Nash: He faced no special dangers, wanted a handgun for general self-defense, and had only a restricted license permitting him to carry a handgun outside the home for hunting and target shooting. In late 2017, Koch applied to a licensing officer to remove the restrictions on his license, citing his extensive experience in safely handling firearms. Like Nash's application, Koch's was denied, except that the officer permitted Koch to "carry to and from work." *Id.,* at 114.

C

Respondents are the superintendent of the New York State Police, who oversees the enforcement of the State's licensing laws, and a New York Supreme Court justice, who oversees the processing of licensing applications in Rensselaer County. Petitioners sued respondents for declaratory and injunctive relief under Rev. Stat. 1979, 42 U.S.C. §1983, alleging that respondents

violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications on the basis that they had failed to show "proper cause," *i.e.,* had failed to demonstrate a unique need for self-defense.

The District Court dismissed petitioners' complaint and the Court of Appeals affirmed. See 818 Fed.Appx. 99, 100 (CA2 2020). Both courts relied on the Court of Appeals' prior decision in *Kachalsky,* 701 F.3d 81, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important governmental interest." *Id.,* at 96. *14

We granted certiorari to decide whether New York's denial of petitioners' license applications violated the Constitution. 593 U.S. (2021).

II

In *Heller* and *McDonald,* we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense. In doing so, we held unconstitutional two laws that prohibited the possession and use of handguns in the home. In the years since, the Courts of Appeals have coalesced around a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.

Today, we decline to adopt that two-part approach. In keeping with *Heller,* we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second

Amendment's "unqualified command." *Konigsberg v. State Bar of Cal.,* 366 U.S. 36, 50, n. 10 (1961).[3] *15

> [3] Rather than begin with its view of the governing legal framework, the dissent chronicles, in painstaking detail, evidence of crimes committed by individuals with firearms. See *post,* at 1-9 (opinion of BREYER, J.). The dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use. But, as Members of the Court have already explained, "[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications." *McDonald v. Chicago,* 561 U.S. 742, 783 (2010) (plurality opinion).

A

Since *Heller* and *McDonald,* the two-step test that Courts of Appeals have developed to assess Second Amendment claims proceeds as follows. At the first step, the government may justify its regulation by "establishing] that the challenged law regulates activity falling outside the scope of the right as originally understood." *E.g., Kanter v. Barr,* 919 F.3d 437, 441 (CA7 2019) (internal quotation marks omitted). But see *United States v. Boyd,* 999 F.3d 171, 185 (CA3 2021) (requiring claimant to show "'a burden on conduct falling within the scope of the Second Amendment's guarantee'"). The Courts of Appeals then ascertain the original scope of the right based on its historical meaning. *E.g., United States v. Focia,* 869 F.3d 1269, 1285 (CA11 2017). If the government can prove that the regulated conduct falls beyond the Amendment's original scope, "then the analysis can stop there; the regulated activity is categorically unprotected." *United States v. Greeno,* 679 F.3d 510, 518 (CA6 2012) (internal quotation marks omitted). But if the historical evidence at this step is "inconclusive or suggests that the regulated activity is *not*

categorically unprotected," the courts generally proceed to step two. *Kanter,* 919 F.3d, at 441 (internal quotation marks omitted).

At the second step, courts often analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Ibid,* (internal quotation marks omitted). The Courts of Appeals generally maintain "that the core Second Amendment right is limited to self-defense *in the home." Gould,* 907 F.3d, at 671 (emphasis added). But see *Wrenn,* 864 F.3d, at 659 ("[T]he Amendment's core generally covers carrying in public for self defense"). If a "core" Second Amendment right is burdened, courts apply "strict scrutiny" and ask whether the Government can prove that the law is "narrowly tailored to achieve a compelling governmental interest." *Kolbe v. Hogan,* 849 F.3d 114, 133 (CA4 2017) (internal quotation \*16 marks omitted). Otherwise, they apply intermediate scrutiny and consider whether the Government can show that the regulation is "substantially related to the achievement of an important governmental interest." *Kachalsky,* 701 F.3d, at 96.[4] Both respondents and the United States largely agree with this consensus, arguing that intermediate scrutiny is appropriate when text and history are unclear in attempting to delineate the scope of the right. See Brief for Respondents 37; Brief for United States as *Amicus Curiae* 4.

[4] See *Association of N. J. Rifle & Pistol Clubs, Inc. v. Attorney General N. J.,*910F.3d 106, 117 (CA3 2018); accord, *Worman v. Healey,* 922 F.3d 26, 33, 36-39 (CA1 2019); *Libertarian Party of Erie Cty. v. Cuomo,* 970 F.3d 106, 127-128 (CA2 2020); *Harleyv. Wilkinson,* 988 F.3d 766, 769 (CA4 2021); *National Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 700 F.3d 185, 194-195 (CA5 2012); *United States v. Greeno,* 679 F.3d 510, 518 (CA6 2012); *Kanter v. Barr,* 919 F.3d 437, 442 (CA7 2019); *Young v. Hawaii,* 992 F.3d 765, 783 (CA9 2021) (en banc); *United States v.*

*Reese,* 627 F.3d 792, 800-801 (CA10 2010); *GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d 1244, 1260, n. 34 (CA11 2012); *United States. Class,* 930 F.3d 460, 463 (CADC 2019).

B

Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller,* which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

1

To show why *Heller* does not support applying means-end scrutiny, we first summarize *Heller's* methodological approach to the Second Amendment.

In *Heller,* we began with a "textual analysis" focused on \*17 the "'normal and ordinary'" meaning of the Second Amendment's language. 554 U.S., at 576-577, 578. That analysis suggested that the Amendment's operative clause-"the right of the people to keep and bear Arms shall not be infringed"-"guarantee[] the individual right to possess and carry weapons in case of confrontation" that does not depend on service in the militia. *Id.,* at 592.

From there, we assessed whether our initial conclusion was "confirmed by the historical background of the Second Amendment." *Ibid.* We looked to history because "it has always been widely understood that the Second Amendment . . . . codified a *pre-existing* right." *Ibid.* The Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Id.,* at 599 (alterations and internal quotation marks omitted).

After surveying English history dating from the late 1600s, along with American colonial views leading up to the founding, we found "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.,* at 595.

We then canvassed the historical record and found yet further confirmation. That history included the "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment," *id.,* at 600-601, and "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," *id.,* at 605. When the principal dissent charged that the latter category of sources was illegitimate "postenactment legislative history," *id.,* at 662, n. 28 (opinion of Stevens, J.), we clarified that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" was "a critical tool of constitutional interpretation," *id.,* at 605 (majority opinion).

In assessing the postratification history, we looked to four *18 different types of sources. First, we reviewed "[t]hree important founding-era legal scholars [who] interpreted the Second Amendment in published writings." *Ibid.* Second, we looked to "19th-century cases that interpreted the Second Amendment" and found that they "universally support an individual right" to keep and bear arms. *Id.,* at 610. Third, we examined the "discussion of the Second Amendment in Congress and in public discourse" after the Civil War, "as people debated whether and how to secure constitutional rights for newly freed slaves." *Id.,* at 614. Fourth, we considered how post-Civil War commentators understood the right. See *id.,* at 616-619.

After holding that the Second Amendment protected an individual right to armed self-defense, we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right. We noted that,

"[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.,* at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Ibid.* For example, we found it "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons'" that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'" *Id.,* at 627 (first citing 4 W. Blackstone, Commentaries on the Laws of England 148-149 (1769); then quoting *United States v. Miller,* 307 U.S. 174, 179 (1939)). That said, we cautioned that we were not "undertaking] an exhaustive historical analysis today of the full scope of the Second Amendment" and moved on to considering the constitutionality of the District of Columbia's handgun ban. 554 U.S., at 627.

We assessed the lawfulness of that handgun ban by scrutinizing whether it comported with history and tradition. Although we noted that the ban "would fail constitutional *19 muster" "[u] rider any of the standards of scrutiny that we have applied to enumerated constitutional rights," *id.,* at 628-629, we did not engage in means-end scrutiny when resolving the constitutional question. Instead, we focused on the historically unprecedented nature of the District's ban, observing that "[f]ew laws in the history of our Nation have come close to [that] severe restriction." *Id.,* at 629. Likewise, when one of the dissents attempted to justify the District's prohibition with "founding-era historical precedent," including "various restrictive laws in the colonial period," we addressed each purported analogue and concluded that they were either irrelevant or "d[id] not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.,* at 631-632; see *id.,* at 631-634. Thus, our earlier historical analysis sufficed to show that the Second Amendment did not

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

countenance a "complete prohibition" on the use of "the most popular weapon chosen by Americans for self-defense in the home." *Id.,* at 629.

2

As the foregoing shows, *Heller's* methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny.

Moreover, *Heller* and *McDonald* expressly rejected the application of any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller,* 554 U.S., at 634 (quoting *id.,* at 689-690 (BREYER, J., dissenting)); see also *McDonald,* 561 U.S., at 790-791 (plurality opinion) (the Second Amendment does not permit-let alone require-"judges to assess the costs and benefits of firearms restrictions" under means-end scrutiny). We declined to engage in means-end scrutiny because "[t]he very enumeration of the right takes out of the hands of government-even the Third Branch of Government-the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller,* 554 U.S., at 634. We then concluded: "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Ibid.*

20    \*20

Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt. Dissenting in *Heller,* JUSTICE BREYER's proposed standard-"ask[ing] whether [a] statute burdens a protected interest in a way or to an

extent that is out of proportion to the statute's salutary effects upon other important governmental interests," *id.,* at 689-690 (dissenting opinion)-simply expressed a classic formulation of intermediate scrutiny in a slightly different way, see *Clark v. Jeter,* 486 U.S. 456, 461 (1988) (asking whether the challenged law is "substantially related to an important government objective"). In fact, JUSTICE BREYER all but admitted that his *Heller* dissent advocated for intermediate scrutiny by repeatedly invoking a quintessential intermediate-scrutiny precedent. See *Heller,* 554 U.S., at 690, 696, 704-705 (citing *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180 (1997)). Thus, when *Heller* expressly rejected that dissent's "interest-balancing inquiry," 554 U.S., at 634 (internal quotation marks omitted), it necessarily rejected intermediate scrutiny.[5] \*21

21

> [5] The dissent asserts that we misread *Heller* to eschew means-end scrutiny because *Heller* mentioned that the District of Columbia's handgun ban "would fail constitutional muster"" [u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller,* 554 U.S., at 628-629; see *post,* at 23 (opinion of BREYER, J.). But *Heller's* passing observation that the District's ban would fail under any heightened "standar[d] of scrutiny" did not supplant *Heller's* focus on constitutional text and history. Rather, *Heller's* comment "was more of a gilding-the-lily observation about the extreme nature of D.C.'s law," *Heller v. District of Columbia,* 670 F.3d 1244, 1277 (CADC 2011) (Ka-vanaugh, J., dissenting), than a reflection of *Heller's* methodology or holding.

In sum, the Courts of Appeals' second step is inconsistent with *Heller's* historical approach and its rejection of means-end scrutiny. We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's

casetext

conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg,* 366 U.S., at 50, n. 10.

C

This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms. 554 U.S., at 582, 595, 606, 618, 634-635. In that context, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816 (2000); see also *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777 (1986). In some cases, that burden includes showing whether the expressive conduct falls outside of the category of protected speech. See *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.,* 538 U.S. 600, 620, n. 9 (2003). And to carry that burden, the government must generally point to *historical* evidence about the reach of the First Amendment's protections. See, *22 e.g., United States v. Stevens,* 559 U.S. 460, 468-471 (2010) (placing the burden on the government to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)).

And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims. If a litigant asserts the right in court to "be confronted with the witnesses against him," U.S. Const., Amdt. 6, we require courts to consult history to determine the scope of that right. See, *e.g., Giles v. California,* 554 U.S. 353, 358 (2008) ("admitting only those exceptions [to the Confrontation Clause] established at the time of the founding" (internal quotation marks omitted)). Similarly, when a litigant claims a violation of his rights under the Establishment Clause, Members of this Court "loo[k] to history for guidance." *American Legion v. American Humanist Assn.,* 588 U.S.,(2019) (plurality opinion) (slip op., at 25). We adopt a similar approach here.

To be sure, "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *McDonald,* 561 U.S., at 803-804 (Scalia, J., concurring). But reliance on history to inform the meaning of constitutional text-especially text meant to codify a *pre-existing* right-is, in our view, more legitimate and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field. *Id.,* at 790-791 (plurality opinion).[6] *23

---

[6] The dissent claims that *Heller's* text-and-history test will prove unworkable compared to means-end scrutiny in part because judges are relatively ill equipped to "resolv[e] difficult historical questions" or engage in "searching historical surveys." *Post,* at 26, 30. We are unpersuaded. The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties. W. Baude & S. Sachs, Originalism and the Law of the Past, 37 L. & Hist. Rev. 809, 810-811 (2019). For example, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United Statesv. Sineneng-Smith,* 590 U.S.,(2020)

(slip op., at 3). Courts are thus entitled to decide a case based on the historical record compiled by the parties.

If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable-and, elsewhere, appropriate-it is not deference that the Constitution demands here. The Second Amendment "is the *very product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller,* 554 U.S., at 635. It is this balance-struck by the traditions of the American people-that demands our unqualified deference.

D

The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that
24  also could be evidence that *24 a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Heller* itself exemplifies this kind of straightforward historical inquiry. One of the District's regulations challenged in *Heller* "totally ban[ned] handgun possession in the home." *Id.,* at 628. The District in *Heller* addressed a perceived societal problem-firearm violence in densely populated communities-and it employed a regulation-a flat ban on the possession of handguns in the home-that the Founders themselves could have adopted to confront that problem. Accordingly, after considering "founding-era historical precedent," including "various restrictive laws in the colonial period," and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional. *Id.,* at 631; see also *id.,* at 634 (describing the claim that "there were somewhat similar restrictions in the founding period" a "false proposition").

New York's proper-cause requirement concerns the same alleged societal problem addressed in *Heller:* "handgun violence," primarily in "urban area[s]." *Ibid.* Following the course charted by *Heller,* we will consider whether "historical precedent" from before, during, and even after the founding evinces a comparable tradition of regulation. *Id.,* at 631. And, as we explain below, we find no such tradition in the historical materials that respondents and their *amid* have brought to bear on that question. See Part III-B, *infra.*

While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always
25  the same *25 as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution-and a Second Amendment- "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCul-loch v. Maryland,* 4 Wheat. 316, 415 (1819) (emphasis deleted). Although its meaning

is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated. See, *e.g., United States v. Jones,* 565 U.S. 400, 404-405 (2012) (holding that installation of a tracking device was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted").

We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." 554 U.S., at 582. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Ibid,* (citations omitted). Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. Cf. *Caetano v. Massachusetts,* 577 U.S. 411, 411-412 (2016) *(per curiam)* (stun guns).

Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all *26 analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993). And because "[everything is similar in infinite

ways to everything else," *id.,* at 774, one needs "some metric enabling the anal-ogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, Analogy, Expertise, and Experience, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." See *ibid.* They are not relevantly similar if the applicable metric is "things you can wear."

While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald,* "individual self-defense is 'the *central component'* of the Second Amendment right." *McDonald,* 561 U.S., at 767 (quoting *Heller,* 554 U.S., at 599); see also *id.,* at 628 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *"'central'"* considerations when engaging in an analogical inquiry. *McDonald,* 561 U.S., at 767 (quoting *Heller,* 554 U.S., at 599).[7]

27    *27

> [7] This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. Again, the Second Amendment is the "product of an interest balancing *by the people,"* not the evolving product of federal judges. *Heller,* 554 U.S., at 635 (emphasis altered). Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, and contrary to the dissent's assertion, there is nothing "[i]roni[c]" about that undertaking. *Post,* at 30. It is not an invitation to revise that balance through means-end scrutiny.

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straight]acket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson,* 9 F. 4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue,* not a historical *twin.* So even if a modern-day regulation is not a dead ringer for historical precursors, it still maybe analogous enough to pass constitutional muster.

Consider, for example, *Hellers* discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S., at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited-*e.g.,* legislative assemblies, polling places, and courthouses-we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018); see also Brief for Independent Institute as *Amicus Curiae* 11-17'. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

Although we have no occasion to comprehensively define *28 "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. See Part III-B, *infra.* Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

Like *Heller,* we "do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." 554 U.S., at 626. And we acknowledge that "applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins." *Heller v. District of Columbia,* 670 F.3d 1244, 1275 (CADC 2011) (Kavanaugh, J., dissenting). "But that is hardly unique to the Second Amendment. It is an essential component of judicial decisionmaking under our enduring Constitution." *Ibid.* We see no reason why judges frequently tasked with answering these kinds of historical, analogical questions cannot do the same for Second Amendment claims. *29

III

Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement.

A

It is undisputed that petitioners Koch and Nash-two ordinary, law-abiding, adult citizens-are part of "the people" whom the Second Amendment protects. See *Heller,* 554 U.S., at 580. Nor does any party dispute that handguns are weapons "in common use" today for self-defense. See *id.,* at 627; see also *Caetano, hll* U.S., at 411-412. We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct-carrying handguns publicly for self-defense.

We have little difficulty concluding that it does. Respondents do not dispute this. See Brief for Respondents 19. Nor could they. Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms. As we explained in *Heller,* the "textual elements" of the Second Amendment's operative clause- "the right of the people to keep and bear Arms, shall not be infringed"-"guarantee the individual right to possess and carry weapons in case of confrontation." 554 U.S., at 592. *Heller* further confirmed that the right to "bear arms" refers to the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.,* at 584 (quoting *Mus-carello v. United States,* 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting); internal quotation marks omitted).

This definition of "bear" naturally encompasses public carry. Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often "keep" firearms in their home, at the ready for self-defense, most do not "bear" *(i.e.,* carry) them in the home beyond moments of actual confrontation. To confine the right to "bear" arms to the home would nullify half of the Second Amendment's operative protections.

Moreover, confining the right to "bear" arms to the home would make little sense given that self-defense is "the *central component* of the [Second Amendment] right itself." *Heller,* 554 U.S., at 599; see also *McDonald,* 561 U.S., at 767. After all, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," *Heller,* 554 U.S., at 592, and confrontation can surely take place outside the home.

Although we remarked in *Heller* that the need for armed self-defense is perhaps "most acute" in the home, *id.,* at 628, we did not suggest that the need was insignificant elsewhere. Many Americans hazard greater danger outside the home than in it. See *Moore v. Madigan,* 702 F.3d 933, 937 (CA7 2012) ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower"). The text of the Second Amendment reflects that reality.

The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense.

B

Conceding that the Second Amendment guarantees a general right to public carry, contra, *Young,* 992 F.3d, at 813, respondents instead claim that the Amendment "permits a State to condition handgun carrying in areas 'frequented by the general public' on a showing of a non-speculative need for armed self-defense in those areas," Brief for Respondents 19 (citation omitted).[8] To support that claim, the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct.

8 The dissent claims that we cannot answer the question presented without giving respondents the opportunity to develop an evidentiary record fleshing out "how New York's law is administered in practice, how much discretion licensing officers in New York possess, or whether the proper cause standard differs across counties." *Post,* at 20. We disagree. The dissent does not dispute that any applicant for an unrestricted concealed-carry license in New York can satisfy the proper-cause standard only if he has "' "a special need for self-protection distinguishable from that of the general community."'" *Post,* at 13 (quoting *Kachalsky v. County of Westchester,* 701 F.3d 81, 86 (CA2 2012)). And in light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense. See *infra,* at 62. That conclusion does not depend upon any of the factual questions raised by the dissent. Nash and Koch allege that they were denied unrestricted licenses because they had not "demonstrate[d] a special need for self-defense that distinguished [them] from the general public." App. 123, 125. If those allegations are proven true, then it simply does not matter whether licensing officers have applied the proper-cause standard differently to other concealed-carry license applicants; Nash's and Koch's constitutional rights to bear arms in public for self-defense were still violated.

Respondents appeal to a variety of historical sources from the late 1200s to the early 1900s. We categorize these periods as follows: (1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries.

We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them." Heller,* 554 U.S., at 634-635 (emphasis added). The Second Amendment was adopted in 1791; the *32 Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to "reac[h] back to the 14th century" for English practices that "prevailed up to the 'period immediately before and after the framing of the Constitution.'" *Sprint Communications Co. v. APCC Services, Inc.,* 554 U.S. 269, 311 (2008) (ROBERTS, C. J., dissenting). It is quite another to rely on an "ancient" practice that had become "obsolete in England at the time of the adoption of the Constitution" and never "was acted upon or accepted in the colonies." *Dimick v. Schiedt,* 293 U.S. 474, 477 (1935).

As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights. The common law, of course, developed over time. *Associated Gen. Contractors of Cat., Inc. v. Carpenters,* 459 U.S. 519, 533, n. 28 (1983); see also *Rogers v. Tennessee,* 532 U.S. 451, 461 (2001). And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution. Even "the words of *Magna Charta"*-foundational as they were to the rights of America's forefathers-"stood for very different things at the time of the separation of the American Colonies from what they represented originally" in 1215. *Hurtado v. California,* 110 U.S. 516, 529 (1884). Sometimes, in interpreting our own Constitution, "it [is] better not to go too far back into antiquity for the best securities of our liberties," *Funk v. United States,* 290 U.S. 371, 382 (1933), unless evidence shows that medieval law survived to become our Founders' law. A long, unbroken line of common-

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice.

Similarly, we must also guard against giving postenactment history more weight than it can rightly bear. It is true *33 that in *Heller* we reiterated that evidence of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represented a "critical tool of constitutional interpretation." 554 U.S., at 605. We therefore examined "a variety of legal and other sources to determine *the public understanding* of [the Second Amendment] after its . . . ratification." *Ibid.* And, in other contexts, we have explained that "'a regular course of practice' can 'liquidate & settle the meaning of disputed or indeterminate 'terms & phrases'" in the Constitution. *Chiafalo v. Washington,* 591 U.S. __, __ (2020) (slip op., at 13) (quoting Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)); see also, *e.g., Houston Community College System v. Wilson,* 595 U.S. __, __ (2022) (slip op., at 5) (same); The Federalist No. 37, p. 229 (C. Rossiter ed. 1961) (J. Madison); see generally C. Nelson, *Stare Decisis* and Demonstrably Erroneous Precedents, 87 Va.L.Rev. 1, 10-21 (2001); W. Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1 (2019). In other words, we recognize that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *NLRB v. Noel Canning,* 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment); see *also Myers v. United States,* 272 U.S. 52, 174 (1926); *Printz v. United States,* 521 U.S. 898, 905 (1997).

But to the extent later history contradicts what the text says, the text controls. "'[Liquidating' indeterminacies in written laws is far removed from expanding or altering them." *Gamble v. United States,* 587 U.S. __, __(2019) (THOMAS, J., concurring) (slip op., at 13); see also Letter

from J. Madison to N. Trist (Dec. 1831), in 9 Writings of James Madison 477 (G. Hunt ed. 1910). Thus, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text *34 obviously cannot overcome or alter that text." *Heller,* 670 F.3d, at 1274, n. 6 (Kavanaugh, J., dissenting); see also *Espinoza v. Montana Dept. of Revenue,* 591 U.S. __, __ (2020) (slip op., at 15).

As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." 554 U.S., at 614; cf. *Sprint Communications Co.,* 554 U.S., at 312 (ROBERTS, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]"). And we made clear in *Gamble* that *Hellers* interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading-including the text of the Second Amendment and state constitutions." *Gamble,* 587 U.S., at __ (majority opinion) (slip op., at 23). In other words, this 19th-century evidence was "treated as mere confirmation of what the Court thought had already been established." *Ibid.*

A final word on historical method: Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. See, *e.g., Barron ex rel. Tiernan v. Mayor of Baltimore,* 7 Pet. 243, 250-251 (1833) (Bill of Rights applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. See, *e.g., Ramos v. Louisiana,* 590 U.S. __, __ (2020) (slip op., at 7); *Timbs v. Indiana,* 586 U.S. __, __ - __ (2019) (slip op., at 2-3); *Malloy v. Hogan,* 378

casetext

**19**

35 U.S. 1, 10-11 (1964). And we have generally assumed that the *35 scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. See, *e.g., Crawford v. Washington,* 541 U.S. 36, 42-50 (2004) (Sixth Amendment); *Virginia v. Moore,* 553 U.S. 164, 168-169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan,* 564 U.S. 117, 122-125 (2011) (First Amendment).

We also acknowledge that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.,* A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), *https://papers.ssrn*.com/sol3/papers.cfm? abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings"). We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.

* * *

With these principles in mind, we turn to respondents' historical evidence. Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not

36 demonstrate a tradition of broadly *36 prohibiting the public carry of commonly used firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense.[9] We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Under *Heller's* text-and-history standard, the proper-cause requirement is therefore unconstitutional.

[9] To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko,* 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller,* 554 U.S. 570, 635 (2008). Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid.* And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham,* 394 U.S. 147, 151 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cant-well v. Connecticut,* 310 U.S. 296, 305 (1940)-features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy

wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

1

Respondents' substantial reliance on English history and custom before the founding makes some sense given our statement in *Heller* that the Second Amendment "codified a right 'inherited from our English ancestors.'" 554 U.S., at 599 (quoting *Robertson v. Baldwin,* 165 U.S. 275, 281 (1897)); see also *Smith v. Alabama,* 124 U.S. 465, 37  478 *37 (1888). But this Court has long cautioned that the English common law "is not to be taken in all respects to be that of America." *Van Ness v. Pacard,* 2 Pet. 137, 144 (1829) (Story, J., for the Court); see also *Wheaton v. Peters,* 8 Pet. 591, 659 (1834); *Funk,* 290 U.S., at 384. Thus, "[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted,"* not as they existed in the Middle Ages. *Ex parte Grossman,* 267 U.S. 87, 108-109 (1925) (emphasis added); see also *United States v. Reid,* 12 How. 361, 363 (1852).

We interpret the English history that respondents and the United States muster in light of these interpretive principles. We find that history ambiguous at best and see little reason to think that the Framers would have thought it applicable in the New World. It is not sufficiently probative to defend New York's proper-cause requirement.

To begin, respondents and their *amid* point to several medieval English regulations from as early as 1285 that they say indicate a longstanding tradition of restricting the public carry of firearms. See 13 Edw. 1, 102. The most prominent is the 1328 Statute of Northampton (or Statute), passed shortly after Edward II was deposed by force of arms and his son, Edward III, took the throne of a kingdom where "tendency to turmoil and rebellion was everywhere apparent throughout the realm." N. Trenholme, The Risings in the English

Monastic Towns in 1327, 6 Am. Hist. Rev. 650, 651 (1901). At the time, "[b]ands of malefactors, knights as well as those of lesser degree, harried the country, committing assaults and murders," prompted by a more general "spirit of insubordination" that led to a "decay in English national life." K. Vickers, England in the Later Middle Ages 107 (1926).

The Statute of Northampton was, in part, "a product of . . . the acute disorder that still plagued England." A. Ver-duyn, The Politics of Law and 38  Order During the Early *38 Years of Edward III, 108 Eng. Hist. Rev. 842, 850 (1993). It provided that, with some exceptions, Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." 2 Edw. 3 c. 3 (1328).

Respondents argue that the prohibition on "rid[ing]" or "go[ing] . . . armed" was a sweeping restriction on public carry of self-defense weapons that would ultimately be adopted in Colonial America and justify onerous public-carry regulations. Notwithstanding the ink the parties spill over this provision, the Statute of Northampton-at least as it was understood during the Middle Ages-has little bearing on the Second Amendment adopted in 1791. The Statute of Northampton was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the Fourteenth Amendment.

The Statute's prohibition on going or riding "armed" obviously did not contemplate handguns, given they did not appear in Europe until about the

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

mid-1500s. See K. Chase, Firearms: A Global History to 1700, p. 61 (2003). Rather, it appears to have been centrally concerned with the wearing of armor. See, *e.g.,* Calendar of the Close Rolls, Edward III, 1330-1333, p. 131 (Apr. 3, 1330) (H. Maxwell-Lyte ed. 1898); *id.,* at 243 (May 28, 1331); *id.,* Edward III, 1327-1330, at 314 (Aug. 29, 1328) (1896). If it did apply beyond armor, it applied to such weapons as the "launcegay," a 10- to 12-foot-long lightweight lance. See 7 Rich. 2 c. 13 (1383); 20 Rich. 2 c. 1 (1396).

The Statute's apparent focus on armor and, perhaps, *39 weapons like launcegays makes sense given that armor and lances were generally worn or carried only when one intended to engage in lawful combat or-as most early violations of the Statute show-to breach the peace. See, *e.g.,* Calendar of the Close Rolls, Edward III, 1327-1330, at 402 (July 7, 1328); *id.,* Edward III, 1333-1337, at 695 (Aug. 18, 1336) (1898). Contrast these arms with daggers. In the medieval period, "[a]lmost everyone carried a knife or a dagger in his belt." H. Peterson, Daggers and Fighting Knives of the Western World 12 (2001). While these knives were used by knights in warfare, "[c]ivilians wore them for self-protection," among other things. *Ibid.* Respondents point to no evidence suggesting the Statute applied to the smaller medieval weapons that strike us as most analogous to modern handguns.

When handguns were introduced in England during the Tudor and early Stuart eras, they did prompt royal efforts at suppression. For example, Henry VIII issued several proclamations decrying the proliferation of handguns, and Parliament passed several statutes restricting their possession. See, *e.g.,* 6 Hen. 8 c. 13, §1 (1514); 25 Hen. 8 c. 17, §1 (1533); 33 Hen. 8 c. 6 (1541); Prohibiting Use of Handguns and Crossbows (Jan. 1537), in 1 Tudor Royal Proclamations 249 (P. Hughes & J. Larkin eds. 1964). But Henry VIII's displeasure with handguns arose not primarily from concerns about their safety but rather their inefficacy. Henry VIII worried that handguns threatened

Englishmen's proficiency with the longbow-a weapon many believed was crucial to English military victories in the 1300s and 1400s, including the legendary English victories at Crecy and Ag-incourt. See R. Payne-Gallwey, The Crossbow 32, 34 (1903); L. Schwoerer, Gun Culture in Early Modern England 54 (2016) (Schwoerer).

Similarly, James I considered small handguns-called dags-"utterly unserviceable for defence, Militarie practise, or other lawful use." A Proclamation Against Steelets, *40 Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616). But, in any event, James I's proclamation in 1616 "was the last one regarding civilians carrying dags," Schwoerer 63. "After this the question faded without explanation." *Ibid.* So, by the time Englishmen began to arrive in America in the early 1600s, the public carry of handguns was no longer widely proscribed.

When we look to the latter half of the 17th century, respondents' case only weakens. As in *Heller,* we consider this history "[b]etween the [Stuart] Restoration [in 1660] and the Glorious Revolution [in 1688]" to be particularly instructive. 554 U.S., at 592. During that time, the Stuart Kings Charles II and James II ramped up efforts to disarm their political opponents, an experience that "caused Englishmen ... to be jealous of their arms." *Id.,* at 593.

In one notable example, the government charged Sir John Knight, a prominent detractor of James II, with violating the Statute of Northampton because he allegedly "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686). Chief Justice Herbert explained that the Statute of Northampton had "almost gone in *desuetudinem," Rex v. Sir John Knight,* 1 Comb. 38, 38-39, 90 Eng. Rep. 330 (K. B. 1686), meaning that the Statute had largely

become obsolete through disuse.[10] And the Chief Justice further explained *41 that the act of "go[ing] armed to *terrify* the King's subjects" was "a great offence at the *common law"* and that the Statute of Northampton "is but an affirmance of that law." 3 Mod., at 118, 87 Eng. Rep., at 76 (first emphasis added). Thus, one's conduct "will come within the Act,"-*i.e.,* would terrify the King's subjects-only "where the crime shall appear to be malo animo," 1 Comb., at 39, 90 Eng. Rep., at 330, with evil intent or malice. Knight was ultimately acquitted by the jury.[11] *42

10 Another medieval firearm restriction-a 1541 statute enacted under Henry VIII that limited the ownership and use of handguns (which could not be shorter than a yard) to those subjects with annual property values of at least £100, see 33 Hen. 8 c. 6, §§1-2- fell into a similar obsolescence. As far as we can discern, the last recorded prosecutions under the 1541 statute occurred in 1693, neither of which appears to have been successful. See *King and Queen v. Bullock,* 4 Mod. 147, 87 Eng. Rep. 315 (K. B. 1693); *Kingv. Litten,* 1 Shower, K. B. 367, 89 Eng. Rep. 644 (K. B. 1693). It seems that other prosecutions under the 1541 statute during the late 1600s were similarly unsuccessful. See *Kingv. Silcot,* 3 Mod. 280, 280-281, 87 Eng. Rep. 186 (K. B. 1690); *King v. Lewellin,* 1 Shower, K. B. 48, 89 Eng. Rep. 440 (K. B. 1689); cf. *King and Queen v. Alsop,* 4 Mod. 49, 50-51, 87 Eng. Rep. 256, 256-257 (K. B. 1691). By the late 1700s, it was widely recognized that the 1541 statute was "obsolete." 2 R. Burn, The Justice of the Peace, and Parish Officer 243, n. (11th ed. 1769); see also, *e.g.,* The Farmer's Lawyer 143 (1774) ("entirely obsolete"); 1 G. Jacob, Game-Laws II, Law-Dictionary (T. Tomlins ed. 1797); 2 R. Burn, The Justice of the Peace, and Parish Officer 409 (18th ed. 1797) (calling the 1541 statute "a matter more of curiosity than use"). In any event, lest one be tempted to put much evidentiary weight on

the 1541 statute, it impeded not only public carry, but further made it unlawful for those without sufficient means to "kepe in his or their houses" any "handgun." 33 Hen. 8 c. 6, §1. Of course, this kind of limitation is inconsistent with *Heller's* historical analysis regarding the Second Amendment's meaning at the founding and thereafter. So, even if a severe restriction on keeping firearms in the home may have seemed appropriate in the mid-1500s, it was not incorporated into the Second Amendment's scope. We see little reason why the parts of the 1541 statute that address public carry should not be understood similarly. We note also that even this otherwise restrictive 1541 statute, which generally prohibited shooting firearms in any city, exempted discharges "for the defence of [one's] p[er]son or house." §4. Apparently, the paramount need for self-defense trumped the Crown's interest in firearm suppression even during the 16th century.

11 The dissent discounts *Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep. 75, because it only "arguably" supports the view that an evil-intent requirement attached to the Statute of Northampton by the late 1600s and early 1700s. See *post,* at 37. But again, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope. See *supra,* at 15. To the extent there are multiple plausible interpretations of *Sir John Knight's Case,* we will favor the one that is more consistent with the Second Amendment's command.

Just three years later, Parliament responded by writing the "predecessor to our Second Amendment" into the 1689 English Bill of Rights, *Heller,* 554 U.S., at 593, guaranteeing that "Protestants . . . may have Arms for their Defence

suitable to their Conditions, and as allowed by Law," 1 Wm. & Mary c. 2, §7, in 3 Eng. Stat, at Large 417 (1689). Although this right was initially limited-it was restricted to Protestants and held only against the Crown, but not Parliament-it represented a watershed in English history. Englishmen had "never before claimed . . . the right of the individual to arms." Schwoerer 156.[12] And as that individual right matured, "by the time of the founding," the right to keep and bear arms was "understood to be an individual right protecting against both public and private violence." *Heller,* 554 U.S., at 594.

> [12] Even Catholics, who fell beyond the protection of the right to have arms, and who were stripped of all "Arms, Weapons, Gunpowder, [and] Ammunition," were at least allowed to keep "such necessary Weapons as shall be allowed ... by Order of the Justices of the Peace . . . for the Defence of his House or Person." 1 Wm. & Mary c. 15, §4, in 3 Eng. Stat, at Large 399 (1688).

To be sure, the Statute of Northampton survived both *Sir John Knight's Case* and the English Bill of Rights, but no obstacle to public carry for self-defense in the decades leading to the founding. Serjeant William Hawkins, in his widely read 1716 treatise, confirmed that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." 1 Pleas of the Crown 136. To illustrate that proposition, Hawkins noted as an example that "Persons of Quality" were "in no Danger of Offending against this Statute by wearing common Weapons" because, in those circumstances, it would be clear that they *43 had no "Intention to commit any Act of Violence or Disturbance of the Peace." *Ibid.;* see also T. Barlow, The Justice of Peace 12 (1745). Respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people. In fact, the opposite seems to have

been true. As time went on, "domestic gun culture [in England] softened" any "terror" that firearms might once have conveyed. Schwoerer 4. Thus, whatever place handguns had in English society during the Tudor and Stuart reigns, by the time we reach the 18th century-and near the founding-they had gained a fairly secure footing in English culture.

At the very least, we cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection.

**2**

Respondents next point us to the history of the Colonies and early Republic, but there is little evidence of an early American practice of regulating public carry by the general public. This should come as no surprise-English subjects founded the Colonies at about the time England had itself begun to eliminate restrictions on the ownership and use of handguns.

In the colonial era, respondents point to only three restrictions on public carry. For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation. In any event, even looking at these laws on their own terms, we are not convinced that they regulated public carry akin to the New York law before us.

Two of the statutes were substantively identical. Colonial Massachusetts and New Hampshire both authorized justices of the peace to arrest "all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or *44 go armed Offensively ... by Night or by Day, in Fear or Affray of Their Majesties Liege People." 1692 Mass. Acts and Laws no. 6, pp. 11-12; see 1699 N. H. Acts and Laws ch. 1. Respondents and their *amici* contend that being "armed offensively" meant bearing any offensive weapons, including firearms. See Brief for Respondents 33. In

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

particular, respondents' *amici* argue that "'offensive'" arms in the 1600s and 1700s were what Blackstone and others referred to as "'dangerous or unusual weapons,'" Brief for Professors of History and Law as *Amici Curiae* 7 (quoting 4 Blackstone, Commentaries, at 148-149), a category that they say included firearms, see also *post,* at 40-42 (BREYER, J., dissenting).

Respondents, their *amici,* and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself. See *supra,* at 34-37. For instance, the Massachusetts statute proscribed "go[ing] armed Offensively ... in Fear or Affray" of the people, indicating that these laws were modeled after the Statute of Northampton to the extent that the statute would have been understood to limit public carry *in the late 1600s.* Moreover, it makes very little sense to read these statutes as banning the public carry of all firearms just a few years after Chief Justice Herbert in *Sir John Knight's Case* indicated that the English common law did not do so.

Regardless, even if respondents' reading of these colonial statutes were correct, it would still do little to support restrictions on the public carry of handguns *today.* At most, respondents can show that colonial legislatures sometimes prohibited the carrying of "dangerous and unusual weapons"-a fact we already acknowledged in *Heller.* See 554 U.S., at 627. Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the *45 time," as opposed to those that "are highly unusual in society at large." *Ibid,* (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Id.,* at 629. Thus, even if these colonial laws

prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

The third statute invoked by respondents was enacted in East New Jersey in 1686. It prohibited the concealed carry of "pocket pistol[s]" or other "unusual or unlawful weapons," and it further prohibited "planter[s]" from carrying all pistols unless in military service or, if "strangers," when traveling through the Province. An Act Against Wearing Swords, &c, ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881) (Grants and Concessions). These restrictions do not meaningfully support respondents. The law restricted only concealed carry, not all public carry, and its restrictions applied only to certain "unusual or unlawful weapons," including "pocket pistol[s]." *Ibid.* It also did not apply to all pistols, let alone all firearms. "Pocket pistols" had barrel lengths of perhaps 3 or 4 inches, far smaller than the 6-inch to 14-inch barrels found on the other belt and hip pistols that were commonly used for lawful purposes in the 1600s. J. George, English Pistols and Revolvers 16 (1938); see also, *e.g.,* 14 Car. 2 c. 3, §20 (1662); H. Peterson, Arms and Armor in Colonial America, 1526-1783, p. 208 (1956) (Peterson). Moreover, the law prohibited only the *concealed* carry of pocket pistols; it presumably did not by its terms touch the *46 open carry of larger, presumably more common pistols, except as to "planters."[13] In colonial times, a "planter" was simply a farmer or plantation owner who settled new territory. R. Lederer, Colonial American English 175 (1985); New Jersey State Archives, J. Klett, Using the Records of the East and West Jersey Proprietors 31 (rev. ed. 2014), *https://www.nj.gov/state/archives/pdf/proprietors.pdf.* While the reason behind this singular restriction is not entirely clear, planters may have been targeted because colonial-era East New

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

Jersey was riven with "strife and excitement" between planters and the Colony's proprietors "respecting titles to the soil." See W. Whitehead, East Jersey Under the Proprietary Governments 150-151 (rev. 2d ed. 1875); see also T. Gordon, The History of New Jersey 49 (1834).

> 13  Even assuming that pocket pistols were, as East Jersey in 1686 deemed them, "unusual or unlawful," it appears that they were commonly used at least by the founding. See, *e.g., G.* Neumann, The History of Weapons of the American Revolution 150-151 (1967); see also H. Hen-drick, P. Paradis, & R. Hornick, Human Factors Issues in Handgun Safety and Forensics 44 (2008).

In any event, we cannot put meaningful weight on this solitary statute. First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense- including the popular musket and carbine. See Peterson 41. Second, it does not appear that the statute survived for very long. By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol . . . into the woods, or plantations" unless their owner accompanied them. Grants and Concessions 341. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752). At most eight years of *47 history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.

Respondents next direct our attention to three late-18th-century and early-19th-century statutes, but each parallels the colonial statutes already discussed. One 1786 Virginia statute provided that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794).[14] A Massachusetts statute from 1795 commanded justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth." 1795 Mass. Acts and Laws ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts. And an 1801 Tennessee statute likewise required any person who would "publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" to post a surety; otherwise, his continued violation of the law would be "punished as for a breach of the peace, or riot at common law." 1801 Tenn. Acts pp. 260-261.

> 14  The Virginia statute all but codified the existing common law in this regard. See G. Webb, The Office and Authority of a Justice of Peace 92 (1736) (explaining how a constable "may take away Arms from such who ride, or go, offensively armed, in Terror of the People").

A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads "fear" or "terror" among the people. As we have already explained, Chief Justice Herbert in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public. See *supra,* at 34-35. Respondents give us no reason to think that the founding generation held a different view. Thus, all told, in the century leading up to the Second Amendment *48 and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.

**3**

Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime.

*Common-Law Offenses.* As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But as with the earlier periods, there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

For example, the Tennessee attorney general once charged a defendant with the common-law offense of affray, arguing that the man committed the crime when he "'arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people.'" *Simpson v. State,* 13 Tenn. 356, 358 (1833). More specifically, the indictment charged that Simpson "with force and arms being arrayed in a warlike manner . . . unlawfully, and to the great terror and disturbance of divers good citizens, did make an affray." *Id.,* at 361. The Tennessee Supreme Court quashed the indictment, holding that the Statute of Northampton was never part of Tennessee law. *Id.,* at 359. But even assuming that Tennesseans' ancestors brought with them the common law associated with the Statute, the *Simpson* court found that if the Statute had *49 made, as an "independent ground of affray," the mere arming of oneself with firearms, the Tennessee Constitution's Second Amendment analogue had "completely abrogated it." *Id.,* at 360. At least in light of that constitutional guarantee, the court did not think that it could attribute to the mere carrying of arms "a necessarily consequent operation as terror to the people." *Ibid.*

Perhaps more telling was the North Carolina Supreme Court's decision in *State v. Huntly,* 25 N. C. 418 (1843) *(per curiam).* Unlike the Tennessee Supreme Court in *Simpson,* the *Huntly* court held that the common-law offense codified by the Statute of Northampton was part of the State's law. See 25 N. C, at 421-422. However, consistent with the Statute's long-settled interpretation, the North Carolina Supreme Court acknowledged "that the carrying of a gun" for a lawful purpose *"per se* constitutes no offence." *Id.,* at 422-423. Only carrying for a "wicked purpose" with a "mischievous result . . . constituted a] crime." *Id.,* at 423; see also J. Haywood, The Duty and Office of Justices of Peace 10 (1800); H. Potter, The Office and Duties of a Justice of the Peace 39 (1816).[15] Other state courts likewise recognized that the common law did not punish the carrying of *50 *50 deadly weapons *per se,* but only the carrying of such weapons "for the purpose of an affray, and in such manner as to strike terror to the people." *O'Neil v. State,* 16 Ala. 65, 67 (1849). Therefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so.

  [15] The dissent concedes that *Huntly,* 25 N. C. 418, recognized that citizens were "'at perfect liberty' to carry for 'lawful purpose[s].'" *Post,* at 42 (quoting *Huntly,* 25 N. C, at 423). But the dissent disputes that such "lawful purpose [s]" included self-defense, because *Huntly* goes on to speak more specifically of carrying arms for "business or amusement." *Id.,* at 422-423. This is an unduly stingy interpretation *of Huntly.* In particular, *Huntly* stated that "the citizen is at perfect liberty to carry his gun"" [f]or *any* lawful purpose," of which "business" and "amusement" were then mentioned. *Ibid,* (emphasis added). *Huntly* then contrasted these "lawful purpose [s]" with the "wicked purpose ... to terrify and alarm." *Ibid.* Because there is no evidence that *Huntly* considered self-defense a "wicked purpose," we think the best reading of *Huntly* would sanction public

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

carry for self-defense, so long as it was not "in such [a] manner as naturally will terrify and alarm." *Id.,* at 423.

*Statutory Prohibitions.*

In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. As we recognized in *Heller,* "the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S., at 626. Respondents unsurprisingly cite these statutes[16]-and decisions upholding them[17]-as evidence that States were historically free to ban public carry.

[16] Beginning in 1813 with Kentucky, six States (five of which were in the South) enacted laws prohibiting the concealed carry of pistols by 1846. See 1813 Ky. Acts §1, p. 100; 1813 La. Acts p. 172; 1820 Ind. Acts p. 39; Ark. Rev. Stat. §13, p. 280 (1838); 1838 Va. Acts ch. 101, §1, p. 76; 1839 Ala. Acts no. 77, §1. During this period, Georgia enacted a law that appeared to prohibit both concealed and open carry, see 1837 Ga. Acts §§1, 4, p. 90, but the Georgia Supreme Court later held that the prohibition could not extend to open carry consistent with the Second Amendment. See *infra,* at 45-46. Between 1846 and 1859, only one other State, Ohio, joined this group. 1859 Ohio Laws §1, p. 56. Tennessee, meanwhile, enacted in 1821 a broader law that prohibited carrying, among other things, "belt or pocket pistols, either public or private," except while traveling. 1821 Tenn. Acts ch. 13, §1, p. 15. And the Territory of Florida prohibited concealed carry during this same timeframe. See 1835 Terr, of Fla. Laws p. 423.

[17] See *State v. Mitchell,* 3 Blackf. 229 (Ind. 1833); *State v. Reid,* 1 Ala. 612, 616 (1840); *State v. Buzzard,* 4 Ark. 18 (1842); *Nunn v. State,* 1 Ga. 243 (1846); *State v.*

*Chandler,* 5 La. 489 (1850); *State v. Smith,* 11 La. 633 (1856); *State v. Jumel,* 13 La. 399 (1858). But see *Bliss v. Commonwealth,* 12 Ky. 90 (1822). See generally 2 J. Kent, Commentaries on American Law *340, n. *b.*

In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' *51 cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. That was true in Alabama. See *State v. Reid,* 1 Ala. 612, 616, 619-621 (1840).[18] It was also true in Louisiana. See *State v. Chandler,* 5 La. 489, 490 (1850).[19] Kentucky, meanwhile, went one step further-the State Supreme Court *invalidated* a concealed-carry prohibition. See *Bliss v. Commonwealth,* 12 Ky. 90 (1822).[20]

[18] See *Reid,* 1 Ala., at 619 (holding that "the Legislature cannot inhibit the citizen from bearing arms openly"); *id.,* at 621 (noting that there was no evidence "tending to show that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person").

[19] See, *e.g., Chandler,* 5 La., at 490 (Louisiana concealed-carry prohibition "interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality"); *Smith,* 11 La., at 633 (The "arms" described in the Second Amendment "are such as are borne by a people in war, or at least carried openly"); *Jumel,* 13 La., at 399-400 ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society").

[20] With respect to Indiana's concealed-carry prohibition, the Indiana Supreme Court's reasons for upholding it are unknown because the court issued a one-sentence *per*

**28**

*curiam* order holding the law "not unconstitutional." *Mitchell,* 3 Blackf, at 229. Similarly, the Arkansas Supreme Court upheld Arkansas' prohibition, but without reaching a majority rationale. See *Buzzard,* 4 Ark. 18. The Arkansas Supreme Court would later adopt Tennessee's approach, which tolerated the prohibition of all public carry of handguns except for military-style revolvers. See, *e.g., Fife v. State,* 31 Ark. 455 (1876).

The Georgia Supreme Court's decision in *Nunn v. State,* 1 Ga. 243 (1846), is particularly instructive. Georgia's 1837 statute broadly prohibited "wearing" or "carrying" pistols "as arms of offence or defence," without distinguishing between concealed and open carry. 1837 Ga. Acts 90, §1. To the extent the 1837 Act prohibited "carrying certain weapons *secretly,"* the court explained, it was "valid." *Nunn,* *52 1 Ga., at 251. But to the extent the Act also prohibited "bearing arms *openly,"* the court went on, it was "in conflict with the Constitutio[n] and *void" Ibid.;* see also *Heller,* 554 U.S., at 612. The Georgia Supreme Court's treatment of the State's general prohibition on the public carriage of handguns indicates that it was considered beyond the constitutional pale in antebellum America to altogether prohibit public carry.

Finally, we agree that Tennessee's prohibition on carrying "publicly or privately" any "belt or pocket pisto[l]," 1821 Tenn. Acts ch. 13, p. 15, was, on its face, uniquely severe, see *Heller,* 554 U.S., at 629. That said, when the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, see 1870 Tenn. Acts ch. 13, §1, p. 28, the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would "violat[e] the constitutional right to keep arms." *Andrews v. State,* 50 Tenn. 165, 187 (1871); see also *Heller,* 554 U.S., at 629 (discussing *Andrews). [21]*

[21] Shortly after *Andrews,* 50 Tenn. 165, Tennessee codified an exception to the State's handgun ban for "an[y] army pistol, or such as are commonly carried and used in the United States Army" so long as they were carried "openly in [one's] hands." 1871 Tenn. Pub. Acts ch. 90, §1; see also *State v. Wilburn,* 66 Tenn. 57, 61-63 (1872); *Porter v. State,* 66 Tenn. 106, 107-108 (1874).

All told, these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of "arms" protected by the Second Amendment or state analogues.[22] *53

[22] The Territory of New Mexico made it a crime in 1860 to carry "any class of pistols whatever" "concealed or otherwise." 1860 Terr, of N.M. Laws §§1-2, p. 94. This extreme restriction is an outlier statute enacted by a territorial government nearly 70 years after the ratification of the Bill of Rights, and its constitutionality was never tested in court. Its value in discerning the original meaning of the Second Amendment is insubstantial. Moreover, like many other stringent carry restrictions that were localized in the Western Territories, New Mexico's prohibition ended when the Territory entered the Union as a State in 1911 and guaranteed in its State Constitution that "[t]he people have the right to bear arms for their security and defense, but nothing herein shall be held to permit the carrying of concealed weapons." N.M. Const., Art. II, §6 (1911); see *infra,* at 61.

*Surety Statutes.*

In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their

reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.

As discussed earlier, Massachusetts had prohibited riding or going "armed offensively, to the fear or terror of the good citizens of this Commonwealth" since 1795. 1795 Mass. Acts and Laws ch. 2, at 436, in Laws of the Commonwealth of Massachusetts. In 1836, Massachusetts enacted a new law providing:

> "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided." Mass. Rev. Stat., ch. 134, §16.

In short, the Commonwealth required any person who was reasonably likely to "breach the peace," and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm. Between 1838 and 1871, nine other jurisdictions adopted variants of 54 \*54 the Massachusetts law.[23] Contrary to respondents' position, these "reasonable-cause laws" in no way represented the "direct precursor" to the proper-cause requirement. Brief for Respondents 27. While New York presumes that individuals have *no* public carry right without a showing of heightened need, the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836).[24] As William Rawle explained in an influential treatise, an individual's carrying of arms was "sufficient cause to require him to give surety of the peace" only

when "attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them." A View of the Constitution of the United States of America 126 (2d ed. 1829). Then, even on such a showing, the surety laws did not *prohibit* public carry in locations frequented by the general community. Rather, an accused arms-bearer "could go on carrying without criminal penalty" so long as he "post[ed] money that would be forfeited if he breached the peace or injured others-a requirement from which he was exempt if *he* needed self-defense." *Wrenn*, 864 F.3d, at 661.

23 See 1838 Terr. of Wis.Stat. §16, p. 381; Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); 1847 Va. Acts ch. 14, §16; Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat. ch. 16, §17, p. 220; D. C. Rev. Code ch. 141, §16 (1857); 1860 Pa. Laws p. 432, §6; W.Va. Code, ch. 153, §8 (1868).

24 It is true that two of the antebellum surety laws were unusually broad in that they did not expressly require a citizen complaint to trigger the posting of a surety. See 1847 Va. Acts ch. 14, §16; W.Va. Code, ch. 153, §8 (1868).

Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace. And, even then, proving special need simply avoided a fee rather than a ban. All told, therefore, "[u]nder surety 55 laws \*55 . . . everyone started out with robust carrying rights" and only those reasonably accused were required to show a special need in order to avoid posting a bond. *Ibid.* These antebellum special-need requirements "did not expand carrying for the responsible; it shrank burdens on carrying by the (allegedly) reckless." *Ibid.*

One Court of Appeals has nonetheless remarked that these surety laws were "a severe constraint on anyone thinking of carrying a weapon in public." *Young,* 992 F.3d, at 820. That contention has little

support in the historical record. Respondents cite no evidence showing the average size of surety postings. And given that surety laws were "intended merely for prevention" and were "not meant as any degree of punishment," 4 Blackstone, Commentaries, at 249, the burden these surety statutes may have had on the right to public carry was likely too insignificant to shed light on New York's proper-cause standard-a violation of which can carry a 4-year prison term or a $5,000 fine. In *Heller,* we noted that founding-era laws punishing unlawful discharge "with a small fine and forfeiture of the weapon . . ., not with significant criminal penalties," likely did not "preven[t] a person in the founding era from using a gun to protect himself or his family from violence, or that if he did so the law would be enforced against him." 554 U.S., at 633-634. Similarly, we have little reason to think that the hypothetical possibility of posting a bond would have prevented anyone from carrying a firearm for self-defense in the 19th century.

Besides, respondents offer little evidence that authorities ever enforced surety laws. The only recorded case that we know of involved a justice of the peace *declining* to require a surety, even when the complainant alleged that the arms-bearer "'did threaten to beat, wou[n]d, mai[m], and kill'" him. Brief for Professor Robert Leider et al. as *Amid Curiae* 31 (quoting *Groverv. Bullock,* No. 185 (Worcester Cty., *56 Aug. 13, 1853)); see E. Ruben & S. Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130, n. 53 (2015). And one scholar who canvassed 19th-century newspapers- which routinely reported on local judicial matters-found only a handful of other examples in Massachusetts and the District of Columbia, all involving black defendants who may have been targeted for selective or pretextual enforcement. See R. Leider, Constitutional Liquidation, Surety Laws, and the Right To Bear Arms 15-17, in New Histories of Gun Rights and Regulation (J. Blocher, J. Charles, & D. Miller

eds.) (forthcoming); see also Brief for Professor Robert Leider et al. as *Amici Curiae* 31-32. That is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry.[25]

> [25] The dissent speculates that the absence of recorded cases involving surety laws may simply "show that these laws were normally followed." *Post,* at 45. Perhaps. But again, the burden rests with the government to establish the relevant tradition of regulation, see *supra,* at 15, and, given all of the other features of surety laws that make them poor analogues to New York's proper-cause standard, we consider the barren record of enforcement to be simply one additional reason to discount their relevance.

Respondents also argue that surety statutes were severe restrictions on firearms because the "reasonable cause to fear" standard was essentially *pro forma,* given that "merely carrying firearms in populous areas breached the peace" *per se.* Brief for Respondents 27. But that is a counterintuitive reading of the language that the surety statutes actually used. If the mere carrying of handguns breached the peace, it would be odd to draft a surety statute requiring a complainant to demonstrate "reasonable cause to fear an injury, or breach of the peace," Mass. Rev. Stat., ch. 134, §16, rather than a reasonable likelihood that the arms-bearer carried a covered weapon. After all, if it was the nature of the weapon rather than the manner of carry that *57 was dispositive, then the "reasonable fear" requirement would be redundant.

Moreover, the overlapping scope of surety statutes and criminal statutes suggests that the former were not viewed as substantial restrictions on public carry. For example, when Massachusetts enacted its surety statute in 1836, it reaffirmed its 1794 criminal prohibition on "go[ing] armed offensively, to the terror of the people." Mass. Rev. Stat., ch. 85, §24. And Massachusetts

continued to criminalize the carrying of various "dangerous weapons" well after passing the 1836 surety statute. See, *e.g.,* 1850 Mass. Acts ch. 194, §1, p. 401; Mass. Gen. Stat., ch. 164, §10 (1860). Similarly, Virginia had criminalized the concealed carry of pistols since 1838, see 1838 Va. Acts ch. 101, §1, nearly a decade before it enacted its surety statute, see 1847 Va. Acts ch. 14, §16. It is unlikely that these surety statutes constituted a "severe" restraint on public carry, let alone a restriction tantamount to a ban, when they were supplemented by direct criminal prohibitions on specific weapons and methods of carry.

To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry-concealed carry-so long as they left open the option to carry openly.

None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose. *58    58 *58

**4**

Evidence from around the adoption of the Fourteenth Amendment also fails to support respondents' position. For the most part, respondents and the United States ignore the "outpouring of discussion of the [right to keep and bear arms] in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves" after the Civil War. *Heller,* 554 U.S., at 614. Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is

respondents' burden. Nevertheless, we think a short review of the public discourse surrounding Reconstruction is useful in demonstrating how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens.

A short prologue is in order. Even before the Civil War commenced in 1861, this Court indirectly affirmed the importance of the right to keep and bear arms in public. Writing for the Court in *Bred Scott v. Sandford,* 19 How. 393 (1857), Chief Justice Taney offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and immunities of citizens, including the right "to keep and carry arms *wherever they went." Id.,* at 417 (emphasis added). Thus, even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms-a right free blacks were often denied in antebellum America.

After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted. This Court has already recounted some of the Southern abuses violating blacks' right to keep and bear arms. See *McDonald,* 561 U.S., at 771 (noting the "systematic efforts" *59 made to disarm blacks); 59 *id.,* at 845-847 (THOMAS, J., concurring in part and concurring in judgment); see also S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) ("Pistols, old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics").

In the years before the 39th Congress proposed the Fourteenth Amendment, the Freedmen's Bureau regularly kept it abreast of the dangers to blacks and Union men in the postbellum South. The reports described how blacks used publicly carried weapons to defend themselves and their communities. For example, the Bureau reported

that a teacher from a Freedmen's school in Maryland had written to say that, because of attacks on the school, "[b]oth the mayor and sheriff have warned the colored people to go armed to school, (which they do,)" and that the "[t]he superintendent of schools came down and brought [the teacher] a revolver" for his protection. Cong. Globe, 39th Cong., 1st Sess., 658 (1866); see also H. R. Exec. Doc. No. 68, 39th Cong., 2d Sess., 91 (1867) (noting how, during the New Orleans riots, blacks under attack "defended themselves . . . with such pistols as they had").

Witnesses before the Joint Committee on Reconstruction also described the depredations visited on Southern blacks, and the efforts they made to defend themselves. One Virginia music professor related that when "[t]wo Union men were attacked . . . they drew their revolvers and held their assailants at bay." H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 110 (1866). An assistant commissioner to the Bureau from Alabama similarly reported that men were "robbing and disarming negroes upon the highway," H. R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 297 (1866), indicating that blacks indeed carried arms publicly for their self-protection, even if not always with success. See also H. R. Exec. Doc. No. 329, 40th Cong., 2d Sess., 41 (1868) (describing a Ku Klux Klan outfit that rode

60   "through the country *60 . . . robbing every one they come across of money, pistols, papers, &c."); *id.,* at 36 (noting how a black man in Tennessee had been murdered on his way to get book subscriptions, with the murderer taking, among other things, the man's pistol).

Blacks had "procured great numbers of old army muskets and revolvers, particularly in Texas," and "employed them to protect themselves" with "vigor and audacity." S. Exec. Doc. No. 43, 39th Cong., 1st Sess., at 8. Seeing that government was inadequately protecting them, "there [was] the

strongest desire on the part of the freedmen to secure arms, revolvers particularly." H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 3, at 102.

On July 6, 1868, Congress extended the 1866 Freedmen's Bureau Act, see 15 Stat. 83, and reaffirmed that freedmen were entitled to the "full and equal benefit of all laws and proceedings concerning personal liberty [and] personal security . . . *including the constitutional right to keep and bear arms."* §14, 14 Stat. 176 (1866) (emphasis added). That same day, a Bureau official reported that freedmen in Kentucky and Tennessee were still constantly under threat: "No Union man or negro who attempts to take any active part in politics, or the improvement of his race, is safe a single day; and nearly all sleep upon their arms at night, and carry concealed weapons during the day." H. R. Exec. Doc. No. 329, 40th Cong., 2d Sess., at 40.

Of course, even during Reconstruction the right to keep and bear arms had limits. But those limits were consistent with a right of the public to peaceably carry handguns for self-defense. For instance, when General D. E. Sickles issued a decree in 1866 pre-empting South Carolina's Black Codes-which prohibited firearm possession by blacks-he stated: "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice

61   of carrying concealed weapons. . . . And no *61 disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess., at 908-909; see also *McDonald,* 561 U.S., at 847-848 (opinion of THOMAS, J.).[26] Around the same time, the editors of The Loyal Georgian, a prominent black-owned newspaper, were asked by "A Colored Citizen" whether "colored persons [have] a right to own and carry fire arms." The editors responded that blacks had "the *same* right to own and carry fire arms that *other* citizens have." The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4. And, borrowing language from a Freedmen's Bureau

casetext

circular, the editors maintained that "[a]ny person, white or black, may be disarmed if convicted of making an improper or dangerous use of weapons," even though "no military or civil officer has the right or authority to disarm any class of people, thereby placing them at the mercy of others." *Ibid,* (quoting Circular No. 5, Freedmen's Bureau, Dec. 22, 1865); see also *McDonald,* 561 U.S., at 848-849 (opinion of THOMAS, J.).[27] *62

62

---

26 Respondents invoke General Orders No. 10, which covered the Second Military District (North and South Carolina), and provided that "[t]he practice of carrying deadly weapons, except by officers and soldiers in the military service of the United States, is prohibited." Headquarters Second Military Dist., Gen. Orders No. 10 (Charleston, S. C, Apr. 11, 1867), in S. Exec. Doc. No. 14, 40th Cong., 1st Sess., 64 (1867). We put little weight on this categorical restriction given that the order also specified that a violation of this prohibition would "render the offender amenable to trial and punishment by military commission," *ibid.,* rather than a jury otherwise guaranteed by the Constitution. There is thus little indication that these military dictates were designed to align with the Constitution's usual application during times of peace.

27 That said, Southern prohibitions on concealed carry were not always applied equally, even when under federal scrutiny. One lieutenant posted in Saint Augustine, Florida, remarked how local enforcement of concealed-carry laws discriminated against blacks: "To sentence a negro to several dollars' fine for carrying a revolver concealed upon his person, is in accordance with an ordinance of the town; but still the question naturally arises in my mind, 'Why is this poor fellow fined for an offence which is committed hourly by every other white man I meet in the streets?'" H. R. Exec. Doc. No. 57, 40th

Cong., 2d Sess., 83 (1867); see also H. R. Rep. No. 16, 39th Cong., 2d Sess., 427 (1867).

As for Reconstruction-era state regulations, there was little innovation over the kinds of public-carry restrictions that had been commonplace in the early 19th century. For instance, South Carolina in 1870 authorized the arrest of "all who go armed offensively, to the terror of the people," 1870 S. C. Acts p. 403, no. 288, §4, parroting earlier statutes that codified the common-law offense. That same year, after it cleaved from Virginia, West Virginia enacted a surety statute nearly identical to the one it inherited from Virginia. See W.Va. Code, ch. 153, §8. Also in 1870, Tennessee essentially reenacted its 1821 prohibition on the public carry of handguns but, as explained above, Tennessee courts interpreted that statute to exempt large pistols suitable for military use. See *supra,* at 46.

Respondents and the United States, however, direct our attention primarily to two late-19th-century cases in Texas. In 1871, Texas law forbade anyone from "carrying on or about his person . . . any pistol. . . unless he has reasonable grounds for fearing an unlawful attack on his person." 1871 Tex. Gen. Laws §1. The Texas Supreme Court upheld that restriction in *English v. State,* 35 Tex. 473 (1871). The Court reasoned that the Second Amendment, and the State's constitutional analogue, protected only those arms "as are useful and proper to an armed militia," including holster pistols, but not other kinds of handguns. *Id.,* at 474-475. Beyond that constitutional holding, the *English* court further opined that the law was not "contrary to public policy," *id.,* at 479, given that it "ma[de] all necessary exceptions" allowing deadly weapons to "be carried as means of self-defense," and therefore "fully cover[ed] all wants of society," *id.,* at 477.

Four years later, in *State v. Duke,* 42 Tex. 455 (1875), the Texas Supreme Court modified its analysis. The court reinterpreted Texas' State Constitution to protect not only *63 military-style weapons but rather all arms "as are commonly

63

kept, according to the customs of the people, and are appropriate for open and manly use in self-defense." *Id.,* at 458. On that understanding, the court recognized that, in addition to "holster pistol[s]," the right to bear arms covered the carry of "such pistols at least as are not adapted to being carried concealed." *Id.,* at 458-459. Nonetheless, after expanding the scope of firearms that warranted state constitutional protection, *Duke* held that requiring any pistol-bearer to have "'reasonable grounds fearing an unlawful attack on [one's] person'" was a "legitimate and highly proper" regulation of handgun carriage. *Id.,* at 456, 459-460. *Duke* thus concluded that the 1871 statute "appear[ed] to have respected the right to carry a pistol openly when needed for self-defense." *Id.,* at 459.

We acknowledge that the Texas cases support New York's proper-cause requirement, which one can analogize to Texas' "reasonable grounds" standard. But the Texas statute, and the rationales set forth in *English* and *Duke,* are outliers. In fact, only one other State, West Virginia, adopted a similar public-carry statute before 1900. See W.Va. Code, ch. 148, §7 (1887). The West Virginia Supreme Court upheld that prohibition, reasoning that *no* handguns of any kind were protected by the Second Amendment, a rationale endorsed by no other court during this period. See *State v. Workman,* 35 W.Va. 367, 371-374, 14 S. E. 9, 11 (1891). The Texas decisions therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public.

In the end, while we recognize the support that postbellum Texas provides for respondents' view, we will not give disproportionate weight to a single state statute and a pair of state-court decisions. As in *Heller,* we will not "stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other
64 evidence regarding the right to keep and *64 bear arms for defense" in public. 554 U.S., at 632.

**5**

Finally, respondents point to the slight uptick in gun regulation during the late-19th century-principally in the Western Territories. As we suggested in *Heller,* however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence. See *id.,* at 614; *supra,* at 28.[28] Here, moreover, respondents' reliance on late-19th-century laws has several serious flaws even beyond their temporal distance from the founding.

> [28] We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amid.* As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.

The vast majority of the statutes that respondents invoke come from the Western Territories. Two Territories prohibited the carry of pistols in towns, cities, and villages, but seemingly permitted the carry of rifles and other long guns everywhere. See 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16; 1869 N.M. Laws ch. 32, §§1-2, p. 72.[29] Two others prohibited the carry of *all* firearms in towns, cities, and villages, including long guns. See 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23. And one Territory completely prohibited public carry of pistols *everywhere,* but allowed the carry of "shot-guns or rifles" for certain purposes. See 1890 Okla. Terr. Stats., Art. 47, §§1-2, 5, p. 495.

> [29] The New Mexico restriction allowed an exception for individuals carrying for "the lawful defence of themselves, their families or their property, and the same being then and there threatened with danger." 1869 Terr, of N.M. Laws ch. 32, §1, p. 72. The Arizona law similarly exempted those who have "reasonable

ground for fearing an unlawful attack upon his person." 1889 Ariz. Terr. Sess. Laws no. 13, §2, p. 17.

These territorial restrictions fail to justify New York's *65 proper-cause requirement for several reasons. First, the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry. For starters, "[t]he very transitional and temporary character of the American [territorial] system" often "permitted legislative improvisations which might not have been tolerated in a permanent setup." E. Pomeroy, The Territories and the United States 1861-1890, p. 4 (1947). These territorial "legislative improvisations," which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect "the origins and continuing significance of the Second Amendment" and we do not consider them "instructive." *Heller,* 554 U.S., at 614.

The exceptional nature of these western restrictions is all the more apparent when one considers the miniscule territorial populations who would have lived under them. To put that point into perspective, one need not look further than the 1890 census. Roughly 62 million people lived in the United States at that time. Arizona, Idaho, New Mexico, Oklahoma, and Wyoming combined to account for only 420,000 of those inhabitants-about two-thirds of 1% of the population. See Dept. of Interior, Compendium of the Eleventh Census: 1890, Part I.-Population 2 (1892). Put simply, these western restrictions were irrelevant to more than 99% of the American population. We have already explained that we will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city, "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms" in public for self-defense. *Heller,* 554 U.S., at 632; see *supra,* at 57-58. Similarly, we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also "contradic[t] the overwhelming weight" of *66 other, more contemporaneous historical evidence. *Heller,* 554 U.S., at 632. Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality. When States generally prohibited both open and concealed carry of handguns in the late-19th century, state courts usually upheld the restrictions when they exempted army revolvers, or read the laws to exempt at least that category of weapons. See, *e.g., Haile v. State,* 38 Ark. 564, 567 (1882); *Wilson v. State,* 33 Ark. 557, 560 (1878); *Fife v. State,* 31 Ark. 455, 461 (1876); *State v. Wil-burn,* 66 Tenn. 57, 60 (1872); *Andrews,* 50 Tenn., at 187.[30] Those state courts that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller.* For example, the Kansas Supreme Court upheld a complete ban on public carry enacted by the city of Salina in 1901 based on the rationale that the Second Amendment protects only "the right to bear arms as a member of the state militia, or some other military organization provided for by law." *Salina v. Blaksley,* 72 Kan. 230, 232, 83 P. 619, 620 (1905). That was clearly erroneous. See *Heller,* 554 U.S., at 592.

---

[30] Many other state courts during this period continued the antebellum tradition of upholding concealed carry regimes that seemingly provided for open carry. See, *e.g., State v. Speller,* 86 N. C. 697 (1882); *Chatteaux v. State,* 52 Ala. 388 (1875); *Eslavav. State,* 49 Ala. 355 (1873); *State v. Shelby,* 90 Mo. 302, 2 S. W. 468 (1886); *Carrollv. State,* 28 Ark. 99 (1872); cf. *Robertson v. Baldwin,* 165 U.S. 275, 281-282 (1897) (remarking in dicta that "the right of the people to keep and bear arms ... is not infringed by laws prohibiting the carrying of concealed weapons").

Absent any evidence explaining *why* these unprecedented prohibitions on *all* public carry were understood to comport with the Second Amendment, we fail to see how they inform "the origins and continuing significance of the Amendment." *Id.,* at 614; see also The Federalist No. 37, *67 at 229 (explaining that the meaning of ambiguous constitutional provisions can be "liquidated and ascertained *by a series of particular discussions and adjudications"* (emphasis added)).

Finally, these territorial restrictions deserve little weight because they were-consistent with the transitory nature of territorial government-short lived. Some were held unconstitutional shortly after passage. See *In re Brickey,* 8 Idaho 597, 70 P. 609 (1902). Others did not survive a Territory's admission to the Union as a State. See Wyo. Rev. Stat., ch. 3, §5051 (1899) (1890 law enacted upon statehood prohibiting public carry only when combined with "intent, or avowed purpose, of injuring [one's] fellow-man"). Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation.

Beyond these Territories, respondents identify one Western State-Kansas-that instructed cities with more than 15,000 inhabitants to pass ordinances prohibiting the public carry of firearms. See 1881 Kan. Sess. Laws §§1, 23, pp. 79, 92.[31] By 1890, the only cities meeting the population threshold were Kansas City, Topeka, and Wichita. See Compendium of the Eleventh Census: 1890, at 442-452. Even if each of these three cities enacted prohibitions by 1890, their combined population (93,000) accounted for only 6.5% of Kansas' total population. *Ibid.* Although other Kansas cities may also have restricted public carry unilaterally,[32] the lone late-19th-century state law respondents *68 identify does not prove that Kansas meaningfully restricted public carry, let alone demonstrate a broad tradition of States doing so.

31  In 1875, Arkansas prohibited the public carry of all pistols. See 1875 Ark. Acts p. 156, §1. But this categorical prohibition was also short lived. About six years later, Arkansas exempted "pistols as are used in the army or navy of the United States," so long as they were carried "uncovered, and in [the] hand." 1881 Ark. Acts p. 191, no. 96, §§1, 2.

32  In 1879, Salina, Kansas, prohibited the carry of pistols but broadly exempted "cases when any person carrying [a pistol] is engaged in the pursuit of any lawful business, calling or employment" and the circumstances were "such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family." Salina, Kan., Rev. Ordinance No. 268, §2.

* * *

At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to "all Americans" the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. *Heller,* 554 U.S., at 581. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" in order to carry arms in public. *Klenosky,* 75 App. Div., at 793, 428 N.Y.S. 2d, at 257.

IV

The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald,* 561 U.S., at 780 (plurality opinion). We know of no other constitutional right that an individual may exercise only after demonstrating to government *69 officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense.

New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.* *70

Justice Alito, concurring.

I join the opinion of the Court in full but add the following comments in response to the dissent.

I

Much of the dissent seems designed to obscure the specific question that the Court has decided, and therefore it may be helpful to provide a succinct summary of what we have actually held. In *District of Columbia v. Heller,* 554 U.S. 570 (2008), the Court concluded that the Second Amendment protects the right to keep a handgun in the home for self-defense. *Heller* found that the Amendment codified a preexisting right and that this right was regarded at the time of the Amendment's adoption as rooted in "'the natural right of resistance and self-preservation.'" *Id.,* at

594. "[T]he inherent right of self-defense," *Heller* explained, is "central to the Second Amendment right." *Id.,* at 628.

Although *Heller* concerned the possession of a handgun in the home, the key point that we decided was that "the people," not just members of the "militia," have the right to use a firearm to defend themselves. And because many people face a serious risk of lethal violence when they venture *71 outside their homes, the Second Amendment was understood at the time of adoption to apply under those circumstances. The Court's exhaustive historical survey establishes that point very clearly, and today's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for this purpose.

That is all we decide. Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago,* 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns.

In light of what we have actually held, it is hard to see what legitimate purpose can possibly be served by most of the dissent's lengthy introductory section. See *post,* at 1-8 (opinion of BREYER, J.). Why, for example, does the dissent think it is relevant to recount the mass shootings that have occurred in recent years? *Post,* at 4-5. Does the dissent think that laws like New York's prevent or deter such atrocities? Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home? And how does the dissent account for the fact that one of the mass shootings near the top of its list took place in Buffalo? The New York law at issue in this case obviously did not stop that perpetrator.

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

What is the relevance of statistics about the use of guns to commit suicide? *See post,* at 5-6. Does the dissent think that a lot of people who possess guns in their homes will be stopped or deterred from shooting themselves if they cannot lawfully take them outside?

The dissent cites statistics about the use of guns in domestic disputes, see *post,* at 5, but it does not explain why these statistics are relevant to the question presented in *72 this case. How many of the cases involving the use of a gun in a domestic dispute occur outside the home, and how many are prevented by laws like New York's?

72

The dissent cites statistics on children and adolescents killed by guns, see *post,* at 1, 4, but what does this have to do with the question whether an adult who is licensed to possess a handgun may be prohibited from carrying it outside the home? Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, 18 U.S.C. §§922(x)(2)-(5), and bars the sale of a handgun to anyone under the age of 21, §§922(b)(1), (c)(1).[1]

[1] The dissent makes no effort to explain the relevance of most of the incidents and statistics cited in its introductory section *(post,* at 1-8) (opinion of BREYER, J.). Instead, it points to studies (summarized later in its opinion) regarding the effects of "shall issue" licensing regimes on rates of homicide and other violent crimes. I note only that the dissent's presentation of such studies is one-sided. See RAND Corporation, Effects of Concealed-Carry Laws on Violent Crime (Apr. 22, 2022), *https://www.rand.org/research/gun-policy/anarysis/concealed*carry/violent-crime-html; see also Brief for William English et al. as *Amid Curiae* 3 ("The overwhelming weight of statistical analysis on the effects of [right-to-carry] laws on violent crime concludes that RTC laws do not result in any statistically significant

increase in violent crime rates"); Brief for Arizona et al. as *Amid Curiae* 12 ("Papulation-level data on licensed carry is extensive, and the weight of the evidence confirms that objective, non-discriminatory licensed-carry laws have two results: (1) statistically significant reductions in some types of violent crime, or (2) no statistically significant effect on overall violent crime"); Brief for Law Enforcement Groups et al. as *Amid Curiae* 12 ("[0]ver the period 1991-2019 the inventory of firearms more than doubled; the number of concealed carry permits increased by at least sevenfold," but "murder rates fell by almost half, from 9.8 per 100,000 people in 1991 to 5.0 per 100,000 in 2019" and "[v]iolent crimes plummeted by over half").

The dissent cites the large number of guns in private hands-nearly 400 million-but it does not explain what this statistic has to do with the question whether a person who already has the right to keep a gun in the home for self- *73 defense is likely to be deterred from acquiring a gun by the knowledge that the gun cannot be carried outside the home. See *post,* at 3. And while the dissent seemingly thinks that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining the New York law, the dissent appears not to understand that it is these very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense.

73

No one apparently knows how many of the 400 million privately held guns are in the hands of criminals, but there can be little doubt that many muggers and rapists are armed and are undeterred by the Sullivan Law. Each year, the New York City Police Department (NYPD) confiscates thousands of guns,[2] and it is fair to assume that the number of guns seized is a fraction of the total number held unlawfully. The police cannot disarm every person who acquires a gun for use in criminal activity; nor can they provide bodyguard protection for the State's nearly 20 million

casetext

residents or the 8.8 million people who live in New York City. Some of these people live in high-crime neighborhoods. Some must traverse dark and dangerous streets in order to reach their homes after work or other evening activities. Some are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury.

2   NYPD statistics show approximately 6,000 illegal guns were seized in 2021. A. Southall, This Police Captain's Plan To Stop Gun Violence Uses More Than Handcuffs, N.Y.Times, Feb. 4, 2022. According to recent remarks by New York City Mayor Eric Adams, the NYPD has confiscated 3,000 firearms in 2022 so far. City of New York, Transcript: Mayor Eric Adams Makes Announcement About NYPD Gun Violence Suppression Division (June 6, 2022), *https://wwwl.nyc.gov/office-of-the*mayor/news/369-22/trascript-mayor-eric-adams-makes-announcement-nypd-gun-violence-suppression-division.

Ordinary citizens frequently use firearms to
74  protect *74 themselves from criminal attack. According to survey data, defensive firearm use occurs up to 2.5 million times per year. Brief for Law Enforcement Groups et al. as *Amici Curiae* 5. A Centers for Disease Control and Prevention report commissioned by former President Barack Obama reviewed the literature surrounding firearms use and noted that "[s]tudies that directly assessed the effect of actual defensive uses of guns . . . have found consistently lower injury rates among gun-using crime victims compared with victims who used other self-protective strategies." Institute of Medicine and National Research Council, Priorities for Research To Reduce the Threat of Firearm-Related Violence 15-16 (2013) (referenced in Brief for Independent Women's Law Center as *Amicus Curiae* 19-20).

Many of the *amicus* briefs filed in this case tell the story of such people. Some recount incidents in which a potential victim escaped death or serious injury only because carrying a gun for self-defense was allowed in the jurisdiction where the incident occurred. Here are two examples. One night in 1987, Austin Fulk, a gay man from Arkansas, "was chatting with another man in a parking lot when four gay bashers charged them with baseball bats and tire irons. Fulk's companion drew his pistol from under the seat of his car, brandished it at the attackers, and fired a single shot over their heads, causing them to flee and saving the would-be victims from serious harm." Brief for DC Project Foundation et al. as *Amici Curiae* 31 (footnote omitted).

On July 7, 2020, a woman was brutally assaulted in the parking lot of a fast food restaurant in Jefferson City, Tennessee. Her assailant slammed her to the ground and began to drag her around while strangling her. She was saved when a bystander who was lawfully carrying a pistol pointed his gun at the assailant, who then stopped the assault and the assailant was arrested. *Ibid,* (citing C. Wethington, Jefferson City Police: Legally Armed Good Samaritan Stops Assault,
75  ABC News 6, *WATE.com* (July 9, 2020), *75 *https://www.wate.com/news/local-news/jefferson-city-police*-legally-armed-good-samaritan-stops-assault/).

In other incidents, a law-abiding person was driven to violate the Sullivan Law because of fear of victimization and as a result was arrested, prosecuted, and incarcerated. See Brief for Black Attorneys of Legal Aid et al. as *Amid Curiae* 22-25.

Some briefs were filed by members of groups whose members feel that they have special reasons to fear attacks. See Brief for Asian Pacific American Gun Owners Association as *Amicus Curiae;* Brief for DC Project Foundation et al. as *Amid Curiae;* Brief for Black Guns Matter et al. as *Amid Curiae;* Brief for Independent Women's Law

Center as *Amicus Curiae;* Brief for National African American Gun Association, Inc., as *Amicus Curiae.*

I reiterate: All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional.

II

This brings me to Part II-B of the dissent, *post,* at 11-21, which chastises the Court for deciding this case without a trial and factual findings about just how hard it is for a law-abiding New Yorker to get a carry permit. The record before us, however, tells us everything we need on this score. At argument, New York's solicitor general was asked about an ordinary person who works at night and must walk through dark and crime-infested streets to get home. Tr. of Oral Arg. 66-67. The solicitor general was asked whether such a person would be issued a carry permit if she pleaded: "[T]here have been a lot of muggings in this area, and I am scared to death." *Id.,* at 67. The solicitor general's candid answer was "in general," no. *Ibid.* To get a permit, the applicant would have to show more-for 76 example, that she *76 had been singled out for attack. *Id.,* at 65; see also *id.,* at 58. A law that dictates that answer violates the Second Amendment.

III

My final point concerns the dissent's complaint that the Court relies too heavily on history and should instead approve the sort of "means-end" analysis employed in this case by the Second Circuit. Under that approach, a court, in most cases, assesses a law's burden on the Second Amendment right and the strength of the State's interest in imposing the challenged restriction. See *post,* at 20. This mode of analysis places no firm

limits on the ability of judges to sustain any law restricting the possession or use of a gun. Two examples illustrate the point.

The first is the Second Circuit's decision in a case the Court decided two Terms ago, *New York State Rifle & Pistol Assn., Inc. v. City of New York,* 590 U.S. (2020). The law in that case affected New York City residents who had been issued permits to keep a gun in the home for self-defense. The city recommended that these permit holders practice at a range to ensure that they are able to handle their guns safely, but the law prohibited them from taking their guns to any range other than the seven that were spread around the city's five boroughs. Even if such a person unloaded the gun, locked it in the trunk of a car, and drove to the nearest range, that person would violate the law if the nearest range happened to be outside city limits. The Second Circuit held that the law was constitutional, concluding, among other things, that the restriction was substantially related to the city's interests in public safety and crime prevention. See *New York State Rifle & Pistol Assn., Inc. v. New York,* 883 F.3d 45, 62-64 (2018). But after we agreed to review that decision, the city repealed the law and admitted that it did not actually have any beneficial effect on public safety. See N.Y.Penal Law Ann. *77 §400.00(6) (West Cum. Supp. 2022); Suggestion of Mootness in *New York State Rifle & Pistol Assn., Inc. v. City of New York,* O. T. 2019, No. 18-280, pp. 5-7.

Exhibit two is the dissent filed in *Heller* by JUSTICE BREYER, the author of today's dissent. At issue in *Heller* was an ordinance that made it impossible for any District of Columbia resident to keep a handgun in the home for self-defense. See 554 U.S., at 574-575. Even the respondent, who carried a gun on the job while protecting federal facilities, did not qualify. *Id.,* at 575-576. The District of Columbia law was an extreme outlier; only a few other jurisdictions in the entire country had similar laws. Nevertheless, Justice Breyer's dissent, while accepting for the sake of argument that the Second Amendment protects the

right to keep a handgun in the home, concluded, based on essentially the same test that today's dissent defends, that the District's complete ban was constitutional. See *id.,* at 689, 722 (under "an interest-balancing inquiry. . ." the dissent would "conclude that the District's measure is a proportionate, not a disproportionate, response to the compelling concerns that led the District to adopt it").

Like that dissent in *Heller,* the real thrust of today's dissent is that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit.[3] That argument was rejected in *Heller,* and while the dissent protests that it is not rearguing *Heller,* it proceeds to do just that. See *post,* at 25-28.

> [3] If we put together the dissent in this case and JUSTICE BREYER's *Heller* dissent, States and local governments would essentially be free to ban the possession of all handguns, and it is unclear whether its approach would impose any significant restrictions on laws regulating long guns. The dissent would extend a very large measure of deference to legislation implicating Second Amendment rights, but it does not claim that such deference is appropriate when any other constitutional right is at issue.

*Heller* correctly recognized that the Second
78 Amendment *78 codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun. In 1791, when the Second Amendment was adopted, there were no police departments, and many families lived alone on isolated farms or on the frontiers. If these people were attacked, they were on their own. It is hard to imagine the furor that would have erupted if the Federal Government and the States had tried to take away the guns that these people needed for protection.

Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves. And today, no less than in 1791, the Second Amendment
79 guarantees their right to do so. *79

KAVANAUGH, J., concurring.

Justice Kavanaugh, with whom The Chief Justice joins, concurring.

The Court employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense. See *District of Columbia v. Heller,* 554 U.S. 570 (2008); *McDonald v. Chicago,* 561 U.S. 742 (2010). Applying that test, the Court correctly holds that New York's outlier "may-issue" licensing regime for carrying handguns for self-defense violates the Second Amendment.

I join the Court's opinion, and I write separately to underscore two important points about the limits of the Court's decision.

*First,* the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. In particular, the Court's decision does not affect the existing licensing regimes-known as "shall-issue" regimes-that are employed in 43 States.

The Court's decision addresses only the unusual discretionary licensing regimes, known as "may-issue" regimes, that are employed by 6 States
80 including New York. As the *80 Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime- the unchanneled discretion for licensing officials and the special-need requirement-in effect deny the right to carry handguns for self-defense to many "ordinary, law-abiding citizens." *Ante,* at 1; see

also *Heller,* 554 U.S., at 635. The Court has held that "individual self-defense is 'the *central component'* of the Second Amendment right." *McDonald,* 561 U.S., at 767 (quoting *Heller,* 554 U.S., at 599). New York's law is inconsistent with the Second Amendment right to possess and carry handguns for self-defense.

By contrast, 43 States employ objective shall-issue licensing regimes. Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements. Brief for Arizona et al. as *Amid Curiae* 7. Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense. As petitioners acknowledge, shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice. Tr. of Oral Arg. 50-51.

Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so. Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States. *81

*Second,* as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment "is neither a regulatory straight]acket nor a regulatory blank check." *Ante,* at 21. Properly interpreted, the Second Amendment allows a "variety" of gun regulations. *Heller,* 554 U.S., at 636. As Justice Scalia wrote in his opinion for the Court in *Heller,* and JUSTICE ALITO reiterated in relevant part in the principal opinion in *McDonald:*

"Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.]

"We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller,* 554 U.S., at 626-627, and n. 26 (citations and quotation marks omitted); see also *McDonald,* 561 U.S., at 786 (plurality opinion).

\* \* \*

With those additional comments, I join the opinion of the Court. *82

Barrett, J., concurring

Justice Barrett, concurring.

I join the Court's opinion in full. I write separately to highlight two methodological points that the Court does not resolve. First, the Court does not conclusively determine the manner and circumstances in which postratification practice may bear on the original meaning of the Constitution. See *ante,* at 24-29. Scholars have proposed competing and potentially conflicting frameworks for this analysis, including liquidation, tradition, and precedent. See, *e.g.,* Nelson, Originalism and Interpretive Conventions,

70 U. Chi. L. Rev. 519 (2003); McConnell, Time, Institutions, and Interpretation, 95 B. U. L. Rev. 1745 (2015). The limits on the permissible use of history may vary between these frameworks (and between different articulations of each one). To name just a few unsettled questions: How long after ratification may subsequent practice illuminate original public meaning? Cf. *McCulloch v. Maryland,* 4 Wheat. 316, 401 (1819) (citing practice "introduced at a very early period of our history"). What form must practice take to carry weight in constitutional analysis? See *Myers v. United States,* 272 U.S. 52, 175 (1926) (citing a "legislative exposition of the Constitution . . . acquiesced in for a long term of years"). And may practice settle the meaning of individual *83 rights as well as structural provisions? See Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1, 49-51 (2019) (canvassing arguments). The historical inquiry presented in this case does not require us to answer such questions, which might make a difference in another case. See *ante,* at 17-19.

Second and relatedly, the Court avoids another "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Bill of Rights was ratified in 1791. *Ante,* at 29. Here, the lack of support for New York's law in either period makes it unnecessary to choose between them. But if 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little). Cf. *Espinoza v. Montana Dept. of Revenue,* 591 U.S. __, __ - __ (2020) (slip op., at 15-16) (a practice that "arose in the second half of the 19th century. . . cannot by itself establish an early American tradition" informing our understanding of the First Amendment). So today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution "against giving postenactment history more weight than it can rightly bear." *Ante,* at 26.

84   *84

Justice Breyer, with whom Justice Sotomayor and Justice Kagan join, dissenting.

In 2020, 45,222 Americans were killed by firearms. See Centers for Disease Control and Prevention, Fast Facts: Firearm Violence Prevention (last updated May 4, 2022) (CDC, Fast Facts), *https://www.cdc.gov/violenceprevention/* firearms/fastfact.html. Since the start of this year (2022), there have been 277 reported mass shootings-an average of more than one per day. See Gun Violence Archive (last visited June 20, 2022), *https://www.gunviolence archive.org.* Gun violence has now surpassed motor vehicle crashes as the leading cause of death among children and adolescents. J. Goldstick, R. Cunningham, & P. Carter, Current Causes of Death in Children and Adolescents in the United States, 386 New England J. Med. 1955 (May 19, 2022) (Goldstick).

Many States have tried to address some of the dangers of gun violence just described by passing laws that limit, in various ways, who may purchase, carry, or use firearms of different kinds. The Court today severely burdens States' efforts to do so. It invokes the Second Amendment to strike down a New York law regulating the public carriage of *85 concealed handguns. In my view, that decision rests upon several serious mistakes.

First, the Court decides this case on the basis of the pleadings, without the benefit of discovery or an evidentiary record. As a result, it may well rest its decision on a mistaken understanding of how New York's law operates in practice. Second, the Court wrongly limits its analysis to focus nearly exclusively on history. It refuses to consider the government interests that justify a challenged gun regulation, regardless of how compelling those interests may be. The Constitution contains no such limitation, and neither do our precedents. Third, the Court itself demonstrates the practical

problems with its history-only approach. In applying that approach to New York's law, the Court fails to correctly identify and analyze the relevant historical facts. Only by ignoring an abundance of historical evidence supporting regulations restricting the public carriage of firearms can the Court conclude that New York's law is not "consistent with the Nation's historical tradition of firearm regulation." See *ante,* at 15.

In my view, when courts interpret the Second Amendment, it is constitutionally proper, indeed often necessary, for them to consider the serious dangers and consequences of gun violence that lead States to regulate firearms. The Second Circuit has done so and has held that New York's law does not violate the Second Amendment. See *Kachalsky v. County of Westchester,* 701 F.3d 81, 97-99, 101 (2012). I would affirm that holding. At a minimum, I would not strike down the law based only on the pleadings, as the Court does today-without first allowing for the development of an evidentiary record and without considering the State's compelling interest in preventing gun violence. I respectfully dissent.

I

The question before us concerns the extent to which the \*86 Second Amendment prevents democratically elected officials from enacting laws to address the serious problem of gun violence. And yet the Court today purports to answer that question without discussing the nature or severity of that problem.

In 2017, there were an estimated 393.3 million civilian-held firearms in the United States, or about 120 firearms per 100 people. A. Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey 4 (June 2018), *https://www.smallarmssurvey.org/sites/default/files/* resources/SAS-BP-Civilian-Firearms-Numbers.pdf. That is more guns per capita than in any other country in the world. *Ibid.* (By comparison, Yemen is second with about 52.8 firearms per 100 people-less than half the per

capita rate in the United States-and some countries, like Indonesia and Japan, have fewer than one firearm per 100 people. *Id.,* at 3-4.)

Unsurprisingly, the United States also suffers a disproportionately high rate of firearm-related deaths and injuries. Cf. Brief for Educational Fund To Stop Gun Violence et al. as *Amid Curiae* 17-18 (Brief for Educational Fund) (citing studies showing that, within the United States, "states that rank among the highest in gun ownership also rank among the highest in gun deaths" while "states with lower rates of gun ownership have lower rates of gun deaths"). In 2015, approximately 36,000 people were killed by firearms nationwide. M. Siegel et al., Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States, 107 Am. J. Pub. Health 1923 (2017). Of those deaths, 22,018 (or about 61%) were suicides, 13,463 (37%) were homicides, and 489 (1%) were unintentional injuries. *Ibid.* On top of that, firearms caused an average of 85,694 emergency room visits for nonfatal injuries each year between 2009 and 2017. E. Kaufman et al., Epidemiological Trends in Fatal and Nonfatal Firearm Injuries in the US, 2009-2017, 181 JAMA Internal Medicine \*87 237 (2021) (Kaufman).

Worse yet, gun violence appears to be on the rise. By 2020, the number of firearm-related deaths had risen to 45,222, CDC, Fast Facts, or by about 25% since 2015. That means that, in 2020, an average of about 124 people died from gun violence every day. *Ibid.* As I mentioned above, gun violence has now become the leading cause of death in children and adolescents, surpassing car crashes, which had previously been the leading cause of death in that age group for over 60 years. Goldstick 1955; J. Bates, Guns Became the Leading Cause of Death for American Children and Teens in 2020, Time, Apr. 27, 2022, *https://www.time.com/6170864/cause-of-death-children-guns/*. And the consequences of gun violence are borne disproportionately by communities of color, and Black communities in particular. See CDC, Age-

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

Adjusted Rates of Firearm-Related Homicide, by Race, Hispanic Origin, and Sex-National Vital Statistics System, United States, 2019, at 1491 (Oct. 22, 2021), *https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/* mm7042a6-H.pdf (documenting 34.9 firearm-related homicides per 100,000 population for non-Hispanic Black men in 2019, compared to 7.7 such homicides per 100,000 population for men of all races); S. Kegler et al., CDC, *Vital Signs:* Changes in Firearm Homicide and Suicide Rates-United States, 2019-2020, at 656-658 (May 13, 2022), *https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7119el-H.pdf.*

The dangers posed by firearms can take many forms. Newspapers report mass shootings occurring at an entertainment district in Philadelphia, Pennsylvania (3 dead and 11 injured); an elementary school in Uvalde, Texas (21 dead); a supermarket in Buffalo, New York (10 dead and 3 injured); a series of spas in Atlanta, Georgia (8 dead); a busy street in an entertainment district of Dayton, Ohio (9 dead and 17 injured); a nightclub in Orlando, Florida (50 dead and 53 injured); a church in Charleston, South Carolina (9 dead); a movie theater in Aurora, Colorado (12 dead and 50 [*88] injured); an elementary school in Newtown, Connecticut (26 dead); and many, many more. See, *e.g.,* R. Todt, 3 Dead, 11 Wounded in Philadelphia Shooting on Busy Street, Washington Post, June 5, 2022; A. Hernandez, J. Slater, D. Barrett, & S. Foster-Frau, At Least 19 Children, 2 Teachers Killed at Texas Elementary School, Washington Post, May 25, 2022; A. Joly, J. Slater, D. Barrett, & A. Hernandez, 10 Killed in Racially Motivated Shooting at Buffalo Grocery Store, Washington Post, May 14, 2022; C. McWhirter & V. Bauerlein, Atlanta-Area Shootings at Spas Leave Eight Dead, Wall Street Journal, Mar. 17, 2021; A. Hassan, Dayton Gunman Shot 26 People in 32 Seconds, Police Timeline Reveals, N.Y.Times, Aug. 13, 2019; L. Alvarez & R. Perez-Pena, Orlando Gunman Attacks Gay Nightclub,

Leaving 50 Dead, N.Y.Times, June 12, 2016; J. Horowitz, N. Corasa-niti, & A. Southall, Nine Killed in Shooting at Black Church in Charleston, N.Y.Times, June 17, 2015; R. Lin, Gunman Kills 12 at 'Dark Knight Rises' Screening in Colorado, L. A. Times, July 20, 2012; J. Barron, Nation Reels After Gunman Massacres 20 Children at School in Connecticut, N.Y.Times, Dec. 14, 2012. Since the start of this year alone (2022), there have already been 277 reported mass shootings-an average of more than one per day. Gun Violence Archive; see also Gun Violence Archive, General Methodology, *https://www.gunviolencearchive.org/methodology* (defining mass shootings to include incidents in which at least four victims are shot, not including the shooter).

And mass shootings are just one part of the problem. Easy access to firearms can also make many other aspects of American life more dangerous. Consider, for example, the effect of guns on road rage. In 2021, an average of 44 people each month were shot and either killed or wounded in road rage incidents, double the annual average between 2016 and 2019. S. Burd-Sharps & K. Bistline, Everytown for Gun Safety, Reports of Road Rage Shootings Are on the Rise (Apr. 4, 2022),

*https://www.everytownresearch.org/reports-* [*89] of-road-rage-shootings-are-on-the-rise/; see also J. Dono-hue, A. Aneja, & K. Weber, Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis, 16 J. Empirical Legal Studies 198, 204 (2019). Some of those deaths might have been avoided if there had not been a loaded gun in the car. See *ibid.;* Brief for American Bar Association as *Amicus Curiae* 17-18; Brief for Educational Fund 20-23 (citing studies showing that the presence of a firearm is likely to increase aggression in both the person carrying the gun and others who see it).

New York State Rifle & Pistol Assn., Inc. v. Bruen   No. 20-843 (U.S. Jun. 23, 2022)

The same could be said of protests: A study of 30,000 protests between January 2020 and June 2021 found that armed protests were nearly six times more likely to become violent or destructive than unarmed protests. Everytown for Gun Safety, Armed Assembly: Guns, Demonstrations, and Political Violence in America (Aug. 23, 2021), *https:// www.everytownresearch.org/report/armed-assembly-guns*-demonstrations-and-political-violence-in-america/ (finding that 16% of armed protests turned violent, compared to less than 3% of unarmed protests). Or domestic disputes: Another study found that a woman is five times more likely to be killed by an abusive partner if that partner has access to a gun. Brief for Educational Fund 8 (citing A. Zeoli, R. Ma-linski, & B. Turchan, Risks and Targeted Interventions: Firearms in Intimate Partner Violence, 38 Epidemiologic Revs. 125 (2016); J. Campbell et al., Risk Factors for Femicide in Abusive Relationships: Results From a Multisite Case Control Study, 93 Am. J. Pub. Health 1089, 1092 (2003)). Or suicides: A study found that men who own handguns are three times as likely to commit suicide than men who do not and women who own handguns are seven times as likely to commit suicide than women who do not. D. Studdert et al., Handgun Ownership and Suicide in California, 382 New England J. Med. 2220, 2224 (June 4, 2020). *90

Consider, too, interactions with police officers. The presence of a gun in the hands of a civilian poses a risk to both officers and civilians. *Amid* prosecutors and police chiefs tell us that most officers who are killed in the line of duty are killed by firearms; they explain that officers in States with high rates of gun ownership are three times as likely to be killed in the line of duty as officers in States with low rates of gun ownership. Brief for Prosecutors Against Gun Violence as *Amicus Curiae* 23-24; Brief for Former Major City Police Chiefs as *Amid Curiae* 13-14, and n. 21, (citing D. Swedler, M. Simmons, F. Dominici, & D. Hemenway, Firearm Prevalence and Homicides of

Law Enforcement Officers in the United States, 105 Am. J. Pub. Health 2042, 2045 (2015)). They also say that States with the highest rates of gun ownership report four times as many fatal shootings of civilians by police officers compared to States with the lowest rates of gun ownership. Brief for Former Major City Police Chiefs as *Amid Curiae* 16 (citing D. Hemenway, D. Azrael, A. Connor, & M. Miller, Variation in Rates of Fatal Police Shootings Across U.S. States: The Role of Firearm Availability, 96 J. Urb. Health 63, 67 (2018)).

These are just some examples of the dangers that firearms pose. There is, of course, another side to the story. I am not simply saying that "guns are bad." See *ante*, at 8 (ALITO, J., concurring). Some Americans use guns for legitimate purposes, such as sport *(e.g.,* hunting or target shooting), certain types of employment *(e.g.,* as a private security guard), or self-defense. Cf. *ante*, at 4-6 (ALITO, J., concurring). Balancing these lawful uses against the dangers of firearms is primarily the responsibility of elected bodies, such as legislatures. It requires consideration of facts, statistics, expert opinions, predictive judgments, relevant values, and a host of other circumstances, which together make decisions about how, when, and where to regulate guns more appropriately legislative work. That consideration counsels modesty and restraint on the part of judges *91 when they interpret and apply the Second Amendment.

Consider, for one thing, that different types of firearms may pose different risks and serve different purposes. The Court has previously observed that handguns, the type of firearm at issue here, "are the most popular weapon chosen by Americans for self-defense in the home." *District of Columbia v. Heller,* 554 U.S. 570, 629 (2008). But handguns are also the most popular weapon chosen by perpetrators of violent crimes. In 2018, 64.4% of firearm homicides and 91.8% of nonfatal firearm assaults were committed with a handgun. Dept. of Justice, Bureau of Justice

Statistics, G. Kena & J. Truman, Trends and Patterns in Firearm Violence, 1993-2018, pp. 5-6 (Apr. 2022). Handguns are also the most commonly stolen type of firearm-63% of burglaries resulting in gun theft between 2005 and 2010 involved the theft of at least one handgun. Dept. of Justice, Bureau of Justice Statistics, L. Langton, Firearms Stolen During Household Burglaries and Other Property Crimes, 2005-2010, p. 3 (Nov. 2012).

Or consider, for another thing, that the dangers and benefits posed by firearms may differ between urban and rural areas. See generally Brief for City of Chicago et al. as *Amid Curiae* (detailing particular concerns about gun violence in large cities). Firearm-related homicides and assaults are significantly more common in urban areas than rural ones. For example, from 1999 to 2016, 89.8% of the 213,175 firearm-related homicides in the United States occurred in "metropolitan" areas. M. Siegel et al., The Impact of State Firearm Laws on Homicide Rates in Suburban and Rural Areas Compared to Large Cities in the United States, 1991-2016, 36 J. Rural Health 255 (2020); see also Brief for Partnership for New York City as *Amicus Curiae* 10; Kaufman 237 (finding higher rates of fatal assault injuries from firearms in urban areas compared to rural areas); C. Bra-nas, M. Nance, M. Elliott, T. Richmond, & C. Schwab, Urban-Rural Shifts in Intentional Firearm Death: Different *92 Causes, Same Results, 94 Am. J. Pub. Health 1750, 1752 (2004) (finding higher rates of firearm homicide in urban counties compared to rural counties).

92

JUSTICE ALITO asks why I have begun my opinion by reviewing some of the dangers and challenges posed by gun violence and what relevance that has to today's case. *Ante,* at 2-4 (concurring opinion). All of the above considerations illustrate that the question of firearm regulation presents a complex problem-one that should be solved by legislatures rather than courts. What kinds of firearm regulations should a State adopt? Different States might

choose to answer that question differently. They may face different challenges because of their different geographic and demographic compositions. A State like New York, which must account for the roughly 8.5 million people living in the 303 square miles of New York City, might choose to adopt different (and stricter) firearms regulations than States like Montana or Wyoming, which do not contain any city remotely comparable in terms of population or density. See U.S. Census Bureau, Quick Facts: New York City (last updated July 1, 2021) (Quick Facts: New York City), *https://www.census.gov/quickfacts/newyorkcitynewyork/*; Brief for City of New York as *Amicus Curiae* 8, 22. For a variety of reasons, States may also be willing to tolerate different degrees of risk and therefore choose to balance the competing benefits and dangers of firearms differently.

The question presented in this case concerns the extent to which the Second Amendment restricts different States (and the Federal Government) from working out solutions to these problems through democratic processes. The primary difference between the Court's view and mine is that I believe the Amendment allows States to take account of the serious problems posed by gun violence that I have just described. I fear that the Court's interpretation ignores these significant dangers and leaves States without the ability to address them. *93

93

II

A

New York State requires individuals to obtain a license in order to carry a concealed handgun in public. N.Y.Penal Law Ann. §400.00(2) (West Cum. Supp. 2022). I address the specifics of that licensing regime in greater detail in Part II-B below. Because, at this stage in the proceedings, the parties have not had an opportunity to develop the evidentiary record, I refer to facts and representations made in petitioners' complaint and in *amicus* briefs filed before us.

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

Under New York's regime, petitioners Brandon Koch and Robert Nash have obtained restricted licenses that permit them to carry a concealed handgun for certain purposes and at certain times and places. They wish to expand the scope of their licenses so that they can carry a concealed handgun without restriction.

Koch and Nash are residents of Rensselaer County, New York. Koch lives in Troy, a town of about 50,000, located eight miles from New York's capital city of Albany, which has a population of about 98,000. See App. 100; U.S. Census Bureau, Quick Facts: Troy City, New York (last updated July 1, 2021), *https://www.census.gov/quickfacts/* troycitynewyork; *id.,* Albany City, New York, *https://www. census.gov/quickfacts/albanycitynewyork*. Nash lives in Averill Park, a small town 12.5 miles from Albany. App. 100.

Koch and Nash each applied for a license to carry a concealed handgun. Both were issued restricted licenses that allowed them to carry handguns only for purposes of hunting and target shooting. *Id.,* at 104, 106. But they wanted "unrestricted" licenses that would allow them to carry concealed handguns "for personal protection and all lawful purposes." *Id.,* at 112; see also *id.,* at 40. They wrote to the licensing officer in Rensselaer County-Justice Richard [*94] McNally, a justice of the New York Supreme Court-requesting that the hunting and target shooting restrictions on their licenses be removed. *Id.,* at 40, 111-113. After holding individual hearings for each petitioner, Justice McNally denied their requests. *Id.,* at 31, 41, 105, 107, 114. He clarified that, in addition to hunting and target shooting, Koch and Nash could "carry concealed for purposes of off road back country, outdoor activities similar to hunting, for example fishing, hiking & camping." *Id.,* at 41, 114. He also permitted Koch, who was employed by the New York Court System's Division of Technology, to "carry to and from work." *Id.,* at 111, 114. But he reaffirmed that Nash was prohibited from carrying a concealed handgun in locations "typically open to and frequented by the general public." *Id.,* at 41. Neither Koch nor Nash alleges that he appealed Justice McNally's decision. Brief for Respondents 13; see App. 122-126.

Instead, petitioners Koch and Nash, along with the New York State Rifle & Pistol Association, Inc., brought this lawsuit in federal court against Justice McNally and other State representatives responsible for enforcing New York's firearms laws. Petitioners claimed that the State's refusal to modify Koch's and Nash's licenses violated the Second Amendment. The District Court dismissed their complaint. It followed Second Circuit precedent holding that New York's licensing regime was constitutional. See *Kachalsky,* 701 F.3d, at 101. The Court of Appeals for the Second Circuit affirmed. We granted certiorari to review the constitutionality of "New York's denial of petitioners' license applications." *Ante,* at 8 (majority opinion).

B

As the Court recognizes, New York's licensing regime traces its origins to 1911, when New York enacted the "Sullivan Law," which prohibited public carriage of handguns without a license. See [*95] 1911 N.Y.Laws ch. 195, §1, p. 443. Two years later in 1913, New York amended the law to establish substantive standards for the issuance of a license. See 1913 N.Y.Laws ch. 608, §1, pp. 1627-1629. Those standards have remained the foundation of New York's licensing regime ever since-a regime that the Court now, more than a century later, strikes down as unconstitutional.

As it did over 100 years ago, New York's law today continues to require individuals to obtain a license before carrying a concealed handgun in public. N.Y.Penal Law Ann. §400.00(2); *Kachalsky,* 701 F.3d, at 85-86. Because the State does not allow the open carriage of handguns at all, a concealed-carry license is the only way to legally carry a handgun in public. *Id.,* at 86. This licensing requirement applies only to handguns

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

*(i.e.,* "pistols and revolvers") and short-barreled rifles and shotguns, not to all types of firearms. *Id.,* at 85. For instance, the State does not require a license to carry a long gun *(i.e.,* a rifle or a shotgun over a certain length) in public. *Ibid.;* §265.00(3) (West 2022).

To obtain a concealed-carry license for a handgun, an applicant must satisfy certain eligibility criteria. Among other things, he must generally be at least 21 years old and of "good moral character." §400.00(1). And he cannot have been convicted of a felony, dishonorably discharged from the military, or involuntarily committed to a mental hygiene facility. *Ibid.* If these and other eligibility criteria are satisfied, New York law provides that a concealed-carry license "shall be issued" to individuals working in certain professions, such as judges, corrections officers, or messengers of a "banking institution or express company." §400.00(2). Individuals who satisfy the eligibility criteria but do not work in one of these professions may still obtain a concealed-carry license, but they must additionally show that "proper cause exists for the issuance thereof." §400.00(2)(f).

The words "proper cause" may appear on their
96  face to be *96 broad, but there is "a substantial body of law instructing licensing officials on the application of this standard." *Id.,* at 86. New York courts have interpreted proper cause "to include carrying a handgun for target practice, hunting, or self-defense." *Ibid.* When an applicant seeks a license for target practice or hunting, he must show" 'a sincere desire to participate in target shooting and hunting.'" *Ibid,* (quoting *In re O'Connor,* 154 Misc.2d 694, 697, 585 N.Y.S.2d 1000, 1003 (Westchester Cty. 1992)). When an applicant seeks a license for self-defense, he must show "'a special need for self-protection distinguishable from that of the general community.'" 701 F.3d, at 86 (quoting *In re Klenosky,* 75 A.D.2d 793, 793, 428 N.Y.S.2d 256, 257 (1980)). Whether an applicant meets these proper cause standards in the first instance is determined by a "licensing officer in the city or

county . . . where the applicant resides." §400.00(3). In most counties, the licensing officer is a local judge. *Kachalsky,* 701 F.3d, at 87, n. 6. For example, in Rensselaer County, the licensing officer who denied petitioners' requests to remove the restrictions on their licenses was a justice of the New York Supreme Court. App. 31. If the officer denies an application, the applicant can obtain judicial review under Article 78 of New York's Civil Practice Law and Rules. *Kachalsky,* 701 F.3d, at 87. New York courts will then review whether the denial was arbitrary and capricious. *Ibid.*

In describing New York's law, the Court recites the above facts but adds its own gloss. It suggests that New York's licensing regime gives licensing officers too much discretion and provides too "limited" judicial review of their decisions, *ante,* at 4; that the proper cause standard is too "demanding," *ante,* at 3; and that these features make New York an outlier compared to the "vast majority of States," *ante,* at 4. But on what evidence does the Court base these characterizations? Recall that this case comes to us at the pleading stage. The parties have not had
97  an opportunity to conduct *97 discovery, and no evidentiary hearings have been held to develop the record. See App. 15-26. Thus, at this point, there is no record to support the Court's negative characterizations, as we know very little about how the law has actually been applied on the ground.

Consider each of the Court's criticisms in turn. First, the Court says that New York gives licensing officers too much discretion and "leaves applicants little recourse if their local licensing officer denies a permit." *Ante,* at 4. But there is nothing unusual about broad statutory language that can be given more specific content by judicial interpretation. Nor is there anything unusual or inadequate about subjecting licensing officers' decisions to arbitrary-and-capricious review. Judges routinely apply that standard, for example, to determine whether an agency action is lawful under both

New York law and the Administrative Procedure Act. See, *e.g.,* N.Y.Civ. Prac. Law Ann. §7803(3) (2021); 5 U.S.C. §706(2)(A). The arbitrary-and-capricious standard has thus been used to review important policies concerning health, safety, and immigration, to name just a few examples. See, *e.g., Biden v. Missouri,* 595 U.S. __, __(2022) *(per curiam)* (slip op., at 8); *Department of Homeland Security v. Regents of Univ. of Cal,* 591 U.S. __, __, __ (2020) (slip op., at 9, 17); *Department of Commerce v. New York,* 588 U.S. __, __(2019) (slip op., at 16); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 41, 46 (1983).

Without an evidentiary record, there is no reason to assume that New York courts applying this standard fail to provide license applicants with meaningful review. And there is no evidentiary record to support the Court's assumption here. Based on the pleadings alone, we cannot know how often New York courts find the denial of a concealed-carry license to be arbitrary and capricious or on what basis. We do not even know how a court would have reviewed the licensing officer's decisions in Koch's and *98 Nash's cases because they do not appear to have sought judicial review at all. See Brief for Respondents 13; App. 122-126.

Second, the Court characterizes New York's proper cause standard as substantively "demanding." *Ante,* at 3. But, again, the Court has before it no evidentiary record to demonstrate how the standard has actually been applied. How "demanding" is the proper cause standard in practice? Does that answer differ from county to county? How many license applications are granted and denied each year? At the pleading stage, we do not know the answers to these and other important questions, so the Court's characterization of New York's law may very well be wrong.

In support of its assertion that the law is "demanding," the Court cites only to cases originating in New York City. *Ibid,* (citing *In re Martinek,* 294 A.D.2d 221, 743 N.Y.S.2d 80 (2002) (New York County, *i.e.,* Manhattan); *In re Kaplan,* 249 A.D.2d 199, 673 N.Y.S.2d 66 (1998) (same); *In re Klenosky,* 75 A.D.2d 793, 428 N.Y.S.2d 256 (same); *In re Bernstein,* 85 A.D.2d 574, 445 N.Y.S.2d 716 (1981) (Bronx County)). But cases from New York City may not accurately represent how the proper cause standard is applied in other parts of the State, including in Rensselaer County where petitioners reside.

To the contrary, *amid* tell us that New York's licensing regime is purposefully flexible: It allows counties and cities to respond to the particular needs and challenges of each area. See Brief for American Bar Association as *Amicus Curiae* 12; Brief for City of New York as *Amicus Curiae* 20-29. *Amici* suggest that some areas may interpret words such as "proper cause" or "special need" more or less strictly, depending upon each area's unique circumstances. See *ibid.* New York City, for example, reports that it "has applied the [proper cause] requirement relatively rigorously" because its densely populated urban areas pose a heightened risk of gun violence. Brief for City of New York *99 as *Amicus Curiae* 20. In comparison, other (perhaps more rural) counties "have tailored the requirement to their own circumstances, often issuing concealed-carry licenses more freely than the City." *Ibid.;* see also *In re O'Connor,* 154 Misc.2d, at 698, 585 N.Y.S. 2d, at 1004 ("The circumstances which exist in New York City are significantly different than those which exist in Oswego or Putnam Counties. . . . The licensing officers in each county are in the best position to determine whether any interest of the population of their county is furthered by the use of restrictions on pistol licenses"); Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 18-19. Given the geographic variation across the State, it is too sweeping for the Court to suggest, without an evidentiary

record, that the proper cause standard is "demanding" in Rensselaer County merely because it may be so in New York City.

Finally, the Court compares New York's licensing regime to that of other States. *Ante,* at 4-6. It says that New York's law is a "may issue" licensing regime, which the Court describes as a law that provides licensing officers greater discretion to grant or deny licenses than a "shall issue" licensing regime. *Ante,* at 4-5. Because the Court counts 43 "shall issue" jurisdictions and only 7 "may issue" jurisdictions, it suggests that New York's law is an outlier. *Ibid.;* see also *ante,* at 1-2 (KAVANAUGH, J., concurring). Implicitly, the Court appears to ask, if so many other States have adopted the more generous "shall issue" approach, why can New York not be required to do the same?

But the Court's tabulation, and its implicit question, overlook important context. In drawing a line between "may issue" and "shall issue" licensing regimes, the Court ignores the degree of variation within and across these categories. Not all "may issue" regimes are necessarily alike, nor are all "shall issue" regimes. Conversely, not all "may issue" regimes are as different from the "shall issue" *100 regimes as the Court assumes. For instance, the Court recognizes in a footnote that three States (Connecticut, Delaware, and Rhode Island) have statutes with discretionary criteria, like so-called "may issue" regimes do. *Ante,* at 5, n. 1. But the Court nonetheless counts them among the 43 "shall issue" jurisdictions because, it says, these three States' laws operate in practice more like "shall issue" regimes. *Ibid.;* see also Brief for American Bar Association as *Amicus Curiae* 10 (recognizing, conversely, that some "shall issue" States, *e.g.,* Alabama, Colorado, Georgia, Oregon, and Virginia, still grant some degree of discretion to licensing authorities).

As these three States demonstrate, the line between "may issue" and "shall issue" regimes is not as clear cut as the Court suggests, and that line depends at least in part on how statutory discretion is applied in practice. Here, because the Court strikes down New York's law without affording the State an opportunity to develop an evidentiary record, we do not know how much discretion licensing officers in New York have in practice or how that discretion is exercised, let alone how the licensing regimes in the other six "may issue" jurisdictions operate.

Even accepting the Court's line between "may issue" and "shall issue" regimes and assuming that its tally (7 "may issue" and 43 "shall issue" jurisdictions) is correct, that count does not support the Court's implicit suggestion that the seven "may issue" jurisdictions are somehow outliers or anomalies. The Court's count captures only a snapshot in time. It forgets that "shall issue" licensing regimes are a relatively recent development. Until the 1980s, "may issue" regimes predominated. See *id.,* at 9; R. Grossman & S. Lee, May Issue Versus Shall Issue: Explaining the Pattern of Concealed-Carry Handgun Laws, 1960-2001, 26 Contemp. Econ. Pol'y 198, 200 (2008) (Grossman). As of 1987, 16 States and the District of Columbia prohibited concealed *101 carriage outright, 26 States had "may issue" licensing regimes, 7 States had "shall issue" regimes, and 1 State (Vermont) allowed concealed carriage without a permit. Congressional Research Service, Gun Control: Concealed Carry Legislation in the 115th Congress 1 (Jan. 30, 2018). Thus, it has only been in the last few decades that States have shifted toward "shall issue" licensing laws. Prior to that, most States operated "may issue" licensing regimes without legal or practical problem.

Moreover, even considering, as the Court does, only the present state of play, its tally provides an incomplete picture because it accounts for only the number of States with "may issue" regimes, not the number of people governed by those regimes.

**52**

By the Court's count, the seven "may issue" jurisdictions are New York, California, Hawaii, Maryland, Massachusetts, New Jersey, and the District of Columbia. *Ante,* at 5-6. Together, these seven jurisdictions comprise about 84.4 million people and account for over a quarter of the country's population. U.S. Census Bureau, 2020 Population and Housing State Data (Aug. 12, 2021) (2020 Population), *https://www.census.gov/library/visualizations/* interactive/2020-population-and-housing-state-data.html. Thus, "may issue" laws can hardly be described as a marginal or outdated regime.

And there are good reasons why these seven jurisdictions may have chosen not to follow other States in shifting toward "shall issue" regimes. The seven remaining "may issue" jurisdictions are among the most densely populated in the United States: the District of Columbia (with an average of 11,280.0 people/square mile in 2020), New Jersey (1,263.0), Massachusetts (901.2), Maryland (636.1), New York (428.7), California (253.7), and Hawaii (226.6). U.S. Census Bureau, Historical Population Density (1910-2020) (Apr. 26, 2001), *https://www.census.gov/data/tables/time-* series/dec/density-data-text.html. In comparison, the average population density of the United [102] States as a whole is *102 93.8 people/square mile, and some States have population densities as low as 1.3 (Alaska), 5.9 (Wyoming), and 7.4 (Montana) people/square mile. *Ibid.* These numbers reflect in part the fact that these "may issue" jurisdictions contain some of the country's densest and most populous urban areas, *e.g.,* New York City, Los Angeles, San Francisco, the District of Columbia, Honolulu, and Boston. U.S. Census Bureau, Urban Area Facts (Oct. 8, 2021), *https://www.census* .gov/programs-surveys/geography/guidance/geo-areas/ urban-rural/ua-facts.html. New York City, for example, has a population of about 8.5 million people, making it more populous than 38 States, and it squeezes that population into just over 300 square

miles. Quick Facts: New York City; 2020 Population; Brief for City of New York as *Amicus Curiae* 8, 22.

As I explained above, *supra,* at 8-9, densely populated urban areas face different kinds and degrees of dangers from gun violence than rural areas. It is thus easy to see why the seven "may issue" jurisdictions might choose to regulate firearm carriage more strictly than other States. See Grossman 199 ("We find strong evidence that more urban states are less likely to shift to 'shall issue' than rural states").

New York and its *amid* present substantial data justifying the State's decision to retain a "may issue" licensing regime. The data show that stricter gun regulations are associated with lower rates of firearm-related death and injury. See, *e.g.,* Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 9-11; Brief for Former Major City Police Chiefs as *Amici Curiae* 9-12; Brief for Educational Fund 25-28; Brief for Social Scientists et al. as *Amici Curiae* 9-19. In particular, studies have shown that "may issue" licensing regimes, like New York's, are associated with lower homicide rates and lower violent crime rates than "shall issue" licensing regimes. For example, one study compared homicide rates [103] across all 50 States during the *103 25-year period from 1991 to 2015 and found that "shall issue" laws were associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates. Siegel, 107 Am. J. Pub. Health, at 1924-1925, 1927. Another study longitudinally followed 33 States that had adopted "shall-issue" laws between 1981 and 2007 and found that the adoption of those laws was associated with a 13%-15% increase in rates of violent crime after 10 years. Donohue, 16 J. Empirical Legal Studies, at 200, 240. Numerous other studies show similar results. See, *e.g.,* Siegel, 36 J. Rural Health, at 261 (finding that "may issue" laws are associated with 17% lower firearm homicide rates in large cities); C. Crifasi et al., Association Between Firearm

Laws and Homicide in Urban Counties, 95 J. Urb. Health 383, 387 (2018) (finding that "shall issue" laws are associated with a 4% increase in firearm homicide rates in urban counties); M. Doucette, C. Crifasi, & S. Frattaroli, Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis (1992-2017), 109 Am. J. Pub. Health 1747, 1751 (Dec. 2019) (finding that States with "shall issue" laws between 1992 and 2017 experienced 29% higher rates of firearm-related workplace homicides); Brief for Social Scientists et al. as *Amici Curiae* 15-16, and nn. 17-20 (citing "thirteen . . . empirical papers from just the last few years linking ["shall issue"] laws to higher violent crime").

JUSTICE ALITO points to competing empirical evidence that arrives at a different conclusion. *Ante,* at 3, n. 1 (concurring opinion). But these types of disagreements are exactly the sort that are better addressed by legislatures than courts. The Court today restricts the ability of legislatures to fulfill that role. It does so without knowing how New York's law is administered in practice, how much discretion licensing officers in New York possess, or whether the proper cause standard differs across counties. And it does so without giving the State an opportunity to develop the *104 evidentiary record to answer those questions. Yet it strikes down New York's licensing regime as a violation of the Second Amendment.

III

A

How does the Court justify striking down New York's law without first considering how it actually works on the ground and what purposes it serves? The Court does so by purporting to rely nearly exclusively on history. It requires "the government [to] affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Ante,* at 10. Beyond this historical inquiry, the Court refuses to employ what it calls "means-end scrutiny." *Ibid.* That is, it

refuses to consider whether New York has a compelling interest in regulating the concealed carriage of handguns or whether New York's law is narrowly tailored to achieve that interest. Although I agree that history can often be a useful tool in determining the meaning and scope of constitutional provisions, I believe the Court's near-exclusive reliance on that single tool today goes much too far.

The Court concedes that no Court of Appeals has adopted its rigid history-only approach. See *ante,* at 8. To the contrary, every Court of Appeals to have addressed the question has agreed on a two-step framework for evaluating whether a firearm regulation is consistent with the Second Amendment. *Ibid.; ante,* at 10, n. 4 (majority opinion) (listing cases from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D. C. Circuits). At the first step, the Courts of Appeals use text and history to determine "whether the regulated activity falls within the scope of the Second Amendment." *Ezell v. Chicago,* 846 F.3d 888, 892 (CA7 2017). If it does, they go on to the second step and consider" 'the strength of the government's justification for restricting or regulating'" the Second *105 Amendment right. *Ibid.* In doing so, they apply a level of "means-ends" scrutiny "that is proportionate to the severity of the burden that the law imposes on the right": strict scrutiny if the burden is severe, and intermediate scrutiny if it is not. *National Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,* 700 F.3d 185, 195, 198, 205 (CA5 2012).

The Court today replaces the Courts of Appeals' consensus framework with its own history-only approach. That is unusual. We do not normally disrupt settled consensus among the Courts of Appeals, especially not when that consensus approach has been applied without issue for over a decade. See Brief for Second Amendment Law Professors as *Amici Curiae* 4, 13-15; see also this Court's Rule 10. The Court attempts to justify its deviation from our normal practice by claiming

that the Courts of Appeals' approach is inconsistent with *Heller.* See *ante,* at 10. In doing so, the Court implies that all 11 Courts of Appeals that have considered this question misread *Heller.*

To the contrary, it is this Court that misreads *Heller.* The opinion in *Heller* did focus primarily on "constitutional text and history," *ante,* at 13 (majority opinion), but it did *not* "rejec[t] . . . means-end scrutiny," as the Court claims, *ante,* at 15. Consider what the *Heller* Court actually said. True, the Court spent many pages in *Heller* discussing the text and historical context of the Second Amendment. 554 U.S., at 579-619. But that is not surprising because the *Heller* Court was asked to answer the preliminary question whether the Second Amendment right to "bear Arms" encompasses an individual right to possess a firearm in the home for self-defense. *Id.,* at 577. The *Heller* Court concluded that the Second Amendment's text and history were sufficiently clear to resolve that question: The Second Amendment, it said, does include such an individual right. *Id.,* at 579-619. There was thus no need for the Court to go further-to look beyond text and history, or to suggest what *106 analysis would be appropriate in other cases where the text and history are not clear.

But the *Heller* Court did not end its opinion with that preliminary question. After concluding that the Second Amendment protects an individual right to possess a firearm for self-defense, the *Heller* Court added that that right is "not unlimited." *Id.,* at 626. It thus had to determine whether the District of Columbia's law, which banned handgun possession in the home, was a permissible regulation of the right. Id., at 628-630. In answering that second question, it said: "Under *any of the standards of scrutiny that we have applied to enumerated constitutional rights,* banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' would fail constitutional muster." *Id.,* at 628-629 (emphasis added; footnote and citation omitted). That language makes clear

that the *Heller* Court understood some form of means-end scrutiny to apply. It did not need to specify whether that scrutiny should be intermediate or strict because, in its view, the District's handgun ban was so "severe" that it would have failed either level of scrutiny. *Id.,* at 628-629; see also *id.,* at 628, n. 27 (clarifying that rational-basis review was not the proper level of scrutiny).

Despite *Heller's* express invocation of means-end scrutiny, the Court today claims that the majority in *Heller* rejected means-end scrutiny because it rejected my dissent in that case. But that argument misreads both my dissent and the majority opinion. My dissent in *Heller* proposed directly weighing "the interests protected by the Second Amendment on one side and the governmental public-safety concerns on the other." *Id.,* at 689. I would have asked "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.,* at 689-690. The majority rejected my dissent, *107 not because I proposed using means-end scrutiny, but because, in its view, I had done the opposite. In its own words, the majority faulted my dissent for proposing "a *freestanding* 'interest-balancing' approach" that accorded with *"none of the traditionally expressed levels* [of scrutiny] (strict scrutiny, intermediate scrutiny, rational basis)." *Id.,* at 634 (emphasis added).

The majority further made clear that its rejection of freestanding interest balancing did *not* extend to traditional forms of means-end scrutiny. It said: "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Ibid.* To illustrate this point, it cited as an example the First Amendment right to free speech. *Id.,* at 635. Judges, of course, regularly use means-end scrutiny, including both strict and intermediate scrutiny, when they interpret or apply the First Amendment. See, *e.g., United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 813

(2000) (applying strict scrutiny); *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 186, 189-190 (1997) (applying intermediate scrutiny). The majority therefore cannot have intended its opinion, consistent with our First Amendment jurisprudence, to be read as rejecting all traditional forms of means-end scrutiny.

As *Heller's* First Amendment example illustrates, the Court today is wrong when it says that its rejection of means-end scrutiny and near-exclusive focus on history "accords with how we protect other constitutional rights." *Ante,* at 15. As the Court points out, we do look to history in the First Amendment context to determine "whether the expressive conduct falls outside of the category of protected speech." *Ibid.* But, if conduct falls within a category of protected speech, we then use means-end scrutiny to determine whether a challenged regulation unconstitutionally burdens that speech. And the degree of scrutiny we apply *108 often depends on the type of speech burdened and the severity of the burden. See, *e.g., Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* 564 U.S. 721, 734 (2011) (applying strict scrutiny to laws that burden political speech); *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to time, place, and manner restrictions); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.,* 447 U.S. 557, 564-566 (1980) (applying intermediate scrutiny to laws that burden commercial speech).

Additionally, beyond the right to freedom of speech, we regularly use means-end scrutiny in cases involving other constitutional provisions. See, *e.g., Church of Lukumi Ba-balu Aye, Inc. v. Hialeah,* 508 U.S. 520, 546 (1993) (applying strict scrutiny under the First Amendment to laws that restrict free exercise of religion in a way that is not neutral and generally applicable); *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 227 (1995) (applying strict scrutiny under the Equal Protection Clause to race-based classifications); *Clark v. Jeter,* 486 U.S. 456, 461 (1988) (applying

intermediate scrutiny under the Equal Protection Clause to sex-based classifications); see also *Virginia v. Moore,* 553 U.S. 164, 171 (2008) ("When history has not provided a conclusive answer, we have analyzed a search or seizure in light of traditional standards of reasonableness").

The upshot is that applying means-end scrutiny to laws that regulate the Second Amendment right to bear arms would not create a constitutional anomaly. Rather, it is the Court's rejection of means-end scrutiny and adoption of a rigid history-only approach that is anomalous.

B

The Court's near-exclusive reliance on history is not only unnecessary, it is deeply impractical. It imposes a task on the lower courts that judges cannot easily accomplish. Judges understand well how to weigh a law's objectives (its *109 "ends") against the methods used to achieve those objectives (its "means"). Judges are far less accustomed to resolving difficult historical questions. Courts are, after all, staffed by lawyers, not historians. Legal experts typically have little experience answering contested historical questions or applying those answers to resolve contemporary problems.

The Court's insistence that judges and lawyers rely nearly exclusively on history to interpret the Second Amendment thus raises a host of troubling questions. Consider, for example, the following. Do lower courts have the research resources necessary to conduct exhaustive historical analyses in every Second Amendment case? What historical regulations and decisions qualify as representative analogues to modern laws? How will judges determine which historians have the better view of close historical questions? Will the meaning of the Second Amendment change if or when new historical evidence becomes available? And, most importantly, will the Court's approach permit judges to reach the outcomes they prefer and then cloak those outcomes in the language of history? See S. Cornell, *Heller,* New Originalism,

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

and Law Office History: "Meet the New Boss, Same as the Old Boss," 56 UCLA L. Rev. 1095, 1098 (2009) (describing "law office history" as "a results oriented methodology in which evidence is selectively gathered and interpreted to produce a preordained conclusion").

Consider *Heller* itself. That case, fraught with difficult historical questions, illustrates the practical problems with expecting courts to decide important constitutional questions based solely on history. The majority in *Heller* undertook 40 pages of textual and historical analysis and concluded that the Second Amendment's protection of the right to "keep and bear Arms" historically encompassed an "individual right to possess and carry weapons in case of confrontation"-that is, for self-defense. 554 U.S., at 592; see also *id.,* at 579-619. Justice Stevens' dissent conducted an *110 equally searching textual and historical inquiry and concluded, to the contrary, that the term "bear Arms" was an idiom that protected only the right "to use and possess arms in conjunction with service in a well-regulated militia." *Id.,* at 651. I do not intend to re litigate *Heller* here. I accept its holding as a matter of *stare decisis.* I refer to its historical analysis only to show the difficulties inherent in answering historical questions and to suggest that judges do not have the expertise needed to answer those questions accurately.

For example, the *Heller* majority relied heavily on its interpretation of the English Bill of Rights. Citing Black-stone, the majority claimed that the English Bill of Rights protected a "'right of having and using arms for self-preservation and defence.'" *Id.,* at 594 (quoting 1 Commentaries on the Laws of England 140 (1765)). The majority interpreted that language to mean a private right to bear arms for self-defense, "having nothing whatever to do with service in a militia." 554 U.S., at 593. Two years later, however, 21 English and early American historians (including experts at top universities) told us in *McDonald v. Chicago,* 561 U.S. 742 (2010), that the *Heller* Court had gotten the history wrong: The English Bill of Rights "did

not . . . protect an individual's right to possess, own, or use arms for private purposes such as to defend a home against burglars." Brief for English/Early American Historians as *Amici Curiae* in *McDonald v. Chicago,* O. T. 2009, No. 08-1521, p. 2. Rather, these *amici* historians explained, the English right to "have arms" ensured that the Crown could not deny Parliament (which represented the people) the power to arm the landed gentry and raise a militia-or the right of the people to possess arms to take part in that militia-"should the sovereign usurp the laws, liberties, estates, and Protestant religion of the nation." *Id.,* at 2-3. Thus, the English right did protect a right of "self-preservation and defence," as Blackstone said, but that right "was to *111 be exercised not by individuals acting privately or independently, but as a militia organized by their elected representatives," *i.e.,* Parliament. *Id.,* at 7-8. The Court, not an expert in history, had misread Blackstone and other sources explaining the English Bill of Rights.

And that was not the *Heller* Court's only questionable judgment. The majority rejected Justice Stevens' argument that the Second Amendment's use of the words "bear Arms" drew on an idiomatic meaning that, at the time of the founding, commonly referred to military service. 554 U.S., at 586. Linguistics experts now tell us that the majority was wrong to do so. See, *e.g.,* Brief for Corpus Linguistics Professors and Experts as *Amid Curiae* (Brief for Linguistics Professors); Brief for Neal Goldfarb as *Amicus Curiae;* Brief for Americans Against Gun Violence as *Amicus Curiae* 13-15. Since *Heller* was decided, experts have searched over 120,000 founding-era texts from between 1760 and 1799, as well as 40,000 texts from sources dating as far back as 1475, for historical uses of the phrase "bear arms," and they concluded that the phrase was overwhelmingly used to refer to "'war, soldiering, or other forms of armed action by a group rather than an individual.'" Brief for Linguistics Professors 11, 14; see also D. Baron,

Corpus Evidence Illuminates the Meaning of Bear Arms, 46 Hastings Const. L. Q. 509, 510 (2019) ("Non-military uses of *bear arms* in reference to hunting or personal self-defense are not just rare, they are almost nonexistent"); *id.,* at 510-511 (reporting 900 instances in which "bear arms" was used to refer to military or collective use of firearms and only 7 instances that were either ambiguous or without a military connotation).

These are just two examples. Other scholars have continued to write books and articles arguing that the Court's decision in *Heller* misread the text and history of the Second Amendment. See generally, *e.g.,* M. Waldman, The Second Amendment (2014); S. Cornell, The Changing Meaning of *112 the Right To Keep and Bear Arms: 1688-1788, in Guns in Law 20-27 (A. Sarat, L. Douglas, & M. Umphrey eds. 2019); P. Finkelman, The Living Constitution and the Second Amendment: Poor History, False Originalism, and a Very Confused Court, 37 Cardozo L. Rev. 623 (2015); D. Walker, Necessary to the Security of Free States: The Second Amendment as the Auxiliary Right of Federalism, 56 Am. J. Legal Hist. 365 (2016); W. Merkel, *Heller* as Hubris, and How *McDonald v. City of Chicago* May Well Change the Constitutional World as We Know It, 50 Santa Clara L. Rev. 1221 (2010).

I repeat that I do not cite these arguments in order to relitigate *Heller.* I wish only to illustrate the difficulties that may befall lawyers and judges when they attempt to rely *solely* on history to interpret the Constitution. In *Heller,* we attempted to determine the scope of the Second Amendment right to bear arms by conducting a historical analysis, and some of us arrived at very different conclusions based on the same historical sources. Many experts now tell us that the Court got it wrong in a number of ways. That is understandable given the difficulty of the inquiry that the Court attempted to undertake. The Court's past experience with historical analysis should

serve as a warning against relying exclusively, or nearly exclusively, on this mode of analysis in the future.

Failing to heed that warning, the Court today does just that. Its near-exclusive reliance on history will pose a number of practical problems. First, the difficulties attendant to extensive historical analysis will be especially acute in the lower courts. The Court's historical analysis in this case is over 30 pages long and reviews numerous original sources from over 600 years of English and American history. *Ante,* at 30-62. Lower courts-especially district courts-typically have fewer research resources, less assistance from *amici* historians, and higher caseloads than we do. They are therefore ill equipped to conduct the type of *113 searching historical surveys that the Court's approach requires. Tellingly, even the Courts of Appeals that have addressed the question presented here (namely, the constitutionality of public carriage restrictions like New York's) "have, in large part, avoided extensive historical analysis." *Young v. Hawaii,* 992 F.3d 765, 784-785 (CA9 2021) (collecting cases). In contrast, lawyers and courts are well equipped to administer means-end scrutiny, which is regularly applied in a variety of constitutional contexts, see *supra,* at 24-25.

Second, the Court's opinion today compounds these problems, for it gives the lower courts precious little guidance regarding how to resolve modern constitutional questions based almost solely on history. See, *e.g., ante,* at 1 (BARRETT, J., concurring) ("highlighting] two methodological points that the Court does not resolve"). The Court declines to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Ante,* at 20. Other than noting that its history-only analysis is "neither a . . . straight] acket nor a . . . blank check," the Court offers little explanation of how stringently its test should be applied. *Ante, at 21.* Ironically, the only two "relevan[t]" metrics that the Court does identify are "how and why" a gun

control regulation "burden[s the] right to armed self-defense." *Ante,* at 20. In other words, the Court believes that the most relevant metrics of comparison are a regulation's means (how) and ends (why)-even as it rejects the utility of means-end scrutiny.

What the Court offers instead is a laundry list of reasons to discount seemingly relevant historical evidence. The Court believes that some historical laws and decisions cannot justify upholding modern regulations because, it says, they were outliers. It explains that just two court decisions or three colonial laws are not enough to satisfy its test. *Ante,* at 37, 57. But the Court does not say how many cases or laws would suffice "to show a tradition of public-carry *114 regulation." *Ante,* at 37. Other laws are irrelevant, the Court claims, because they are too dissimilar from New York's concealed-carry licensing regime. See, *e.g., ante,* at 48-49. But the Court does not say what "representative historical analogue," short of a "twin" or a "dead ringer," would suffice. See *ante, at 21* (emphasis deleted). Indeed, the Court offers many and varied reasons to reject potential representative analogues, but very few reasons to accept them. At best, the numerous justifications that the Court finds for rejecting historical evidence give judges ample tools to pick their friends out of history's crowd. At worst, they create a one-way ratchet that will disqualify virtually any "representative historical analogue" and make it nearly impossible to sustain common-sense regulations necessary to our Nation's safety and security.

Third, even under ideal conditions, historical evidence will often fail to provide clear answers to difficult questions. As an initial matter, many aspects of the history of firearms and their regulation are ambiguous, contradictory, or disputed. Unsurprisingly, the extent to which colonial statutes enacted over 200 years ago were actually enforced, the basis for an acquittal in a 17th-century decision, and the interpretation of English laws from the Middle Ages (to name just

a few examples) are often less than clear. And even historical experts may reach conflicting conclusions based on the same sources. Compare, *e.g.,* P. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Clev. St. L. Rev. 1, 14 (2012), with J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 104 (1994). As a result, history, as much as any other interpretive method, leaves ample discretion to "loo[k] over the heads of the [crowd] for one's friends." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 377 (2012).

Fourth, I fear that history will be an especially inadequate *115 tool when it comes to modern cases presenting modern problems. Consider the Court's apparent preference for founding-era regulation. See *ante,* at 25-28. Our country confronted profoundly different problems during that time period than it does today. Society at the founding was "predominantly rural." C. McKirdy, Misreading the Past: The Faulty Historical Basis Behind the Supreme Court's Decision in *District of Columbia v. Heller*, 45 Capital U. L. Rev. 107, 151 (2017). In 1790, most of America's relatively small population of just four million people lived on farms or in small towns. *Ibid.* Even New York City, the largest American city then, as it is now, had a population of just 33,000 people. *Ibid.* Small founding-era towns are unlikely to have faced the same degrees and types of risks from gun violence as major metropolitan areas do today, so the types of regulations they adopted are unlikely to address modern needs. *Id.,* at 152 ("For the most part, a population living on farms and in very small towns did not create conditions in which firearms created a significant danger to the public welfare"); see also *supra,* at 8-9.

This problem is all the more acute when it comes to "modern-day circumstances that [the Framers] could not have anticipated." *Heller,* 554 U.S., at 721-722 (BREYER, J., dissenting). How can we expect laws and cases that are over a century old

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

to dictate the legality of regulations targeting "ghost guns" constructed with the aid of a three-dimensional printer? See, *e.g.,* White House Briefing Room, FACT SHEET: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has The Leadership It Needs To Enforce Our Gun Laws (Apr. 11, 2022), *https:// whitehouse.gov/briefing-room/statements-releases/2022/* 04/11 /fact-sheet-the-biden-administration-cracks- down-on- ghost- guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/. Or modern laws requiring all gun shops to offer smart guns, which can only be fired by authorized users? See, *e.g.,* N. J. Stat. Ann. §2C:58-2.10(a) *116 (West Cum. Supp. 2022). Or laws imposing additional criminal penalties for the use of bullets capable of piercing body armor? See, *e.g.,* 18 U.S.C. §§921(a)(17)(B), 929(a).

The Court's answer is that judges will simply have to employ "analogical reasoning." *Ante,* at 19-20. But, as I explained above, the Court does not provide clear guidance on how to apply such reasoning. Even seemingly straightforward historical restrictions on firearm use may prove surprisingly difficult to apply to modern circumstances. The Court affirms *Heller's* recognition that States may forbid public carriage in "sensitive places." *Ante,* at 21-22. But what, in 21st-century New York City, may properly be considered a sensitive place? Presumably "legislative assemblies, polling places, and courthouses," which the Court tells us are among the "relatively few" places "where weapons were altogether prohibited" in the 18th and 19th centuries. *Ante,* at 21. On the other hand, the Court also tells us that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines th[at] category . . . far too broadly." *Ante,* at 22. So where does that leave the many locations in a modern city with no obvious

18th- or 19th-century analogue? What about subways, nightclubs, movie theaters, and sports stadiums? The Court does not say.

Although I hope-fervently-that future courts will be able to identify historical analogues supporting the validity of regulations that address new technologies, I fear that it will often prove difficult to identify analogous technological and social problems from Medieval England, the founding era, or the time period in which the Fourteenth Amendment was ratified. Laws addressing repeating crossbows, launcegays, dirks, dagges, skeines, stilladers, and other ancient weapons will be of little help to courts confronting modern problems. And as technological progress pushes *117 our society ever further beyond the bounds of the Framers' imaginations, attempts at "analogical reasoning" will become increasingly tortured. In short, a standard that relies solely on history is unjustifiable and unworkable.

IV

Indeed, the Court's application of its history-only test in this case demonstrates the very pitfalls described above. The historical evidence reveals a 700-year Anglo-American tradition of regulating the public carriage of firearms in general, and concealed or concealable firearms in particular. The Court spends more than half of its opinion trying to discredit this tradition. But, in my view, the robust evidence of such a tradition cannot be so easily explained away. Laws regulating the public carriage of weapons existed in England as early as the 13th century and on this Continent since before the founding. Similar laws remained on the books through the ratifications of the Second and Fourteenth Amendments through to the present day. Many of those historical regulations imposed significantly stricter restrictions on public carriage than New York's licensing requirements do today. Thus, even applying the Court's history-only analysis, New York's law must be upheld because "historical precedent from before, during, and . . . after the

founding evinces a comparable tradition of regulation." *Ante,* at 18 (majority opinion) (internal quotation marks omitted).

A. England.

The right codified by the Second Amendment was" 'inherited from our English ancestors.'" *Heller,* 554 U.S., at 599 (quoting *Robertson v. Baldwin,* 165 U.S. 275, 281 (1897)); see also *ante,* at 30 (majority opinion). And some of England's earliest laws regulating the public carriage of weapons were precursors of similar American 118  laws enacted  *118  roughly contemporaneously with the ratification of the Second Amendment. See *infra,* at 40-42. I therefore begin, as the Court does, *ante,* at 30-31, with the English ancestors of New York's laws regulating public carriage of firearms.

The relevant English history begins in the late-13th and early-14th centuries, when Edward I and Edward II issued a series of orders to local sheriffs that prohibited any person from "going armed." See 4 Calendar of the Close Rolls, Edward I, 1296-1302, p. 318 (Sept. 15, 1299) (1906); *id.,* at 588 (July 16, 1302); 5 *id.,* Edward I, 1302-1307, at 210 (June 10, 1304) (1908); *id.,* Edward II, 1307-1313, at 52 (Feb. 9, 1308) (1892); *id.,* at 257 (Apr. 9, 1310); *id.,* at 553 (Oct. 12, 1312); *id.,* Edward II, 1323-1327, at 560 (Apr. 28, 1326) (1898); 1 Calendar of Plea and Memoranda Rolls of the City of London, 1323-1364, p. 15 (Nov. 1326) (A. Thomas ed. 1926). Violators were subject to punishment, including "forfeiture of life and limb." See, *e.g.,* 4 Calendar of the Close Rolls, Edward I, 1296-1302, at 318 (Sept. 15, 1299) (1906). Many of these royal edicts contained exemptions for persons who had obtained "the king's special licence." See *ibid.;* 5 *id.,* Edward I, 1302-1307, at 210 (June 10, 1304); *id.,* Edward II, 1307-1313, at 553 (Oct. 12, 1312); *id.,* Edward II, 1323-1327, at 560 (Apr. 28, 1326). Like New York's law, these early edicts prohibited public

carriage absent special governmental permission and enforced that prohibition on pain of punishment.

The Court seems to suggest that these early regulations are irrelevant because they were enacted during a time of "turmoil" when "malefactors . . . harried the country, committing assaults and murders." *Ante,* at 31 (internal quotation marks omitted). But it would seem to me that what the Court characterizes as a "right of armed self-defense" would be more, rather than less, necessary during a time of "turmoil." *Ante,* at 20. The Court also suggests that laws that were enacted before firearms arrived in England, like 119  *119  these early edicts and the subsequent Statute of Northampton, are irrelevant. *Ante,* at 32. But why should that be? Pregun regulations prohibiting "going armed" in public illustrate an entrenched tradition of restricting public carriage of weapons. That tradition seems as likely to apply to firearms as to any other lethal weapons-particularly if we follow the Court's instruction to use analogical reasoning. See *ante,* at 19-20. And indeed, as we shall shortly see, the most significant prefirearm regulation of public carriage- the Statute of Northampton-was in fact applied to guns once they appeared in England. See *Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)

The Statute of Northampton was enacted in 1328. 2 Edw. 3, 258, c. 3. By its terms, the statute made it a criminal offense to carry arms without the King's authorization. It provided that, without such authorization, "no Man great nor small, of what Condition soever he be," could "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." *Ibid.* For more than a century following its enactment, England's sheriffs were routinely reminded to strictly enforce the Statute of Northampton against those going armed without the King's permission. See Calendar of the

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

Close Rolls, Edward III, 1330-1333, at 131 (Apr. 3, 1330) (1898); 1 Calendar of the Close Rolls, Richard II, 1377-1381, at 34 (Dec. 1, 1377) (1914); 2 *id.,* Richard II, 1381-1385, at 3 (Aug. 7, 1381) (1920); 3 *id.,* Richard II, 1385-1389, at 128 (Feb. 6, 1386) (1921); *id.,* at 399-400 (May 16, 1388); 4 *id.,* Henry VI, 1441-1447, at 224 (May 12, 1444) (1937); see also 11 Tudor Royal Proclamations, The Later Tudors: 1553-1587, pp. 442-445 (Proclamation 641, 21 Elizabeth I, July 26, 1579) (P. Hughes & J. Larkin eds. 1969).

The Court thinks that the Statute of Northampton "has little bearing on the Second Amendment," in part because *120 it was "enacted . . . more than 450 years before the ratification of the Constitution." *Ante,* at 32. The statute, however, remained in force for hundreds of years, well into the 18th century. See 4 W. Blackstone, Commentaries 148-149 (1769) ("The offence of *riding* or *going armed,* with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; *and is particularly prohibited by the Statute of Northampton"* (first emphasis in original, second emphasis added)). It was discussed in the writings of Blackstone, Coke, and others. See *ibid.;* W. Hawkins, 1 Pleas of the Crown 135 (1716) (Hawkins); E. Coke, The Third Part of the Institutes of the Laws of England 160 (1797). And several American Colonies and States enacted restrictions modeled on the statute. See *infra,* at 40-42. There is thus every reason to believe that the Framers of the Second Amendment would have considered the Statute of Northampton a significant chapter in the Anglo-American tradition of firearms regulation.

The Court also believes that, by the end of the 17th century, the Statute of Northampton was understood to contain an extratextual intent element: the intent to cause terror in others. *Ante,* at 34-38, 41. The Court relies on two sources that arguably suggest that view: a 1686 decision, *Sir John Knight's Case,* and a 1716 treatise written by Serjeant William Hawkins. *Ante,* at 34-37. But

other sources suggest that carrying arms in public was prohibited *because* it naturally tended to terrify the people. See, *e.g.,* M. Dal-ton, The Country Justice 282-283 (1690) ("[T]o wear Armor, or Weapons not usually worn, . . . seems also be a breach, or means of breach of the Peace . . .; *for* they strike a fear and terror in the People" (emphasis added)). According to these sources, terror was the natural consequence-not an additional element-of the crime.

I find this view more persuasive in large part because it is not entirely clear that the two sources 121 the Court relies on *121 actually support the existence of an intent-to-terrify requirement. Start with *Sir John Knight's Case,* which, according to the Court, considered Knight's arrest for walking "'about the streets'" and into a church "'armed with guns.'" *Ante,* at 34 (quoting *Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep., at 76). The Court thinks that Knight's acquittal by a jury demonstrates that the Statute of Northampton only prohibited public carriage of firearms with an intent to terrify. *Ante,* at 34-35. But by now the legal significance of Knight's acquittal is impossible to reconstruct. Brief for Patrick J. Charles as *Amicus Curiae* 23, n. 9. The primary source describing the case (the English Reports) was notoriously incomplete at the time *Sir John Knight's Case* was decided. *Id.,* at 24-25. And the facts that historians can reconstruct do not uniformly support the Court's interpretation. The King's Bench required Knight to pay a surety to guarantee his future good behavior, so it may be more accurate to think of the case as having ended in "a conditional pardon" than acquittal. *Young,* 992 F.3d, at 791; see also *Rex v. Sir John Knight,* 1 Comb. 40, 90 Eng. Rep. 331 (K. B. 1686). And, notably, it appears that Knight based his defense on his loyalty to the Crown, not a lack of intent to terrify. 3 The Entring Book of Roger Morrice 1677-1691: The Reign of James II, 1685-1687, pp. 307-308 (T. Harris ed. 2007).

Similarly, the passage from the Hawkins treatise on which the Court relies states that the Statute of Northampton's prohibition on the public carriage of weapons did not apply to the "wearing of Arms . . . unless it be accompanied with such Circumstances as are apt to terrify the People." Hawkins 136. But Hawkins goes on to enumerate relatively narrow circumstances where this exception applied: when "Persons of Quality . . . wea[r] common Weapons, or hav[e] their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common 122 Fashion to make use *122 of them," or to persons merely wearing "privy Coats of Mail." *Ibid.* It would make little sense if a narrow exception for nobility, see Oxford English Dictionary (3d ed., Dec. 2012), *https://www.oed.com/view/Entry/155878* (defining "quality," A.I.5.a), and "privy coats of mail" were allowed to swallow the broad rule that Hawkins (and other commentators of his time) described elsewhere. That rule provided that "there may be an Affray where there is no actual Violence; as where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People, which is . . . strictly prohibited by [the Statute of Northampton]." Hawkins 135. And it provided no exception for those who attempted to "excuse the wearing such Armour in Publick, by alleging that ... he wears it for the Safety of his Person from . . . Assault." *Id.,* at 136. In my view, that rule announces the better reading of the Statute of Northampton-as a broad prohibition on the public carriage of firearms and other weapons, without an intent-to-terrify requirement or exception for self-defense.

Although the Statute of Northampton is particularly significant because of its breadth, longevity, and impact on American law, it was far from the only English restriction on firearms or their carriage. See, *e.g.,* 6 Hen. 8 c. 13, §1 (1514) (restricting the use and ownership of handguns);

25 Hen. 8 c. 17, §1 (1533) (same); 33 Hen. 8 c. 6, §§1-2 (1541) (same); 25 Edw. 3, st. 5, c. 2 (1350) (making it a "Felony or Trespass" to "ride armed covertly or secretly with Men of Arms against any other, to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance") (brackets and footnote omitted). Whatever right to bear arms we inherited from our English forebears, it was qualified by a robust tradition of public carriage regulations.

As I have made clear, I am not a historian. But if the foregoing facts, which historians and other 123 scholars have *123 presented to us, are even roughly correct, it is difficult to see how the Court can believe that English history fails to support legal restrictions on the public carriage of firearms.

B. The Colonies.

The American Colonies continued the English tradition of regulating public carriage on this side of the Atlantic. In 1686, the colony of East New Jersey passed a law providing that "no person or persons . . . shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province." An Act Against Wearing Swords, &c, ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881). East New Jersey also specifically prohibited "planter[s]" from "rid[ing] or go[ing] armed with sword, pistol, or dagger." *Ibid.* Massachusetts Bay and New Hampshire followed suit in 1692 and 1771, respectively, enacting laws that, like the Statute of Northampton, provided that those who went "armed Offensively" could be punished. An Act for the Punishing of Criminal Offenders, 1692 Mass. Acts and Laws no. 6, pp. 11-12; An Act for the Punishing of Criminal Offenders, 1771 N. H. Acts and Laws ch. 6, §5, p. 17.

It is true, as the Court points out, that these laws were only enacted in three colonies. *Ante,* at 37. But that does not mean that they may be dismissed

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

as outliers. They were successors to several centuries of comparable laws in England, see *supra,* at 34-40, and predecessors to numerous similar (in some cases, materially identical) laws enacted by the States after the founding, see *infra,* at 41-42. And while it may be true that these laws applied only to "dangerous and unusual weapons," see *ante,* at 38 (majority opinion), that category almost certainly included guns, see Charles, 60 Clev. St. L. Rev., at 34, n. 181 (listing 18th century sources defining "'offensive weapons'" to include "'Fire Arms'" and "'Guns'"); *State v. Huntly,* 25 N. C. 418, 422 (1843) *124 (per curiam)* ("A gun is an 'unusual weapon,' wherewith to be armed and clad"). Finally, the Court points out that New Jersey's ban on public carriage applied only to certain people or to the concealed carriage of certain smaller firearms. *Ante,* at 39-40. But the Court's refusal to credit the relevance of East New Jersey's law on this basis raises a serious question about what, short of a "twin" or a "dead ringer," qualifies as a relevant historical analogue. See *ante, at 21* (majority opinion) (emphasis deleted).

C. The Founding Era.

The tradition of regulations restricting public carriage of firearms, inherited from England and adopted by the Colonies, continued into the founding era. Virginia, for example, enacted a law in 1786 that, like the Statute of Northampton, prohibited any person from "go[ing] nor rid[ing] armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." 1786 Va. Acts, ch. 21. And, as the Court acknowledges, "public-carry restrictions proliferate[d]" after the Second Amendment's ratification five years later in 1791. *Ante,* at 42. Just a year after that, North Carolina enacted a law whose language was lifted from the Statute of Northampton virtually verbatim (vestigial references to the King included). Collection of Statutes, pp. 60-61, ch. 3 (F. Martin ed. 1792). Other States passed similar laws in the late-18th and 19th centuries. See, *e.g.,* 1795 Mass. Acts and Laws ch. 2, p. 436; 1801

Tenn. Acts pp. 260-261; 1821 Me. Laws p. 285; *see also Charles,* 60 Clev. St. L. Rev., at 40, n. 213 (collecting sources).

The Court discounts these laws primarily because they were modeled on the Statute of Northampton, which it believes prohibited only public carriage with the intent to terrify. *Ante,* at 41. I have previously explained why I believe *125 that preventing public terror was one *reason* that the Statute of Northampton prohibited public carriage, but not an *element* of the crime. See *supra,* at 37-39. And, consistent with that understanding, American regulations modeled on the Statute of Northampton appear to have been understood to set forth a broad prohibition on public carriage of firearms without any intent-to-terrify requirement. See Charles, 60 Clev. St. L. Rev., at 35, 37-41; J. Haywood, A Manual of the Laws of North-Carolina, pt. 2, p. 40 (3d ed.1814); J. Ewing, The Office and Duty of a Justice of the Peace 546 (1805).

The Court cites three cases considering common-law offenses, *ante,* at 42-44, but those cases do not support the view that only public carriage in a manner likely to terrify violated American successors to the Statute of Northampton. If anything, they suggest that public carriage of firearms was not common practice. At least one of the cases the Court cites, *State v. Huntly,* wrote that the Statute of Northampton codified a pre-existing common-law offense, which provided that "riding or going armed with dangerous or unusual weapons, is a crime against the public peace, *by* terrifying the good people of the land." 25 N. C, at 420-421 (quoting 4 Blackstone, Commentaries, at 149; emphasis added). *Huntly* added that "[a] gun is an 'unusual weapon'" and that "[n]o man amongst us carries it about with him, as one of his every-day accoutrements-as a part of his dress-and never, we trust, will the day come when any deadly weapon will be worn or wielded in our peace-loving and law-abiding State, as an appendage of manly equipment." 25 N. C, at 422. True, *Huntly* recognized that citizens were

nonetheless "at perfect liberty" to carry for "lawful purpose[]"-but it specified that those purposes were "business or amusement." *Id.,* at 422-423. New York's law similarly recognizes that hunting, target shooting, and certain professional activities are proper causes justifying lawful carriage of a firearm. See *supra,* at 12-13. The other two *126 cases the Court cites for this point similarly offer it only limited support-either because the atextual intent element the Court advocates was irrelevant to the decision's result, see *O'Neill v. State,* 16 Ala. 65 (1849), or because the decision adopted an outlier position not reflected in the other cases cited by the Court, see *Simpson v. State,* 13 Tenn. 356, 360 (1833); see also *ante,* at 42-43, 57 (majority opinion) (refusing to give "a pair of state-court decisions" "disproportionate weight"). The founding-era regulations- like the colonial and English laws on which they were modeled-thus demonstrate a longstanding tradition of broad restrictions on public carriage of firearms.

D. The 19th Century.

Beginning in the 19th century, States began to innovate on the Statute of Northampton in at least two ways. First, many States and Territories passed bans on concealed carriage or on any carriage, concealed or otherwise, of certain concealable weapons. For example, Georgia made it unlawful to carry, "unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence." Ga. Code §4413 (1861). Other States and Territories enacted similar prohibitions. See, *e.g.,* Ala. Code §3274 (1852) (banning, with limited exceptions, concealed carriage of "a pistol, or any other description of fire arms"); see also *ante,* at 44, n. 16 (majority opinion) (collecting sources). And the Territory of New Mexico appears to have banned all carriage whatsoever of "any class of pistols whatever," as well as "bowie kni[ves,] . . . Arkansas toothpick[s], Spanish daggers], slung-shot[s], or any other deadly

weapon." 1860 Terr, of N.M. Laws §§1-2, p. 94. These 19th-century bans on concealed carriage were stricter than New York's law, for they prohibited concealed carriage with at most limited exceptions, while New York permits concealed carriage *127 with a lawfully obtained license. See *supra,* at 12. Moreover, as *Heller* recognized, and the Court acknowledges, "the majority of the 19th-century courts to consider the question held that [these types of] prohibitions on carrying concealed weapons *were lawful* under the Second Amendment or state analogues." 554 U.S., at 626 (emphasis added); see also *ante,* at 44.

The Court discounts this history because, it says, courts in four Southern States suggested or held that a ban on concealed carriage was only lawful if open carriage or carriage of military pistols was allowed. *Ante,* at 44-46. (The Court also cites *Bliss v. Commonwealth,* 12 Ky. 90 (1822), which invalidated Kentucky's concealed-carry prohibition as contrary to that State's Second Amendment analogue. *Id.,* at 90-93. *Bliss* was later overturned by constitutional amendment and was, as the Court appears to concede, an outlier. See *Peruta v. County of San Diego,* 824 F.3d 919, 935-936 (CA9 2016); *ante,* at 45.) Several of these decisions, however, emphasized States' leeway to regulate firearms carriage as necessary "to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence." *State v. Smith,* 11 La. 633 (1856); see also *Andrews v. State,* 50 Tenn. 165, 179-180 (1871) (stating that "the right to *keep"* rifles, shotguns, muskets, and repeaters could not be *"infringed* or *forbidden,"* but "[t]heir use [may] be subordinated to such regulations and limitations as are or may be authorized by the law of the land, passed to subserve the general good, so as not to infringe the right secured and the necessary incidents to the exercise of such right"); *State v. Reid,* 1 Ala. 612, 616 (1840) (recognizing that the constitutional right to bear arms "necessarily . . . leave[s] with the Legislature the authority to adopt such regulations of police, as

maybe dictated by the safety of the people and the advancement of public morals"). And other courts upheld concealed-carry restrictions without any reference to an exception allowing *128 open carriage, so it is far from clear that the cases the Court cites represent a consensus view. See *State v. Mitchell,* 3 Blackf. 229 (Ind. 1833); *State v. Buzzard,* 4 Ark. 18 (1842). And, of course, the Court does not say whether the result in this case would be different if New York allowed open carriage by law-abiding citizens as a matter of course.

The second 19th-century innovation, adopted in a number of States, was surety laws. Massachusetts' surety law, which served as a model for laws adopted by many other States, provided that any person who went "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon," and who lacked "reasonable cause to fear an as-sualt *[sic],"* could be made to pay a surety upon the "complaint of any person having reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Other States and Territories enacted identical or substantially similar laws. See, *e.g.,* Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat., ch. 16, §17; W.Va. Code, ch. 153, §8 (1868); 1862 Pa. Laws p. 250, §6. These laws resemble New York's licensing regime in many, though admittedly not all, relevant respects. Most notably, like New York's proper cause requirement, the surety laws conditioned public carriage in at least some circumstances on a special showing of need. Compare *supra,* at 13, with Mass. Rev. Stat., ch. 134, §16.

The Court believes that the absence of recorded cases involving surety laws means that they were rarely enforced. *Ante,* at 49-50. Of course, this may just as well show that these laws were normally followed. In any case, scholars cited by the Court tell us that "traditional case law research is not especially probative of the application of

these restrictions" because "in many cases those records did not survive the passage of time" or "are not well indexed or digitally searchable." E. Ruben & S. Cornell, Firearms *129 Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130-131, n. 53 (2015). On the contrary, "the fact that restrictions on public carry were well accepted in places like Massachusetts and were included in the relevant manuals for justices of the peace" suggests "that violations were enforced at the justice of peace level, but did not result in expensive appeals that would have produced searchable case law." *Id.,* at 131, n. 53 (citation omitted). The surety laws and broader bans on concealed carriage enacted in the 19th century demonstrate that even relatively stringent restrictions on public carriage have long been understood to be consistent with the Second Amendment and its state equivalents.

E. Postbellum Regulation.

After the Civil War, public carriage of firearms remained subject to extensive regulation. See, *e.g.,* Cong. Globe, 39th Cong., 1st Sess., 908 (1866) ("The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons"). Of course, during this period, Congress provided (and commentators recognized) that firearm regulations could not be designed or enforced in a discriminatory manner. See *ibid.;* Act of July 16, 1866, §14, 14 Stat. 176-177 (ensuring that all citizens were entitled to the "full and equal benefit of all laws . . . including the constitutional right to keep and bear arms . . . without respect to race or color, or previous condition of slavery"); see also The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4. But that by-now uncontroversial proposition says little about the validity of nondiscriminatory restrictions on public carriage, like New York's.

New York State Rifle & Pistol Assn., Inc. v. Bruen    No. 20-843 (U.S. Jun. 23, 2022)

What is more relevant for our purposes is the fact that, in the postbellum period, States continued to enact generally applicable restrictions on public carriage, many of *130 which were even more restrictive than their predecessors. See S. Cornell & J. Florence, The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation? 50 Santa Clara L. Rev. 1043, 1066 (2010). Most notably, many States and Western Territories enacted stringent regulations that prohibited *any* public carriage of firearms, with only limited exceptions. For example, Texas made it a misdemeanor to carry in public "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense" absent "reasonable grounds for fearing an [immediate and pressing] unlawful attack." 1871 Tex. Gen. Laws ch. 34, §1. Similarly, New Mexico made it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory." 1869 Terr, of N.M. Laws ch. 32, §1. New Mexico's prohibition contained only narrow exceptions for carriage on a person's own property, for self-defense in the face of immediate danger, or with official authorization. *Ibid.* Other States and Territories adopted similar laws. See, *e.g.,* 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23; 1881 Kan. Sess. Laws §23, p. 92; 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16.

When they were challenged, these laws were generally upheld. P. Charles, The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters, 64 Clev. St. L. Rev. 373, 414 (2016); see also *ante,* at 56-57 (majority opinion) (recognizing that postbellum Texas law and court decisions support the validity of New York's licensing regime); *Andrews,* 50 Tenn., at 182 (recognizing that "a man may well be prohibited from carrying his arms to church, or other public assemblage," and that the carriage of arms other than rifles, shot guns, muskets, and

repeaters "may be prohibited if the Legislature 131 *131 deems proper, absolutely, at all times, and under all circumstances").

The Court's principal answer to these broad prohibitions on public carriage is to discount gun control laws passed in the American West. *Ante,* at 58-61. It notes that laws enacted in the Western Territories were "rarely subject to judicial scrutiny." *Ante,* at 60. But, of course, that may well mean that "[w]e . . . can assume it settled that these" regulations were "consistent with the Second Amendment." See *ante,* at 21 (majority opinion). The Court also reasons that laws enacted in the Western Territories applied to a relatively small portion of the population and were comparatively short lived. See *ante,* 59-61. But even assuming that is true, it does not mean that these laws were historical aberrations. To the contrary, bans on public carriage in the American West and elsewhere constitute just one chapter of the centuries-old tradition of comparable firearms regulations described above.

F. The 20th Century.

The Court disregards "20th-century historical evidence." *Ante,* at 58, n. 28. But it is worth noting that the law the Court strikes down today is well over 100 years old, having been enacted in 1911 and amended to substantially its present form in 1913. See *supra,* at 12. That alone gives it a longer historical pedigree than at least three of the four types of firearms regulations that *Heller* identified as "presumptively lawful." 554 U.S., at 626-627, and n. 26; see C. Larson, Four Exceptions in Search of a Theory: *District of Columbia v. Heller* and Judicial *Ipse Dixit,* 60 Hastings L.J. 1371, 1374-1379 (2009) (concluding that "prohibitions on the possession of firearms by felons and the mentally ill [and] laws imposing conditions and qualifications on the commercial sale of arms'" have their origins in the 20th century); *Ranter v. Barr,* 919 F.3d 437, 451 (CA7 2019) (Barrett, J., 132 dissenting) ("Founding-era legislatures *132 did not strip felons of the right to bear arms simply

because of their status as felons"). Like JUSTICE KAVANAUGH, I understand the Court's opinion today to cast no doubt on that aspect of *Heller's* holding. *Ante,* at 3 (concurring opinion). But unlike JUSTICE KAVANAUGH, I find the disconnect between *Hellers* treatment of laws prohibiting, for example, firearms possession by felons or the mentally ill, and the Court's treatment of New York's licensing regime, hard to square. The inconsistency suggests that the Court today takes either an unnecessarily cramped view of the relevant historical record or a needlessly rigid approach to analogical reasoning.

* * *

The historical examples of regulations similar to New York's licensing regime are legion. Closely analogous English laws were enacted beginning in the 13th century, and similar American regulations were passed during the colonial period, the founding era, the 19th century, and the 20th century. Not all of these laws were identical to New York's, but that is inevitable in an analysis that demands examination of seven centuries of history. At a minimum, the laws I have recounted *resembled* New York's law, similarly restricting the right to publicly carry weapons and serving roughly similar purposes. That is all that the Court's test, which allows and even encourages "analogical reasoning," purports to require. See *ante, at 21* (disclaiming the necessity of a "historical *twin").*

In each instance, the Court finds a reason to discount the historical evidence's persuasive force. Some of the laws New York has identified are too old. But others are too recent. Still others did not last long enough. Some applied to too few people. Some were enacted for the wrong reasons. Some may have been based on a constitutional rationale that is now impossible to identify. Some arose in historically unique circumstances. And some are [133] not sufficiently *133 analogous to the licensing regime at issue here. But if the examples discussed above, taken together, do not show a tradition and

history of regulation that supports the validity of New York's law, what could? Sadly, I do not know the answer to that question. What is worse, the Court appears to have no answer either.

V

We are bound by *Heller* insofar as *Heller* interpreted the Second Amendment to protect an individual right to possess a firearm for self-defense. But *Heller* recognized that that right was not without limits and could appropriately be subject to government regulation. 554 U.S., at 626-627. *Heller* therefore does not require holding that New York's law violates the Second Amendment. In so holding, the Court goes beyond *Heller.*

It bases its decision to strike down New York's law almost exclusively on its application of what it calls historical "analogical reasoning." *Ante,* at 19-20. As I have admitted above, I am not a historian, and neither is the Court. But the history, as it appears to me, seems to establish a robust tradition of regulations restricting the public carriage of concealed firearms. To the extent that any uncertainty remains between the Court's view of the history and mine, that uncertainty counsels against relying on history alone. In my view, it is appropriate in such circumstances to look beyond the history and engage in what the Court calls means-end scrutiny. Courts must be permitted to consider the State's interest in preventing gun violence, the effectiveness of the contested law in achieving that interest, the degree to which the law burdens the Second Amendment right, and, if appropriate, any less restrictive alternatives.

The Second Circuit has previously done just that, and it held that New York's law does not violate the Second Amendment. *See Kachalsky,* 701 F.3d, at 101. It first evaluated the degree to which the [134] law burdens the Second *134 Amendment right to bear arms. *Id.,* at 93-94. It concluded that the law "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public," but does not burden the right to

possess a firearm in the home, where *Heller* said "'the need for defense of self, family, and property is most acute.'" *Kachalsky,* 701 F.3d, at 93-94 (quoting *Heller,* 554 U.S., at 628). The Second Circuit therefore determined that the law should be subject to heightened scrutiny, but not to strict scrutiny and its attendant presumption of unconstitutionality. 701 F.3d, at 93-94. In applying such heightened scrutiny, the Second Circuit recognized that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." *Id.,* at 97. I agree. As I have demonstrated above, see *supra,* at 3-9, firearms in public present a number of dangers, ranging from mass shootings to road rage killings, and are responsible for many deaths and injuries in the United States. The Second Circuit then evaluated New York's law and concluded that it is "substantially related" to New York's compelling interests. *Kachalsky,* 701 F.3d, at 98-99. To support that conclusion, the Second Circuit pointed to "studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." *Id.,* at 99. We have before us additional studies confirming that conclusion. See, *e.g., supra,* at 19-20 (summarizing studies finding that "may issue" licensing regimes are associated with lower rates of violent crime than "shall issue" regimes). And we have been made aware of no

less restrictive, but equally effective, alternative. After considering all of these factors, the Second Circuit held that New York's law does not unconstitutionally burden the right to bear arms under the Second Amendment. I would affirm that holding. *135 \*135

New York's Legislature considered the empirical evidence about gun violence and adopted a reasonable licensing law to regulate the concealed carriage of handguns in order to keep the people of New York safe. The Court today strikes down that law based only on the pleadings. It gives the State no opportunity to present evidence justifying its reasons for adopting the law or showing how the law actually operates in practice, and it does not so much as acknowledge these important considerations. Because I cannot agree with the Court's decision to strike New York's law down without allowing for discovery or the development of any evidentiary record, without considering the State's compelling interest in preventing gun violence and protecting the safety of its citizens, and without considering the potentially deadly consequences of its decision, I respectfully dissent.

 casetext

# EXHIBIT 02

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
-------------------------------:

CAVALIER D. KNIGHT,             : Case No.: 22-cv-10755

                 Plaintiff, :

     v.                         :

CITY OF NEW YORK,               : New York, New York

                 Defendant. : November 9, 2023

-------------------------------:



      TRANSCRIPT OF STATUS CONFERENCE HEARING

    BEFORE THE HONORABLE VALERIE FIGUEREDO

        UNITED STATES MAGISTRATE JUDGE




APPEARANCES:

For Plaintiff:          CAVALIER D. KNIGHT
                        511 W. 165th Street - #627
                        New York, New York 10032

For Defendant:          NEW YORK CITY LAW DEPARTMENT
                        BY:  Nicholas Ciappetta, Esq.
                        100 Church Street
                        New York, New York 10003
```

```
Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

    AMM TRANSCRIPTION SERVICE - 631.334.1445
```

71

# [PAGE 2]

1            THE DEPUTY CLERK:  Good afternoon, Your

2  Honor.  This is a matter of Knight v. City of New

3  York.

4            Plaintiff, can you please make your

5  appearance for the record.

6            MR. KNIGHT:  Cavalier D. Knight.

7            THE DEPUTY CLERK:  Defense?

8            MR. CIAPPETTA:  Good afternoon, Your

9  Honor.  Nicholas Ciappetta, senior counsel with the

10  Office of the Corporation Counsel for defendant.

11            I'm also joined by my colleague from my

12  office, Leah Rice, who's not admitted to this court

13  and is waiting admission for state court, but she

14  just joined because she wanted to come witness the

15  proceedings.

16            THE COURT:  Well, good afternoon to

17  everyone, and I really do appreciate everyone being

18  here.  I'm hoping this won't take too long.

19            But what I really wanted to address was

20  Mr. Knight's Second Amendment claim as it pertains

21  to what I understand him to be challenging, which is

22  the number of handguns he can have on a carry

23  license.  And I understand the City, in their motion

24  papers -- in their motion to dismiss, indicates that

25  the City regulation at issue here, 38 RCNY

# [PAGE 3]

1    5-25(d)(4)(i), doesn't violate the Second Amendment.
2    But I wanted to talk through that a bit, because my
3    understanding of the landscape post *Bruen* is that
4    there really is no dispute here that the conduct
5    he's challenging would be at the core of what the
6    Second Amendment protection is.  And my
7    understanding of the test following *Bruen* is that it
8    would be the government's burden to identify a
9    historical analogue that would be, not the twin of
10   whatever the city regulation, but something
11   analogous to that dates back, you know, a regulation
12   from the time of the founding or sometime near then.
13            But it struck me from the briefing, from
14   the City's motion, that it almost was pointing to
15   Knight, and it seemed to shift the burden on him to
16   explain why the regulation was somehow infringing
17   his rights.
18            And so, you know, we spent some time
19   looking at cases to see if there was anything, like,
20   factually similar, and we didn't find anything.  So
21   I just wanted to talk through this, because on a
22   motion to dismiss where he points to a City rule, I
23   know *Bruen*, it's 2022 decision, so there's not many
24   cases interpreting it.
25            But given the procedural posture of the

AMM TRANSCRIPTION SERVICE - 631.334.1445

# [PAGE 4]

1   case, I wanted to discuss what the City's argument

2   really is for dismissal of this claim.

3          And, Mr. Knight, I understand you're pro

4   se, and I'm going to give you an opportunity to

5   speak.  So at any time, once Mr. Ciappetta is done,

6   you'll have ample opportunity to respond --

7          MR. KNIGHT:  Thank you.

8          MR. CIAPPETTA:  Thank you, Your Honor.

9          And our argument is directed at the first

10   step of the *Bruen* test.  You're correct that if

11   plaintiff satisfies his pleading burden at the first

12   step, then it would be up to the City to identify

13   historical analogues.  But *Bruen* also requires a

14   first step.  And at that first step, the plaintiff

15   must identify his or her proposed course of conduct

16   and show through the text of the Second Amendment

17   that that proposed course of conduct finds

18   protection in the text of the Second Amendment.

19          And our argument is that this is not core

20   Second Amendment conduct, and it doesn't implicate

21   the Second Amendment.

22          THE COURT:  So I understand Mr. Knight to

23   be saying that he should not be restricted in the

24   number of handguns he can carry in public.

25          MR. CIAPPETTA:  I think it's a little

5

```
1    more nuanced.  You're correct in pointing to
2    5-25(d)(4).  That is a regulation with respect to
3    how many guns can be listed on your particular
4    license.
5               THE COURT:  On the carry license?
6               MR. CIAPPETTA:  On the carry license.
7               THE COURT:  Which would allow him to
8    carry them outside of the home?
9               MR. CIAPPETTA:  Correct.  But there's a
10   separate rule that says you can only -- in
11   5-22(a)(7), that talks about you can only carry one
12   at a time.  This rule, all it does -- that he's
13   challenging is, it only regulates with respect to
14   how many guns you can actually list on your license.
15              So, Your Honor, we provided a declaration
16   in support of our motion, and I think that it helps
17   if you look at that.  Our Exhibit A has a copy of
18   his various licenses.  It has his carry license, his
19   premise license and his rifle/shotgun.  And then it
20   shows on the back of that license card the guns that
21   correspond with that particular license.
22              So all this regulation says is you can
23   only list two guns on the back of your carry
24   license.
25              THE COURT:  So how would it work if he
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    wanted to walk out of the house with three guns?

2              MR. CIAPPETTA:  He would not be allowed

3    to.

4              THE COURT:  Okay.

5              MR. CIAPPETTA:  That's from a separate

6    rule, though.  That separate rule says you can only

7    carry one on your person at a time.  This is really

8    just a rule as to how many guns you can list on any

9    license.  Because if you go further down, right, he

10   also had a premise residence license, which I

11   believe has now been expired because he hasn't paid

12   the renewal fee.  That says you can have one

13   handgun, except additional shall be added.  So

14   really, you can have, in effect -- there's not

15   really a cap on how many you can have on your

16   premise residence, which is to safeguard your home.

17              So really, it's two separate rules.  This

18   rule is just how many you can actually list on your

19   license.  And that's why we view this as really --

20   this is a ministerial requirement that doesn't go to

21   the core of the Second Amendment.

22              THE COURT:  And this is the one that

23   restricts how many guns you can list on the license

24   is 5-25(d)(4)?

25              MR. CIAPPETTA:  That's correct.


          AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1              THE COURT:  And which is the one that
2    restricts how many guns you can walk out of the
3    house with?
4              MR. CIAPPETTA:  5-22(a)(7).  Now, that's
5    not being challenged here.  We don't think that goes
6    to the core either.  But I'm not going to argue that
7    because that would be a separate case.  But we don't
8    think that goes to the core either.
9              So our argument is simply at the first
10   step, right, the plaintiff does have a burden under
11   Bruen.  He just can't say, I challenge this.  The
12   ball is in the court of the government.  He has to
13   establish -- that first step means something, right.
14             In Bruen it was fairly simple because,
15   quite clearly, it regulated core area, right.  The
16   regulation at issue in Bruen said an ordinary
17   law-abiding person couldn't carry in public unless
18   they demonstrated a special need.  Nobody would
19   dispute that that implicated the Second Amendment
20   there, right.  Very clearly it did, because it
21   prevented ordinary people from being able to carry
22   in the same way that Heller prevented ordinary
23   people from being able to have a gun at all in their
24   home because there was a flatout prohibition in
25   Heller and then in McDonald on having any gun in
```

1    your home.  That's not the case in this case.

2            We're so far afield from what happened in

3    *Bruen* and *Heller* and *McDonald*.  This doesn't

4    implicate somebody's ability to possess a gun, to

5    defend themself in the home, or to possess a gun and

6    carry the gun to defend themself in public.

7            So we're saying at the first step here,

8    he needs to demonstrate that the proposed conduct,

9    which needs to be defined by the plaintiff, which he

10   hasn't really defined it as, and then you have to

11   show that that proposed conduct meets the textual

12   definition of the Second Amendment, right.

13           The *Bruen* Court said that this is a text

14   and history test, right.  The first step is the

15   text.  Look at the text.  And then if it's

16   protected, then you get to the history, right, and

17   then the burden is on us.  But there's an initial

18   pleading burden that's on the plaintiff.  And that's

19   why we've made a motion to dismiss.  We say he

20   hasn't satisfied that because he, one, hasn't

21   defined his proposed conduct; two, if he's defined

22   it, it's at a level of generality that's improper.

23   And when properly defined, which is really -- we

24   really think the proposed conduct here is the

25   ability to have an unlimited number of guns on your

         AMM TRANSCRIPTION SERVICE - 631.334.1445

1    carry license.  That doesn't implicate the Second
2    Amendment.  Not every regulation implicates the
3    Second Amendment.  And we think that's very clear
4    from the *Bruen* case itself.
5             *Bruen* drew a distinction, Your Honor,
6    between New York's special need requirement -- that
7    was in penal law 400 at the time -- that, as we
8    said, quite clearly implicated the Second Amendment.
9    But then they talked about, "shall issue licensing
10   regimes," and they said those are presumptively
11   constitutional.  They did that without any resort to
12   history, because in that case, a "shall issue
13   licensing regime" is just designed to see whether a
14   law-abiding person can exercise the right to carry.
15            So really, we're saying it implicates the
16   Second Amendment if it implicates your ability to
17   carry or possess, which this doesn't do.  These are
18   really very different regulations that were issued
19   in there.  These are ancillary, almost ministerial
20   requirements.  And that is clear by a case that was
21   fairly recently decided by Judge Rakoff.  It's not
22   exactly the same, but it's instructive, *United*
23   *States v. Libertad*.  And it was decided in July.
24   And they were evaluating a federal law there.  But
25   they're saying that not every statute infringes the

# [PAGE 10]

1    right to keep and bear arms, so long as they aren't

2    applied to prevent law-abiding citizens from

3    obtaining and carrying guns.

4         And they then themselves note that the

5    majority opinion in the concurrence in *Bruen*

6    indicated "the likely constitutionality of shallow

7    issue regimes without any historical analysis."

8    Because you don't trigger *Bruen* and the need to go

9    into history if, on its face, the regulation doesn't

10   prevent somebody from being able to keep and bear

11   arms.

12        And these regulations don't do that. To

13   protect yourself in the home, you need a firearm,

14   right. The City is not preventing anyone from

15   getting a firearm to keep in their home and to use

16   it if necessary. And similarly, the City's

17   regulations are not preventing anyone from taking a

18   firearm in public, carrying it on their person to

19   defend themself in the event of a confrontation.

20   That's not what these regulations do at all.

21        These regulations just control how many

22   you can list on each license. You can have two on a

23   carry, one of which can be carried in public and one

24   of which, obviously, can be used to defend yourself

25   in public. And you can have many on your premise

# [PAGE 11]

1    residence, which you can use then to defend yourself
2    in the home.  And you can also then, with the PD's
3    permission, switch guns that are listed on your
4    premise from your premise to your carry, and vice
5    versa, if you want as well.
6              THE COURT:  Is there any restriction on
7    the number of guns that can be listed on the
8    premises residence license?
9              MR. CIAPPETTA:  The Regulation 5-25, Your
10   Honor, (d)(vi) says one handgun, but then it says,
11   except that additional handguns shall be approved
12   upon request after licensee shows appropriate levels
13   of safeguarding.
14             So, in practice, there's no real
15   discretion in there, right.  It's not like you're
16   applying for it.  It's going to be done as a matter
17   of course.
18             THE COURT:  And the Judge Rakoff
19   decision, do you have a cite for it?
20             MR. CIAPPETTA:  Yeah.  2023 U.S. District
21   117057.
22             THE COURT:  Do you have a date?
23             MR. CIAPPETTA:  Yeah, July 7, 2023.  And
24   that was a case where they decided it at step one.
25   And there's other cases, too, where it's decided it

AMM TRANSCRIPTION SERVICE - 631.334.1445

# [PAGE 12]

1    at the step one.  You know, the plaintiff can't just
2    bring a case, say I'm challenging this rule, and the
3    burden shifts to us.  There is still a step-one
4    analysis that must be done by the Court and the
5    plaintiff.
6            The plaintiff must define their proposed
7    conduct in step one, and then once they define the
8    proposed conduct, show that that fits within the
9    protection of the text of the Second Amendment.
10           If done so, then you're correct, the
11   burden shifts to the City in this case, or the
12   government in other cases, to find historical
13   analogues.
14           But as Judge Rakoff said there, there
15   were no historical analogues needed.  And likewise,
16   we don't believe there's any historical analogues
17   here, because, if anything, this is a ministerial
18   burden, and not every burden requires that
19   historical analysis.
20           And the Court in *Libertad*, too, was
21   citing to the Second Circuit's case in *DeCastro*,
22   which was pre-*Bruen*, but still should be good for
23   the notion that certain things don't go to the core
24   of Second Amendment conduct.  And this doesn't go to
25   the core because the core, after *Bruen*, and

# [PAGE 13]

1   obviously we're waiting on *Rahimi*, but the core
2   after *Bruen*, the core right is that an ordinary
3   law-abiding person should have the ability to
4   possess a gun in the home, to defend themself in the
5   home in the event of a confrontation, or to defend
6   themself in public in the event of a confrontation.
7           And the City's rules allow that because
8   they allow people to acquire guns in order to do so,
9   right.  Our regulation doesn't regulate the
10  acquisition of the guns, and it doesn't regulate the
11  possession or the carrying.  It also doesn't say who
12  may carry or where they may carry.  So this is a
13  very, very limited regulation.
14          THE COURT:  Thank you, Mr. Ciappetta.
15          Mr. Knight, is there anything you want to
16  add?
17          MR. KNIGHT:  Yes.  First -- excuse me --
18  I would like to say, under the state Penal Law
19  402(f), which is the law that allows you to carry
20  firearms, it says, "Having carry concealed without
21  regard to employment of place of possession, subject
22  to the restrictions of state and federal law by any
23  person."  It says nothing about amount of firearms
24  you can carry.  It says nothing about subject to
25  restrictions of local law.  It doesn't give you a

1   number.

2           Now, I'm going to elaborate on what he

3   stated.  We originally have premises licenses, which

4   allows you to keep firearms in your home within a

5   safe.  You could take them to the range in a locked

6   container, bring them back in a locked container,

7   put them back in a safe.  You couldn't carry them at

8   all.  Now that we have carry licenses, you are

9   limited to only two firearms on a carry license.

10          So I'm going to break it down.  A premise

11  license allows you to keep firearms, but it doesn't

12  allow you to bear them, because you can't carry any

13  of those firearms outside the home.  No firearm on

14  that license can be carried.

15          So the Second Amendment is being split

16  into two separate entities.  If you have a carry

17  license, you can only have two firearms on that

18  license, which means if I want to possess a third

19  license -- let's say I didn't even have a premise

20  license, I can't acquire a third firearm because a

21  carry license will only allow me to possess two.

22  Therefore, it prohibits me from acquiring and

23  possessing a third license.

24          THE COURT:  A third license, or --

25          MR. KNIGHT:  I mean, sorry, a third

1    firearm.

2            THE COURT:  But couldn't you acquire that

3    third firearm under your premises license?

4            MR. KNIGHT:  But I can't carry it.  So

5    now I'm being prohibited from carrying that firearm.

6    You can't carry them.

7            THE COURT:  But you don't dispute -- so

8    as I understand the complaint here, you're

9    challenging the restriction, the specific rule

10   5-25(d)(4) that limits how many handguns you can

11   list on your carry license.

12           MR. KNIGHT:  That's part of the

13   complaint.  That's the part you're addressing.  But

14   that's not the entirety of the complaint.

15           THE COURT:  So let's take that component.

16   As to that component, you don't dispute that you can

17   own more than the two that can be listed on your

18   carry business license.  You just would have to have

19   them under the state premises license, and you

20   couldn't walk out the door with those two?

21           MR. KNIGHT:  Correct.  That part, the

22   premise license allows that.  But -- I'm sorry.

23           THE COURT:  No, go ahead.

24           MR. KNIGHT:  There's no other state or

25   locality that I'm aware of that has two licenses.

1    There's no other state or locality that has a
2    license to keep and a license to bear.
3           THE COURT:  But that's okay, because New
4    York City doesn't have to follow what other state or
5    localities do.
6           MR. KNIGHT:  And even though I included
7    other law-abiding citizens in my case, because it's
8    a facial challenge, if someone was to possess a
9    carry license and they wanted to acquire a third
10   firearm, they can only possess two.
11          They shouldn't be forced to purchase a
12   secondary license just to keep a gun in a safe that
13   you can't do anything with.  If I have a carry
14   firearm, I don't really need a gun stuck in a safe
15   that I can't carry on me in the home because my
16   carry firearm can be used to protect the home as
17   well, but I can't purchase a third firearm.  So it
18   limits the right to possess.  Everyone didn't have a
19   premise license prior to *Bruen*.
20          So people acquiring carry licenses are
21   now prohibited from possessing more than three
22   licenses -- I mean, sorry, three firearms, unless
23   they acquire a totally new license.  And there's no
24   lawful reason for that under the penal law.  It
25   prohibits possession of more than two firearms, and

AMM TRANSCRIPTION SERVICE - 631.334.1445

 1    it's at the discretion of the NYPD.  Not being

 2    fringe means not being fringe.  It doesn't mean at

 3    the discretion.  He even said the NYPD grants you

 4    permission.

 5              Under the First Amendment Right, you

 6    can't say you can speak two times, but no more than

 7    three times, because we're limiting you to two

 8    things that you can say.  It's a constitutional

 9    right.

10              Now, what we're confusing here -- I'm not

11    arguing I should be allowed to carry 20 firearms on

12    me at once.  That's not the gist of what I'm saying.

13    What I'm saying is, I should be able to list all my

14    firearms on my carry license, even if they wanted to

15    say, you have 20 firearms, you can only carry two of

16    those 20 at any given time, but you choose which

17    two.  They're saying you can only carry two.  And if

18    you have a carry license, you cannot possess or

19    acquire another firearm under that license.

20    Everybody doesn't have a premise license.  Everybody

21    can't afford two licenses.  So that's the gist of

22    that.  It's a Second Amendment violation.

23              Also, because to acquire --

24              THE COURT:  I'm sorry to interrupt, but I

25    just want to make sure I totally understand this.

1          So your Second Amendment claim is that
2    you should be able to list as many handguns as you
3    want on the carry license, but the City would be
4    able to restrict you to walking out the door with
5    two, but you should be able to pick which two out of
6    however many you own.
7          MR. KNIGHT:  Okay.  I'm going to
8    elaborate on that.
9          Under the Second Amendment, that probably
10   will be flawed, but I'm not going to fight that
11   here.  But I'm saying that would be more relatable
12   than what they're stating.  I'm not necessarily
13   saying that's the way it should be.  But even if
14   they said, we're only going to let you carry two,
15   you can possess as many firearms as you choose, but
16   you can only walk out the door with two.  I'm not
17   arguing I need to walk out the door with more than
18   two firearms.  I'm saying once I have this carry
19   license, I can't acquire another firearm.
20         Like he said, my piece, claiming that my
21   premises expired is actually on hold.  But if it was
22   to expire, my other handguns on that premise license
23   get confiscated and destroyed because I cannot
24   transfer them to my carry license.  So now my
25   personal property is being taken and destroyed

         AMM TRANSCRIPTION SERVICE - 631.334.1445

1    because I say, well, why do I need a carry and a

2    premise if the carry fulfills the same purpose that

3    the premise does?  What do I need the premise

4    license for?

5              THE COURT:  But I thought I heard you say

6    that you are not arguing that you should be allowed

7    to walk out the door with more than one handgun.

8              MR. KNIGHT:  I mean, if you want to look

9    at it under the Second Amendment aspect, that would

10   be true, but that's not the gist of what I'm

11   fighting.  I'm not saying I want to take 13 guns

12   outside with me, they're stopping me.

13             I'm saying, if I have a carry license, I

14   shouldn't have to renew my premise license.  I don't

15   need that anymore.  All my firearms can be on my

16   carry.  If they choose to limit me to taking two

17   outside with me, any two of my choice, that's fine.

18   That's a fight for another day.

19             THE COURT:  Okay.

20             MR. KNIGHT:  That's fine, but there's

21   just no need for two licenses.  It serves absolutely

22   no purpose whatsoever.

23             And also, I wanted to say under the

24   Second Amendment, because he said I need to meet

25   this first step of *Bruen*, to acquire a firearm in

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    the City of New York, you have to acquire a license.

2    So getting a carry license is part of the plain text

3    of the Second Amendment, acquiring a firearm.

4    Because you can't possess it without the license.

5    So that is the first step of the Second Amendment.

6    You can't acquire the firearm without either a

7    premise or a carry license.

8              THE COURT:  But the license after *Bruen*,

9    there's no test.  The City's former test that

10   required, you know, a showing of special need or

11   good cause for having the carry license permit is no

12   longer the case.

13             MR. KNIGHT:  I'm not arguing a proper

14   cause.  I'm just saying the license is a step to

15   possess.  You have to get the license to get the

16   firearm.  So under Second Amendment is possessing

17   firearms, right.  So the step to possess is to first

18   get the license to allow you to possess.  So it's

19   right in the middle.  You can't remove it from the

20   plain text of the Second Amendment, because without

21   acquiring a license, you can't possess a firearm.

22             So it's a law that controls how you

23   acquire and possess firearms.  So that is the very

24   core of the Second Amendment Right.

25             THE COURT:  But *Bruen* seems to suggest

1      that the state can issue regulations.  They shall
2      issue regulations, and those would be permissible as
3      long as there's no litmus test that requires a
4      showing of either good moral character or good cause
5      or things that would give the City some discretion
6      in denying the license.
7              MR. KNIGHT:  True.  As long as those laws
8      are analogous or have a similarity to the
9      ratification of the Second Amendment in 1791.
10             In 1791, if you want to get technical,
11     there were no gun licenses.  There was no need to
12     possess a license at all.  That's not the argument
13     here.  But if you want to go into the plain text of
14     the Second Amendment, there were no firearm licenses
15     needed to acquire firearms at all, for premise or to
16     carry.
17             So I'm not fighting that argument.  But
18     if I were to lose my premise license, all my guns on
19     that hand license -- all my firearms on that license
20     are now confiscated and destroyed.  I can't put them
21     on my carry license.  I'm not getting any money for
22     it.  I'm not getting paid for it.  And to anybody
23     who now says, well, I can get a carry license in New
24     York, the City has no authority to limit you to
25     possess only two items.  The Second Amendment does

```
1   not restrict how many firearms you can own.  The
2   City has no authority to say you can only have two.
3              Their argument seems to be, if we allow
4   you to possess a firearm, we've met our parameter.
5   We're not saying you have to get two, three, four,
6   five.  If we let you do it one time, your
7   constitutional right has been satisfied.  You can't
8   limit a constitutional right to one time.  You don't
9   get one time to speak under the First Amendment.
10  They're trying to limit it.  Well, if we allowed you
11  to do it, we've met our burden.  But it's an
12  unlimited right.  There's no limit.  There's no
13  number they can put on it.
14             We're not Westchester.  But Westchester
15  County has no such limit.  If I have a gun, and I
16  want to purchase ten more guns in one day, they have
17  a document that lists each firearm I purchase.  I
18  take it to the Westchester County Department that
19  handles guns.  They add it to your license.  Once
20  the little license card can't fit any more firearms
21  on it, they give you an additional card, and you go
22  about your business.
23             THE COURT:  And in Westchester, these are
24  carry licenses?
25             MR. KNIGHT:  Yes.
```

1        THE COURT:  Okay.  But you don't dispute

2   that nothing in *Bruen* indicates that New York City

3   has to do it the way that Westchester does it?

4        MR. KNIGHT:  Not unless it's an

5   infringement on the Second Amendment Right to keep

6   and bear.  If it's in the totality and infringement,

7   everyone's supposed to do it the same way.  Do they

8   have to specifically do it the way that Westchester

9   does it?  I'm not stating that.  But my question to

10  them is, what is the purpose of the parameters?

11  What do these parameters support?  Why are they

12  there?  Why are we doing it this way?

13        We just do basically whatever we want to

14  do.  If we come up with it, and that's what we want

15  to do, it makes it discretionary.  He even said, the

16  NYPD gives you permission.  So on my premise

17  license, it's not technically unlimited.  I can

18  possess more than one firearm, but the NYPD License

19  Division has to authorize it.

20        If the officer in the License Division

21  says, well, Mr. Knight, we're not allowing you to

22  get any more than four handguns, they have the right

23  to say that.  So they would be prohibiting me.  It's

24  discretionary.

25        THE COURT:  But I thought it was

AMM TRANSCRIPTION SERVICE - 631.334.1445

24

1    discretionary only to the extent that you have to
2    show proper safekeeping in the home, like proper
3    storage.  But it's not really discretionary in that
4    they can look at just anything to deny the
5    additional weapons on the state --
6              MR. KNIGHT:  They can state that, well,
7    why do you need to have 21 firearms?  You already
8    have 20.  They have the right to do that.  It's
9    discretionary.  I applied for my first carry license
10   in 2014.  I've been fighting this a long time.  And
11   I'm also a federally-licensed firearms dealer, so
12   I'm well versed in firearm laws throughout the
13   country.  It's discretionary.  Because -- the reason
14   that makes it discretionary on its face is you have
15   to acquire a purchase authorization from them.
16              If I want a new firearm, I have to
17   contact the License Division, tell them which
18   firearm I want to purchase, and they have to
19   authorize it by sending me a purchase authorization
20   form.  If they choose not to send me that form, I
21   can't acquire a firearm.  They're not obligated to
22   send me that form.  They can say yes or no.  So I
23   have to get authorization from them.  So it's still
24   discretionary.  It's at the discretion of the
25   licensing officer, even if they don't use proper

 1    cause.  They can just simply decide, you don't need

 2    more than 20 guns.  We're not giving you an

 3    authorization form to get another one.  You have to

 4    get permission to start with.  If there's any

 5    permission, it's always going to make it subjective

 6    or discretionary because somebody has to say yes or

 7    no.

 8              THE COURT:  I've never purchased a gun,

 9    so excuse me, I just don't know.  But you need to

10    ask the NYPD before you can buy a gun?

11              MR. KNIGHT:  Yes, you have to get a

12    purchase authorization.  That's within my case.  You

13    can email them now.  You tell them -- it's a

14    document that they have.  You put the caliber, the

15    type of firearm you want to get, you fill it in, you

16    send it to them.  If they authorize it, you have to

17    come in and pick up a purchase authorization form

18    from them.  You have to sign for the form.  It's

19    good for 30 days.  If you don't purchase a firearm

20    within 30 days, you have to bring the form back, and

21    you can get it extended for an additional ten days.

22    If not, you have to turn it back into them.  But

23    without that purchase authorization, you can't

24    acquire firearm.  So you have to get permission from

25    them.

          AMM TRANSCRIPTION SERVICE - 631.334.1445

1          Any other state that I'm aware of, you go

2     in a gun store, you show your license, if they have

3     license, and some states are constitutional, they

4     have no license, you purchase your firearm.

5          I have to get permission from the NYPD.

6     I have to take that purchase authorization to the

7     gun store, give it to them for them to fill out

8     before I can acquire that firearm from them.  And

9     once I acquire that firearm, I have to bring it back

10    to the NYPD, 1 Police Plaza, for them to inspect it

11    and put it in their database that I have this

12    firearm.  So it has to be inspected once you get it,

13    and then you can take it home, and it's yours to go

14    forward with from there.

15          THE COURT:  Is that just because you're

16    trying to operate as a dealer, or is that like --

17          MR. KNIGHT:  No, that's everyone who has

18    a license.  You're need a purchase authorization for

19    every firearm you acquire.  You have to get

20    permission to get it.

21          THE COURT:  I just want to confirm,

22    Mr. Ciappetta, that's right?

23          MR. CIAPPETTA:  Somewhat.  I mean,

24    Mr. Knight said a lot of things, which I'm sure I'll

25    be able to get an opportunity to respond to, but

1      it's correct that you need a purchase authorization.
2      It's incorrect that the NYPD can deny it because
3      they feel like it.  That's not correct.
4              The purpose of the purchase authorization
5      form is to see what gun you're acquiring before the
6      NYPD lists it on your license, because they want to
7      make sure that the gun that you're acquiring is
8      legal in New York State and legal in New York City
9      because there are guns prohibited by the New York
10     State Penal Law that you cannot have.  Certain
11     semi-automatic guns are not.
12             So if your purchase authorization was for
13     a semi-automatic gun, then that's illegal.  But if
14     it was for a regular gun that's allowed, it's just a
15     paperwork requirement.
16             THE COURT:  But there's no discretion.
17     So if he goes to purchase a legal handgun, and
18     that's what he puts on the purchase authorization,
19     there's no discretion in terms of denying the
20     application?
21             MR. CIAPPETTA:  It should be fine.
22             And Your Honor, Mr. Knight, as he's very
23     familiar with the process and it's worked for him,
24     he has four guns listed on his premise residence
25     license.  He has another two listed on his concealed

1  carry license.  So this is really -- and I think his

2  argument makes clear, this is a very theoretical

3  argument.  It's objections to the rules without

4  really any injury or harm to him.  He's been able to

5  add four license -- four guns to his premise.  He

6  hasn't said that he has been rejected from adding a

7  fifth.  That's not alleged anywhere.  He has two on

8  his concealed carry.  If he wants to swap one of the

9  ones that's on his concealed carry for a

10  newly-acquired gun, he can do that.  Hasn't said

11  he's been denied the ability to do that.

12      It's a very theoretical argument that

13  he's making.  He's saying that everybody should be

14  able to, you shouldn't have to have two gun

15  licenses.  It's really arguing for somebody else

16  because he has acquired those two licenses.  In

17  fact, he has three.  He also has a rifle/shotgun

18  license.  So it's not like the NYPD has taken any

19  actions that has injured him here.  He's applied for

20  licenses.  He's been granted licenses.  He's

21  requested that guns be added to his licenses.  Those

22  requests have been granted.

23      This is a very theoretical lawsuit at

24  this point, and any injury is really self-afflicted

25  because he has a premise residence.  He's saying you

1    shouldn't have to have one, and he has one.  He
2    applied for one, he has one.  He has a concealed
3    carry now.  And if he pays his renewal fee, he'll be
4    able to -- assuming he hasn't committed a crime of
5    some sort, his premise residence will be renewed.
6    PD is waiting on his renewal fee.  He has refused to
7    pay his renewal fee because I think he wants to make
8    this federal challenge.

9            THE COURT:  Mr. Knight, you still haven't
10   paid the fee?

11           MR. KNIGHT:  No, it's on hold.  As long
12   as you put it on hold, it stays in an unexpired
13   state until the fee is paid pending the case.  But
14   it's not canceled, it's not expired.  It's kind of
15   like in limbo, but it's still active.  I just have
16   to pay the fee on it.

17           But what he stated was incorrect.  I
18   don't have four firearms on my premise license and
19   two on my carry.  I had four firearms on my premise
20   license.  When I got my carry license, I was allowed
21   to transfer two of those firearms from my premise
22   license to my carry license.  The two other firearms
23   remain on my premise license.

24           And like he said, if I want to take one
25   off of the carry license and put it on the premise,

             AMM TRANSCRIPTION SERVICE - 631.334.1445

1    one off the premise and put it on the carry, I have

2    to get permission from the NYPD to do so.

3              So, once again, it's subjective and

4    discretionary.  I can't just do it.  They have to

5    allow me to do it.  I can only keep two on my

6    premise.  So I took two off the premise and put two

7    on the carry.

8              THE COURT:  So you have four total?

9              MR. KNIGHT:  Yes, I have four.

10             THE COURT:  Four total.  Okay.

11             And so you originally had the premises

12   license --

13             MR. KNIGHT:  Yes.

14             THE COURT:  -- which was supposed to

15   expire in December of 2022, is now on hold.

16             MR. KNIGHT:  Correct.

17             THE COURT:  And so once they issued, I

18   think in December of 2022, they also issued you the

19   carry license?

20             MR. KNIGHT:  They issued -- December 30,

21   2022, I received the carry license.

22             THE COURT:  Okay.  So you got two new

23   handguns?

24             MR. KNIGHT:  Yes, I had two firearms, and

25   I placed those two firearms.  I'm not sure if I

1    purchased two new or I had one that I took off the
2    premise and put on the carry, but I did get two
3    firearms on the carry.  I don't remember if I
4    purchased them or if I had them already.
5              THE COURT:  But have you tried at all to
6    transfer a handgun from -- switch -- so transfer a
7    handgun from the premises to the carry license?
8              MR. KNIGHT:  Oh, well, at this point, I
9    have two firearms on the carry license currently.
10   It's not necessarily that I need to take one off and
11   put another one on.  If I didn't have the premise
12   license, it would be no need for me to go to the
13   NYPD and do all the swapping, because like I said, I
14   could just carry whichever two or one.  It doesn't
15   even mean I need to take two firearms.  I can take
16   one, but I could pick any of what I have.  I still
17   have to go to them to get permission, which makes it
18   subjective and discretionary.
19             They like to paint this pretty picture,
20   like, no, it's the DMV.  You go in, you take your
21   permit test, you pass, you pass your road test, you
22   get your driver's license.  It is not that cut and
23   dry.  It looks nice to say that in the courtroom,
24   but the NYPD has been very biased with carry
25   licenses, which is why the *Bruen* case was such a big

1   hurt to New York City.  It's not that simple.

2              When I originally went to apply for my

3   carry license, even though this is a little off from

4   this, my investigator asked me, well, why do you

5   need a carry license?  I said, I'm a

6   federally-licensed firearms dealer.  I'm also a

7   passport vendor with the city for police equipment.

8   I can transport firearms, ammunition from point A to

9   point B, storage and all of that.  I also sell body

10  armor, so I don't want anybody robbing me of this

11  stuff if I'm transporting it from point A.  She

12  says, well, how do they know what you have?  I said,

13  I have a website.  She said, well, you put yourself

14  in danger because you have a website.

15             If that's not discretionary, I don't know

16  what is.  Northrop Grumman has a website.  Boeing

17  has a website.  They make nuclear arms and missiles.

18  What business doesn't have a website?

19             THE COURT:  But was this conversation

20  pre-*Bruen*?

21             MR. KNIGHT:  This was before *Bruen*.  This

22  was before *Bruen*.  She just basically said, well, my

23  need was I transport firearms and ammunition, or I

24  can on my federal license.  I'm also a vendor for

25  the City of New York for police equipment.  The

1　equipment that I want to sell to them, which is my
2　other case, I can't even do that because of that
3　case, I don't have the state license yet, which the
4　NYPD refuses to give me.

5　　　　　　But back to this case, yes, I can't just
6　swap.  I have to go to them for permission, well, I
7　want to take this handgun off, put this on the
8　premise and put it in a safe and put this one on the
9　carry.  It doesn't make any sense why I have to do
10　all that.

11　　　　　　For instance, let's say if they
12　eliminated the purchase authorization, they said,
13　well, they want to make sure you have the handgun
14　you're supposed to have, it needs to be legal in New
15　York City or New York State.

16　　　　　　If you go to a federal licensed firearms
17　dealer to buy a firearm, New York City -- New York
18　State firearm dealers, they know what handguns are
19　legal in the state of New York because they can't
20　sell a handgun that's illegal in the state of New
21　York.  So that already eliminates you buying a
22　firearm you can't have.  You could just get the
23　firearm from them and take it in for an inspection
24　and skip the authorization.

25　　　　　　THE COURT:  Sure.  But what if you bought

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1   your firearm, like, across the river in New Jersey,
2   where maybe they have different rules regarding
3   what's a legal firearm?
4          MR. KNIGHT:  Well, if you buy a firearm
5   in New Jersey that's not legal and you take it to
6   get inspected by the NYPD, they're going to
7   confiscate it.  So that would be foolish on you to
8   do that.  You can't --
9          THE COURT:  No, but I mean -- I guess
10  because that's what you were indicating, that maybe
11  they should get rid of the purchase order because
12  the person who's going to sell you the gun isn't
13  going to sell you --
14         MR. KNIGHT:  Yeah, because it starts at
15  the dealer.  It doesn't matter what I want.  If I go
16  in there and say I want ten Uzi submachine guns,
17  he's going to look at me like I'm crazy.  I'll lose
18  my FFL license, and I'm going to jail for selling
19  you that.  I can't sell you a fully-automatic
20  weapon.  So it doesn't matter what I want to buy.
21  As a dealer, you can't get it.
22         If you go to New Jersey, you're still
23  going to need some type of form to show them that
24  you can purchase a firearm.  Because if you go to
25  New Jersey, they're going to run your name through
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1     the FBI NICS background check.  So if it's something
2     you're not supposed to have, you're not going to get
3     it.  And if you somehow acquire a firearm that you
4     shouldn't have, you're not going to be able to
5     register it in New York City, whether you get it
6     from any state, you just purchased the firearm
7     illegally, and no FFL should be selling you a
8     firearm illegally.  That would just be the person
9     illegally buying a firearm.  It would have nothing
10    to do with the laws and rules.  That's on the
11    purchaser.  You know what you can and can't have
12    because you can't take it to the NYPD and get it
13    inspected if it's an illegal firearm.
14           The purchase authorization doesn't force
15    you into getting a riped gun because you still have
16    to bring it to them.  You can't get a gun that you
17    can't have because they're not going to let you have
18    it, unless you get it and take it home.  And now
19    that's illegal.  So that cuts out the NYPD
20    altogether.  And the laws don't matter because you
21    just committed a felony.
22           THE COURT:  If you had to tell me at the
23    end of the day exactly what you're looking for, as I
24    understand it, you want to completely eliminate the
25    City's requirement.  It sounded like you would have
```

1   been okay with a carry license restriction that

2   required you to list all your guns as long as there

3   was no limit on the numbers you could list; is that

4   right?

5         MR. KNIGHT: That, at this level, would

6   be satisfactory. I'm not saying -- I want to make

7   it specific on the record. I'm not condoning well,

8   NYPD, I'm okay with you telling me I can only carry

9   two because under the Second Amendment, you

10   shouldn't be telling me anything. But if you were

11   to do that, it would be more reasonable.

12         The only need now for a premise license

13   is a cash grab for the City. It's $340 for each

14   license, and when you renew each license, it's $340.

15   Any other state you renew a license, there's a

16   reduced fee. They're getting $340 every three years

17   for two licenses when you only need one.

18         So my question to them is, let's say I

19   get a carry license, I don't have a premise license

20   at all. I get a carry license. You can only have

21   two firearms on this license. Okay. Fine. I

22   decide I want to get more guns. I'm a gun

23   enthusiast, I want to collect firearms. I now have

24   to spend $340 just to get a license to keep guns in

25   a safe. Why am I getting a gun safe license?

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    That's all it is.  You can't remove them from the
2    safe unless you go to the gun range and come home.
3    So what is the point of that?  You don't need a
4    license.  That's like having a driver's license and
5    New York City saying, well, you need a left-turn
6    license.  You can come to the City, but you can't
7    make left turns unless get a left-turn license.
8          The premise license has been superseded
9    by the carry license in all other states that had a
10   carry license before *Bruen*.  Once *Bruen* happened,
11   the premise licenses were automatically converted to
12   carry licenses.  No one was made to buy -- I mean,
13   acquire a second carry license.  They just sent out
14   a memo, all premise licenses are now converted to
15   current carry licenses; if you want to update it to
16   a physical license that says carry, there may be a
17   minimal fee for doing that, but the premise license
18   no longer exists.  It's now carry.  They didn't
19   create a secondary license.  Because New York City
20   already had carry licenses before *Bruen*.  But only
21   entertainers and people who were wealthy could get
22   them.  They had a carry license.  You just couldn't
23   get it.  So they had carry licenses.
24          THE COURT:  Okay.  So it sounds to me
25   like in an ideal world, there would be no state

1   license -- the state RPL, the residence premises

2   license?

3            MR. KNIGHT:  At this point, it's not

4   necessary.

5            THE COURT:  Because it's not necessary.

6   And it allows the City to collect this $340 fee on a

7   recurring basis.

8            MR. KNIGHT:  Yes, that's it.

9            THE COURT:  Because you have the carry

10  license.  And in an ideal world, the City wouldn't

11  be able to restrict how many guns you could list on

12  the carry.

13           MR. KNIGHT:  Yes, like I said, it serves

14  no purpose.  If we went with the version of, okay,

15  Mr. Knight, you can have a hundred, but you can only

16  pick two of y'all 100 at any time, it's the same

17  deal.  I'm only getting to carry two.  Nothing

18  happens to the City, nothing happens to the NYPD.

19           Those other firearms, I'm not carrying

20  are still home in a safe, technically.  So they have

21  the benefit of the premise license because they're

22  in a safe at home.  But if I choose to open a safe

23  and say, well, I want to spend some time with you

24  today, I could take that firearm out, put another

25  one in and take two different ones.  They don't lose

```
 1    anything.  They don't have a horse in a race.  I
 2    don't understand what they're fighting for because
 3    the premise license gains them nothing.  Even if I
 4    had 1,000 guns on a carry license, and I can only
 5    carry two, those other guns are still home in a
 6    safe, just like they would be on a premise license.
 7    So what is the premise license for?  It doesn't make
 8    sense.  If that makes any logical sense to you, I
 9    mean, I think it does.
10              Logically speaking, in a logical world,
11    why do I need this second license if you can put all
12    your guns in the safe and just take two out on your
13    carry.  Win for me, win for them.  It's the same
14    deal at the end of the day, minus $340 times however
15    many people have a premise license.  That's a lot of
16    money.
17              THE COURT:  Okay.  I'm pretty clear on
18    the argument now.
19              Mr. Ciappetta, did you want to respond to
20    anything?
21              MR. CIAPPETTA:  Yes, thank you, Your
22    Honor.  And thank you for your time, and I think it
23    was helpful to come in and crystallize the arguments
24    in this emerging area law.  Address a few of the
25    points made by Mr. Knight.
```

1          I think it's very clear listening to the
2    argument that this is a lot of, I don't think the PD
3    should have this, it's unnecessary, and this would
4    be satisfactory.  But the standard in the Second
5    Amendment case is not what the plaintiff likes or
6    what he thinks or what the PD should do.  It's what
7    conduct violates the Second Amendment.  Saying that
8    you don't like the PD's rules, That's not
9    sufficient.
10          New York City is very clear, is a major
11    metropolitan area which is densely populated.
12    That's why the penal law treats New York City very
13    differently.  If you have a license, for example, in
14    Orange County, the penal law says that license is
15    not good in New York City.  You need to get a
16    separate special carry from New York City which has
17    been recently upheld in a case in this District,
18    *Frey v. Bruen*.
19          New York City is treated differently in a
20    lot of respects.  In New York City, the licensing
21    officer is the police commissioner.  In Orange
22    County, it's a member of the judiciary.  So New York
23    City is different, and it's been recognized that
24    way.  And as I said, the fact that Mr. Knight
25    doesn't like the City's rules, doesn't make them

AMM TRANSCRIPTION SERVICE - 631.334.1445

1   unconstitutional.  He says that the premise
2   residence is unnecessary now.  That's his opinion,
3   right, but his opinion doesn't make a constitutional
4   violation.
5               And in any event, it's not unnecessary.
6   Some people choose to only have a premise residence
7   license.  People choose to just apply for a premise
8   residence for a number of reasons, right, because
9   the requirements are different.  After the state's
10  Concealed Carry Act, a premise residence license and
11  the concealed carry differ in a number of respects.
12              If you want a concealed carry, the state
13  requires you to submit four references, to disclose
14  social media, and to get, I believe it's 16 hours of
15  training.  So some people choose not to do that.
16  They may prefer to have a concealed carry weapon.
17  Maybe they only want their gun to protect themself
18  in the home, they don't want to carry it in public.
19  There's any number of reasons why some may prefer
20  one versus the other.  Mr. Knight says it's
21  unnecessary.  That's not true.  Some prefer one
22  versus the other.
23              THE COURT:  Is the difference between --
24  if I had a residence license but wanted to walk out
25  the door with my gun because I'm moving, because I

1    want to go to the shooting range, for whatever

2    reason, is the difference between the carry license

3    and the residence license is that with the residence

4    license, I have to put that gun in a safe and walk

5    out the door with the gun in a box?

6             MR. CIAPPETTA:  Yeah.  Premise allows you

7    to go to a target range and to do shooting because

8    you have to be proficient in the handgun, but you

9    have to keep it in a locked box.  The concealed

10   carry license would allow me to have it on my

11   person, concealed, and walk around the City of New

12   York wherever I want.  Of course, the state passed a

13   law that has certain sensitive places.  I wouldn't

14   certainly be able to bring it in this building

15   pre-*Bruen* or after the state's Concealed Carry Act.

16   But yes, that's generally the gist, right.

17             The premise is meant to protect me and my

18   home, whereas the concealed carry allows me to carry

19   in public subject to restrictions on sensitive

20   places.  Somebody may not want to carry it around

21   with them, you know, they may feel that they could

22   lose it, they could drop it, somebody could take it

23   from them.  It's personal preference.

24             There's a number of different licenses,

25   and there used to be more.  There was a business

         AMM TRANSCRIPTION SERVICE - 631.334.1445

**119**

```
1    premise.  There was a carry guard license.  The PD
2    has a lot of different licenses that people can
3    apply for.  The State just added a specific license
4    for semi-automatic rifles and shotguns.  And the
5    City has a separate permit itself for rifles and
6    shotgun licenses.  These aren't irrelevant after
7    Bruen.  You can have different licensing.  And Bruen
8    itself said licensing is fine.
9              THE COURT:  Do you know what the City
10   rule is if Mr. Knight wanted to switch out one of
11   his guns that he has in his home under the state
12   residence premises license, and he wanted to list
13   that on the carry license and switch out one of the
14   current guns on the carry license and move it off
15   that license, is there a rule that --
16             MR. CIAPPETTA:  There's not, no.  We
17   don't have separate rules on that.  And it's not as
18   discretionary as he makes it seem that he'd just
19   make a request to the PD to do it.  And my
20   understanding is it happens.  It's quite easy to do,
21   and it's not burdensome.  And he hasn't alleged that
22   it's burdensome.
23             THE COURT:  Does it come with a fee?
24             MR. CIAPPETTA:  I don't believe so, no,
25   Your Honor.  I don't believe so.  The fee is for the
```

44

1    application itself, not to switch them out.

2              THE COURT:  Do you happen to know, does

3    it take a long time to get that done?

4              MR. CIAPPETTA:  Not as far as I know.  I

5    mean, it may not be, like, instantaneously, but it's

6    not like the process to review the initial

7    application itself or to renew the application.  The

8    initial application takes longer, the renewal takes

9    less.  And they have to go through a number of

10   things because that's why it takes so long, because

11   you have to review their criminal record, you have

12   to do interviews with them.  That's not happening to

13   switch out your license.  It's just a request.

14             THE COURT:  I'm sorry, Mr. Knight, I

15   think you wanted to say something?

16             MR. KNIGHT:  It's not necessarily a

17   strenuous process.  To switch a firearm, you do have

18   to get a notarized letter stating which firearms you

19   want to switch out.  You have to make an appointment

20   to go to the NYPD and give it to them, and they will

21   basically swap it.  That's not that hectic of a

22   thing.

23             But something I wanted to add to

24   something that he just said that I notice when I

25   state things like, well, it's prohibiting you from

1    getting this three firearms, it's speculative when I

2    say it, but when he states, well, maybe somebody

3    doesn't want to carry their gun, maybe they might

4    drop it, maybe they could get robbed, it's not

5    speculative when he comes up with those things.

6            Something that he did say that I do agree

7    with is, it's not Mr. Knight's opinion of what the

8    law should be.  That is absolutely correct.  It's

9    what the Second Amendment states.  So in the same

10   gist, it's not what the NYPD wants, because they're

11   the NYPD.  The NYPD is not a legislative body.  They

12   are a local police department.  They are not the

13   State Assembly.  They do not create laws, they

14   enforce laws.

15           So if the NYPD says, I only want you to

16   carry one gun and one bullet, that's just as the

17   same as me saying, well, I want to be able to carry

18   32 guns, Halloween orange.  That's an opinion.  Just

19   because they're the police department, them stating

20   something doesn't make it not an opinion because

21   it's coming from them.  They're not legislators.

22   They're not legislators.  They're a police

23   department.  They don't make law, they enforce law.

24           So it's not fair for him to say, for

25   instance, if he says, somebody doesn't want to carry

46

```
 1    their gun, if you have a carry license, you don't
 2    have to carry that gun.  You could never take it out
 3    of your home.  You could still not carry it.  You
 4    don't need a premise license to force you to not
 5    carry it.  You simply don't carry it.  It doesn't
 6    matter.  So I don't like it when I have court
 7    sessions and the attorneys on the other side, it's
 8    speculative when I say it, but when they come up
 9    with these theoretical things that could be --
10    they're like, no, this is what it is.  No, that's
11    speculation as well.  You don't want to carry your
12    gun, don't carry it.  Leave it home.
13              THE COURT:  Right.  No, and I hear what
14    you're saying, but it does sound to me at least like
15    your fundamental problem is the fact that they're
16    requiring you to have two licenses.
17              MR. KNIGHT:  That's correct.  And my
18    argument on that is because you couldn't get a carry
19    license.  I'm a federally-licensed firearms dealer.
20    They denied me two times.  I couldn't get one.  Now
21    that I can get one, why do we still have this
22    license?
23              THE COURT:  Sure.  And that's a perfectly
24    good question.
25              MR. KNIGHT:  That's a fair, legitimate
```

1    question.  Okay, I can get a carry now.  I don't
2    have to deal with the premise.  I don't have to deal
3    with firearms in my safe.  If I want to go to the
4    range, I can have a firearm in my holster, take it
5    out of my holster, use in a range.  I could put that
6    firearm in a lockbox and take it to the range.
7                 The carry license covers the
8    circumference of everything.
9                 THE COURT:  No, and I hear you.
10                MR. KNIGHT:  That's all I'm asking.
11                THE COURT:  Right.  And maybe there's a
12   more efficient world where we would just have the
13   one license.  But I think -- I mean, you're
14   obviously very well versed in this, and I'm sure
15   you've read *Bruen*.  But *Bruen* didn't strike down all
16   licensing regimes or regulations, right?  It does
17   recognize that some are permissible.
18                So it seems to me like if what you're
19   underlying -- and I understand we've talked about
20   the different things you disagree with, but it
21   sounds like -- and maybe you're not going to
22   acknowledge this, but the City is allowed to
23   regulate this so long as there isn't some litmus
24   test.  As *Bruen* makes clear, they could require you
25   to have two licenses as long as you can --

                 AMM TRANSCRIPTION SERVICE - 631.334.1445

1            MR. KNIGHT:  I'll add something to that.

2    I'll never deny the truth.  What we're skipping over

3    with *Bruen* is the analogies.  The NYPD can make any

4    rule they want.

5            THE COURT:  But this isn't an NYPD rule,

6    right.

7            MR. KNIGHT:  That's the rule of the City

8    of New York.

9            THE COURT:  But it wasn't promulgated by

10   the NYPD.

11           MR. CIAPPETTA:  It was, yes, Your Honor.

12           THE COURT:  The 38 RCNY is the NYPD rule?

13           MR. CIAPPETTA:  Yeah, that was the NYPD's

14   rule.

15           THE COURT:  And is that because the City

16   Council or the state licensing regime gives the NYPD

17   the power to do that?

18           MR. CIAPPETTA:  Yeah.  I mean, the NYPD

19   is -- Mr. Knight is correct.  It's not a legislative

20   body, but the NYPD is allowed to adopt rules.  All

21   Chapter 38 of the RCNY applies to the NYPD.  There's

22   many, many, many rules there.  Some dealing with

23   guns and some dealing with many other things.

24           THE COURT:  And is that delegation of

25   authority in that penal law 400-section?

            AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. CIAPPETTA:  Yeah, penal law or the Ad

2     Code as well.  The PD is allowed to fill in the

3     interstitial gaps and do rule-making pursuant to the

4     Ad Code as well.

5          THE COURT:  But that would be -- I mean,

6     I guess, to the extent, Mr. Knight, that you are

7     frustrated by that, that would be a challenge.

8     That's not really a Second Amendment challenge.

9     That would be some other --

10          MR. KNIGHT:  No, Your Honor, I don't

11     agree with that because, one, it's in violation of

12     the penal law.  We're skipping a lot of things.  The

13     penal law doesn't even require that for any

14     licensing throughout the state.  It's not in the

15     penal law.  It's a local law.  Local laws are

16     superseded by state law.  State laws are superseded

17     by federal laws.  All those laws are superseded by

18     the Supremacy Clause.

19          What I don't want us to escape from here

20     is letting them dodge the analogous laws of *Bruen*.

21     That's what they're doing.  This is pertaining to

22     possession, acquiring and carrying firearms.

23     They're trying to bypass that, well, we don't need

24     analogues.  No, there's -- present me an analogous

25     law around the Ratification of 1791, stating that I

1    can only possess two firearms on any type of a

2    license or any similar law to be licensed.  We're

3    not saying no laws can exist, but there's a thin

4    line between what the Second Amendment and *Bruen*

5    says, and says, well, we can just separate this from

6    *Bruen*.  Well, what laws can they create under *Bruen*?

7    What laws can't they create under *Bruen*?  It's a

8    Second Amendment issue.

9          A firearm can almost not be a Second

10   Amendment issue unless you committed a homicide with

11   a legal firearm.  Then I don't think that's a Second

12   Amendment issue.  But a lawful citizen acquiring a

13   firearm is under the Second Amendment, which makes

14   it fall under *Bruen*.  So, okay, you want to do this

15   law, that's fine.  Give me the analogy.  Give me the

16   cousin of an analogy.  Give me the sister of an

17   analogy.  Under *Bruen*, you have to give me

18   something.  You can't just give me, well, you're the

19   PD, and you could kind of juggle some stuff and so

20   that would defeat *Bruen*.

21         The *Bruen* case beat New York City's

22   Proper Cause Law.  It was basically -- wasn't even

23   New York State.  It was about New York City.  New

24   York City took a loss.  They don't like it.  And

25   they're doing everything to dodge having to use

1    *Bruen*.

2            You can make -- you're the judge, you

3    make whatever determination you want.  But I'm not

4    going to sit here and think it's fair to allow them

5    to make it a non-Second Amendment issue to dodge

6    that bullet, because that's what we had before

7    *Bruen*.  There was nothing to control them and make

8    them do anything.  They just did whatever they want.

9    If they wanted to wake up the next day and say, you

10   can only have one gun and three bullets, you do it.

11   You go to state court, state court agreed with them

12   all the way to the top.  I went from the bottom

13   state court all the way to the top.  Not one state

14   judge even said, well, Mr. Knight, this part of what

15   you're saying is correct.  This part is incorrect.

16   It went all for the NYPD, completely slanted.

17           Now that *Bruen* is here, and *Bruen* is the

18   big brother to everything, all of these law

19   enforcement agencies and everything are trying to

20   dodge the *Bruen* analogy.  It's a law that pertains

21   to you acquiring and possessing firearms.  If it

22   says you can only have two firearms, that's

23   possession.  That falls under the plain text of the

24   Second Amendment and the conduct of the plaintiff.

25           I want my analogies.  I have the right to

1    ask for them.  It's under the Supremacy Clause.
2    They shouldn't be allowed to dodge that, because
3    then they can come in here with any gun thing and
4    say, all of that stuff is under New York City
5    Administrative Law and Title 38, Rules of City of
6    New York.
7            If that's the case, like in the other
8    case I tried to present to the Court -- I don't know
9    if it's the S-R-O -- *Srour*.  I don't know if I'm
10   pronouncing it correct.  S-R-O-U-R, submitted that
11   case to the Court.  You said I didn't need to submit
12   it.
13           THE COURT:  Oh, yes, because it was Judge
14   Cronan's decision?
15           MR. KNIGHT:  Yeah.  They're appealing.
16           THE COURT:  Yeah, we have it.
17           MR. KNIGHT:  They're appealing now.  Even
18   the judge stated under *Bruen*, this doesn't fit.  He
19   said, you didn't give me any -- they didn't even try
20   to give an analogy.
21           If having a handgun doesn't fall under
22   the Second Amendment acquiring one, what does?  That
23   is the Second Amendment.  That's like saying the
24   First Amendment gives you freedom of speech, but not
25   if you say those words you're saying.  We're

1    removing that from the First Amendment.  That
2    doesn't apply to -- you can't say that under the
3    First Amendment.  Most likely I can, even if you
4    disagree with it.  The NYPD can have their opinions.
5    Like he said, Mr. Knight doesn't like this law.  You
6    can flip that and say, well, the NYPD does like the
7    local law they made.  That does not make it lawful
8    under federal law or *Bruen*, just because they want
9    it.
10              They don't automatically get endowed with
11   it being right because they created it.  It doesn't
12   work like that.  That's not how the law is supposed
13   to work.  They can create any rule they want.
14   Doesn't make it lawful.  That's what the judges are
15   for, right?  That's what we come to court to
16   adjudicate what's lawful.  The legislators can
17   create laws.  You can go to court and say, well, the
18   law you just legislated is wrong.
19              If that's the case, when Dred Scott was
20   in court, he just feels he shouldn't be a slave,
21   Your Honor.  He just doesn't want to be a slave.
22   That's his opinion.  He has no right to not be a
23   slave.  He just doesn't like being one.  Doesn't
24   work like that.  Even though it did in Dred Scott,
25   but worst Supreme Court case ever.  What, he doesn't

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    want to be a slave?  Too bad for him.  That's his

2    opinion.

3           No, I'm saying the law supports my

4    argument.  Penal law supports my argument.  *Bruen*

5    supports my argument.  I'm not taking anything away

6    from the NYPD.  They can keep their license system.

7    They can still have me carry two guns.  I'm just

8    saying, why do all the citizens need a premise

9    license?  Eliminate that.  We put our guns on our

10   carry license if we want to, and we just carry our

11   two guns if that's the rule.  If somebody wants to

12   fight the two gun rule, feel free to do that.  It's

13   just not, well, it's just there, we should leave it

14   there, it's cool, it doesn't harm anything.  That's

15   how you feel.  I don't think it's lawful under the

16   Second Amendment, because they're separating the

17   right to keep and bear arms into two separate

18   things.

19          A premise license lets you keep, violates

20   the right to bear.  A carry license allows you to

21   bear, but violates the right to keep more than two

22   firearms.  So either way, you can't split the Second

23   Amendment into two separate entities because each

24   license violates one part of the Second Amendment.

25   You can't get away from that.  You can't get away

```
1    from it.  It's not like your laws cannot be abridged
2    in one place under the theory that you can conduct
3    yourself doing that in some other place.  You know
4    what I mean?  Like, well, you can't do that here,
5    but if you step outside the door, it's okay.  It's
6    the law.  It's the law.
7            They split the Second Amendment into two
8    parts.  One license allows you to keep.  One license
9    allows you to bear.  The bear license violates the
10   right to keep more than two.  The keep license
11   violates the right to bear any firearms.  It's a
12   direct violation -- sorry -- of the Second
13   Amendment.  It's pretty crystal.
14           THE COURT:  Mr. Ciappetta, is there
15   anything else you want to add?  I think I'm --
16           MR. CIAPPETTA:  Yeah, just -- I'd like to
17   summarize.  I had a couple of points addressed
18   before.  It's actually helpful Mr. Knight makes a
19   comparison with the First Amendment a lot.  But the
20   First Amendment does require you, if you want to
21   have a parade outside somewhere, you have to get a
22   permit.
23           And under First Amendment jurisprudence,
24   which is different here than the Second Amendment,
25   not everything is protected under the First
```

1   Amendment.  Fighting words are not protected.

2   Certain hate speech is not protected.  If I have

3   speech regarding an illegal transaction, that's not

4   protected.

5            And so in those situations, strict

6   scrutiny or intermediate scrutiny is not triggered

7   at all in those situations.  And that's really the

8   case here.  We're saying that this requirement,

9   these rules by the PD, these are innocuous,

10  ministerial requirements that don't go to the core

11  of the Second Amendment, don't even come close.

12  They are really ministerial requirements.  As I

13  said, they're innocuous.

14           And the proposed conduct, as Mr. Knight

15  has said, made clear, is the ability to have an

16  unlimited number of guns on his carry license.  That

17  is not conduct when defined that way.  That

18  infringes on a Second Amendment Right.  And if it

19  doesn't infringe on the Second Amendment Right, you

20  don't get to the second step of the *Bruen* test.

21           That's what the Court said in the

22  *Libertad* case.  That's what the Supreme Court said

23  in *Bruen*.  The Supreme Court in *Bruen* endorsed

24  background checks.  They said background checks are

25  presumptively lawful.  They don't require you to

1   find a historical analogue for it.

2          Same thing with licensing fees.  They

3   said those are presumptively lawful.  They don't

4   require you to find analogues for that.  And there

5   was recently -- I don't have it in front of me -- a

6   Northern District or a Western District case where

7   somebody was challenging the fees that the state

8   charges for a semi-automatic rifle shotgun license.

9   And the Court there rejected the first step.  They

10  said this doesn't implicate the Second Amendment.

11  This is a ministerial fee requirement.  And they

12  didn't require then somebody to go find an analogue

13  for a $5 permit fee.  It's not required in every

14  case.

15         Mr. Knight gave the example of, you can't

16  paint your gun orange.  Well, if the PD passed a

17  rule that said you can't paint your guns, that

18  doesn't impact your ability to defend your home or

19  carry in public.  You wouldn't have to go find an

20  analogue to that.  And that's the case here.

21         At the bottom, I think it's kind of

22  simple in that the NYPD's rules don't infringe on

23  what the Second Amendment constitutes as defined by

24  *Bruen*, *Heller* and *McDonald*.  And that core right is

25  clear.  It's the right of an individual law-abiding

1 person to carry in public in the event of a
2 confrontation, or to defend themself in the home in
3 the event of a confrontation or break-in there.
4        The NYPD's rules do not infringe on that
5 because you can acquire and possess and carry guns.
6 He may not like how that is the regulation of that,
7 but the Supreme Court said the manner of carry is
8 okay to be regulated.
9        And so our point here is that there's no
10 infringement because he can acquire guns, which he
11 has.  He can possess them and carry them, which he
12 says he can as well.  He has licenses to do same,
13 and he can use those guns to defend himself in
14 public or to defend his home.  And there's no burden
15 on the Second Amendment Right.
16        THE COURT:  Mr. Ciappetta, you had
17 briefly mentioned a case involving the payment of
18 fees out of either the Western or the Northern
19 District.
20        Would you mind supplying that case
21 citation?
22        MR. CIAPPETTA:  Sure.  Yeah.  Yeah.  And
23 there's other cases as well.  I don't want to go
24 through them all.  There was a -- in San Jose, there
25 was an insurance requirement that the City of San

1    Jose adopted.  They said that didn't implicate the

2    Second Amendment.  There was a case, I'm not sure if

3    it was pre-*Bruen* or not, that had a restriction as

4    to where you could have a zoning regulation that you

5    couldn't have a firearm range in certain places.

6    They said that didn't implicate the Second Amendment

7    either.

8            So there are cases that decide that.

9    We're not saying that nothing violates, infringes.

10   That wouldn't be the case, right.  If we made a law

11   that said somebody cannot possess a gun in their

12   home.  Obviously, that would infringe on the core.

13   But this doesn't, because you can possess, you can

14   acquire and carry.

15           THE COURT:  Okay.  Sure.

16           MR. KNIGHT:  One thing quickly.

17           As far as his discussion about the orange

18   guns, there is a case that supports that.  I would

19   just like to read briefly from my case, paragraph

20   38.

21           "Accordingly, in light of the

22   comprehensive and detailed regulatory language and

23   scheme of New York Penal Law, Section 400, which

24   demonstrates the legislator's attempt to preempt the

25   field of firearm regulation, it preempts Title 38,

60

```
 1    RCNY §5-25(d)(i), see Chwick v. Mulvey, 2010," who
 2    happens to be a good friend of mine.  That case was
 3    about Nassau County saying certain guns couldn't be
 4    certain colors because you might mistake them for a
 5    toy, it could be a real gun.  And they lost that
 6    case because New York Penal Law has nothing about
 7    the coloration of guns.  And the judge said if the
 8    state legislators wanted deceptively-colored guns to
 9    be illegal, they would have put it in the penal law.
10    So there is a gun case about deceptively-colored
11    guns.
12            In that case, which I believe was Nassau
13    County, Nassau County lost, because the argument
14    was, say you go to a gun range in Nassau County,
15    you're not from there.  You don't know about the
16    deceptively-colored things.  You're on a gun range
17    next to a state trooper who's just on a range
18    shooting.  He sees that deceptively-colored gun, he
19    has to arrest you for a felony.  Just because the
20    gun is a color, it would have been a felony.
21            So that case actually happened in Nassau
22    Chwick v. Mulvey, 2010.  It's in my case, paragraph
23    38.  They weren't able to prohibit that because it
24    was a violation.  It was preempted by penal law,
25    which is what I'm saying about the New York City
```

```
 1   laws.  It's preempted by state penal law.  The law
 2   that allows you to carry firearms does not subject
 3   you to a set amount of firearms that you could
 4   possess or carry on a carry license.  It's a
 5   construct of the NYPD.
 6              MR. CIAPPETTA:  And that, Your Honor, as
 7   Mr. Knight acknowledged, that's a preemption case.
 8   We're here for the limited purpose of dealing
 9   with -- today with, I believe, paragraphs 52 to 55,
10   which is a Second Amendment argument.
11              MR. KNIGHT:  Preemption is in my case as
12   part of the challenge, sir.
13              MR. CIAPPETTA:  Yeah, which we've
14   addressed and briefed as well.
15              THE COURT:  Yeah.  I haven't forgotten
16   about preemption, but the case law on that was more
17   subtle than it was clear, based on both the
18   complaint and the briefing.
19              And so on this one, again, because *Bruen*
20   was so recent, I just thought it would be helpful to
21   hear everyone out.  I do, again, appreciate
22   everyone's time, and unless there's anything else,
23   it's been incredibly helpful.
24              MR. CIAPPETTA:  Thank you, Your Honor.
25   How would you like me to get that case?  Would you
```

1    just like me to send it in a letter?

2              THE COURT:  If you don't mind putting it

3    on a letter on the docket so Mr. Knight can also

4    have it.

5              MR. CIAPPETTA:  Okay.

6              THE COURT:  And, Mr. Knight, I just

7    wanted to flag something -- actually, for both of

8    you.

9              We had had a conference I believe in this

10   case back in March, a phone call to discuss --

11   because you had originally, back in December of

12   2022, filed a motion for a TRO.

13             MR. KNIGHT:  Yes.

14             THE COURT:  And that got referred to me

15   by Judge Caproni sometime in January.  Then we had a

16   phone call in March of 2023 where we discussed the

17   motion for the TRO and the relevant standard there,

18   just as if you were seeking a preliminary

19   injunction, you'd have to show both a likelihood of

20   success and, more importantly, irreparable harm.

21   And we discussed this.  And at the time, you had

22   indicated that you still had the state RPL license,

23   that it was on hold, as you've said today, because

24   of the fact that you filed the application for

25   renewal but hadn't paid the fee.

1          And I had explained on that phone call

2     that because the injury you were alleging was the

3     potential revocation of this license, or potential

4     revocation of your guns, or the NYPD seizing them if

5     the license were taken away, I had explained that I

6     didn't think you had adequately alleged an

7     irreparable harm, because an irreparable harm has to

8     be both eminent and concrete and can't be remedied

9     by money damages.

10          And at the time, I had indicated that for

11     all those reasons, I didn't think the TRO should be

12     granted, but that I couldn't terminate your TRO.  It

13     had to be something done by the district judge.  And

14     we subsequently, for reasons, we didn't issue an RNR

15     explaining our reasoning to the district judge, but

16     that RNR is coming today.

17          And so I just wanted to flag for you that

18     that will be entered on the docket, explaining,

19     again, consistent with everything I've said now and

20     at the transcript, which is on the docket, if you

21     were to go back and look at it, why the TRO -- we

22     would recommend that the TRO be denied because

23     that's ultimately something that Judge Caproni has

24     to do.

25          MR. KNIGHT:  Okay.  Also, just on that

1    point, my point on that was, well, if part of the

2    case is the constitutionality of the premise

3    license, wouldn't that kind of throw it into that

4    box?  Because we questioned, is the premise license

5    even constitutional at this point?

6              THE COURT:  Yes.  No, and so we didn't

7    even at the time, and I don't in what's coming, go

8    into the merits of your claim, because the most

9    important factor for getting a TRO or a preliminary

10   injunction is a showing of eminent irreparable harm.

11             And as we discussed, your state RPL

12   hasn't been taken away, it's on hold, as you've

13   indicated, it would be processed and renewed should

14   you pay the application fee.

15             And your guns are still in your

16   possession.  No one's taken them away?

17             MR. KNIGHT:  Not at this point.  But if

18   that license isn't renewed or canceled, those guns

19   are gone.

20             THE COURT:  Yes, exactly.  But the "if"

21   is too attenuated in the context of trying to

22   establish irreparable harm.  And the reason it's

23   attenuated and not sufficiently concrete and eminent

24   is because you could forego this injury altogether

25   if you paid the fee.

1          And I understand you claim you shouldn't
2     be required to pay the fee, but if you were to win
3     on the merits of that claim, you would be
4     compensated in whole with a monetary judgment.  And
5     so the case law is very clear on this, that an
6     irreparable harm can't be one that could be
7     adequately compensated with a monetary judgment, and
8     it also can't be one that you've -- I'll use the
9     term manufactured or created.
10          And in this circumstance, because we all
11     seem to agree that if you paid the fee, this license
12     would get processed.  This is a harm that
13     essentially is one that could be eliminated with
14     just the payment of money.  And so for that reason,
15     as you'll see in the written RNR that's coming, for
16     all the reasons we discussed in March of 2023, you
17     haven't made the requisite showing for a TRO,
18     putting aside the merits of the claim.
19          MR. KNIGHT:  Understandable.  But I do
20     have a question.
21          THE COURT:  Sure.
22          MR. KNIGHT:  The constitutionality of the
23     premise license can be questioned, right?
24          THE COURT:  100%.
25          MR. KNIGHT:  That's allowable.  And it

AMM TRANSCRIPTION SERVICE - 631.334.1445

1     can be determined at a later date that maybe it is

2     unconstitutional next week. It can be adjudicated.

3            THE COURT: Yes. So the TRO is really

4     just a mechanism by which you say, look, the status

5     quo should remain in the resolution, right.

6            MR. KNIGHT: I understand. I mean,

7     that's fine, because, like I said, the license isn't

8     canceled. It's there. As you said, I haven't been

9     armed yet. But if, for whatever reason it does

10    happen, I don't want to lose my firearms. One of

11    those firearms cost, like, $1,500. They're

12    expensive firearms, and there's no compensation.

13    They take them and they melt them.

14           THE COURT: Yeah. Oh.

15           MR. KNIGHT: They melt them. And the

16    thing is, it's not the property of the NYPD. It's a

17    firearm. But it belongs to me. It doesn't belong

18    to them. They have no right.

19           THE COURT: But since you are challenging

20    in a way, both in this case --

21           MR. KNIGHT: But, I mean, I understand

22    the TRO part.

23           THE COURT: Okay. But what I was going

24    to say is you might want to consider paying the fee,

25    given the expense of the firearms.

67

```
 1          MR. KNIGHT:  Well, being that it's still
 2   being adjudicated in court, it gives me time to pay
 3   it at the time of the decision.  If it's decided I
 4   have to keep it, then I keep it.  It hasn't been
 5   decided yet whether I have to keep it.
 6          THE COURT:  Okay.  Yeah.  I wanted to
 7   just flag for you that that's why that's coming and
 8   that's why it's coming now and didn't come soon
 9   after March 2023.
10          MR. KNIGHT:  Okay.  Understand.
11          THE COURT:  Thank you very much,
12   everyone.
13          MR. CIAPPETTA:  Thank you, Your Honor.
14          MR. KNIGHT:  Thank you, Your Honor.
15          MR. CIAPPETTA:  Your Honor, may I just --
16   I mentioned a couple of other cases, and may I
17   include those in the letter as well?
18          THE COURT:  You can include as many cases
19   as you'd like.
20          MR. CIAPPETTA:  Okay, great.  Thank you,
21   Honor.
22          THE COURT:  Thanks so much.
23
24                      0o0
25
```

68

1                    C E R T I F I C A T E

2

3        I, Adrienne M. Mignano, certify that the

4    foregoing transcript of proceedings in the case of

5    Knight v. The City of New York; Docket #22CV10755 was

6    prepared using digital transcription software and is

7    a true and accurate record of the proceedings.

8

9

10   Signature   *Adrienne M. Mignano*

11               ADRIENNE M. MIGNANO, RPR

12

13   Date:        November 13, 2023

14

15

16

17

18

19

20

21

22

23

24

25

              AMM TRANSCRIPTION SERVICE - 631.334.1445

**145**

# EXHIBIT 03

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

CAVALIER D. KNIGHT,

                              Plaintiff,

               -against-

CITY OF NEW YORK; KEECHANT SEWELL,

                              Defendants.
----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:__ 11/20/2023

22-CV-10755 (VEC)(VF)

**REPORT AND
RECOMMENDATION**

**VALERIE FIGUEREDO, United States Magistrate Judge**
**TO: THE HONORABLE VALERIE E. CAPRONI, United States District Judge**

On December 20, 2022, Plaintiff Cavalier D. Knight ("Knight") commenced this action

against Defendants The City of New York and Keechant Sewell, the then-Commissioner of the

New York City Police Department[1] (collectively, "Defendants"), claiming that 38 RCNY § 5-

25(d)(4)(i)[2], which limits to two the number of handguns that can appear on a carry handgun

license, violates the Second Amendment of the United States Constitution, the New York State

Civil Rights Law § 4, and is preempted by New York Penal Law § 400.00. See ECF No. 1

("Compl.") at ¶¶ 23, 27, 34, 37-38, 53-54. Knight also appears to be asserting a claim under the

Takings Clause of the Fifth Amendment and the Due Process and Equal Protection Clauses of

---

[1] Knight sued Sewell, the then-Commissioner of the New York City Police Department
("NYPD"), in her official capacity. On July 17, 2023, Edward Caban replaced Sewell as
Commissioner of the NYPD, and is therefore substituted as the named defendant. See Fed. R.
Civ. P. 25(d) (permitting automatic substitution of a party who is a public official sued in his
official capacity when the public official "ceases to hold office" while a suit is pending).

[2] Knight's Complaint cites to "38 RCNY § 5-25(d)(i)," see, e.g., Compl. at ¶ 17, but that
specific statutory subsection does not exist. Defendants point out that the relevant provision
Knight challenges is 38 RCNY § 5-25(d)(4)(i), see ECF No. 24, at n.1, and Knight does not
contend otherwise.

the Fourteenth Amendment based on the potential that his handguns will be confiscated given the

expiration of his residence premise license. Compl. ¶¶ 3, 13, 29-30, 43, 45, 49, 51. On April 7,

2023, Defendants moved to dismiss the Complaint. See ECF Nos. 22-24. For the reasons that

follow, I respectfully recommend that Defendants' motion be **GRANTED**.

**BACKGROUND**

**A. Factual Background**[3]

  Knight, a New York City resident, has had a Residence Premises License ("RPL") since

2010. See Compl. at ¶¶ 1, 5. Knight's RPL was issued by the License Division of the NYPD and

was scheduled to expire on December 26, 2022.[4] Id. at ¶¶ 1, 43. The License Division has

approved four handguns on Knight's RPL. Id., Ex. 2 at 5. On September 14, 2022, Knight sent

an e-mail to Nicole Berkovich of the License Division "to inquire as to why he would need to

pay to renew his state RPL after receiving his state [carry license]." Id. at ¶ 28. Although Knight

initiated a renewal application for his RPL, he has not paid the fee for that application. See id. at

¶ 28. On December 6, 2022, Knight's "state [carry license] was approved but [had] not been

issued."[5] Id. at ¶ 3.

---

[3] The factual allegations recounted herein are taken from the Complaint. For purposes of considering Defendants' motion to dismiss, I accept as true all well-pled factual allegations in Knight's Complaint and draw all reasonable inferences in Knight's favor. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

[4] A RPL permits a licensee to have a handgun that is "safeguarded at the specific address indicated on the license. See 38 RCNY § 5-01(a).

[5] Defendants indicate that Knight's license to carry a concealed handgun was issued "[o]n or about March 22, 2023." See ECF No. 24 at 2. At a conference on November 13, 2023, Knight confirmed that he had received a carry license. See ECF No. 37 at 30. A carry license permits the licensee to carry concealed handgun on his person. See 38 RCNY § 5-01(b).

**148**

### B.  Procedural Background

Knight commenced this action on December 20, 2022. See ECF No. 1. Knight claims that 38 RCNY § 5-25(d)(4)(i), which requires that only two handguns be listed on a carry license, violates the Second Amendment, the Takings Clause of the Fifth Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the New York State Civil Rights Law § 4. See Compl. at ¶¶ 53-54. Knight also alleges that the City rule has been preempted by Penal Law § 400.00. Id. at ¶¶ 37-38.

On December 21, 2022, Knight filed a motion for a temporary restraining order and preliminary injunction to prevent the City from requiring him to surrender his handguns, because his RPL was to expire on December 26, 2022. See ECF No. 8 at ¶¶ 1, 8. In his motion, Knight stated that he had no intention to pay the fee necessary to renew his RPL pending the Court's determination of the motion. Id. at ¶ 9.

I held a conference to address the motion on March 16, 2023. See ECF No. 25 ("3/16/23 Tr."). During the conference, Knight indicated that he had received his carry license on December 30, 2022, and still had his RPL, despite its expiration, because he had submitted a timely renewal application. See 3/16/23 Tr. at 4-5. Knight explained that he owns four handguns, two listed on the carry license permit and two under the RPL. Id. at 5. Knight further explained that if his RPL is not renewed, the two firearms associated with that license will be "vouchered to the NYPD." Id. at 5-6. Knight confirmed that if he paid the fee for the renewal application for his RPL, he would not have his handguns taken away. Id. at 4-5. Because Knight still had his handguns and his RPL would not be revoked if he paid the application fee, I explained to Knight that he had not shown irreparable harm, as is necessary for a temporary restraining order. Id. at

6-7, 9. I subsequently issued a Report & Recommendation, recommending that Knight's motion

for a TRO and preliminary injunction be denied. See ECF No. 32.

On April 7, 2023, Defendants moved to dismiss Knight's Complaint in its entirety. See

ECF Nos. 22-24. On April 21, 2023, Knight filed an opposition to Defendants' motion to

dismiss. ECF No. 27.[6] On April 28, 2023, Defendants filed a reply in support of their motion to

dismiss. ECF No. 28. On November 9, 2023, the Court held oral argument on Defendants'

motion. See ECF No. 37 ("11/13/23 Tr.").

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint "must plead 'enough facts to state a claim to relief that is plausible on its face.'" Green

v. Dep't of Educ. of City of New York, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation

omitted). In determining if a claim is sufficiently plausible to withstand dismissal, a court must

accept all factual allegations in the complaint as true and draw all reasonable inferences in the

plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007);

Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322, 324 (2007). However, a court does

not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of

action." Iqbal, 556 U.S. at 678. The court's function on a motion to dismiss is "not to weigh the

---

[6] Although the text for the Docket Entry at ECF No. 27 describes the filing as a "First
Letter Motion for Leave to File Letter Motion," the substance of document confirms that it is not
a separate motion but, rather, Knight's opposition to Defendants' motion to dismiss.

evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

## DISCUSSION

**A.  Knight lacks standing to assert his Fifth and Fourteenth Amendment claims.**

Under Article III of the United States Constitution, the jurisdiction of the federal courts is limited to "Cases" and "Controversies." Hedges v. Obama, 724 F.3d 170, 188 (2d Cir. 2013). One aspect of that limitation is the requirement that a plaintiff have standing to sue. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). The doctrine of standing requires that a plaintiff in federal court have "a personal stake in the outcome of the controversy." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).

To establish standing, a plaintiff must satisfy three elements: the plaintiff must have (1) suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). The Second Circuit has explained that "'threatened injury must be *certainly impending* to constitute injury in fact,'" and "'[a]llegations of *possible* future injury' are not sufficient." ACLU v. Clapper, 785 F.3d 787, 800 (2d Cir. 2015) (quoting Clapper v. Amnesty Int'l, 568 U.S. 398, 409 (2013) (emphasis and alteration in original)). As the party invoking the Court's jurisdiction, Knight bears the burden of establishing all three elements necessary for standing. Hedges, 724 F.3d at 188.

Knight appears to be basing his Fifth and Fourteenth Amendment claims on the possibility that the NYPD will confiscate his handguns. See Compl. at ¶¶ 3, 13, 28, 30, 43, 49. But that injury has not materialized. As recently as November 13, 2023, Knight still had his

handguns. See 11/13/23 Tr. at 29-30. And, Knight's RPL remains valid, as Defendants and

Knight have both indicated. See Defendant's Reply, ECF No. 28 at 3; 11/13/23 Tr. at 29.

Moreover, Knight acknowledged that his RPL would be renewed by the City if he were to pay

the application fee. See 3/16/23 Tr. at 4-6; 11/13/23 Tr. at 29. Additionally, if Knight wanted to

own more than the four handguns he currently owns, the License Division is required to approve

a request to add handguns to a RPL so long as Knight is able to demonstrate proper safeguarding

and compliance with the mandatory waiting period. See 38 RCNY § 5-25(d)(4)(vi).

      In other words, even though Knight's due process, equal protection, and takings clause

claims are premised on the possibility that the City will take away his handguns for violating 38

RCNY § 5-25(d)(4)(i), Knight has not shown that he has suffered such an injury or that such a

threatened injury is imminent. Harty v. West Point Realty, Inc., 28 F.4th 435, 443 (S.D.N.Y.

2022) (holding that plaintiff had not suffered injury in fact for standing where plaintiff had not

used the allegedly non-ADA-compliant website to arrange future travel and thus had not alleged

that his ability to travel was harmed in a concrete way). Nor has Knight shown that he has

suffered or will imminently suffer an injury. To the contrary, it appears that Knight's RPL

renewal application would be approved if he simply paid the processing fee. Knight therefore has

not pled that he has suffered an injury-in-fact, which is an "indispensable requirement for

standing." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168,

174 (2d Cir. 2005).

      Relatedly, Knight's allegations are insufficient to establish that his claims are ripe for

judicial review. The doctrine of ripeness contains two requirements—constitutional ripeness and

prudential ripeness. Simmonds v. Immigr. & Naturalization Serv., 326 F.3d 351, 356-57 (2d Cir.

2003). Constitutional ripeness "prevents a federal court from entangling itself in abstract

**152**

disagreements over matters that are premature for review because the injury is merely speculative and may never occur." In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 725 F.3d 65, 110 (2d Cir. 2013) (quoting Ross v. Bank of Am., N.A. (USA), 524 F.3d 217, 226 (2d Cir. 2008)). For a claim to satisfy the requirement of constitutional ripeness, the plaintiff's injury must be "imminent rather than conjectural or hypothetical." Id. Prudential ripeness looks at whether the claim "is fit for judicial resolution" and "whether and to what extent the parties will endure hardship if decision is withheld." Simmonds, 326 F.3d at 359.

Here, Knight's RPL has not been revoked and his renewal application would be approved if he paid the necessary fee. Additionally, Knight has not had his handguns confiscated and nor is there any indication that Knight would not be permitted to add additional handguns to his RPL. In short, any claim premised on the denial of the license or confiscation of the handguns is speculative as neither injury has occurred and may never occur. See United States v. Broadcast Music, Inc., 275 F.3d 168, 178-79 (2d Cir. 2001) (holding that the case was not ripe for adjudication because "the threat of an injury [was] speculative"). Knight's claims are thus not ripe for judicial intervention.

Knight also appears to be asserting third-party standing to sue on behalf of "all law-abiding citizens." See Compl. at ¶¶ 33-34, 46-47. However, third-party standing still requires a plaintiff to "meet[ ] 'the constitutional prerequisites of standing,'" such as injury-in-fact. Mid–Hudson Catskill Rural Migrant Ministry, Inc., 418 F.3d at 174 (quoting Lewis v. Thompson, 252 F.3d 567, 584 (2d Cir. 2001)). As already discussed, Knight has not pled that he suffered an injury-in-fact.

Nevertheless, even if Knight had sufficiently alleged an injury-in-fact, he still would be unable to satisfy the requirements of third-party standing. In addition to the constitutional

prerequisites of standing, third-party standing requires the plaintiff to "satisfy 'prudential limitations,' such as "(1) a 'close relation with the third party' and (2) 'some hindrance to the third party's ability to protect his or her own interests.'" <u>Lewis</u>, 252 F.3d at 584 (quoting <u>Lake v. Reno</u>, 226 F.3d 141, 146 (2d Cir. 2000)). Because Knight is alleging third-party standing on behalf of "all law-abiding citizens" (Compl. at ¶¶ 33-34), it is plain that he will be unable to show a "close relation" with those third parties, as is necessary for Knight to have prudential standing to sue on their behalf. <u>Cf. Lewis</u>, 252 F.3d at 585 (finding first element of prudential standing satisfied where plaintiffs were citizen children and third parties were the children's alien mothers).

In short, I recommend that Defendants' motion to dismiss Knight's Fifth and Fourteenth Amendment claims be granted because Knight lacks standing to bring those claims.

**B.** <u>**Knight fails to state a claim under the Second Amendment and New York State's Civil Rights Law § 4.**</u>

<u>Knight contends that 38 RCNY § 5-25(d)(4)(i) violates the Second Amendment of the United States Constitution and the New York State Civil Rights Law § 4.[7] See Compl. Fifth Cause of Action. Knight alleges that the city regulation restricts and substantially burdens an individual's right to keep and bear arms and is thus unconstitutional on its face and as applied to Knight and other law-abiding citizens. Id. ¶¶ 53-55. As explained below, Knight has not pled a plausible violation of federal or state law.</u>

---

[7] New York's Civil Rights Law § 4 provides that "[a] well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms cannot be infringed." State courts interpret Civil Rights Law § 4 consistent "with federal Second Amendment jurisprudence." <u>See, e.g.</u>, <u>Haverstraw Town Police v. C.G.</u>, 79 Misc. 3d 1005, 1010 (N.Y. Sup. Ct. Apr. 20, 2023).

In <u>Heller v. District of Columbia</u>, 554 U.S. 570 (2008), the United States Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." <u>Id.</u> at 592. Following <u>Heller</u>, courts applied a "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." <u>New York State & Rifle Assoc., Inc. v. Bruen</u>, 597 U.S. --- , 142 S. Ct. 2111, 2125 (2022). The first step of the analysis involves ascertaining whether a particular gun regulation implicates conduct protected by "the original scope of the right based on its historical meaning," because if it does not, "then the analysis can stop there; the regulated activity is categorically unprotected." <u>Id.</u> at 2126. At the second step, a court examines "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." <u>Id.</u> The Court in <u>Bruen</u> confirmed that step one of the analysis "is broadly consistent with <u>Heller</u>." <u>Id.</u> at 2127. But it eliminated step two of the analysis, explaining that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and the government must therefore "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." <u>Id.</u> at 2129-30.

<u>Heller</u> and <u>Bruen</u> make clear, however, that the right to keep and bear arms is "not unlimited." 554 U.S. at 595. "[T]he right to keep and bear arms is 'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 786 (2010); <u>see also</u> <u>Heller</u>, 554 U.S. at 626 (explaining that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"). Indeed, although the Court in <u>Bruen</u> struck down New York's "may issue" firearms-permitting regime, which required citizens to show a "special need" for self-defense and submit to a discretionary licensing process in order to exercise their Second

Amendment right to carry arms, the Court nonetheless emphasized that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit." Bruen, 142 S. Ct. at 2138 n.9; see also id. at 2161 (Kavanaugh, J., concurring) ("The Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense [and] [i]n particular . . . does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States.").

Knight has not pled a claim that 38 RCNY § 5-25(d)(4)(i) violates the Second Amendment. As discussed, at the first step of the analysis, a court must examine whether the conduct is protected by the Second Amendment, because if the "Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Bruen, 142 S. Ct. at 2126. The question thus becomes whether the conduct at issue in 38 RCNY § 5-25(d)(4)(i) is covered by the text of the Second Amendment. It is not.

The Second Amendment states that "the right of the people to keep and bear Arms[ ] shall not be infringed." U.S. Const. amend. II. At the core of the Second Amendment is an individual's right to possess weapons in the home and in public for self-defense. Bruen, 142 S. Ct. at 2134-35 (concluding that the Second Amendment's plain text guarantees the right of an individual to bear arms in public for self-defense); Heller, 554 U.S. at 584 (explaining that the right to "bear arms" means the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person") (alteration in original). The City's regulation does not restrict who may keep or bear firearms, whether inside the home or in public.

156

First, the City's rule places no restrictions on an individual's ability to carry a handgun in public for self-defense. The rule does not regulate the acquisition of a gun. Nor does the rule speak to who can obtain a carry license or what must be shown by a person to obtain such a license. What's more, the rule does not limit the number of handguns that can be carried on a person at one time.[8] And, Knight himself has a carry license. See ECF No. 23-1 (photographs of Knight's carry license). Second, the rule does not concern possession of a handgun in the home. It therefore places no restrictions on a person's ability to possess a gun in the home for self-defense. All the challenged rule does is limit how many handguns can be listed on a carry license.[9] Under the rule, a licensee may list only two handguns at a time on a carry license. See 38 RCNY § 5-25(d)(4)(i). Consequently, the City's regulation concerns neither the possession of a firearm in the home or in public for self-defense—the core conduct protected by the Second Amendment. See Bruen, 142 S. Ct. at 2125 (explaining that Heller and McDonald held that the Second Amendment protects an individual right to keep and bear arms for self-defense).

Although Knight argues that the complained-of regulation pertains to the acquisition and possession of a firearm (11/13/23 Tr. at 16, 20, 49-51), if it does, it is at most indirectly and, more significantly, without restricting who may obtain a license to carry in public. Bruen makes clear that some burdens on core conduct are permissible, such as those imposed by "shall issue" licensing regimes. See 142 S. Ct. at 2138 n.9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes" which

---

[8] A different rule, 38 RCNY § 5-22(a)(7), restricts a licensee to carrying only one handgun at a time on their person.

[9] Although a licensee can list only two handguns at a time on his carry license, it can be any two handguns the licensee picks. As Knight explained at oral argument, a licensee can change which of his handguns is listed on the carry license. The process is not "strenuous" and requires only that a gun owner submit a notarized letter to the NYPD asking for a "swap" of one gun for another. See 11/13/23 Tr. at 44.

**157**

"require applicants to undergo a background check or pass a firearms safety course"); <u>see also</u> <u>id.</u> at 2161 ("The Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."). At bottom, Knight is opposed to 38 RCNY § 5-25(d)(4)(i) because it forces a gun owner to obtain more than one license to possess more than two handguns, because only two handguns can be listed on the carry license.[10] <u>See</u> 11/13/23 Tr. at 15-17, 19. <u>Although Knight contends that there is no "need for two licenses" (see 11/13/23 Tr. at 19-20, 36-39, 46-47, 54-55), nothing in Bruen, Heller, or McDonald prevent the City from requiring gun owners to obtain multiple licenses, one for the home and one to carry in public, so long as the licensing regime does not allow for the denial of a license "based on a perceived lack of need or suitability." Bruen, 142 S. Ct. at 2123. And, here, the challenged rule does not even impose a license requirement or pertain to the requirements for issuance of a carry or residence license.</u>

In sum, the challenged rule does not operate to prevent anyone from keeping or bearing arms. 38 RCNY § 5-25(d)(4)(i) therefore does not violate the Second Amendment because it does not infringe on the core conduct protected by the Second Amendment. And because the Second Amendment and New York's Civil Rights Law § 4 are interpreted consistently, Knight also has not pled a violation of the state law.

### C. The City's Licensing Regulation is not preempted by Penal Law § 400.00.

In his Complaint, Knight contends that 38 RCNY § 5-25(d)(4)(i) is preempted by Penal Law § 400.00, a "comprehensive and detailed regulatory" scheme that evinces an intent by the New York Legislature to preempt local laws that regulate firearms. Compl. at ¶¶ 36-38. Knight is mistaken.

---

[10] To possess more than two handguns, a person would need a RPL, which allows you to keep handguns in the home. <u>See</u> 38 RCNY §§ 5-02, 5-25(d)(4)(vi).

Preemption "embodies the untrammeled primacy of the Legislature to act . . . with respect to matters of State concern." Ass'n of Home Appliance Mfrs. v. City of New York, 36 F. Supp. 3d 366, 375 (S.D.N.Y. 2014) (quoting Albany Area Builders Ass'n v. Town of Guilderland, 74 N.Y.2d 372, 377 (1989)). "The New York Court of Appeals has explained that a local law is preempted 'where there is a direct conflict with a state statute (conflict preemption)' or where the local law is inconsistent with state law because it 'prohibit[s] what would be permissible under State law, or impose[s] prerequisite additional restrictions on rights under State law, so as to inhibit the operation of the State's general laws.'" New York Pet Welfare Ass'n v. City of New York, 850 F.3d 79, 93 (2nd Cir. 2017) (quoting Eric M. Berman, P.C. v. City of New York, 25 N.Y.3d 684, 690 (2015)).

In Penal Law § 400.00, the Legislature created a licensing regime for the possession of "firearms" in New York, making it unlawful to possess a handgun in the state without a license. See Juzumas v. Nassau Cty., 33 F.4th 681, 683-84 (2d Cir. 2022). The eligibility requirements for a license are governed by Penal Law § 400.00(1). However, the Legislature recognized the uniqueness of New York City, allowing the City to develop its own application and license for firearms, issue special permits for licensees seeking to carry in the City, and setting its own licensing fee. See Penal Law §§ 400.00(3)(a), (6), (7), (14). Further, Penal Law § 400.30, which was added by the Legislature in 2022, and became effective September 1, 2022, states that "[n]othing in this article shall be construed to impair or in any way prevent the enactment or application of any local law, code, ordinance, rule or regulation that is more restrictive than any requirement set forth in or established by this article." There is no indication in the text of Penal Law § 400.00 to indicate that the Legislature intended to preempt New York City's licensing regulations. Moreover, given the broad language in Penal Law § 400.30, it appears evident that

**159**

the Legislature intended to allow the City's licensing regulations, even if more restrictive than those imposed in Penal Law § 400.00.

Finally, Knight's memorandum of law in opposition to Defendants' motion to dismiss raises an argument that the City's rule violates the Privileges and Immunities Clause of the United States Constitution. See ECF No. 27 at 7. Knight does not raise this claim in his Complaint. Instead, Knight raised this claim for the first time in his memorandum in opposition to Defendants' motion. Because Knight did not plead this claim in his Complaint, it should not be considered here. See Cooper v. Slice Technologies, Inc., 17-CV-7102 (JPO), 2018 WL 2727888, at *5 n.3 (S.D.N.Y. June 6, 2018) ("The Court will not consider [a] cause of action raised for the first time in opposition to the motion to dismiss"); see also O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."); U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co., 12-CV-6811 (CM) (JCF), 2013 WL 791462, at *2 (S.D.N.Y. March 5, 2013) ("If the plaintiff wishes to add new claims, theories, or allegations to its pleadings, the proper course is to seek leave of the Court to do so.").

**CONCLUSION**

For the reasons set forth above, I recommend that Defendants' motion to dismiss be

**GRANTED**. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 22

and 27.

      **SO ORDERED.**

DATED:      New York, New York
              November 20, 2023

 

_____
VALERIE FIGUEREDO
United States Magistrate Judge

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND
RECOMMENDATION**

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Valerie E. Caproni. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**

# EXHIBIT 04

## § 5-25 Handgun Purchase Authorizations.

(a)   The licensee may not obtain a handgun without prior written authorization from the Division Head, License Division. This authorization shall be provided in the nature of a "Handgun Purchase Authorization" form. The following are the rules concerning handgun acquisition:

(1)   The "Handgun Purchase Authorization" form is valid only for thirty (30) calendar days from the issuance date.

(2)   Pursuant to New York City Administrative Code § 10-311(a), it shall be unlawful for any person or business enterprise to dispose of any handgun which does not contain a safety locking device, defined as a design adaptation or attachable accessory that will prevent the use of the weapon by an unauthorized user. The following types of safety locking devices will be deemed to comply with this provision:

(i)   a trigger lock, which prevents the pulling of the trigger without the use of a key; or

(ii)   a combination handle, which prevents the use of the weapon without the alignment of the combination tumblers; or

(iii)   a detachable or non-detachable locking device, composed primarily of steel or other metal of significant gauge to inhibit breaking, utilizing a metallic key or combination lock, rendering the weapon inoperable until the locking device is removed by an authorized person.

(3)   Pursuant to New York City Administrative Code § 10-311(b), it shall be unlawful for any licensed manufacturer, licensed importer, or licensed dealer to dispose of any handgun in New York City unless it is accompanied by the following warning, which shall appear in conspicuous and legible type in capital letters, and which shall be printed on a label affixed to the handgun and on a separate sheet of paper included within the packaging enclosing the handgun: "THE USE OF A LOCKING DEVICE OR SAFETY LOCK IS ONLY ONE ASPECT OF RESPONSIBLE WEAPON STORAGE. ALL WEAPONS SHOULD BE STORED UNLOADED AND LOCKED IN A LOCATION THAT IS BOTH SEPARATE FROM THEIR AMMUNITION AND INACCESSIBLE TO CHILDREN AND ANY OTHER UNAUTHORIZED PERSONS."

(4)   Pursuant to New York City Administrative Code § 10-311(c), any person who applies for and obtains authorization to purchase, or otherwise lawfully obtains, a handgun shall be required to purchase or obtain a safety locking device at the time s/he purchases or obtains the handgun.

(5)   Pursuant to New York City Administrative Code § 10-311(d), the City of New York and its agencies, officers or employees shall not be liable to any party by reason of any incident involving, or the use or misuse of a safety locking device that may have been purchased in compliance with these rules.

(6)   Once the licensee has purchased the handgun, s/he shall return to the License Division – Room 152, One Police Plaza, New York, New York 10038, within 72 hours to have the handgun and safety locking device inspected. The handgun may not be utilized before it has been inspected by License Division personnel and entered on the license.

(7)   Handgun inspections are conducted only between the hours of 12 to 2 p.m., Monday through Friday.

*Note:* The License Division is closed on all legal holidays.

(8)   The licensee may only purchase a handgun from the following:

(i)   A licensed New York State Firearms Dealer.

(ii)   The holder of a current, valid, New York State, or New York City Handgun License.

(iii)   A New York State or New York City Police Officer or Peace Officer, as defined under the New York State Criminal Procedure Law.

(iv)   Estate of deceased New York City/New York State handgun licensee.

(9)   If the licensee purchases a handgun from a licensed New York State Firearms Dealer, s/he shall submit the following documents when s/he presents the handgun for inspection:

(i)   Completed "Handgun Purchase Authorization" form.

(ii)   Original Bill of Sale and a clear carbon copy or photocopy of same.

(10)   If the licensee purchases a handgun from the holder of a valid New York State or New York City handgun license, s/he shall also submit the following documents when s/he presents the handgun for inspection:

(i)   Completed "Handgun Purchase Authorization" form.

(ii)   A signed and notarized Bill of Sale and a clear photocopy by the seller which includes the following information: make, model, calibre, and serial number of handgun sold; Seller's: name, address, license number; Buyer's: name, address, license number, date of sale.

(iii)   Clear photocopy of the seller's valid, current Handgun License, listing the handgun to be purchased thereon. The front and back of the license shall be photocopied.

(11)   If the licensee purchases a handgun from a New York State or New York City Police Officer or Peace Officer, s/he shall submit the following documents when s/he presents the handgun for inspection:

(i)   Completed "Handgun Purchase Authorization" form.

(ii)   A signed and notarized Original Bill of Sale and a clear photocopy. Bill of Sale shall include: date of sale; Seller's: name, address, agency, including command, and shield number; Buyer's: name, address, license number; make, model, calibre and serial number of handgun.

(12)   The aforementioned transaction shall not be permitted if the seller is a New York City Police Officer who has not complied with Police Department guidelines regarding the sale of firearms to a handgun licensee.

(13)   If the seller is a Police Officer or Peace Officer from a jurisdiction other than New York City, the License Division requires prior written notification as to the seller, so that verification of employment, etc., can be obtained. This information shall be listed in the "Handgun Purchase Authorization" request submitted by licensee.

(14)   If the licensee wishes to purchase a handgun from the Estate of a deceased New York State/New York City licensee, s/he shall provide the below specified documents prior to obtaining a "Handgun Purchase Authorization" form. This transaction shall be conducted in person at the License Division, Room 152, between the hours of 9 a.m. and 12 noon, Monday through Thursday only.

(i)   A written request for purchase authorization for the desired handgun(s) including make, model, calibre and reason for request; the licensee's name, address, and license number.

(ii)   The license is required for this transaction.

(iii)   A copy of the voucher for the handgun(s).

(iv)   The decedent's license, if not previously surrendered, showing registration of the handgun(s) in question.

(v)   A copy of the death certificate.

(vi)   If there is a Will: The License Division requires a short certificate of Letters Testamentary, that gives the Executor or Executrix the authority to dispose of the property. Letters can be obtained from the Surrogate's Court, of the borough in which the deceased lived.

(vii)   If there is no Will: The License Division requires a short certificate of Letters of Administration that gives the administrator the authority to dispose of the property. Letters can be obtained from the Surrogate's Court, of the borough in which the deceased lived.

(viii)   A notarized Bill of Sale from the Executor or Administrator of the decedent's estate, indicating the weapon, make, model, calibre and serial number, and stating that they are being sold to: the licensee's name, address and license number.

(ix)   Once purchased, the handgun shall be presented for inspection within seventy-two (72) hours; Monday through Friday 12 to 2 p.m.

(b)   *New licensees.* A "Handgun Purchase Authorization" form shall be issued to the licensee with her/his new handgun license. As indicated previously this form is only valid for thirty (30) calendar days from the date of issuance.

(1)   If the licensee does not purchase a handgun within the specified period of time, s/he shall within ten (10) calendar days of the expiration date of the "Handgun Purchase Authorization" form, surrender said form and her/his handgun license to the License Division Issuing Unit.

(2)   The license is only valid if there is a handgun listed thereon.

(3)   Requests for extensions for Handgun Purchase Authorizations shall be made by written request to the Division Head, License Division.

(c)   *Purchasing an additional handgun.*

(1)   Requests for the purchase of an additional handgun shall be made in writing to the License Division – Issuing Unit – One Police Plaza, Room 152, New York, New York 10038. Pre-printed request forms are available at the Reception Desk in Room 152.

(2)   The written request shall include: the licensee's name, address and license number, and the make, model and calibre of the handgun s/he wishes to purchase.

(3)   The licensee shall be notified in writing of the approval or disapproval of her/his request for an additional handgun. If the request has been approved, the licensee shall receive by mail, a "Notice of Handgun Purchase Authorization Approval." To receive the purchase document the licensee shall appear at the License Division, Room 152, by the date indicated on the notice. The licensee shall bring the approval notice and her/his license with her/him to receive her/his purchase document.

(4)   Purchase documents are issued only between the hours of 9 a.m. to 12 noon, Monday through Thursday.

   *Note:* The License Division is closed on all legal holidays.

(5)   "Handgun Purchase Authorizations" shall be returned to the License Division within ten (10) calendar days of their expiration date. Failure to return the document within the specified time shall result in the suspension and/or revocation of the handgun license(s).

(6)   All purchasers of handguns shall also be required to prepare a "Handgun Index Card," at the License Division.

(d)   *Number of handguns allowed on a handgun license.*

(1)   All licensees shall utilize a safe when handguns are stored out of the licensee's possession at a premises.

(2)   All licensees must provide proof of the ownership of a safe in which the handguns shall be safeguarded when not in use. Proof of ownership consists of a Bill of Sale for the safe and two color photos of the safe, one with the door open and one with the door closed. Photos may not be stock images and must depict the entirety of the safe, not merely a portion thereof.

(3)   The Division Head, License Division reserves the right to accept or reject the type of safe proposed for safeguarding the handguns.

(4)   The number of handguns allowed under each type of handgun license is listed below. Requests for additional handguns shall be reviewed on an individual basis.

(i)   Carry and Special Carry – Two handguns. The Division Head of the License Division may, in her/his discretion and in accordance with applicable law, limit the number of handguns that appear on the carry handgun license.

(ii)   Reserved.

(iii)   Carry Guard and Special Carry Guard – One handgun.

(iv)   Gun Custodian – Number of handguns shall be determined by the Division Head, License Division, consistent with the demonstrated needs of the applicant.

(v)   Premises Business – One handgun.

(vi)   Premises Residence – One handgun.

(e)   *Requests for additional handguns for "Special Handgun Licenses."*

(1)   Holders of "Special Handgun Licenses" shall comply with the purchase authorization request guidelines of the county in which they hold their basic handgun license. Once the addition has been made to their basic County License, a request to add the handgun to their New York City Special License may be made in writing to the Division Head, License Division. If the Division Head, License Division approves the request, the licensee shall be notified when to report to the License Division to effect the addition. The following documents shall be required at that time:

(i)   The basic County License.

(ii)   A copy of the county Handgun Purchase Authorization form.

(iii)   A copy of the Bill of Sale.

(iv)   The New York City Special Handgun License.

(2)   Inquiries concerning this type of transaction may be made to the Issuing Unit at telephone number (646) 610-5550.

(Amended City Record 8/31/2022, eff. 8/31/2022)



Expiration



## LICENSE DIVISION DIRECTORY

| **Handgun Sections** | **Phone Number** | **Email** |
|---|---|---|
| Main | 646-610-5560 | Fax Number: (646) 610-6399 |
| New Application Intake | 646-610-5058 | DG_LIC-HandgunIntake@NYPD.ORG |
| New Applications | 646-610-5551 | DG_LIC-HandgunNewApps@NYPD.ORG |
| Carry Unit | 646-610-5551 | DG_LIC-Carry@NYPD.ORG |
| Carry Guard | 646-610-4611 | DG_LIC-Carry-Guard@NYPD.ORG |
| Retiree Applications | 646-610-5536 | DG_LIC-Retirees@NYPD.ORG |
| Retiree Renewals | 646-610-6558 | DG_Lic-HandgunRenewals@NYPD.ORG |
| Special Patrolmen | 646-610-5519 | DG_LIC-Special-Patrolmen@NYPD.ORG |
| Incidents | 646-610-5154 | DG_LIC-Incidents@NYPD.ORG |
| Hearings & Appeals | 646-610-6468 | |
| License Renewals | 646-610-5872 | DG_Lic-HandgunRenewals@NYPD.ORG  Fax Number: (646) 610-5488 |
| Cancellations | 646-610-5871 | DG_LIC-Cancellations@NYPD.ORG |
| Issuing | 646-610-5550 | |
| Purchase Authorizations | 646-610-5153 | LIC-PurchaseOrders@NYPD.ORG |

| **Rifle/Shotgun Sections** | **Phone Number** | **Email** |
|---|---|---|
| Main | 718-520-9300 | |
| Intake | 718-520-9300 | DG_LIC-RS-Intake@NYPD.ORG |
| New Applications | 718-520-9300 | DG_LIC-RS-NewApps@NYPD.ORG |
| Incidents | 718-520-9300 | DG_LIC-RS-Incidents@NYPD.ORG |
| Renewals | 718-520-9300 | DG_LIC-RS-Renewals@NYPD.ORG |
| Cancellations | 718-520-9300 | DG_LIC-RS-Cancellations@NYPD.ORG |

**POLICE DEPARTMENT**

**CITY OF NEW YORK**

**LICENSE DIVISION**

# HANDGUN LICENSE INFORMATION BOOKLET

**WEBSITE:** https://licensing.nypdonline.org

**HOURS:** Monday-Friday from 8:30 A.M. - 4:00 P.M.

Closed on all legal holidays



**KEECHANT L. SEWELL**

**Police Commissioner**

NYPD PRINTING SECTION
BM 169-H (12-21)

## Table of Contents

INTRODUCTION TO THIS BOOKLET................................................ 1

IMPORTANT FACTS ABOUT YOUR HANDGUN LICENSE ............ 2

SAFEGUARDING YOUR FIREARM................................................. 2

NOTIFICATIONS............................................................................... 3

ACQUIRING NEW FIREARMS ........................................................ 4

    Number of handguns allowed on a handgun license .......................... 5

DISPOSAL AND/OR SALE OF FIREARMS ..................................... 6

CANCELLATION OF LICENSES ...................................................... 6

RENEWALS OF LICENSES .............................................................. 7

THE "INCIDENT" PROCESS & HEARINGS ..................................... 8

    Hearings........................................................................................... 8

TYPES OF LICENSES ...................................................................... 9

LICENSE DIVISION DIRECTORY .................................................. 11

## INTRODUCTION TO THIS BOOKLET

Congratulations on receiving your New York City Handgun License. Having a license comes with a number of responsibilities. This booklet should be used as a guide to assist you in navigating the rules and regulations that Licensees are required to follow and answer some of the most common questions you may encounter. This is not a substitute for the rules that pertain to your license.

Here is a list of the most significant rules and regulations that you are expected to become familiar with, along with links for free resources to view them online:
1. Title 38 R.C.N.Y. Chapters 5 & 15:
   https://www.amlegal.com/codes/client/new-york-city_ny/
2. N.Y.S. Penal Law Articles 35, 265, and 400:
   http://ypdcrime.com/penal.law/index.htm
3. New York City Administrative Code Title 10, Chapter 1, § 10-131, & Title 10, Chapter 3:
   https://www.amlegal.com/codes/client/new-york-city_ny/
4. 18 U.S.C. Chapter 44:
   https://www.law.cornell.edu/uscode/text/18/part-1/chapter-44

- To the extent that there is a discrepancy between this booklet and the law, please follow the law. We strive to keep the License Division website updated with the current laws. See https://licensing.nypdonline.org

- Contact information for the License Division, and its internal units, can be found listed on the rear cover of this booklet.
- If you require translation services, please be advised that they are available upon request in certain circumstances.

## IMPORTANT FACTS ABOUT YOUR HANDGUN LICENSE

(1) Any misuse of the license, violation of the rules and/or the restrictions of the license, or any action or misconduct on the part of the Licensee may result in the suspension and/or revocation of the license. *In addition* to the previously listed administrative penalties, Licensees must be aware that violations of the New York State Penal Law, or other applicable criminal statutes, may subject the Licensee to separate criminal penalties, including but not limited to, jail time.
(2) The license is revocable at any time.
(3) Your license is not transferable to any other person or location.
(4) The Licensee is authorized to own only the handgun(s) that are listed on his/her license.
(5) The Licensee shall not draw, expose or display handgun(s) unnecessarily.
(6) Handgun(s) must be properly safeguarded at all times.
   **Note:** Firearms are never to be left unattended in a vehicle or any place where a thief or other unauthorized persons may readily obtain them.
(7) It is the Licensee's responsibility to notify the License Division of any matter which require notification. See "notifications" section, page 3.
(8) Any mutilation, alteration, or lamination of the license shall render it void.
(9) The Licensee must be in possession of his/her license at all times while carrying, transporting, possessing at residence, business, or range, the handgun(s) indicated on said license.
(10) The Licensee shall not purchase, replace, sell, or otherwise dispose of a handgun prior to obtaining written permission from the Commanding Officer of the License Division.
(11) The Licensee should endeavor to engage in periodic handgun practice at an authorized range or shooting club.

## SAFEGUARDING YOUR FIREARM

To assure maximum safety, your handgun(s) must be safeguarded at all times. Proper safeguarding practices include, but are not limited to, ensuring that:
- Handgun(s) are never to be left any place where a child, thief, or unauthorized person(s) may readily obtain them.
- Whenever a handgun is outside of your immediate control, it must be rendered inoperable with a safety locking device.
- If there are more than four handguns in your home, they must be stored in a safe.

- If you have a Premise Business or Limited Carry license and your gun is stored at your business, it must be stored unloaded in a safe.
- When transporting your handgun(s) in a vehicle, the handgun(s) may not be in the glove compartment or console of the vehicle, and must be in a locked container with ammunition carried separately.

Even if you have fewer than 4 guns at home, the License Division recommends that Licensees store handguns unloaded and in a safe, or other locked compartment, when not in use. Licensees are also encouraged to voucher their handguns for "safekeeping" with their local precinct if Licensees will be leaving their handguns unattended for extended periods of time, or will otherwise be in a situation that may compromise their ability to safeguard their handguns. Examples of times this may be appropriate include, but are not limited to:

- Extended vacations,
- Extensive renovations of the home or business where the handgun is normally stored,
- During the course of a move or relocation between homes,
- Periods of planned medical incapacity (e.g., recovery after surgery)

If you have any issues vouchering at your local precinct, please contact the **Incident Section** for assistance.

Please note that there are certain places that a gun will never be considered "safeguarded", such as:

- Inside an unattended vehicle; or
- A safety deposit box at a bank.

**Important:** Depending on your license type, you may have additional specific safeguarding requirements to comply with.

For more information regarding safeguarding your handgun please see **Title 38 R.C.N.Y. § 5-22**.

## NOTIFICATIONS

Licensees have extensive responsibilities to timely and proactively contact the License Division (and in some cases, the local police precinct) in certain instances. Many of these instances will be considered "incidents", and the Licensee has a duty to notify the License Division "immediately" upon their occurrence. **It is *not enough* to merely report "incidents" to your local police precinct.** In order to fulfill your notification responsibilities, you must notify the License Division directly.

**Never rely on anyone's representation, including those of police officers, that they will notify the License Division on your behalf. When an incident occurs, the primary responsibility to notify rests with the Licensee.**

Contact information for the License Division and its sections can be found on the rear cover of this booklet. **Make your notification directly to the License Division, preferably by e-mail or otherwise in writing.**

The list below reflects some of the most common times you need to notify the **Incident Section** of the License Division. *This is not an exhaustive list.*

1. Lost or stolen handguns(s), license(s), and/or permit(s)
2. Discharge of handgun - other than at a licensed handgun range
3. Improper use/safeguarding of handgun(s)
4. Public display of an unholstered handgun(s)
5. Arrest, summons, (except traffic infractions), indictment, or conviction of Licensee in any jurisdiction, federal, state, local, etc.
6. The Licensee requests or becomes the subject of an order of protection
7. Receipt of psychiatric treatment or treatment for alcoholism or drug abuse, or the presence or occurrence of any disability or condition that may affect the ability to safely possess or use a handgun.
8. The onset, existence, or change of circumstances, in any of the following conditions by the Licensee:
   a. Epilepsy
   b. Diabetes
   c. Fainting spells
   d. Blackouts
   e. Temporary loss of memory
   f. Nervous disorder
   g. ANY condition that may affect the handling of a handgun.
9. **Whenever the holder of a handgun license becomes involved in a situation which comes to the attention of any police department, or other law enforcement agency.** (For example, complaints about the Licensee, or by the Licensee, resulting in police response, including, but not limited to Domestic Incident Reports)
10. Change of business, occupation or employment
11. Change of address or contact information
12. Change of personal name or business name
13. Any change in the circumstances for which the Licensee received the license
14. Alteration, mutilation, destruction of handgun license

For more information regarding your responsibility to make notifications to the License Division, please see **Title 38 R.C.N.Y. §§ 5-22 & 5-30**.

## ACQUIRING NEW FIREARMS

Licensees may only obtain new handguns *after* seeking, and being granted, written authorization from the Commanding Officer, License Division. This authorization is called a "Handgun Purchase Authorization" form. Licensee must obtain this authorization form prior to the purchase of an initial handgun or

of any additional handgun(s). Remember, you are authorized to own only the handgun(s) that are listed on your license. Inquiries concerning Handgun Purchase Authorizations may be addressed to the **Issuing Unit**.

Once a "Handgun Purchase Authorization" form is granted, the Licensee may only purchase a handgun from the following:

1. A licensed New York State Firearms Dealer;
2. The holder of a current, valid, New York State, or New York City handgun license;
3. A New York State or New York City Police Officer or Peace Officer as defined by the Criminal Procedure Law; or,
4. The estate of a deceased New York City/New York State handgun Licensee.

**Note:** All of these acquisitions will need to be conducted through a federally Licensed Firearms Dealer (FFL), unless the acquisition is from an immediate family member, so that a background check can be conducted through NICS (National Instant Criminal Background Check System).

Under no circumstances may a person acquire more than one (1) handgun in a ninety (90) day period.

 ## Number of handguns allowed on a handgun license

1. Number of handgun(s) allowed:
   a. Carry – Two handguns.  The Commanding Officer of the License Division may in his/her discretion limit the number of handguns to one when the Licensee's needs do not require possession of two handguns.
   b. Premise Business – One handgun
   c. Premise Residence – One handgun. Requests for additional handguns shall be reviewed on an individual basis.
   d. Special Carry – Same as requirements for Carry.
2. Requests for handguns in excess of four (4) will not be entertained without proof of the ownership of a safe in which the weapons will be safeguarded when not in use.  Proof of ownership consists of a Bill of Sale for the safe and two photos of the safe, one with the door open and one with the door closed. The Commanding Officer, License Division reserves the right to accept or reject the type of safe proposed for safeguarding the weapons.
3. Holders of "Special Handgun Licenses" must comply with the purchase authorization request guidelines of the county in which they hold their primary handgun license.  Once the addition has been made to their county license, a request to add the weapon to their N.Y.C. special license may be made in writing to the Commanding Officer, License Division.

For more information regarding the purchase or acquisition of a handgun please see **Title 38 R.C.N.Y. § 5-25**, and **N.Y.C. Administrative Code § 10-302.1**

 ## DISPOSAL AND/OR SALE OF FIREARMS

Licensees may only sell or otherwise dispose of handguns *after* seeking, and being granted, written authorization from the Commanding Officer, License Division. This authorization will be provided in the nature of a "Permission to Sell" notice. Inquiries concerning these transactions may be made to the **Incident Section**.

To legally dispose of his/her handgun(s) the Licensee must either:

(1) Voucher the handgun(s) at his/her local precinct; or
(2) Sell the handguns to a handguns dealer; or
(3) Sell the handgun(s) to a police officer or peace officer; or
(4) Transfer handgun(s) to another license he/she may possess, if authorized to do so; or
(5) Sell the handgun(s) to a Licensee, if authorized to purchase.

**Note:** Most of these transfers or sales will need to be conducted through a federally Licensed Firearms Dealer (FFL). For more information please see **Title 38 R.C.N.Y. § 5-26(e)**.

**Note:** Any person lawfully in possession of a handgun, who disposes of the same without first notifying the Commanding Officer, License Division in writing, is guilty of a Class A Misdemeanor pursuant to **N.Y.S. Penal Law - §265.10(7)**.

**Important:** If the Licensee sells, or otherwise disposes of, the one and only handgun on his/her license, the license becomes invalid and will be cancelled.

For complete rules regarding the sale or disposal of a handgun please see **Title 38 R.C.N.Y. § 5-26**.

 ## CANCELLATION OF LICENSES

If a Licensee no longer wishes to possess a handgun license, a Licensee may cancel his/her license at any time that Licensee is in good standing with the License Division. If he/she chooses to cancel, the Licensee must:

i. Notify the License Division of his/her intent to cancel the license;
ii. Legally dispose of the handgun as stated in the section above;
iii. Return the original license to the License Division with a copy of the voucher or a Bill of Sale for the handgun(s);
iv. Provide a letter explaining the reason for cancellation.
All documents and the license should be mailed to the License Division – **Cancellation Unit, One Police Plaza, Room 152, New York, NY 10038 within ten (10) days** of disposal of the handgun.

**Note:** Licensees must complete the above-listed process irrespective of the reason they choose to cancel the license. Even if the Licensee is moving out of the City/State, transferring his/her handguns to another County's license, or

choosing not to renew the license for any reason, the Licensee **must** inform the License Division of the status of all of the handguns.

- To dispose of handguns, follow the procedure listed above.
- If you are moving out of New York City, and wish to retain possession of your handgun(s) in your new jurisdiction, you must inform the License Division in writing of your new address and the current location of your handguns(s).

For more information regarding the cancellation of a handgun license, including moving out of State, please see **38 R.C.N.Y. § 5-27.**

 ## RENEWALS OF LICENSES

It is the Licensee's responsibility to renew his/her license every three (3) years, unless you wish to cancel the license. Licensees should note that each renewal of your license will be fully investigated by the License Division. The grant of a license in the past does not guarantee the approval of a renewal application.

(a) The renewal process generally begins sixty (60) days prior to the license's expiration date. If Licensee has not received any communication regarding his/her renewal thirty (30) days prior to the expiration date of the license, you must contact the **Renewal Section**.

(b) Renewal instructions will be sent to the Licensee in accord with the contact information associated with Licensee's file. It is your responsibility to update any personal contact information with the License Division, including change of address and/or email.

 (c) If a Licensee timely files for renewal, the license will remain in effect while the renewal application is pending. If the renewal application is disapproved (even if an appeal is pending), Licensee must immediately voucher his or her license and all gun(s) registered thereto at his/her local precinct.

(d) Licensees must carefully read and comply with all the instructions related to the renewal process, as well as any instructions or directives issued by your renewal Investigator.

(e) Incomplete or incorrectly prepared renewal applications and related documents will not be processed, and may result in the disapproval of the renewal application and cancellation of the license.

(f) Failure to renew the license on time is cause for cancellation of the license.

(g) Once a decision has been reached concerning your renewal application, you will be notified.

**Possession of any unlicensed handgun is a violation of Article 265 of the N.Y.S. Penal Law, and may subject the Licensee to arrest.**

**Note:** If a Licensee chooses not to renew his/her license, s/he must follow the cancellation procedures detailed in the previous section.

For more information regarding the cancellation of a handgun license see **38 R.C.N.Y. § 5-28.**

## THE "INCIDENT" PROCESS & HEARINGS

Whenever a handgun Licensee is involved in an "Incident," you must immediately report said incident to the License Division's **Incident Section**. Incidents include, but are not limited to, any contact with the police. For more information about what qualifies as an "incident", and when and how you must report it, please refer to the **"Notifications" section of this booklet, located on page 3, and Title 38 R.C.N.Y. §§ 5-22 & 5-30.**

Once an incident is reported to the License Division, each incident will be reviewed and evaluated by License Division Investigators. The investigation process may include, but is not limited to:

- License suspension pending investigation of the incident. If the License Division finds it necessary to suspend the license, you will be notified. Said notification will advise you of the status of your license and the reason for the suspension.

- Direction to immediately voucher for safekeeping all handgun(s) listed on any license(s) that you have been issued. After the handgun(s) have been vouchered, the Licensee must immediately send his original handgun license and a copy of the "Voucher" to the License Division's Incident Unit. **Failure to comply with these directions constitutes the possession of an unlicensed handgun(s) and is a crime under the N.Y.S. Penal Law and is grounds for revocation of the license.**

- Direction to submit a notarized statement regarding the facts and circumstances of the incident.

- Communication with the Investigator assigned to the investigation.

**Failure to comply with the License Division Investigator may result in the permanent revocation of your handgun license.**

## Hearings

If, after investigation, a license is suspended or revoked by Notice of Determination, the Licensee has the right to submit a written request for a hearing to appeal the decision. This request must be made within thirty (30) days of the Notice of Determination. However, requests for hearings will not be entertained, nor will a hearing be scheduled until the Licensee:

(a) Vouchers the handgun(s);

(b) Provides a copy of the Property Clerk invoice/voucher receipt to the License Division;

(c) Forwards his handgun license to the License Division;

(d) Shows that any Order of Protection against the Licensee has expired or been otherwise vacated, if applicable; and,

(e) Provides a Certificate of Disposition from the court, if applicable.
   i. A hearing will not be granted until all pending matters before the Criminal Court have been concluded and a final disposition is reached, and
   ii. If the Licensee has been convicted of a felony or serious misdemeanor, a Certificate of Relief from Disabilities from the court must also be provided.

To request a hearing, the Licensee must submit a written request to the Commanding Officer, License Division. The letter must include:
   (1) License number - Refer to Incident number if applicable.
   (2) Reason(s) for the request.
   (3) Evidence of proper disposition of license(s) and handgun(s).
Upon receipt of the Licensee's letter, the License Division will schedule the Licensee for a hearing and notify the Licensee by mail.

For more information regarding the incident and hearing process, please see **38 R.C.N.Y. § 5-30 & 38 R.C.N.Y. Chapter 15**.

## TYPES OF LICENSES

The NYPD issues several different types of handgun licenses, with varying restrictions. It is your responsibility as a Licensee to ensure you are familiar with the particular permitted uses, rules, regulations, and restrictions that apply to your license type.

The information below is only a brief summary of the types of licenses; it is not an exhaustive description of the permitted uses, rules, regulations, and restrictions that apply to each type of License. If, after you have read this booklet in its entirety, and referred to 38 R.C.N.Y., Chapter 5, you have questions remaining about your specific license type, you are encouraged to call or email the section of the License Division that most closely corresponds to your license for clarification.

- **PREMISES LICENSE:** This is a restricted type of license. It is issued for your residence or business. The Licensee may possess a handgun ONLY INSIDE of the premises of the address indicated on the front of the license. Licensees may also transport their handgun(s) with the ammunition carried separately, and the handgun unloaded in a locked container, in accordance with all applicable rules, regulations, and statutes.
  - **Note:** New York State law and New York City rules have been amended to expand the range of places to which Premise licensees may transport their handgun(s). You can read the new law on our website at https://licensing.nypdonline.org/app-instruction/

- **CARRY BUSINESS LICENSE:** This license permits the carrying of a handgun concealed on the person. It is valid for the business name, address, and handgun(s) listed on the license. It is not transferable to any other person, business, occupation, or address, without the written approval of the License Division's Commanding Officer. This license may also be issued for safety reasons unrelated to business.

- **LIMITED CARRY BUSINESS LICENSE:** This license authorizes the carrying of the handgun specified on the license in accordance with specific time and place limitations listed thereon. At all other times, the handgun must be safeguarded within the confines of the address listed on the front of the license, either concealed on the Licensee's person in a proper holster or stored unloaded in a locked safe.

- **SPECIAL CARRY LICENSE:** The Special Carry License is valid for the business name, address and handguns listed on the license, only while the Licensee has in his possession a valid carry county license issued according to the provisions of Article 400 of the N.Y.S. Penal law. Upon the revocation, suspension, or cancellation of the basic county license, the Special Carry License is rendered void and must be immediately returned to the License Division.

- **CARRY GUARD LICENSE:** Issued for security guards, couriers, private investigation companies, or a company providing similar services. This license authorizes the carrying of the handgun specified on the license only while the Licensee is actively engaged in employment for the company whose name appears on the license and/or while Licensee is in transit directly to or from residence and place of employment. At all other times, the handgun must be stored unloaded in a locked container, at either the address on the license or at the employee's legal residence (within the State of New York). Applications for this type of license must be made with the documentation provided by a company's gun custodian.

- **LAW ENFORCEMENT RETIREE LICENSE:** This type of license is for retired Law Enforcement Officers.

- **ATTENTION ALL CARRY LICENSEES: THE HANDGUN MAY ONLY BE CARRIED FOR THE APPROVED PURPOSE(S) FOR WHICH THE LICENSE WAS ISSUED (SUCH AS IN CONNECTION WITH THE APPLICANT'S JOB, BUSINESS, OR OCCUPATIONAL REQUIREMENTS).**

For more information regarding the types of handgun licenses and the distinctions between them, please see **38 R.C.N.Y. Chapter 5**.

# EXHIBIT 05

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/12/2024__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
CAVALIER D. KNIGHT,                          :
                                             :
                          Plaintiff,         :
                                             :            22-CV-10755 (VEC)
            -against-                        :
                                             :            ORDER ADOPTING
                                             :            REPORT AND
CITY OF NEW YORK; EDWARD CABAN,              :            RECOMMENDATION
                                             :
                          Defendants.        :
---------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

WHEREAS on December 20, 2022, Cavalier D. Knight, proceeding pro se, sued New

York City and the Police Commissioner challenging a rule issued by the New York City Police

Department, 38 RCNY § 25(d)(4)(i) (the "NYPD Rule"), that limits to two the number of

handguns that can appear on a carry handgun license, Compl. at 1;

WHEREAS Knight alleged that the NYPD Rule violates his rights under the Fifth,

Fourteenth, and Second Amendments, and NY Civil Rights Law § 4 ("Section 4") and is

preempted by New York Penal Law § 400.00, id. ¶¶ 23, 27, 34, 37–38, 53–54;

WHEREAS on January 17, 2023, the Court referred this matter to Magistrate Judge

Figueredo for the preparation of a report and recommendation ("R&R") on any dispositive

motions, see Order, Dkt. 9;

WHEREAS on April 7, 2023, Defendants moved to dismiss the Complaint for lack of

standing and failure to state a claim (the "Motion"), see Mot., Dkts. 22–24;

WHEREAS on November 20, 2023, Judge Figueredo filed an R&R recommending that

the Court grant the motion in full and dismiss Mr. Knight's claims, see R&R, Dkt. 40;

1

WHEREAS the R&R recommended dismissing the Complaint (a) as to the Fifth and Fourteenth amendment claims for lack of standing because the claims are premised on the possibility that the police might some day confiscate Plaintiff's handguns, (b) as to the claims under the Second Amendment and Section 4 because the NYPD Rule does not infringe on the core conduct protected by federal and state law, and (c) as to the preemption claim because the New York Penal Law § 400.00 contains a clear statement that it was not meant to impair the enactment or application of local law, *id.* at 5–14;

WHEREAS the R&R did not consider Mr. Knight's arguments regarding the Privileges and Immunities Clause because that claim does not appear in the Complaint and was raised for the first time in his opposition to Defendant's Motion, *id.* at 14;

WHEREAS Judge Figueredo notified the parties that, pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), they had fourteen days from the filing of the R&R to object, *id.* at 15;

WHEREAS after seeking and receiving an extension of his time to object, *see* Dkts. 43, 44, Mr. Knight objected to the R&R on December 18, 2023, Dkt. 46;

WHEREAS on January 2, 2024, Defendants responded to Plaintiff's objection and asked the Court to adopt the R&R in full, *see* Dkt. 47;

WHEREAS in reviewing an R&R, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge," 28 U.S.C. § 636(b)(1)(C);

WHEREAS when specific objections are made to the R&R, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to," Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997);

2

WHEREAS where objections are "merely perfunctory responses argued in an attempt to . . . rehash[] the same arguments set forth in the original papers," a "district court need only find that there is no clear error on the face of the record in order to accept the Report and Recommendation," *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (cleaned up);

WHEREAS Mr. Knight's objection discusses the Second Amendment broadly but is largely unrelated to Judge Figueredo's conclusions, *see* Dkt. 46 at 1 (quoting large portions of the Supreme Court's opinion in *NY State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1 (2022), without explaining how the R&R misapplies that precedent), and the portions of Mr. Knight's objections that are comprehensible and related to the R&R are both conclusory and duplicative of past arguments, *see id.* at 19 ("This R&R reinforces decades of systemic violations of the 2nd Amendment right to publicly carry handguns for self-defense by the NYPD.");

WHEREAS because Mr. Knight's objections are perfunctory and not substantive, the Court may accept the R&R if there is no clear error on the face of the record;

WHEREAS an error is clear when it leaves the reviewing court with a "definite and firm conviction that a mistake has been committed," *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002) (quoting *McAllister v. United States*, 348 U.S. 19, 20 (1954)); and

WHEREAS careful review of the R&R reveals that there is no clear error.

IT IS HEREBY ORDERED that the R&R at docket entry 40 is adopted in full, Defendants' motion to dismiss is GRANTED, and Mr. Knight's claims under the Fifth and

3

Fourteenth Amendments are DISMISSED and his claims under the Second Amendment, under

Section 4, and regarding pre-emption are DISMISSED with prejudice.

      The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 22 and to

close the case.


**SO ORDERED.**

                                        _____

**Date:  March 12, 2024**  
      **New York, NY**                       **VALERIE CAPRONI**  
                                      **United States District Judge**

4

# EXHIBIT 06

12. Within approximately six months of receipt of your handgun application, and all required documents/forms, you will receive a letter informing you whether your application was approved.

**Renewals**

If you have already been issued a license or permit by the NYPD License Division, and your license or permit is up for renewal, you will receive a letter with instructions for submitting an on-line renewal application. You will not be able to submit your on-line renewal application until after you have received these instructions. As of January 1, 2018, we are no longer accepting renewal applications on paper; only on-line renewal applications will be accepted.

# License and Permit Types

The NYPD issues several different types of handgun licenses, with varying restrictions. The information below will help you determine which type of handgun license is appropriate for you.

**PREMISES LICENSE**: This is a **restricted** type of license. It is issued for your residence or business. The Licensee may possess a handgun ONLY on the premises of the address indicated on the front of the license. Licensees may also transport their handguns and ammunition in separate locked containers, directly to and from an authorized range or hunting location. (For hunting, an endorsement from NYPD License Division is required, in addition to a New York State hunting license). **Handguns must be unloaded** while being transported.

**CARRY BUSINESS LICENSE**: This license permits the carrying of a handgun concealed on the person. It is valid for the business name, address, and handguns listed on the license. It is not transferable to any other person, business, occupation, or address, without the written approval of the License Division's Commanding Officer. This license may also be issued for safety reasons unrelated to business.

**LIMITED CARRY BUSINESS LICENSE**: This is a **restricted** type of license. The licensee may only carry handguns indicated on the license in accordance with the specific limitations listed thereon. At all other times, the handgun must be safeguarded within the confines of the address listed on the front of the license, either concealed on the licensee's person in a proper holster or stored unloaded in a locked safe.

**SPECIAL CARRY LICENSE**: The Special Carry License is valid for the business name, address and handguns listed on the license, only while the licensee has in his possession a valid carry county license issued according to the provisions of article 400 of the N.Y.S. Penal law. Upon the revocation, suspension, or cancellation of the basic county license, the Special Carry License is rendered void and must be immediately returned to the License Division. **(For Retired Law Enforcement officers who wish to apply for a Special Carry handgun license, follow the instructions listed below-"INSTRUCTIONS FOR LAW ENFORCEMENT (NON-NYPD) RETIREES WHO RESIDE OUTSIDE OF NEW YORK CITY").**

**CARRY GUARD LICENSE**: (security guards, etc.) This is a restricted type of license. Applications for this type of license must be made with the documentation provided by a company's gun custodian. It is issued only for the handgun listed on the license. The handgun may be carried only while the licensee is actively engaged in employment for the company whose name appears on the license and/or while licensee is in

# EXHIBIT 07



**POLICE DEPARTMENT**
**License Division**
**One Police Plaza, Room 110A**
**New York, New York 10038**
**Main (646) 610-5872**
**Email: DG_Lic-HandgunRenewals@NYPD.ORG**

CAVALIER KNIGHT



NEW YORK, NY ████

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## RENEWAL PROCESSING LETTER

09/11/2022

Dear CAVALIER KNIGHT:

Your New York City handgun license ████ 324 is due to expire on 12/26/2022. If you wish to renew your license, please follow the instructions in this letter. If you do not wish to renew, please contact the Cancellation Unit by telephone at (646) 610-5871, or by email at DG_LIC-Cancellations@NYPD.ORG.

The NYPD License Division is only accepting renewal applications for handgun permits on-line (via the computer). **Applications on paper are no longer accepted. Pin numbers are NO longer required.** Enclosed, you will find step-by-step instructions on how to navigate through your online renewal application. Begin by first reading through <u>ALL</u> the enclosed documents, then proceed by accessing the on-line renewal application at https://licensing.nypdonline.org. If necessary, you may call the License Division during normal business days, excluding holidays, between 8:30 a.m. and 4:00 p.m. at (646) 610-5872, or by email at DG_Lic-HandgunRenewals@NYPD.ORG. For an immediate response, please email instead of calling.

After completing your online application entirely, you will be able to pay. Application fees must be paid either online or in person. **Online payments** are processed via City Pay with either an echeck or a credit card. Echecks may take 5-7 business days to process, whereas credit card payments will incur a 2% fee and is processed almost instantly. **In-person payments** can be made via credit cards, money orders or bank checks made payable to the "New York City Police Department." Personal checks AND cash are **NOT** accepted. **The Renewal application fee is NONREFUNDABLE.**

After receiving your renewal fee, the License Division will review your renewal application and your uploaded documents. If any addditional documents/forms are needed to process your application, this office will contact you via the email that you've used in creating your account previously. For any and all updates, please login to your account via your Handgun online account. We do encourage checking your emails periodically for correspondences from this office.

Thank you for your cooperation.

Sincerely,

Hugh Bogle
Deputy Inspector

**182**



Expiration





**Cavalier Knight <cavalier.knight@cavalierknight.com>**

---

## Residence Premises Renewal

**Cavalier Knight** <info@cavalierknight.com>                                    Wed, Sep 14, 2022 at 12:57 PM
To: hugh.bogl ▮▮▮▮
Cc: Nicole.Berkovic ▮▮▮▮▮

Greetings I just received documentation to renew my current Residence Premises License ▮▮▮▮ 1324). However, my prior Carry ~~Business~~ License application denial is under review (CB Application # ▮▮▮ -1249). If my Carry ~~Business~~ License is approved that license would issue based upon the fee I paid at the time I applied for it.

However, if I pay to renew my current Residence Premises License I will be paying a fee for a license type that no longer exists and paying twice. Once for the Carry ~~Business~~ License under review and once for the Residence Premises Licence renewal. How do you suggest I proceed? Thank you for your kind consideration in this urgent matter.



Cavalier Knight
FFL 01 | Class III -SOT
Ballistic Threat Management
Bus: (646) 580-7801
www.cavalierknight.com

SBA HUBZone Certified

11/2/22, 5:28 PM
Cavalier Knight Mail - Residence Premises Renewal



Cavalier Knight <cavalier.knight@cavalierknight.com>

## Residence Premises Renewal

**BERKOVICH, NICOLE** <NICOLE.BERKOVICH█████████>          Wed, Nov 2, 2022 at 4:43 PM
To: Cavalier Knight <info@cavalierknight.com>, "BOGLE, HUGH" <HUGH.BOGLE█████████>

Mr. Knight,

Premise Licenses continue to exist. Your Carry application is being reviewed as previously discussed and an outcome should be rendered within the next few weeks. If you wish to maintain both licenses you should submit your premise renewal. If you wish to maintain only a Carry license, I suggest that you wait to begin your renewal until you receive a decision on the Carry, so that you do not pay for a license you do not want.

Your Premise license expires on 12/26/2022, and as long as you submit your renewal application before it expires the license remains valid while the renewal is processed.

I will note that NYC rules limit Carry licenses to 2 firearms, so if you want to maintain more than 2 firearms you would need to maintain the Premise License for any additional firearms you wanted to possess/purchase.

Sincerely,

Nicole Berkovich

Director, License Division

New York City Police Department

One Police Plaza, Room 110A

New York, NY 10038

CONFIDENTIALITY NOTICE: This email and any attachments may contain CONFIDENTIAL and PRIVILEGED information for the use of the designated recipient(s) named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, use, disclosure or distribution of it or its contents is prohibited and may violate laws including the *Electronic Communications Privacy Act*. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

Please treat this and all other communications from the New York City Police Department as **LAW ENFORCEMENT SENSITIVE / FOR OFFICIAL USE ONLY.**

**From:** Cavalier Knight <info@cavalierknight.com>
**Sent:** Wednesday, September 14, 2022 12:58 PM
**To:** BOGLE, HUGH <HUGH.BOGLE█████████
**Cc:** BERKOVICH, NICOLE <NICOLE.BERKOVICH████████████
**Subject:** Residence Premises Renewal

You don't often get email from info@cavalierknight.com. Learn why this is important

---

**CAUTION! EXTERNAL SENDER**

**STOP WHEN UNSURE.** Never click on links or open attachments if sender is unknown, and never provide user ID or password. **Suspicious?** Please report to this email addres ████████████

---

Greetings I just received documentation to renew my current Residence Premises License █████1324). However, my prior Carry ~~Business~~ License application denial is under review (CB Application # ████ -1249). If my Carry ~~Business~~ License is approved that license would issue based upon the fee I paid at the time I applied for it.

However, if I pay to renew my current Residence Premises License I will be paying a fee for a license type that no longer exists and paying twice. Once for the Carry ~~Business~~ License under review and once for the Residence Premises Licence renewal. How do you suggest I proceed? Thank you for your kind consideration in this urgent matter.

[Quoted text hidden]

**186**

# EXHIBIT 08

No Number in Original
Supreme Court of the United States

# Gibbons v. Ogden

22 U.S. 1 (1824)  ·  6 L. Ed. 23  ·  9 U.S. (Wheat.) 1  ·  1824 U.S. LEXIS 370
Decided Mar 2, 1824

No Number in Original

March 2, 1824, Decided

The acts of the Legislature of the State of New-York, granting to Robert R. Livingston and Robert Fulton the exclusive navigation of all the waters within the jurisdiction of that State, with boats moved by fire or steam, for a term of years, are repugnant to that clause of the constitution of the United States, which authorizes Congress to regulate commerce, so far as the said acts prohibit vessels licensed, according to the laws of the United States, for carrying on the coasting trade, from navigating the said waters by means of fire or steam.

Mr. Webster, for the appellant, admitted, that there was a very respectable weight of authority in favour of the decision, which was sought to be reversed. The laws in question, he knew, had been deliberately re-enacted by the Legislature of New-York; and they had also received the sanction, at different times, of all her judicial tribunals, than which there were few, if any, in the country, more justly entitled to respect and deference. The disposition of the Court would be, undoubtedly, to support, if it could, laws so passed and so sanctioned. He admitted, therefore, that it was justly expected of him that he should make out a clear case; and unless he did so, he did not hope for a reversal. It should be remembered, however, that the whole of this branch of power, as exercised by this Court, was a power of revision. The question must be decided by the State Courts, and decided in a particular manner, before it could be brought here at all. Such decisions alone gave

the Court jurisdiction; and therefore, while they are to be respected as the judgments of learned Judges, they are yet in the condition of all decisions from which the law allows an appeal.

It would not be a waste of time to advert to the existing state of the facts connected with the subject of this litigation. The use of steam boats, on the coasts, and in the bays and rivers of the country, had become very general. The intercourse of its different parts essentially depended upon this mode of conveyance and transportation. Rivers and bays, in many cases, form the divisions between States; and thence it was obvious, that if the States should make regulations for the navigation of these waters, and such regulations should be repugnant and hostile, embarrassment would necessarily happen to the general intercourse of the community. Such events had actually occurred, and had created the existing state of things.

By the law of New-York, no one can navigate the bay of New-York, the North River, the Sound, the lakes, or any of the waters of that State, by steam vessels, without a license from the grantees of New-York, under penalty of forfeiture of the vessel.

By the law of the neighboring State of Connecticut, no one can enter her waters with a steam vessel having such license.

By the law of New-Jersey, if any citizen of that State shall be restrained, under the New-York law, from using steam boats between the ancient shores of New-Jersey and New-York, he shall be entitled

casetext

1

to an action for damages, in New-Jersey, with treble costs against the party who thus restrains or impedes him under the law of New-York! This act of New-Jersey is called an act of retortion against the illegal and oppressive legislation of New-York; and seems to be defended on those grounds of public law which justify reprisals between independent States.

It would hardly be contended, that all these acts were consistent with the laws and constitution of the United States. If there were no power in the general government, to control this extreme belligerent legislation of the States, the powers of the government were essentially deficient, in a most important and interesting particular. The present controversy respected the earliest of these State laws, those of New-York. On those, this Court was now to pronounce; and if they should be declared to be valid and operative, he hoped somebody would point out where the State right stopped, and on what grounds the acts of other States were to be held inoperative and void.

It would be necessary to advert more particularly to the laws of New-York, as they were stated in the record. The first was passed March 19th, 1787. By this act, a sole and exclusive right was granted to John Fitch, of making and using every kind of boat or vessel impelled by steam, in all creeks, rivers, bays, and waters, within the territory and jurisdiction of New-York, for fourteen years.

On the 27th of March, 1798, an act was passed, on the suggestion that Fitch was dead, or had withdrawn from the State, without having made any attempt to use his privilege, repealing the grant to him, and conferring similar privileges on Robert R. Livingston, for the term of twenty years, on a suggestion, made by him, that he was possessor of a mode of applying the steam engine to people a boat, on new and advantageous principles. On the 5th of April, 1803, another act was passed, by which it was declared, that the rights and privileges granted to R. R. Livingston, by the last act, should be extended to him and Robert Fulton, for twenty years, from the passing of this act. Then there is the act of April 11, 1808, purporting to extend the monopoly, in point of time, five years for every additional boat, the whole duration, however, not to exceed thirty years; and forbidding any and all persons to navigate the waters of the State, with any steam boat or vessel, without the license of Livingston and Fulton, under penalty of forfeiture of the boat or vessel. And, lastly, comes the act of April 9, 1811, for enforcing the provisions of the last mentioned act, and declaring, that the forfeiture of the boat or vessel, found navigating against the provisions of the previous acts, shall be deemed to accrue on the day on which such boat or vessel should navigate the waters of the State; and that Livingston and Fulton might immediately have an action for such boat or vessel, in like manner as if they themselves had been dispossessed thereof by force; and that on bringing any such suit, the defendant therein should be prohibited, by injunction, from removing the boat or vessel out of the State, or using it within the State. There were one or two other acts mentioned in the pleadings, which principally respected the time allowed for complying with the condition of the grant, and were not material to the discussion of the case.

By these acts, then, an exclusive right is given to Livingston and Fulton, to use steam navigation on all the waters of New-York, for thirty years from 1808.

It is not necessary to recite the several conveyances and agreements, stated in the record, by which Ogden, the plaintiff below, derives title under Livingston and Fulton, to the exclusive use of part of these waters.

The appellant being owner of a steam-boat, and being found navigating the waters between New-Jersey and the city of New-York, over which waters Ogden, the plaintiff below, claimed an exclusive right, under Livingston and Fulton, this bill was filed against him by Ogden, in October,

1818, and an injunction granted, restraining him from such use of his boat. This injunction was made perpetual, on the final hearing of the cause, in the Court of Chancery; and the decree of the Chancellor has been duly affirmed in the Court of Errors. The right, therefore, which the plaintiff below asserts to have an maintain his injunction, depends obviously on the general validity of the New-York laws, and, especially, on their force and operation as against the right set up by the defendant. This right he states, in his answer, to be, that he is a citizen of New-Jersey, and owner of the steam-boat in question; that the boat was a vessel of more than twenty tons burden, duly enrolled and licensed for carrying on the coasting trade, and intended to be employed by him, in that trade, between Elizabethtown, in New-Jersey, and the city of New-York; and was actually employed in navigating between those places, at the time of, and until notice of the injunction from the Court of Chancery was served on him.

On these pleadings the substantial question is raised: Are these laws such as the Legislature of New-York had a right to pass? If so, do they, secondly, in their operation, interfere with any right enjoyed under the constitution and laws of the United States, and are they, therefore, void, as far as such interference extends?

It may be well to state again their general purport and effect, and the purport and effect of the other State laws, which have been enacted by way of retaliation.

A steam vessel, of any description, going to New-York, is forfeited to the representatives of Livingston and Fulton, unless she have their license.

Going from New-York, or elsewhere, to Connecticut, she is prohibited from entering the waters of that State, if she have such license.

If the representatives of Livingston and Fulton, in New-York, carry into effect, by judicial process, the provision of the New-York laws, against any citizen of New-Jersey, they expose themselves to a statute action, in New-Jersey, for all damages, and treble costs.

The New-York laws extend to all steam vessels; to steam frigates, steam ferry-boats, and all intermediate classes.

They extend to public as well as private ships; and to vessels employed in foreign commerce, as well as to those employed in the coasting trade.

The remedy is as summary as the grant itself is ample; for immediate confiscation, without seizure, trial, or judgment, is the penalty of infringement.

In regard to these acts, he should contend, in the first place, that they exceeded the power of the Legislature; and, secondly, that if they could be considered valid, for any purpose, they were void, still, as against any right enjoyed under the laws of the United States, with which they came in collision; and that, in this case, they were found interfering with such rights.

He should contend, that the power of Congress to regulate commerce, was complete and entire, and, to a certain extent, necessarily exclusive; that the acts in question were regulations of commerce, in a most important particular; and affecting it in those respects, in which it was under the exclusive authority of Congress. He stated this first proposition guardedly. He did not mean to say that all regulations which might, in their operation, affect commerce, were exclusively in the power of Congress; but that such power as had been exercised in this case, did not remain with the States. Nothing was more complex than commerce; and in such an age as this, no words embraced a wider field than commercial regulation. Almost all the business and intercourse of life may be connected, incidentally, more or less, with commercial regulations. But it was only necessary to apply to this part of the constitution the well settled rules of construction. Some powers are holden to be exclusive in Congress,

from the use of exclusive words in the grant; others, from the prohibitions on the States to exercise similar powers; and others, again, from the nature of the powers themselves. It has been by this mode of reasoning that the Court has adjudicated on many important questions; and the same mode is proper here. And, as some powers have been holden exclusive, and others not so, under the same form of expression, from the nature of the different powers respectively; so, where the power, on any one subject, is given in general words, like the power to regulate commerce, the true method of construction would be, to consider of what parts the grant is composed, and which of those, from the nature of the thing, ought to be considered exclusive. The right set up in this case, under the laws of New-York, is a monopoly. Now, he thought it very reasonable to say, that the constitution never intended to leave with the States the power of granting monopolies, either of trade or of navigation; and, therefore, that as to this, the commercial power was exclusive in Congress.

It was in vain to look for a precise and exact definition of the powers of Congress, on several subjects. The constitution did not undertake the task of making such exact definitions. In conferring powers, it proceeded in the way of enumeration, stating the powers conferred, one after another, in few words; and, where the power was general, or complex in its nature, the extent of the grant must necessarily be judged of, and limited, by its object, and by the nature of the power.

Few things were better known, than the immediate causes which led to the adoption of the present constitution; and he thought nothing clearer, than that the prevailing motive was to regulate commerce; to rescue it from the embarrassing and destructive consequences, resulting from the legislation of so many different States, and to place it under the protection of a uniform law. The great objects were commerce and revenue; and they were objects indissolubly connected. By the

confederation, divers restrictions had been imposed on the States; but these had not been found sufficient. No State, it was true, could send or receive an embassy; nor make any treaty; nor enter into any compact with another State, or with a foreign power; nor lay duties, interfering with treaties which had been entered into by Congress. But all these were found to be far short of what the actual condition of the country required. The Stated could still, each for itself, regulate commerce, and the consequence was, a perpetual jarring and hostility of commercial regulation.

67] Mr. Chief Justice MARSHALL delivered the opinion of the Court, and, after stating the case, 186 proceeded as follows: *186

The appellant contends that this decree is erroneous, because the laws which purport to give the exclusive privilege it sustains, are repugnant to the constitution and laws of the United States.

They are said to be repugnant --

1st. To that clause in the constitution which authorizes Congress to regulate commerce.

2d. To that which authorizes Congress to promote the progress of science and useful arts.

The State of New-York maintains the constitutionality of these laws; and their Legislature, their Council of Revision, and their Judges, have repeatedly concurred in this opinion. It is supported by great names -- by names which have all the titles to consideration that virtue, intelligence, and office, can bestow. No tribunal can approach the decision of this [**68] question, without feeling a just and real respect for that opinion which is sustained by such authority; but it is the province of this Court, while it respects, not to bow to it implicitly; and the Judges must exercise, in the examination of the subject, that understanding which Providence has bestowed upon them, with that independence which the people of the United States expect from this 187 department of the government. *187

Gibbons v. Ogden    22 U.S. 1 (1824)

As preliminary to the very able discussions of the constitution, which we have heard from the bar, and as having some influence on its construction, reference has been made to the political situation of these States, anterior to its formation. It has been said, that they were sovereign, were completely independent, and were connected with each other only by a league. This is true. But, when these allied sovereigns converted their league into a government, when they converted their Congress of Ambassadors, deputed to deliberate on their common concerns, and to recommend measures of general utility, into a Legislature, empowered to enact laws on the most interesting subjects, the whole character in which the States appear, underwent a change, the extent of which must be determined by a fair consideration of the instrument by which that change was effected.

This instrument contains an enumeration of powers expressly granted by the people to their government. It has been said, that these powers ought to be construed strictly. But why ought they to be so construed? Is there one sentence in the constitution which gives countenance to this rule? In the last of the enumerated powers, that which grants, expressly, the means for carrying all others into execution, Congress is authorized "to make all laws which shall be necessary and proper" for the purpose. But this limitation on the means which may be used, is not extended to the powers which are conferred; nor is there one sentence in [*188] the constitution, which has been pointed out by the gentlemen of the bar, or which we have been able to discern, that prescribes this rule. We do not, therefore, think ourselves justified in adopting it. What do gentlemen mean, by a strict construction? If they contend only against that enlarged construction, which would extend words beyond their natural and obvious import, we might question the application of the term, but should not controvert the principle. If they contend for that narrow construction which, in support of some theory not to be found in the constitution,

would deny to the government those powers which the words of the grant, as usually understood, import, and which are consistent with the general views and objects of the instrument; for that narrow construction, which would cripple the government, and render it unequal to the object, for which it is declared to be instituted, and to which the powers given, as fairly understood, render it competent; then we cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the constitution is to be expounded. As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said. If, from the imperfection of human language, there should be serious doubts respecting the extent of any given power, it is a well settled rule, that the objects for which it was given, especially when those objects are expressed in the instrument itself, should have great influence in the construction. We know of no reason for excluding this rule from the present case. The grant does not convey power which might be beneficial to the grantor, if retained by himself, or which can enure solely to the benefit of the grantee; but is an investment of power for the general advantage, in the hands of agents selected for that purpose; which power can never be exercised by the people themselves, but must be placed in the hands of agents, or lie dormant. We know of no rule for construing the extent of such powers, other than is given by the language of the instrument which confers them, taken in connexion with the purposes for which they were conferred. *189

189

The words are, "Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

Gibbons v. Ogden    22 U.S. 1 (1824)

The subject to be regulated is commerce; and our constitution being, as was aptly said at the bar, one of enumeration, and not of definition, to ascertain the extent of the power, it becomes necessary to settle the meaning of the word. The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term, applicable to many objects, to one of its significations. Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. The mind can scarcely conceive a system for regulating commerce between nations, which shall exclude all laws concerning navigation, which shall be silent on the admission of the vessels of the one nation into the ports of the other, and be confined to prescribing rules for the conduct of individuals, in the actual employment of buying and selling, or 190 of barter. *190

If commerce does not include navigation, the government of the Union has no direct power over that subject, and can make no law prescribing what shall constitute American vessels, or requiring that they shall be navigated by American seamen. Yet this power has been exercised from the commencement of the government, has been exercised with the consent of all, and has been understood by all to be a commercial regulation. All America understands, and has uniformly understood, the word "commerce," to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed. The power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government, and must have been contemplated in forming it. The convention must have used the word in that sense, because all have understood it in that sense; and the attempt to restrict it comes 69 too late. *69

If the opinion that "commerce," as the word is used in the constitution, comprehends navigation also, requires any additional confirmation, that additional confirmation is, we think, furnished by 191 the words of the instrument itself. *191

It is a rule of construction, acknowledged by all, that the exceptions from a power mark its extent; for it would be absurd, as well as useless, to except from a granted power, that which was not granted -- that which the words of the grant could not comprehend. If, then, there are in the constitution plain exceptions from the power over navigation, plain inhibitions to the exercise of that power in a particular way, it is a proof that those who made these exceptions, and prescribed these inhibitions, understood the power to which they applied as being granted.

The 9th section of the 1st article declares, that "no preference shall be given, by any regulation of commerce or revenue, to the ports of one State over those of another." This clause cannot be understood as applicable to those laws only which are passed for the purposes of revenue, because it is expressly applied to commercial regulations; and the most obvious preference which can be given to one port over another, in regulating commerce, relates to navigation. But the subsequent part of the sentence is still more explicit. It is, "nor shall vessels bound to or from one State, be obliged to enter, clear, or pay duties, in another." These words have a direct reference to navigation.

The universally acknowledged power of the government to impose embargoes, must also be considered as showing, that all America is united in that construction which comprehends navigation in the word commerce. Gentlemen have said, in argument, that this is a branch of the war-making power, and that an embargo is an 192 instrument of war, not a regulation of trade. *192

That it may be, and often is, used as an instrument of war, cannot be denied. An embargo may be imposed for the purpose of facilitating the

equipment or manning of a fleet, or for the purpose of concealing the progress of an expedition preparing to sail from a particular port. In these, and in similar cases, it is a military instrument, and partakes of the nature of war. But all embargoes are not of this description. They are sometimes resorted to without a view to war, and with a single view to commerce. In such case, an embargo is no more a war measure, than a merchantman is a ship of war, because both are vessels which navigate the ocean with sails and seamen.

When Congress imposed that embargo which, for a time, engaged the attention of every man in the United States, the avowed object of the law was, the protection of commerce, and the avoiding of war. By its friends and its enemies it was treated as a commercial, not as a war measure. The persevering earnestness and zeal with which it was opposed, in a part of our country which supposed its interests to be vitally affected by the act, cannot be forgotten. A want of acuteness in discovering objections to a measure to which they felt the most deep rooted hostility, will not be imputed to those who were arrayed in opposition to this. Yet they never suspected that navigation was no branch of trade and was, therefore, not comprehended in the power to regulate commerce. They did, indeed, contest the constitutionality of the act, but, on a principle which admits the construction for which the appellant contends. They denied that the particular law in question was made in pursuance of the constitution, not because the power could not act directly on vessels, but because a perpetual embargo was the annihilation, and not the regulation of commerce. In terms, they admitted the applicability of the words used in the constitution to vessels; and that, in a case which produced a degree and an extent of excitement, calculated to draw forth every principle on which legitimate resistance could be sustained. No example could more strongly illustrate the universal understanding of the American people 193 on this subject. *193

The word used in the constitution, then, comprehends, and has been always understood to comprehend, navigation within its meaning; and a power to regulate navigation, is as expressly granted, as if that term had been added to the word "commerce."

To what commerce does this power extend? The constitution informs us, to commerce "with foreign nations, and among the several States, and with the Indian tribes."

It has, we believe, been universally admitted, that these words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend. It has been truly said, that commerce, as the word is used in the constitution, is a unit, every part of which is 194 indicated by the term. *194

If this be the admitted meaning of the word, in its application to foreign nations, it must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it.

The subject to which the power is next applied, is to commerce "among the several States." The word "among" means intermingled with. A thing which is among others, is intermingled with them. Commerce among the States, cannot stop at the external boundary line of each State, but may be introduced into the interior.

It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.

Comprehensive as the word "among" is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been

selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce, to which the power was to be extended, would not have been made, had the intention [*195] been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State. The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself. *70

70

But, in regulating commerce with foreign nations, the power of Congress does not stop at the jurisdictional lines of the several States. It would be a very useless power, if it could not pass those lines. The commerce of the United States with foreign nations, is that of the whole United States. Every district has a right to participate in it. The deep streams which penetrate our country in every direction, pass through the interior of almost every State in the Union, and furnish the means of exercising this right. If Congress has the power to regulate it, that power must be exercised whenever the subject exists. If it exists within the States, if a foreign voyage may commence or terminate at a port within a State, then the power of Congress may be exercised within a State.

This principle is, if possible, still more clear, when applied to commerce "among the several States." They either join each other, in which case they are separated by a mathematical line, or they are remote from each other, in which case other States lie between them. What is commerce "among"

them; and how is it to be conducted? Can a trading expedition between two adjoining States, commence and terminate outside of each? And if the trading intercourse be between two States remote from each other, must it not commence in one, terminate in the other, and probably pass through a third? Commerce among the States must, of necessity, be commerce with the States. In the regulation of trade with the Indian tribes, the action of the law, especially when the constitution was made, was chiefly within a State. The power of Congress, then, whatever it may be, must be exercised within the territorial jurisdiction of the several States. The sense of the nation on this subject, is unequivocally manifested by the provisions made in the laws for transporting goods, by land, between Baltimore and Providence, between New-York and Philadelphia, and between Philadelphia and Baltimore. *196

196

We are now arrived at the inquiry -- What is this power?

It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. These are expressed in plain terms, and do not affect the questions which arise in this case, or which have been discussed at the bar. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they

**195**

have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments. *197

197

The power of Congress, then, comprehends navigation, within the limits of every State in the Union; so far as that navigation may be, in any manner, connected with "commerce with foreign nations, or among the several States, or with the Indian tribes." It may, of consequence, pass the jurisdictional line of New-York, and act upon the very waters to which the prohibition now under consideration applies.

But it has been urged with great earnestness, that, although the power of Congress to regulate commerce with foreign nations, and among the several States, be co-extensive with the subject itself, and have no other limits than are prescribed in the constitution, yet the States may severally exercise the same power, within their respective jurisdictions. In support of this argument, it is said, that they possessed it as an inseparable attribute of sovereignty, before the formation of the constitution, and still retain it, except so far as they have surrendered it by that instrument; that this principle results from the nature of the government, and is secured by the tenth amendment; that an affirmative grant of power is not exclusive, unless in its own nature it be such that the continued exercise of it by the former possessor is inconsistent with the grant, and that this is not of that description. *198

198

The appellant, conceding these postulates, except the last, contends, that full power to regulate a particular subject, implies the whole power, and leaves no residuum; that a grant of the whole is incompatible with the existence of a right in another to any part of it.

Both parties have appealed to the constitution, to legislative, acts, and judicial decisions; and have drawn arguments from all these sources, to support and illustrate the propositions they respectively maintain.

The grant of the power to lay and collect taxes is, like the power to regulate commerce, made in general terms, and has never been understood to interfere with the exercise of the same power by the States; and hence has been drawn an argument which has been applied to the question under consideration. But the two grants are not, it is conceived, similar in their terms or their nature. Although many of the powers formerly [*199] exercised by the States, are transferred to the government of the Union, yet the State governments remain, and constitute a most important [**71] part of our system. The power of taxation is indispensable to their existence, and is a power which, in its own nature, is capable of residing in, and being exercised by, different authorities at the same time. We are accustomed to see it placed, for different purposes, in different hands. Taxation is the simple operation of taking small portions from a perpetually accumulating mass, susceptible of almost infinite division; and a power in one to take what is necessary for certain purposes, is not, in its nature, incompatible with a power in another to take what is necessary for other purposes. Congress is authorized to lay and collect taxes, &c. to pay the debts, and provide for the common defence and general welfare of the United States. This does not interfere with the power of the States to tax for the support of their own governments; nor is the exercise of that power by the States, an exercise of any portion of the power that is granted to the United States. In imposing taxes for State purposes, they are not doing what Congress is empowered to do. Congress is not empowered to tax for those purposes which are within the exclusive province of the States. When, then, each government exercises the power of taxation, neither is exercising the power of the other. But, when a State proceeds to regulate commerce with foreign nations, or among the several States, it is exercising the very power that is granted to Congress, and is doing the very thing which

Congress is authorized to do. There is no analogy, then, between the power of taxation and the power of regulating commerce. *200

In discussing the question, whether this power is still in the States, in the case under consideration, we may dismiss from it the inquiry, whether it is surrendered by the mere grant to Congress, or is retained until Congress shall exercise the power. We may dismiss that inquiry, because it has been exercised, and the regulations which Congress deemed it proper to make, are now in full operation. The sole question is, can a State regulate commerce with foreign nations and among the States, while Congress is regulating it?

The counsel for the respondent answer this question in the affirmative, and rely very much on the restrictions in the 10th section, as supporting their opinion. They say, very truly, that limitations of a power, furnish a strong argument in favour of the existence of that power, and that the section which prohibits the States from laying duties on imports or exports, proves that this power might have been exercised, had it not been expressly forbidden; and, consequently, that any other commercial regulation, not expressly forbidden, to which the original power of the State was competent, may still be made.

That this restriction shows the opinion of the Convention, that a State might impose duties on exports and imports, if not expressly forbidden, will be conceded; but that it follows as a consequence, from this concession, that a State may regulate commerce with foreign nations and among the States, cannot be admitted. *201

We must first determine whether the act of laying "duties or imposts on imports or exports," is considered in the constitution as a branch of the taxing power, or of the power to regulate commerce. We think it very clear, that it is considered as a branch of the taxing power. It is so treated in the first clause of the 8th section: "Congress shall have power to lay and collect taxes, duties, imposts, and excises;" and, before commerce is mentioned, the rule by which the exercise of this power must be governed, is declared. It is, that all duties, imposts, and excises, shall be uniform. In a separate clause of the enumeration, the power to regulate commerce is given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power, not before conferred. The constitution, then, considers these powers as substantive, and distinct from each other; and so places them in the enumeration it contains. The power of imposing duties on imports is classed with the power to levy taxes, and that seems to be its natural place. But the power to levy taxes could never be considered as abridging the right of the States on that subject; and they might, consequently, have exercised it by levying duties on imports or exports, had the constitution contained no prohibition on this subject. This prohibition, then, is an exception from the acknowledged power of the States to levy taxes, not from the questionable power to regulate commerce. *202

"A duty of tonnage" is as much a tax, as a duty on imports or exports; and the reason which induced the prohibition of those taxes, extends to this also. This tax may be imposed by a State, with the consent of Congress; and it may be admitted, that Congress cannot give a right to a State, in virtue of its own powers. But a duty of tonnage being part of the power of imposing taxes, its prohibition may certainly be made to depend on Congress, without affording any implication respecting a power to regulate commerce. It is true, that duties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of commerce; but they may be also imposed with a view to revenue; and it was, therefore, a prudent precaution, to prohibit the States from exercising this power. The idea that the same measure might, according to circumstances, be arranged with different classes of power, was no novelty to the framers of our constitution. Those illustrious statesmen and patriots had been, many of them, deeply engaged in the discussions which preceded

**197**

the war of our revolution, and all of them were well read in those discussions. The right to regulate commerce, even by the imposition of duties, was not controverted; but the right to impose a duty for the purpose of revenue, produced a war as important, perhaps, in its consequences to the human race, as any the world has ever witnessed.

These restrictions, then, are on the taxing power, not on that to regulate commerce; and presuppose the existence of that which they restrain, not of 203 that which they do not purport to restrain. *203

But, the inspection laws are said to be regulations of commerce, and are certainly recognized in the constitution, as being passed in the exercise of a power remaining with the States.

That inspection laws may have a remote and considerable influence on commerce, will not be denied; but that a power to regulate commerce is the source from which the right to pass them is derived, cannot be admitted. The object of inspection laws, is to improve the quality of articles produced by the labour of a country; to fit them for exportation; or, it may be, for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the States, and prepare it for that purpose. They form a portion of that immense mass of legislation, which embraces every thing within the territory of a State, not surrendered to the general government: all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, 72 &c., are component parts of this mass. *72

No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation. If the legislative power of the Union can reach them, it must be for national purposes; it must be where the power is expressly given for a special purpose,

or is clearly incidental to some power which is expressly given. It is obvious, that the government of the Union, in the exercise of its express powers, that, for example, of regulating commerce with foreign nations and among the States, may use means that may also be employed by a State, in the exercise of its acknowledged powers; that, for example, of regulating commerce within the State. If Congress license vessels to sail from one port to another, in the same State, the act is supposed to be, necessarily, incidental to the power expressly granted to Congress, and implies no claim of a direct power to regulate the purely internal commerce of a State, or to act directly on its system of police. So, if a State, in passing laws on subjects acknowledged to be within its control, and with a view to those subjects, shall adopt a measure of the same character with one which Congress may adopt, it does not derive its authority from the particular power which has been granted, but from some other, which remains with the State, and may be executed by the same means. All experience shows, that the same measures, or measures scarcely distinguishable from each other, may flow from distinct powers; but this does not prove that the powers themselves are identical. Although the means used in their execution may sometimes approach each other so nearly as to be confounded, there are other situations in which they are sufficiently distinct to 204 establish their individuality. *204

In our complex system, presenting the rare and difficult scheme of one general government, whose action extends over the whole, but which possesses only certain enumerated powers; and of numerous State governments, which retain and exercise all powers not delegated to the Union, contests respecting power must arise. Were it even otherwise, the measures taken by the respective governments to execute their acknowledged powers, would often be of the same description, and might, sometimes, interfere. This, however, does not prove that the one is exercising, or has a 205 right to exercise, the powers of the other. *205

The acts of Congress, passed in 1796 and 1799, [fn118] empowering and directing the officers of the general government to conform to, and assist in the execution of the quarantine and health laws of a State, proceed, it is said, upon the idea that these laws are constitutional. It is undoubtedly true, that they do proceed upon that idea; and the constitutionality of such laws has never, so far as we are informed, been denied. But they do not imply an acknowledgment that a State may rightfully regulate commerce with foreign nations, or among the States; for they do not imply that such laws are an exercise of that power, or enacted with a view to it. On the contrary, they are treated as quarantine and health laws, are so denominated in the acts of Congress, and are considered as flowing from the acknowledged power of a State, to provide for the health of its citizens. But, as it was apparent that some of the provisions made for this purpose, and in virtue of this power, might interfere with, and be affected by the laws of the United States, made for the regulation of commerce, Congress, in that spirit of harmony and conciliation, which ought always to characterize the conduct of governments standing in the relation which that of the Union and those of the States bear to each other, has directed its officers to aid in the execution of these laws; and has, in some measure, adapted its own legislation to this object, by making provisions in aid of those of the States. But, in making these provisions, the opinion is unequivocally manifested, that Congress may control the State laws, so far as it may be necessary to control them, for the 206 regulation of commerce. *206

The act passed in 1803, [119] prohibiting the importation of slaves into any State which shall itself prohibit their importation, implies, it is said, an admission that the States possessed the power to exclude or admit them; from which it is inferred, that they possess the same power with respect to other articles.

If this inference were correct; if this power was exercised, not under any particular clause in the constitution, but in virtue of a general right over the subject of commerce, to exist as long as the constitution itself, it might now be exercised. Any State might now import African slaves into its own territory. But it is obvious, that the power of the States over this subject, previous to the year 1808, constitutes an exception to the power of [*207] Congress to regulate commerce, and the exception is expressed in such words, as to manifest clearly the intention to continue the pre-existing right of the States to admit or exclude, for a limited period. The words are, "the migration or importation of such persons as any of the States, now existing, shall think proper to admit, shall not be prohibited by the Congress prior to the year 1808. The whole object of the exception is, to preserve the power to those States which might be disposed to exercise it; and its language seems to the Court to convey this idea unequivocally. The possession of this particular power, then, during the time limited in the constitution, cannot be admitted to prove the possession of any other 73 similar power. *73

It has been said, that the act of August 7, 1789, acknowledges a concurrent power in the States to regulate the conduct of pilots, and hence is inferred an admission of their concurrent right with Congress to regulate commerce with foreign nations, and amongst the States. But this inference is not, we think, justified by the fact.

Although Congress cannot enable a State to legislate, Congress may adopt the provisions of a State on any subject. When the government of the Union was brought into existence, it found a system for the regulation of its pilots in full force in every State. The act which has been mentioned, adopts this system, and gives it the same validity as if its provisions had been specially made by Congress. But the act, it may be said, is prospective also, and the adoption of laws to be made in future, presupposes the right in the maker 208 to legislate on the subject. *208

**199**

The act unquestionably manifests an intention to leave this subject entirely to the States, until Congress should think proper to interpose; but the very enactment of such a law indicates an opinion that it was necessary; that the existing system would not be applicable to the new state of things, unless expressly applied to it by Congress. But this section is confined to pilots within the "bays, inlets, rivers, harbours, and ports of the United States," which are, of course, in whole or in part, also within the limits of some particular state. The acknowledged power of a State to regulate its police, its domestic trade, and to govern its own citizens, may enable it to legislate on this subject, to a considerable extent; and the adoption of its system by Congress, and the application of it to the whole subject of commerce, does not seem to the Court to imply a right in the States so to apply it of their own authority. But the adoption of the State system being temporary, being only "until further legislative provision shall be made by Congress," shows, conclusively, an opinion that Congress could control the whole subject, and might adopt the system of the States, or provide one of its own.

A State, it is said, or even a private citizen, may construct light houses. But gentlemen must be aware, that if this proves a power in a State to regulate commerce, it proves that the same power is in the citizen. States, or individuals who own lands, may, if not forbidden by law, erect on those lands what buildings they please; but this power is entirely distinct from that of regulating commerce, and may, we presume, be restrained, if exercised

209 so as to produce a public mischief. *209

These acts were cited at the bar for the purpose of showing an opinion in Congress, that the States possess, concurrently with the Legislature of the Union, the power to regulate commerce with foreign nations and among the States. Upon reviewing them, we think they do not establish the proposition they were intended to prove. They show the opinion, that the States retain powers enabling them to pass the laws to which allusion

has been made, not that those laws proceed from the particular power which has been delegated to Congress.

It has been contended by the counsel for the appellant, that, as the word "to regulate" implies in its nature, full power over the thing to be regulated, it excludes, necessarily, the action of all others that would perform the same operation on the same thing. That regulation is designed for the entire result, applying to those parts which remain as they were, as well as to those which are altered. It produces a uniform whole, which is as much disturbed and deranged by changing what the regulating power designs to leave untouched, as that on which it has operated.

There is great force in this argument, and the Court is not satisfied that it has been refuted.

Since, however, in exercising the power of regulating their own purely internal affairs, whether of trading or police, the States may sometimes enact laws, the validity of which depends on their interfering with, and being contrary to, an act of Congress passed in pursuance of the constitution, the Court will enter upon the inquiry, whether the laws of New-York, as expounded by the highest tribunal of that State, have, in their application to this case, come into collision with an act of Congress, and deprived a citizen of a right to which that act entitles him. Should this collision exist, it will be immaterial whether those laws were passed in virtue of a concurrent power "to regulate commerce with foreign nations and among the several States," or, in virtue of a power to regulate their domestic trade and police. In one case and the other, the acts of New-York must yield to the law of Congress; and the decision sustaining the privilege they confer, against a right given by a law of the Union,

210 must be erroneous. *210

This opinion has been frequently expressed in this Court, and is founded, as well on the nature of the government as on the words of the constitution. In argument, however, it has been contended, that if a

law passed by a State, in the exercise of its acknowledged sovereignty, comes into conflict with a law passed by Congress in pursuance of the constitution, they affect the subject, and each other, like equal opposing powers.

But the framers of our constitution foresaw this state of things, and provided for it, by declaring the supremacy not only of itself, but of the laws made in pursuance of it. The nullity of any act, inconsistent with the constitution, is produced by the declaration, that the constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the State Legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged State powers, interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution, or some treaty made under the authority of the United States. In every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise 211 of powers not controverted, must yield to it. *211

In pursuing this inquiry at the bar, it has been said, that the constitution does not confer the right of intercourse between State and State. That right derives its source from those laws whose authority is acknowledged by civilized man throughout the world. This is true. The constitution found it an existing right, and gave to Congress the power to regulate it. In the exercise of this power, Congress has passed "an act for enrolling or licensing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same." The counsel for the respondent contend, that this act does not give the right to sail from port to port, but confines itself to regulating a pre-existing right, so far only as to confer certain privileges on enrolled 74 and licensed vessels in its exercise. *74

It will at once occur, that, when a Legislature attaches certain privileges and exemptions to the exercise of a right over which its control is absolute, the law must imply a power to exercise

the right. The privileges are gone, if the right itself be annihilated. It would be contrary to all reason, and to the course of human affairs, to say that a State is unable to strip a vessel of the particular privileges attendant on the exercise of a right, and yet may annul the right itself; that the State of New-York cannot prevent an enrolled and licensed vessel, proceeding from Elizabethtown, in New-Jersey, to New-York, from enjoying, in her course, and on her entrance into port, all the privileges conferred by the act of Congress; but can shut her up in her own port, and prohibit altogether her entering the waters and ports of another State. To the Court it seems very clear, that the whole act on the subject of the coasting trade, according to those principles which govern the construction of statutes, implies, unequivocally, an authority to licensed vessels to carry on the coasting trade. 212 *212

But we will proceed briefly to notice those sections which bear more directly on the subject.

The first section declares, that vessels enrolled by virtue of a previous law, and certain other vessels, enrolled as described in that act, and having a license in force, as is by the act required, "and no others, shall be deemed ships or vessels of the United States, entitled to the privileges of ships of vessels employed in the coasting trade."

This section seems to the Court to contain a positive enactment, that the vessels it describes shall be entitled to the privileges of ships or vessels employed in the coasting trade. These privileges cannot be separated from the trade, and cannot be enjoyed, unless the trade may be prosecuted. The grant of the privilege is an idle, empty form, conveying nothing, unless it convey the right to which the privilege is attached, and in the exercise of which its whole value consists. To construe these words otherwise than as entitling the ships or vessels described, to carry on the coasting trade, would be, we think, to disregard 213 the apparent intent of the act. *213

The fourth section directs the proper officer to grant to a vessel qualified to receive it, "a license for carrying on the coasting trade;" and prescribes its form. After reciting the compliance of the applicant with the previous requisites of the law, the operative words of the instrument are, "license is hereby granted for the said steam-boat, Bellona, to be employed in carrying on the coasting trade for one year from the date hereof, and no longer."

These are not the words of the officer; they are the words of the legislature; and convey as explicitly the authority the act intended to give, and operate as effectually, as if they had been inserted in any other part of the act, than in the license itself.

The word "license," means permission, or authority; and a license to do any particular thing, is a permission or authority to do that thing; and if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize. It certainly transfers to him all the right which the grantor can transfer, to do 214 what is within the terms of the license. *214

Would the validity or effect of such an instrument be questioned by the respondent, if executed by persons claiming regularly under the laws of New-York?

The license must be understood to be what it purports to be, a legislative authority to the steamboat Bellona, "to be employed in carrying on the coasting trade, for one year from this date."

It has been denied that these words authorize a voyage from New-Jersey to New-York. It is true, that no ports are specified; but it is equally true, that the words used are perfectly intelligible, and do confer such authority as unquestionably, as if the ports had been mentioned. The coasting trade is a term well understood. The law has defined it; and all know its meaning perfectly. The act describes, with great minuteness, the various operations of a vessel engaged in it; and it cannot, we think, be doubted, that a voyage from New-Jersey to New-York, is one of those operations.

Notwithstanding the decided language of the license, it has also been maintained, that it gives no right to trade; and that its sole purpose is to confer the American character.

The answer given to this argument, that the American character is conferred by the enrolment, and not by the license, is, we think, founded too clearly in the words of the law, to require the support of any additional observations. The enrolment of vessels designed for the coasting trade, corresponds precisely with the registration of vessels designed for the foreign trade, and requires every circumstance which can constitute the American character. The license can be granted only to vessels already enrolled, if they be of the burthen of twenty tons and upwards; and requires no circumstance essential to the American character. The object of the license, then, cannot be to ascertain the character of the vessel, but to do what it professes to do -- that is, to give permission to a vessel already proved by her enrolment to be American, to carry on the coasting 215 trade. *215

But, if the license be a permit to carry on the coasting trade, the respondent denies that these boats were engaged in that trade, or that the decree under consideration has restrained them from prosecuting it. The boats of the appellant were, we are told, employed in the transportation of passengers; and this is no part of that commerce which Congress may regulate.

If, as our whole course of legislation on this subject shows, the power of Congress has been universally understood in America, to comprehend [**75] navigation, it is a very persuasive, if not a conclusive argument, to prove that the construction is correct; and, if it be correct, no clear distinction is perceived between the power to regulate vessels employed in transporting men for hire, and property for hire. The subject is transferred to Congress, and no exception to the grant can be admitted, which is not proved by the words or the nature of the thing. A coasting vessel

employed in the transportation of passengers, is as much a portion of the American marine, as one employed in the transportation of a cargo; and no reason is perceived why such vessel should be withdrawn from the regulating power of that government, which has been thought best fitted for the purpose generally. The provisions of the law respecting native seamen, and respecting ownership, are as applicable to vessels carrying men, as to vessels carrying manufactures; and no reason is perceived why the power over the subject should not be placed in the same hands. The argument urged at the bar, rests on the foundation, that the power of Congress does not extend to navigation, as a branch of commerce, and can only be applied to that subject incidentally and occasionally. But if that foundation be removed, we must show some plain, intelligible distinction, supported by the constitution, or by reason, for discriminating between the power of Congress over vessels employed in navigating the same seas. We can perceive no such distinction.

216   *216

If we refer to the constitution, the inference to be drawn from it is rather against the distinction. The section which restrains Congress from prohibiting the migration or importation of such persons as any of the States may think proper to admit, until the year 1808, has always been considered as an exception from the power to regulate commerce, and certainly seems to class migration with importation. Migration applies as appropriately to voluntary, as importation does to involuntary, arrivals; and, so far as an exception from a power proves its existence, this section proves that the power to regulate commerce applies equally to the regulation of vessels employed in transporting men, who pass from place to place voluntarily, and

217   to those who pass involuntarily. *217

If the power reside in Congress, as a portion of the general grant to regulate commerce, then acts applying that power to vessels generally, must be construed as comprehending all vessels. If none appear to be excluded by the language of the act,

none can be excluded by construction. Vessels have always been employed to a greater or less extent in the transportation of passengers, and have never been supposed to be, on that account, withdrawn from the control or protection of Congress. Packets which ply along the coast, as well as those which make voyages between Europe and America, consider the transportation of passengers as an important part of their business. Yet it has never been suspected that the general laws of navigation did not apply to them.

The duty act, sections 23 and 46, contains provisions respecting passengers, and shows, that vessels which transport them, have the same rights, and must perform the same duties, with other vessels. They are governed by the general laws of navigation.

In the progress of things, this seems to have grown into a particular employment, and to have attracted the particular attention of government. Congress was no longer satisfied with comprehending vessels engaged specially in this business, within those provisions which were intended for vessels generally; and, on the 2d of March, 1819, passed "an act regulating passenger ships and vessels." This wise and humane law provides for the safety and comfort of passengers, and for the communication of every thing concerning them which may interest the government, to the Department of State, but makes no provision concerning the entry of the vessel, or her conduct in the waters of the United States. This, we think, shows conclusively the sense of Congress, (if, indeed, any evidence to that point could be required,) that the pre-existing regulations comprehended passenger ships among others; and, in prescribing the same duties, the Legislature must have considered them as possessing the same

218   rights. *218

If, then, it were even true, that the Bellona and the Stoudinger were employed exclusively in the conveyance of passengers between New-York and New-Jersey, it would not follow that this

occupation did not constitute a part of the coasting trade of the United States, and was not protected by the license annexed to the answer. But we cannot perceive how the occupation of these vessels can be drawn into question, in the case before the Court. The laws of New-York, which grant the exclusive privilege set up by the respondent, take no notice of the employment of vessels, and relate only to the principle by which they are propelled. Those laws do not inquire whether vessels are engaged in transporting men or merchandise, but whether they are moved by steam or wind. If by the former, the waters of New-York are closed against them, though their cargoes be dutiable goods, which the laws of the United States permit them to enter and deliver in New-York. If by the latter, those waters are free to them, though they should carry passengers only. In conformity with the law, is the bill of the plaintiff in the State Court. The bill does not complain that the Bellona and the Stoudinger carry passengers, but that they are moved by steam. This is the injury of which he complains, and is the sole injury against the continuance of which he asks relief. The bill does not even allege, specially, that those vessels were employed in the transportation of passengers, but says, generally, that they were employed "in the transportation of passengers, or otherwise." The answer avers, only, that they were employed in the coasting trade, and insists on the right to carry on any trade authorized by the license. No testimony is taken, and the writ of injunction and decree restrain these licensed vessels, not from carrying passengers, but from being moved through the waters of New-York by 219 steam, for any purpose whatever. *219

The questions, then, whether the conveyance of passengers be a part of the coasting trade, and whether a vessel can be protected in that occupation by a coasting license, are not, and cannot be, raised in this case. The real and sole question seems to be, whether a steam machine, in actual use, deprives a vessel of the privileges 76 conferred by a license. *76

In considering this question, the first idea which presents itself, is, that the laws of Congress for the regulation of commerce, do not look to the principle by which vessels are moved. That subject is left entirely to individual discretion; and, in that vast and complex system of legislative enactment concerning it, which embraces every thing that the Legislature thought it necessary to notice, there is not, we believe, one word respecting the peculiar principle by which vessels are propelled through the water, except what may be found in a single act, granting a particular privilege to steam boats. With this exception, every act, either prescribing duties, or granting privileges, applies to every vessel, whether navigated by the instrumentality of wind or fire, of sails or machinery. The whole weight of proof, then, is thrown, upon him who would introduce a distinction to which the words of the law give no 220 countenance. *220

If a real difference could be admitted to exist between vessels carrying passengers and others, it has already been observed, that there is no fact in this case which can bring up that question. And, if the occupation of steam boats be a matter of such general notoriety, that the Court may be presumed to know it, although not specially informed by the record, then we deny that the transportation of passengers is their exclusive occupation. It is a matter of general history, that, in our western waters, their principal employment is the transportation of merchandise; and all know, that in the waters of the Atlantic they are frequently so employed.

But all inquiry into this subject seems to the Court to be put completely at rest, by the act already mentioned, entitled, "An act for the enrolling and 221 licensing of steam boats." *221

This act authorizes a steam boat employed, or intended to be employed, only in a river or bay of the United States, owned wholly or in part by an

alien, resident within the United States, to be enrolled and licensed as if the same belonged to a citizen of the United States.

This act demonstrates the opinion of Congress, that steam boats may be enrolled and licensed, in common with vessels using sails. They are, of course, entitled to the same privileges, and can no more be restrained from navigating waters, and entering ports which are free to such vessels, than if they were wafted on their voyage by the winds, instead of being propelled by the agency of fire. The one element may be as legitimately used as the other, for every commercial purpose authorized by the laws of the Union; and the act of a State inhibiting the use of either to any vessel having a license under the act of Congress, comes, we think, in direct collision with that act.

As this decides the cause, it is unnecessary to enter in an examination of that part of the constitution which empowers Congress to promote the progress of science and the useful arts.

The Court is aware that, in stating the train of reasoning by which we have been conducted to this result, much time has been consumed in the attempt to demonstrate propositions which may have been thought axioms. It is felt that the tediousness inseparable from the endeavour to prove that which is already clear, is imputable to a considerable part of this opinion. But it was unavoidable. The conclusion to which we have come, depends on a chain of principles which it was necessary to preserve unbroken; and, although some of them were thought nearly self-evident, the magnitude of the question, the weight of character belonging to those from whose judgment we dissent, and the argument at the bar, demanded

222 that we should assume nothing. *222

Powerful and ingenious minds, taking, as postulates, that the powers expressly granted to the government of the Union, are to be contracted by construction, into the narrowest possible compass, and that the original powers of the States are retained, if any possible construction will retain

them, may, by a course of well digested, but refined and metaphysical reasoning, founded on these premises, explain away the constitution of our country, and leave it, a magnificent structure, indeed, to look at, but totally unfit for use. They may so entangle and perplex the understanding, as to obscure principles, which were before thought quite plain, and induce doubts where, if the mind were to pursue its own course, none would be perceived. In such a case, it is peculiarly necessary to recur to safe and fundamental principles to sustain those principles, and, when sustained, to make them the tests of the arguments to be examined.

**Concur by:**JOHNSON

**Concur**

Mr. Justice JOHNSON. The judgment entered by the Court in this cause, has my entire approbation; but having adopted my conclusions on views of the subject materially different from those of my brethren, I feel it incumbent on me to exhibit those views. I have, also, another inducement: in questions of great importance and great delicacy, I feel my duty to the public best discharged, by an effort to maintain my opinions in my own way.

223 *223

In attempts to construe the constitution, I have never found much benefit resulting from the inquiry, whether the whole, or any part of it, is to be construed strictly, or literally. The simple, classical, precise, yet comprehensive language, in which it is couched, leaves, at most, but very little latitude for construction; and when its intent and meaning is discovered, nothing remains but to execute the will of those who made it, in the best manner to effect the purposes intended. The great and paramount purpose, was to unite this mass of wealth and power, for the protection of the humblest individual; his rights, civil and political, his interests and prosperity, are the sole end; the rest are nothing but the means. But the principal of those means, one so essential as to approach nearer the characteristics of an end, was the

independence and harmony of the States, that they may the better subserve the purposes of cherishing and protecting the respective families of this great republic.

The strong sympathies, rather than the feeble government, which bound the States together during a common war, dissolved on the return of peace; and the very principles which gave rise to the war of the revolution, began to threaten the [*224] confederacy with anarchy and ruin. The States had resisted a tax imposed by the parent State, and now reluctantly submitted to, or altogether rejected, the moderate demands of the confederation. Every one recollects the painful and threatening discussions, which arose on the subject of the five per cent. duty. Some States rejected it altogether; others insisted on collecting it themselves; scarcely any acquiesced without reservations, which deprived it altogether of the character of a national measure; and at length, some repealed the laws by which they had 77 signified their acquiescence. *77

For a century the States had submitted, with murmurs, to the commercial restrictions imposed by the parent State; and now, finding themselves in the unlimited possession of those powers over their own commerce, which they had so long been deprived of, and so earnestly coveted, that selfish principle which, well controlled, is so salutary, and which, unrestricted, is so unjust and tyrannical, guided by inexperience and jealousy, began to show itself in iniquitous laws and impolitic measures, from which grew up a conflict of commercial regulations, destructive to the harmony of the States, and fatal to their commercial interests abroad.

This was the immediate cause, that led to the forming of a convention.

As early as 1778, the subject had been pressed upon the attention of Congress, by a memorial from the State of New-Jersey; and in 1781, we find a resolution presented to that body, by one of the most enlightened men of his day, [fn120]

affirming, that "it is indispensably necessary, that the United States, in Congress assembled, should be vested with a right of superintending the commercial regulations of every State, that none may take place that shall be partial or contrary to the common interests." The resolution of Virginia, [fn121] appointing her commissioners, to meet commissioners from other States, expresses their purpose to be, "to take into consideration the trade of the United States, to consider how far an uniform system in their commercial regulations, may be necessary to their common interests and their permanent harmony." And Mr. Madison's resolution, which led to that measure, is introduced by a preamble entirely explicit to this point: "Whereas, the relative situation of the United States has been found, on trial, to require uniformity in their commercial regulations, as the only effectual policy for obtaining, in the ports of foreign nations, a stipulation of privileges reciprocal to those enjoyed by the subjects of such nations in the ports of the United States, for preventing animosities, which cannot fail to arise among the several States, from the interference of partial and separate regulations," &c. "therefore, 225 resolved," &c. *225

The history of the times will, therefore, sustain the opinion, that the grant of power over commerce, if intended to be commensurate with the evils existing, and the purpose of remedying those evils, could be only commensurate with the power of the States over the subject. And this opinion is supported by a very remarkable evidence of the general understanding of the whole American 226 people, when the grant was made. *226

There was not a State in the Union, in which there did not, at that time, exist a variety of commercial regulations; concerning which it is too much to suppose, that the whole ground covered by those regulations was immediately assumed by actual legislation, under the authority of the Union. But where was the existing statute on this subject, that a State attempted to execute? or by what State was it ever thought necessary to repeal those statutes?

By common consent, those laws dropped lifeless from their statute books, for want of the sustaining power, that had been relinquished to Congress.

And the plain and direct import of the words of the grant, is consistent with this general understanding.

The words of the constitution are, "Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

It is not material, in my view of the subject, to inquire whether the article a or the should be prefixed to the word "power." Either, or neither, will produce the same result: if either, it is clear that the article the would be the proper one, since the next preceding grant of power is certainly exclusive, to wit: "to borrow money on the credit of the United States." But mere verbal criticism I reject. *227

227

My opinion is founded on the application of the words of the grant to the subject of it.

The "power to regulate commerce," here meant to be granted, was that power to regulate commerce which previously existed in the States. But what was that power? The States were, unquestionably, supreme; and each possessed that power over commerce, which is acknowledged to reside in every sovereign State. The definition and limits of that power are to be sought among the features of international law; and, as it was not only admitted, but insisted on by both parties, in argument, that, "unaffected by a state of war, by treaties, or by municipal regulations, all commerce among independent States was legitimate," there is no necessity to appeal to the oracles of the jus commune for the correctness of that doctrine. The law of nations, regarding man as a social animal, pronounces all commerce legitimate in a state of peace, until prohibited by positive law. The power of a sovereign state over commerce, therefore, amounts to nothing more than a power to limit and restrain it at pleasure. And since the power to prescribe the limits to its freedom, necessarily implies the power to determine what shall remain unrestrained, it follows, that the power must be exclusive; it can reside but in one potentate; and hence, the grant of this power carries wit it the whole subject, leaving nothing for the State to act upon.

And such has been the practical construction of [*228] the act. Were every law on the subject of commerce repealed to-morrow, all commerce would be lawful; and, in practice, merchants never inquire what is permitted, but what is forbidden commerce. Of all the endless variety of branches of foreign commerce, now carried on to every quarter of the world, I know of no one that is permitted by act of Congress, any otherwise than by not being forbidden. No statute of the United States, that I know of, was ever passed to permit a commerce, unless in consequence of its having been prohibited by some previous statute. *78

78

I speak not here of the treaty making power, for that is not exercised under the grant now under consideration. I confine my observation to laws properly so called. And even where freedom of commercial intercourse is made a subject of stipulation in a treaty, it is generally with a view to the removal of some previous restriction; or the introduction of some new privilege, most frequently, is identified with the return to a state of peace. But another view of the subject leads directly to the same conclusion. Power to regulate foreign commerce, is given in the same words, and in the same breath, as it were, with that over the commerce of the States and with the Indian tribes. But the power to regulate foreign commerce is necessarily exclusive. The States are unknown to foreign nations; their sovereignty exists only with relation to each other and the general government. Whatever regulations foreign commerce should be subjected to in the ports of the Union, the general government would be held responsible for them; and all other regulations, but those which

Congress had imposed, would be regarded by foreign nations as trespasses and violations of national faith and comity. *229

229

But the language which grants the power as to one description of commerce, grants it as to all; and, in fact, if ever the exercise of a right, or acquiescence in a construction, could be inferred from contemporaneous and continued assent, it is that of the exclusive effect of this grant.

A right over the subject has never been pretended to in any instance, except as incidental to the exercise of some other unquestionable power.

The present is an instance of the assertion of that kind, as incidental to a municipal power; that of superintending the internal concerns of a State, and particularly of extending protection and patronage, in the shape of a monopoly, to genius and enterprise.

The grant to Livingston and Fulton, interferes with the freedom of intercourse among the States; and on this principle its constitutionality is contested.

When speaking of the power of Congress over navigation, I do not regard it as a power incidental to that of regulating commerce; I consider it as the thing itself; inseparable from it as vital motion is from vital existence.

Commerce, in its simplest signification, means an exchange of goods; but in the advancement of society, labour, transportation, intelligence, care, and various mediums of exchange, become commodities, and enter into commerce; the subject, the vehicle, the agent, and their various operations, become the objects of commercial regulation. Ship building, the carrying trade, and propagation of seamen, are such vital agents of commercial prosperity, that the nation which could not legislate over these subjects, would not possess power to regulate commerce. *230

230

That such was the understanding of the framers of the constitution, is conspicuous from provisions contained in that instrument.

The first clause of the 9th section, not only considers the right of controlling personal ingress or migration, as implied in the powers previously vested in Congress over commerce, but acknowledges it as a legitimate subject of revenue. And, although the leading object of this section undoubtedly was the importation of slaves, yet the words are obviously calculated to comprise persons of all descriptions, and to recognise in Congress a power to prohibit, where the States permit, although they cannot permit when the States prohibit. The treaty making power undoubtedly goes further. So the fifth clause of the same section furnishes an exposition of the sense of the Convention as to the power of Congress over navigation: "nor shall vessels bound to or from one State, be obliged to enter, clear, or pay duties in another."

But, it is almost labouring to prove a self-evident proposition, since the sense of mankind, the practice of the world, the contemporaneous assumption, and continued exercise of the power, and universal acquiescence, have so clearly established the right of Congress over navigation, and the transportation of both men and their goods, as not only incidental to, but actually of the essence of, the power to regulate commerce. As to the transportation of passengers, and passengers in a steam boat, I consider it as having been solemnly recognized by the State of New-York, as a subject both of commercial regulation and of revenue. She has imposed a transit duty upon steam boat passengers arriving at Albany, and unless this be done in the exercise of her control over personal intercourse, as incident to internal commerce, I know not on what principle the individual has been subjected to this tax. The subsequent imposition upon the steam boat itself, appears to be but a commutation, and operates as an indirect instead of a direct tax upon the same subject. The passenger pays it at last. *231

231

It is impossible, with the views which I entertain of the principle on which the commercial privileges of the people of the United States,

among themselves, rests, to concur in the view which this Court takes of the effect of the coasting license in this cause. I do not regard it as the foundation of the right set up in behalf of the appellant. If there was any one object riding over every other in the adoption of the constitution, it was to keep the commercial intercourse among the States free from all invidious and partial restraints. And I cannot overcome the conviction, that if the licensing act was repealed to-morrow, the rights of the appellant to a reversal of the decision complained of, would be as [*232] strong as it is under this license. One half the doubts in life arise from the defects of language, and if this instrument had been called an exemption instead of a license, it would have given a better idea of its character. Licensing acts, in facts, in legislation, are universally restraining acts; as, for example, acts licensing gaming houses, retailers of spirituous liquors, &c. The act, in this instance, is distinctly of that character, and forms part of an extensive system, the object of which is to encourage American shipping, and place them on an equal footing [**79] with the shipping of other nations. Almost every commercial nation reserves to its own subjects a monopoly of its coasting trade; and a countervailing privilege in favour of American shipping is contemplated, in the whole legislation of the United States on this subject. It is not to give the vessel an American character, that the license is granted; that effect has been correctly attributed to the act of her enrolment. but it is to confer on her American privileges, as contradistinguished from foreign; and to preserve the government from fraud by foreigners, in surreptitiously intruding themselves into the American commercial marine, as well as frauds upon the revenue in the trade coastwise, that this whole system is projected. Many duties and formalities are necessarily imposed upon the American foreign commerce, which would be burdensome in the active coasting trade of the States, and can be dispensed with. A higher rate of tonnage also is imposed, and this license entitles the vessels that take it, to those exemptions, but to

nothing more. A common register, equally entitles vessels to carry on the coasting trade, although it does not exempt them from the forms of foreign commerce, or from compliance with the 16th and 17th sections of the enrolling act. And even a foreign vessel may be employed coastwise, upon complying with the requisitions of the 24th section. I consider the license, therefore, as nothing more than what it purports to be, according to the 1st section of this act, conferring on the licensed vessel certain privileges in that trade, not conferred on other vessels; but the abstract right of commercial intercourse, stripped of those privileges, is common to all. *233

233

Yet there is one view, in which the license may be allowed considerable influence in sustaining the decision of this Court.

It has been contended, that the grants of power to the United States over any subject, do not, necessarily, paralyze the arm of the States, or deprive them of the capacity to act on the same subject. That this can be the effect only of prohibitory provisions in their own constitutions, or in that of the general government. The vis vitae of power is still existing in the States, if not extinguished by the constitution of the United States. That, although as to all those grants of power which may be called aboriginal, with relation to the government, brought into existence by the constitution, they, of course, are out of the reach of State power; yet, as to all concessions of powers which previously existed in the States, it was otherwise. The practice of our government certainly has been, on many subjects, to occupy so much only of the field opened to them, as they think the public interests require. Witness the jurisdiction of the Circuit Courts, limited both as to cases and as to amount; and various other instances that might be cited. But the license furnishes a full answer to this objection; for, although one grant of power over commerce, should not be deemed a total relinquishment of power over the subject, but amounting only to a power to assume, still the power of the State must

be at an end, so far as the United States have, by their legislative act, taken the subject under their immediate superintendence. So far as relates to the commerce coastwise, the act under which this license is granted, contains a full expression of Congress on this subject. Vessels, from five tons upwards, carrying on the coasting trade, are made the subject of regulation by that act. And this license proves, that this vessel has complied with that act, and been regularly ingrafted into one class of the commercial marine of the country.

234  *234

It remains, to consider the objections to this opinion, as presented by the counsel for the appellee. On those which had relation to the particular character of this boat, whether as a steam boat or a ferry boat, I have only to remark, that in both those characters, she is expressly recognized as an object of the provisions which relate to licenses.

The 12th section of the act of 1793, has these words: "That when the master of any ship or vessel, ferry boats excepted, shall be changed," &c. And the act which exempts licensed steam boats from the provisions against alien interests, shows such boats to be both objects of the licensing act, and objects of that act, when employed exclusively within our bays and rivers.

235  *235

But the principal objections to these opinions arise, 1st. From the unavoidable action of some of the municipal powers of the States, upon commercial subjects.

2d. From passages in the constitution, which are supposed to imply a concurrent power in the States in regulating commerce.

It is no objection to the existence of distinct, substantive powers, that, in their application, they bear upon the same subject. The same bale of goods, the same cask of provisions, or the same ship, that may be the subject of commercial regulation, may also be the vehicle of disease. And

the health laws that require them to be stopped and ventilated, are no more intended as regulations on commerce, than the laws which permit their importation, are intended to inoculate the community with disease. Their different purposes mark the distinction between the powers brought into action; and while frankly exercised, they can produce no serious collision. As to laws affecting ferries, turnpike roads, and other subjects of the same class, so far from meriting the epithet of commercial regulations, they are, in fact, commercial facilities, for which, by the consent of mankind, a compensation is paid, upon the same principle that the whole commercial world submit to pay light money to the Danes. Inspection laws are of a more equivocal nature, and it is obvious, that [*236] the constitution has viewed that subject with much solicitude. But so far from sustaining an inference in favour of the power of the States over commerce, I cannot but think that the guarded provisions of the 10th section, on this subject, furnish a strong argument against that inference. It was obvious, that inspection laws must combine municipal with commercial regulations; and, while the power over the subject is yielded to the States, for obvious reasons, an absolute control is given over State legislation on the subject, as far as that legislation may be exercised, so as to affect the commerce of the country. The inferences, to be correctly drawn, from this whole article, appear to me to be altogether in favour of the exclusive grants to Congress of power over commerce, and the reverse of that which the appellee contends for.

80  *80

This section contains the positive restrictions imposed by the constitution upon State power. The first clause of it, specifies those powers which the States are precluded from exercising, even though the Congress were to permit them. The second, those which the States may exercise with the consent of Congress. And here the sedulous attention to the subject of State exclusion from commercial power, is strongly marked. Not

satisfied with the express grant to the United States of the power over commerce, this clause negatives the exercise of that power to the States, as to the only two objects which could ever tempt them to assume the exercise of that power, to wit, the collection of a revenue from imposts and duties on imports and exports; or from a tonnage duty. As to imposts on imports or exports, such a revenue might have been aimed at directly, by express legislation, or indirectly, in the form of inspection laws; and it became necessary to guard against both. Hence, first, the consent of Congress to such imposts or duties, is made necessary; and as to inspection laws, it is limited to the minimum of expenses. Then, the money so raised shall be paid into the treasury of the United States, or may be sued for. since it is declared to be for their use. And lastly, all such laws may be modified, or repealed, by an act of Congress. It is impossible for a right to be more guarded. As to a tonnage duty, that could be recovered in but one way; and a sum so raised, being obviously necessary for the execution of health laws, and other unavoidable port expenses, it was intended that it should go into the State treasuries; and nothing more was required, therefore, than the consent of Congress. But this whole clause, as to these two subjects, appears to have been introduced ex abundanti cautela, to remove every temptation to an attempt to-interfere with the powers of Congress over commerce, and to show how far Congress might consent to permit the States to exercise that power. Beyond those limits, even by the consent of Congress, they could not exercise it. And thus, we have the whole effect of the clause. The inference which counsel would deduce from it, is neither necessary nor consistent with the general purpose

237 of the clause. *237

But instances have been insisted on, with much confidence, in argument, in which, by municipal laws, particular regulations respecting their cargoes have been imposed upon shipping in the ports of the United States; and one, in which forfeiture was made the penalty of disobedience.

238 *238

Until such laws have been tested by exceptions to their constitutionality, the argument certainly wants much of the force attributed to it; but admitting their constitutionality, they present only the familiar case of punishment inflicted by both governments upon the same individual. He who robs the mail, may also steal the horse that carries it, and would, unquestionably, be subject to punishment, at the same time, under the laws of the State in which the crime is committed, and under those of the United States. And these punishments may interfere, and one render it impossible to inflict the other, and yet the two governments would be acting under powers that have no claim to identity.

It would be in vain to deny the possibility of a clashing and collision between the measures of the two governments. The line cannot be drawn with sufficient distinctness between the municipal powers of the one, and the commercial powers of the other. In some points they meet and blend so as scarcely to admit of separation. Hitherto the only remedy has been applied which the case admits of; that of a frank and candid co-operation for the general good. Witness the laws of Congress requiring its officers to respect the inspection laws of the States, and to aid in enforcing their health laws; that which surrenders to the States the superintendence of pilotage, and the many laws passed to permit a tonnage duty to be levied for the use of their ports. Other instances could be cited, abundantly to prove that collision must be sought to be produced; and when it does arise, the question must be decided how far the powers of Congress are adequate to put it down. Wherever the powers of the respective governments are frankly exercised, with a distinct view to the ends of such powers, they may act upon the same object, or use the same means, and yet the powers

be kept perfectly distinct. A resort to the same means, therefore, is no argument to prove the identity of their respective powers. *239

239

I have not touched upon the right of the States to grant patents for inventions or improvements, generally, because it does not necessarily arise in this cause. It is enough for all the purposes of this decision, if they cannot exercise it so as to restrain a free intercourse among the States.

DECREE. This cause came on to be heard on the transcript of the record of the Court for the Trial of Impeachments and Correction of Errors of the State of New-York, and was argued by counsel. On consideration whereof, this Court is of opinion, that the several licenses to the steam boats the Stoudinger and the Bellona, to carry on the coasting trade, which are set up by the appellant, Thomas Gibbons, in his answer to the bill of the respondent, Aaron Ogden, filed in the Court of Chancery for the State of New-York, which were granted under an act of Congress, passed in pursuance of the constitution of the

[*240] United States, gave full authority to those vessels to navigate the waters of the United States, by steam or otherwise, for the purpose of carrying on the coasting trade, any law of the State of New-York to the contrary notwithstanding; and that so much of the several laws of the State of New-York, as prohibits vessels, licensed according to the laws of the United States, from navigating the waters of the State of New-York, by means of fire or steam, is repugnant to the said constitution, and void. This Court is, therefore, of opinion, that the decree of the Court of New-York for the Trial of Impeachments and the Correction of Errors, affirming the decree of the Chancellor of that State, which perpetually enjoins the said Thomas Gibbons, the appellant, from navigating the waters of the State of New-York with the steam boats the Stoudinger and the Bellona, by steam or fire, is erroneous, and ought to be reversed, and the same is hereby reversed and annulled: and this Court doth further DIRECT, ORDER, and DECREE, that the bill of the said Aaron Ogden be dismissed, and this same is hereby dismissed accordingly. *81

81

casetext

**212**

# EXHIBIT 09

No. 42
U.S.

# Shuttlesworth v. Birmingham

394 U.S. 147 (1969)   ·   89 S. Ct. 935
Decided Mar 10, 1969

CERTIORARI TO THE SUPREME COURT OF ALABAMA.

No. 42.

Argued November 18, 1968. Decided March 10, 1969.

Petitioner, a Negro minister who helped lead 52 Negroes in an orderly civil rights march in Birmingham, Ala., in 1963, was arrested and convicted for violating § 1159 of the city's General Code, an ordinance which proscribes participating in any parade or procession on city streets or public ways without first obtaining a permit from the City Commission. Section 1159 permits the Commission to refuse a parade permit if its members believe "the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." Petitioner had previously been given to understand by a member of the Commission that under no circumstances would petitioner and his group be allowed to demonstrate in Birmingham. The 148 Alabama Court of Appeals reversed the conviction on the grounds, *inter alia*, that § 1159, as written, unconstitutionally imposed an "invidious prior restraint" without ascertainable standards for the granting of permits, and that the ordinance had been discriminatorily enforced. However, the Alabama Supreme Court in 1967 narrowly construed § 1159 as an objective, even-handed traffic regulation which did not allow the Commission unlimited discretion in granting or withholding permits, and upheld petitioner's conviction. *Held:*

1. A law subjecting the right of free expression in publicly owned places to the prior restraint of a license, without narrow, objective, and definite standards is unconstitutional, and a person faced with such a law may ignore it and exercise his First Amendment rights. Pp. 150-151.

2. Picketing and parading may constitute methods of expression entitled to First Amendment protection, and use of the streets for that purpose, though subject to regulation, may not be wholly denied. P. 152.

3. Since the terms of § 1159 gave the Commission unbridled authority to issue or withhold parade permits without reference to legitimate regulation of public streets and sidewalks, the ordinance would be, absent a limiting construction, unconstitutional on its face. Pp. 150-151, 153.

*148

4. The narrow construction that the State Supreme Court placed upon § 1159 in 1967 does not necessarily validate petitioner's 1963 conviction; the test is whether the ordinance was actually administered "so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Cox* v. *New Hampshire*, 312 U.S. 569, 574. Pp. 153-155.

5. Since in this case § 1159 was administered in accordance with its impermissibly broad language, so as to "deny or unwarrantedly abridge" the First Amendment rights of the petitioner and his organization, the petitioner's conviction may not stand. *Cox* v. *New Hampshire*, *supra*, distinguished. Pp. 155-159.

281 Ala. 542, 206 So.2d 348, reversed.

*Jack Greenberg* argued the cause for petitioner. With him on the brief were *James M. Nabrit III, Norman C. Amaker, Charles Stephen Ralston, Melvyn Zarr, Arthur D. Shores, Orzell Billingsley, Jr.*, and *Anthony G. Amsterdam*.

*Earl McBee* argued the cause for respondent. With him on the brief were *J. M. Breckenridge* and *William C. Walker*.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner stands convicted for violating an ordinance of Birmingham, Alabama, making it an offense to participate in any "parade or procession or other public demonstration" without first obtaining a permit from the City Commission. The question before us is whether that conviction can be squared with the Constitution of the United States.

On the afternoon of April 12, Good Friday, 1963, 52 people, all Negroes, were led out of a Birmingham church by three Negro ministers, one of whom was the petitioner, Fred L. Shuttlesworth. They walked in orderly fashion, two abreast for the most part, for four *149 blocks. The purpose of their march was to protest the alleged denial of civil rights to Negroes in the city of Birmingham. The marchers stayed on the sidewalks except at street intersections, and they did not interfere with other pedestrians. No automobiles were obstructed, nor were traffic signals disobeyed. The petitioner was with the group for at least part of this time, walking alongside the others, and once moving from the front to the rear. As the marchers moved along, a crowd of spectators fell in behind them at a distance. The spectators at some points spilled out into the street, but the street was not blocked and vehicles were not obstructed.

At the end of four blocks the marchers were stopped by the Birmingham police, and were arrested for violating § 1159 of the General Code of Birmingham. That ordinance reads as follows:

> "It shall be unlawful to organize or hold, or to assist in organizing or holding, or to take part or participate in, any parade or procession or other public demonstration on the streets or other public ways of the city, unless a permit therefor has been secured from the commission.

"To secure such permit, written application shall be made to the commission, setting forth the probable number of persons, vehicles and animals which will be engaged in such parade, procession or other public demonstration, the purpose for which it is to be held or had, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or other public demonstration. The commission shall grant a written permit for such parade, procession or other public demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be *150 refused. It shall be unlawful to use for such purposes any other streets or public ways than those set out in said permit.

"The two preceding paragraphs, however, shall not apply to funeral processions."

The petitioner was convicted for violation of § 1159 and was sentenced to 90 days' imprisonment at hard labor and an additional 48 days at hard labor in default of payment of a $75 fine and $24 costs. The Alabama Court of Appeals reversed the judgment of conviction, holding the evidence was insufficient "to show a procession which would require, under the terms of § 1159, the getting of a permit," that the ordinance had been applied in a discriminatory fashion, and that it was unconstitutional in imposing an "invidious prior restraint" without ascertainable standards for the granting of permits. 43 Ala. App. 68, ___, ___, 180 So.2d 114, 139, 127. The Supreme Court of Alabama, however, giving the language of § 1159 an extraordinarily narrow construction, reversed the judgment of the Court of Appeals and reinstated the conviction. 281 Ala. 542, 206 So.2d 348. We granted certiorari to consider the petitioner's constitutional claims. 390 U.S. 1023.

There can be no doubt that the Birmingham ordinance, as it was written, conferred upon the City Commission virtually unbridled and absolute power to prohibit any "parade," "procession,"[1] or "demonstration" on the city's streets or public ways. For in deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of "public welfare, peace, safety, health, decency, good order, morals or convenience." This ordinance as it was written, therefore, fell squarely within the ambit of the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to *151 the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.[2] "It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official — as by requiring a permit or license which may be granted or withheld in the discretion of such official — is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub* v. *Baxley*, 355 U.S. 313, 322. And our decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license.[3] "The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands." *Jones* v. *Opelika*, 316 U.S. 584, 602 (Stone, C. J., dissenting), adopted *per curiam* on rehearing, 319 U.S. 103, 104. *152

___

[1]    Except funeral processions.

[2]    See *Lovell* v. *Griffin*, 303 U.S. 444; *Hague* v. *C. I. O.*, 307 U.S. 496; *Schneider* v. *State*, 308 U.S. 147, 163-165; *Cantwell* v. *Connecticut*, 310 U.S. 296; *Largent* v. *Texas*, 318 U.S. 418; *Jones* v. *Opelika*, 316

U.S. 584, 600 (Stone, C. J., dissenting), 611 (Murphy, J., dissenting), vacated and previous dissenting opinions adopted *per curiam*, 319 U.S. 103; *Marsh* v. *Alabama*, 326 U.S. 501; *Tucker* v. *Texas*, 326 U.S. 517; *Saia* v. *New York*, 334 U.S. 558; *Kunz* v. *New York*, 340 U.S. 290; *Niemotko* v. *Maryland*, 340 U.S. 268; *Joseph Burstyn, Inc.* v. *Wilson*, 343 U.S. 495; *Gelling* v. *Texas*, 343 U.S. 960; *Superior Films, Inc.* v. *Department of Education*, 346 U.S. 587; *Staub* v. *Baxley*, 355 U.S. 313; *Cox* v. *Louisiana*, 379 U.S. 536; *Interstate Circuit, Inc.* v. *Dallas*, 390 U.S. 676.

3  *Lovell* v. *Griffin*, 303 U.S., at 452-453; *Schneider* v. *State*, 308 U.S., at 159, 165; *Largent* v. *Texas*, 318 U.S., at 419, 422; *Jones* v. *Opelika*, 316 U.S., at 602 (Stone, C. J., dissenting), adopted *per curiam* on rehearing, 319 U.S., at 104; *Staub* v. *Baxley*, 355 U.S., at 319; *Freedman* v. *Maryland*, 380 U.S. 51, 56-57.

It is argued, however, that what was involved here was not "pure speech," but the use of public streets and sidewalks, over which a municipality must rightfully exercise a great deal of control in the interest of traffic regulation and public safety. That, of course, is true. We have emphasized before this that "the First and Fourteenth Amendments [do not] afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech." *Cox* v. *Louisiana*, 379 U.S. 536, 555. "Governmental authorities have the duty and responsibility to keep their streets open and available for movement." *Id.*, at 554-555.

But our decisions have also made clear that picketing and parading may nonetheless constitute methods of expression, entitled to First Amendment protection. *Cox* v. *Louisiana, supra; Edwards* v. *South Carolina*, 372 U.S. 229; *Thornhill* v. *Alabama*, 310 U.S. 88. "Wherever the title of streets and parks may rest, they have

immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." *Hague* v. *C. I. O.*, 307 U.S. 496, 515-516 (opinion of Mr. Justice Roberts, joined by MR. JUSTICE BLACK). *153

153  Accordingly, "[a]lthough this Court has recognized that a statute may be enacted which prevents serious interference with normal usage of streets and parks, . . . we have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." *Kunz* v. *New York*, 340 U.S. 290, 293-294. See also *Saia* v. *New York*, 334 U.S. 558; *Niemotko* v. *Maryland*, 340 U.S. 268. Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

Understandably, under these settled principles, the Alabama Court of Appeals was unable to reach any conclusion other than that § 1159 was unconstitutional. The terms of the Birmingham ordinance clearly gave the City Commission extensive authority to issue or refuse to issue

parade permits on the basis of broad criteria entirely unrelated to legitimate municipal regulation of the public streets and sidewalks.

It is said, however, that no matter how constitutionally invalid the Birmingham ordinance may have been as it was written, nonetheless the authoritative construction that has now been given it by the Supreme Court of Alabama has so modified and narrowed its terms as to render it constitutionally acceptable. It is true that in affirming the petitioner's conviction in the present case, the Supreme Court of Alabama performed a remarkable job of plastic surgery upon the face of the ordinance. The court stated that when § 1159 provided that the City Commission could withhold 154 a permit whenever "in its *154 judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require," the ordinance really meant something quite different:

> "[W]e do not construe this [language] as vesting in the Commission an unfettered discretion in granting or denying permits, but, in view of the purpose of the ordinance, one to be exercised in connection with the safety, comfort and convenience in the use of the streets by the general public. . . . The members of the Commission may not act as censors of what is to be said or displayed in any parade. . . .

> . . . . .

> ". . . [We] do not construe § 1159 as conferring upon the `commission' of the City of Birmingham the right to refuse an application for a permit to carry on a parade, procession or other public demonstration solely on the ground that such activities might tend to provoke disorderly conduct. . . .

"We also hold that under § 1159 the Commission is without authority to act in an arbitrary manner or with unfettered discretion in regard to the issuance of permits. Its discretion must be exercised with uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination. A systematic, consistent and just order of treatment with reference to the convenience of public use of the streets and sidewalks must be followed. Applications for permits to parade must be granted if, after an investigation it is found that the convenience of the public in the use of the streets or sidewalks would not thereby be unduly disturbed." 281 Ala., at 545-546, 206 So.2d, at 350-352.

In transforming § 1159 into an ordinance authorizing no more than the objective and even- 155 handed regulation *155 of traffic on Birmingham's streets and public ways, the Supreme Court of Alabama made a commendable effort to give the legislation "a field of operation within constitutional limits." 281 Ala., at 544, 206 So.2d, at 350. We may assume that this exercise was successful, and that the ordinance as now authoritatively construed would pass constitutional muster.[4] It does not follow, however, that the severely narrowing construction put upon the ordinance by the Alabama Supreme Court in November of 1967 necessarily serves to restore constitutional validity to a conviction that occurred in 1963 under the ordinance as it was written. The inquiry in every case must be that stated by Chief Justice Hughes in *Cox* v. *New Hampshire*, 312 U.S. 569 — whether control of the use of the streets for a parade or procession was, in fact, "exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of

thought and the discussion of public questions immemorially associated with resort to public places." *Id.*, at 574.

> 4 The validity of this assumption would depend upon, among other things, the availability of expeditious judicial review of the Commission's refusal of a permit. Cf. *Poulos* v. *New Hampshire*, 345 U.S. 395, 420 (Frankfurter, J., concurring in result); *Freedman* v. *Maryland*, 380 U.S. 51. See also the concurring opinion of MR. JUSTICE HARLAN, *post*, p. 159.

In *Cox* the Court found that control of the streets had not been exerted unconstitutionally. There the Court was dealing with a parade-permit statute that was silent as to the criteria governing the granting of permits. In affirming the appellants' convictions for parading without a permit, the New Hampshire Supreme Court had construed the statute to require the issuance of a permit to anybody who applied, subject only to the power of the licensing authority to specify the "time, place and manner" of the parade in order to accommodate competing *156 demands for public use of the streets. This Court accepted the state court's characterization of the statute, and its assurance that the appellants "'had a right, under the Act, to a license to march when, where and as they did, if after a required investigation it was found that the convenience of the public in the use of the streets would not thereby be unduly disturbed, upon such conditions or changes in time, place and manner as would avoid disturbance.'" 312 U.S., at 576. In affirming the New Hampshire judgment, however, this Court was careful to emphasize:

> "There is no evidence that the statute has been administered otherwise than in the fair and non-discriminatory manner which the state court has construed it to require." *Id.*, at 577.

In the present case we are confronted with quite a different situation. In April of 1963 the ordinance that was on the books in Birmingham contained language that affirmatively conferred upon the members of the Commission absolute power to refuse a parade permit whenever they thought "the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." It would have taken extraordinary clairvoyance for anyone to perceive that this language meant what the Supreme Court of Alabama was destined to find that it meant more than four years later; and, with First Amendment rights hanging in the balance, we would hesitate long before assuming that either the members of the Commission or the petitioner possessed any such clairvoyance at the time of the Good Friday march.

But we need not deal in assumptions. For, as the respondent in this case has reminded us, in assessing the constitutional claims of the petitioner, "[i]t is less than realistic to ignore the surrounding relevant circumstances. *157 These include not only facts developed in the Record in this case, but also those shown in the opinions in the related case of *Walker* v. *City of Birmingham* (1967), 388 U.S. 307. . . ."[5] The petitioner here was one of the petitioners in the *Walker* case, in which, just two Terms ago, we had before us a record showing many of the "surrounding relevant circumstances" of the Good Friday march. As the respondent suggests, we may properly take judicial notice of the record in that litigation between the same parties who are now before us.[6]

> 5 Brief for Respondent 1-2.

> 6 *National Fire Ins. Co.* v. *Thompson*, 281 U.S. 331, 336, and cases cited therein.

Uncontradicted testimony was offered in *Walker* to show that over a week before the Good Friday march petitioner Shuttlesworth sent a representative to apply for a parade permit. She went to the City Hall and asked "to see the person or persons in charge to issue permits, permits for

parading, picketing, and demonstrating." She was directed to Commissioner Connor, who denied her request in no uncertain terms. "He said, `No, you will not get a permit in Birmingham, Alabama to picket. I will picket you over to the City Jail,' and he repeated that twice." 388 U.S., at 317, n. 9, 325, 335, 339.

Two days later petitioner Shuttlesworth himself sent a telegram to Commissioner Connor requesting, on behalf of his organization, a permit to picket "against the injustices of segregation and discrimination." His request specified the sidewalks where the picketing would take place, and stated that "the normal rules of picketing" would be obeyed. In reply, the Commissioner sent a wire stating that permits were the responsibility of the entire Commission rather than of a single Commissioner, and closing with the blunt admonition: "I insist that you *158 and your people do not start any picketing on the streets in Birmingham, Alabama." *Id.*, at 318, n. 10, 325, 335-336, 339-340.[7]

> [7] The legal and constitutional issues involved in the *Walker* case were quite different from those involved here. The Court recently summarized the *Walker* decision as follows:
>
> "In that case, the Court held that demonstrators who had proceeded with their protest march in face of the prohibition of an injunctive order against such a march, could not defend contempt charges by asserting the unconstitutionality of the injunction. The proper procedure, it was held, was to seek judicial review of the injunction and not to disobey it, no matter how well-founded their doubts might be as to its validity." *Carroll* v. *President and Commissioners of Princess Anne*, 393 U.S. 175, 179.

These "surrounding relevant circumstances" make it indisputably clear, we think, that in April of 1963 — at least with respect to this petitioner and his organization[8] — the city authorities thought

the ordinance meant exactly what it said. The petitioner was clearly given to understand that under no circumstances would he and his group be permitted to demonstrate in Birmingham, not that a demonstration would be approved if a time and place were selected that would minimize traffic problems. There is no indication whatever that the authorities considered themselves obligated — as the Alabama Supreme Court more than four years later said that they were — to issue a permit "if, after an investigation [they] found that the convenience of the public in the use of the streets or sidewalks would not thereby be unduly disturbed."

> [8] In *Walker* the petitioner made an offer of proof that parade permits had been issued to other groups by the city clerk at the request of the traffic bureau of the police department. 388 U.S., at 325-326, 336, 340.

This case, therefore, is a far cry from *Cox* v. *New Hampshire, supra*, where it could be said that there was *159 nothing to show "that the statute has been administered otherwise than in the . . . manner which the state court has construed it to require." Here, by contrast, it is evident that the ordinance was administered so as, in the words of Chief Justice Hughes, "to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought . . . immemorially associated with resort to public places." The judgment is

*Reversed*.

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

MR. JUSTICE HARLAN, concurring.

The Alabama Supreme Court's opinion makes it clear that if petitioner Shuttlesworth had carried his efforts to obtain a parade permit to the highest state court, he could have required the city

authorities to grant permission for his march, so long as his proposals were consistent with Birmingham's interest in traffic control. Thus, the difficult question this case presents is whether the Fourteenth Amendment ever bars a State from punishing a citizen for marching without a permit which could have been procured if all available remedies had been pursued.

The Court answers that a citizen is entitled to rely on the statutory construction adopted by the state officials who are on the front line, administering the permit scheme. If these officials construe a vague statute unconstitutionally, the citizen may take them at their word, and act on the assumption that the statute is void. The Court's holding seems to me to carry seeds of mischief that may impair the conceded ability of the authorities to regulate the use of public thoroughfares in the interests of

160   *160   all. The right to ignore a permit requirement should, in my view, be made to turn on something more substantial than a minor official's view of his authority under the governing statute.

Simply because an inferior state official indicates his view as to a statute's scope, it does not follow that the State's judiciary will come to the same conclusion. Situations do exist, however, in which there can be no effective review of the decision of an inferior state official. In the present case, for example, the decision of Commissioner Connor had the practical effect of the decision of a court of last resort. One week before the Good Friday march, Shuttlesworth learned from Connor that he, as Commissioner of Public Safety, would not issue parade permits, and that the marchers would have to apply to the entire City Commission.[1] But Birmingham's ordinances did not require a prompt

161   decision by *161 the City Commission.[2] Nor did the State of Alabama provide for a speedy court review of the denial of a parade permit.[3]

---

[1] I agree with my Brother STEWART that we may properly take judicial notice of the evidence of record in *Walker* v. *Birmingham*, 388 U.S. 307 (1967). See 9 J.

Wigmore, Evidence § 2579, at 570 (3d ed. 1940); *Butler* v. *Eaton*, 141 U.S. 240 (1891); *Craemer* v. *Washington*, 168 U.S. 124 (1897). That record shows that in response to a request for permission to march on April 5 and 6, Mr. Connor replied by telegram on April 5:

"Under the provisions of the city code of the City of Birmingham, a permit to picket as requested by you cannot be granted by me individually but is the responsibility [*sic*] of the entire commission. I insist that you and your people do not start any picketing on the streets in Birmingham, Alabama.

"Eugene `Bull' Connor, Commissioner of Public Safety."

See *Walker* v. *Birmingham*, No. 249, October Term, 1966, Transcript of Record 415. Mr. Connor's telegram was received in evidence at trial. See Transcript, *supra*, at 350.

I do not, however, find it appropriate to rely upon the slightly earlier episode detailed in my Brother STEWART's opinion, *ante*, at 157, as the trial judge ruled the uncontradicted supporting testimony inadmissible. See Transcript, *supra*, at 355.

[2] Section 1159 does not require the City Commission to act on an application within any fixed amount of time. Indeed, by the time Connor definitively declared that he could not issue parade permits, it is not at all clear that petitioner could even have made a timely permit application to the City Commission at its only remaining regular session set before the scheduled Good Friday march. See General City Code of Birmingham § 21 (1944). While the 1964 City Code makes it clear that petitioner's permit application would have been considered out of time, see § 2-10, the 1944 Code, which was applicable in 1963, is not clear on this point.

**221**

3 Although Shuttlesworth could have petitioned for a writ of mandamus in the Alabama Circuit Court if the City Commission denied his application, that state court is not obliged to render a decision within any fixed period of time.

Given the absence of speedy procedures, the Reverend Shuttlesworth and his associates were faced with a serious dilemma when they received their notice from Mr. Connor. If they attempted to exhaust the administrative and judicial remedies provided by Alabama law, it was almost certain that no effective relief could be obtained by Good Friday. Since the right to engage in peaceful and orderly political demonstrations is, under appropriate conditions, a fundamental aspect of the "liberty" protected by the Fourteenth Amendment, see *Stromberg* v. *California*, 283 U.S. 359, 368-370 (1931); *Hague* v. *C. I. O.*, 307 U.S. 496, 515-516 (1939) (opinion of Roberts, J.); *Garner* v. *Louisiana*, 368 U.S. 157, 201-203 (1961) (opinion of HARLAN, J.), the petitioner was not obliged to invoke procedures which could not give him effective relief. With fundamental rights at stake, he was entitled to adopt the more probable meaning of the ordinance and act on his belief that the city's permit regulations were 162 unconstitutional. *162

It may be suggested, however, that Shuttlesworth's dilemma was of his own making. He could have requested a permit months in advance of Good Friday, thereby allowing Alabama's administrative and judicial machinery the necessary time to operate fully before the date set for the march. But such a suggestion ignores the principle established in *Freedman* v. *Maryland*, 380 U.S. 51, 58-61 (1965), which prohibits the States from requiring persons to invoke unduly cumbersome and time-consuming procedures before they may exercise their constitutional right of expression. *Freedman* holds that if the State is to protect the public from obscene movies, it must afford exhibitors a speedy administrative or judicial right of review, lest "the victorious exhibitor might find the most propitious

opportunity for exhibition [passed]." *Id.*, at 61. The *Freedman* principle is applicable here.[4] The right to assemble peaceably to voice political protest is at least as basic as the right to exhibit a motion picture which may have some aesthetic value. Moreover, slow-moving procedures have a 163 much more severe impact in the instant case *163 than they had in *Freedman*. Though a movie exhibitor might suffer some financial loss if he were obliged to wait for a year or two while the administrative and judicial mills ground out a result, it is nevertheless quite likely that the public would ultimately see the film. In contrast, timing is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all. To require Shuttlesworth to submit his parade permit application months in advance would place a severe burden upon the exercise of his constitutionally protected rights. Cf. *Williams* v. *Rhodes*, 393 U.S. 23, 33 (1968).

4 None of our past decisions have squarely considered whether parade licenses must be handled on an expedited basis. In *Cox* v. *New Hampshire*, 312 U.S. 569 (1941), the question was not argued. In *Poulos* v. *New Hampshire*, 345 U.S. 395 (1953), Poulos' request for a permit to conduct religious services in a public park was refused by the Portsmouth City Council seven and one-half weeks before the first scheduled event. Since the time remaining was sufficient to obtain relief by way of mandamus, see 345 U.S., at 419-420 (opinion of Mr. Justice Frankfurter), there was no need to consider whether the State had a constitutional obligation to provide a more rapid procedure. And, of course, those cases which struck down regulatory schemes which purported to issue licenses on the basis of unconstitutional standards did not reach the question presented here. See, *e. g., Lovell* v. *Griffin*, 303 U.S. 444 (1938); *Schneider* v. *State*, 308 U.S. 147, 163-165

**222**

Shuttlesworth v. Birmingham     394 U.S. 147 (1969)

(1939); *Largent* v. *Texas*, 318 U.S. 418 (1943); *Staub* v. *Baxley*, 355 U.S. 313 (1958).

I do not mean to suggest that a State or city may not reasonably require that parade permit applications be submitted early enough to allow the authorities and the judiciary to determine whether the parade proposal is consistent with the important interests respecting the use of the streets which local authority may legitimately protect. But such applications must be handled on an expedited basis so that rights of political expression will not be lost in a maze of cumbersome and slow-moving procedures.

Neither the city of Birmingham nor the State of Alabama has established such expedited procedures. See nn. 2 and 3, *supra*. Indeed, the city's parade ordinance does not establish any procedure at all to govern the consideration of applications. Section 1159 of the City Code does not state *when* an application must be submitted if it is to be considered timely. The ordinance does not state *how* an application is to be submitted to

164 the "City Commission."[5] Nor have   *164 regulations been published which would answer these questions.[6]

> [5] It would be most remarkable if every parade application involving the march of 52 persons is considered in a plenary manner by the principal governmental body of a city so large as Birmingham. In fact, an offer of proof was made in the *Walker* proceedings that Page 164 the City Commission had never passed on permit applications in the past, but had delegated the task to inferior officials. See Transcript, *supra*, n. 1, at 290. The proof was not admitted on the ground that it was irrelevant. *Ibid*.

> [6] At the trial in *Walker* v. *Birmingham*, the City Clerk, who kept records of the parade permits that had been granted, stated that no regulations had been issued to fill in the gaps left by the Ordinance. See Transcript, *supra*, n. 1, at 286.

In the absence of any guidelines, the most that can fairly be asked of petitioner is that he make a good-faith effort to obtain a permit from the city authorities. Shuttlesworth so acted when he approached the city official most likely to have the authority to deal with permit applications in an expedited manner — Commissioner Connor was the member of the City Commission in charge of public safety. It was Connor, not Shuttlesworth, who broke off all discussions relating to the issuance of permits. After the Commissioner declared that he lacked the power to act, it was reasonable to believe that no public authority would act in time. Since neither the city nor the State provided sufficiently expedited procedures for the consideration of parade permits, petitioner Shuttlesworth cannot be punished for the exercise of his constitutionally protected right of political expression.[7]

> [7] I do not reach the question whether the principle followed in such cases as *Lovell, Schneider, Largent,* and *Staub*, see n. 4, *supra*, allowing persons to ignore entirely licensing schemes which unconstitutionally impinge on other forms of free expression, should be extended to cover "parade" permit statutes involving, as they do, a particularly important state interest.

On this basis I concur in the reversal of the judgment of the Alabama Supreme Court.

165 *165

**223**

# EXHIBIT 10

No. 480

U.S.

# Murdock v. Pennsylvania

319 U.S. 105 (1943) · 63 S. Ct. 870

Decided May 3, 1943

CERTIORARI TO THE SUPERIOR COURT OF PENNSYLVANIA.

No. 480.

Argued March 10, 11, 1943. Decided May 3, 1943.

1. A municipal ordinance which, as construed and applied, requires religious colporteurs to pay a license tax as a condition to the pursuit of their activities, is invalid under the Federal Constitution as a denial of freedom of speech, press and religion. Pp. 108-110. 2. The mere fact that the religious literature is "sold" rather than "donated" does not transform the activities of the colporteur into a commercial enterprise. P. 111. 3. Upon the record in these cases, it can not be said that "Jehovah's Witnesses" were engaged in a commercial rather than in a religious venture. P. 111. 4. A State may not impose a charge for the enjoyment of a right granted by the Federal Constitution. P. 113. 5. The flat license tax here involved restrains in advance the Constitutional liberties of press and religion and inevitably tends to suppress their exercise. P. 114. 6. That the ordinance is "nondiscriminatory," in that it applies also to peddlers of wares and merchandise, is immaterial. The liberties guaranteed by the First Amendment are in a preferred position. P. 115. 7. Since the privilege in question is guaranteed by the Federal Constitution and exists independently of state authority, the inquiry as to whether the State has given something for which it can ask a return is irrelevant. P. 115. 8. A community may not suppress, or the State tax, the dissemination of views because they are unpopular, annoying, or

106 distasteful. P. 116. *106 9. The assumption that the ordinance has been construed to apply only to solicitation from house to house can not sustain it, since it is not narrowly drawn to prevent or control abuses or evils arising from that particular type of activity. P. 117. 149 Pa. Super. 175, 27 A.2d 666, reversed.

CERTIORARI, 318 U.S. 748, to review affirmances of orders in eight cases refusing to allow appeals from judgments and sentences for violations of a municipal ordinance.

*Mr. Hayden C. Covington* for petitioners.

*Mr. Fred B. Trescher* for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The City of Jeannette, Pennsylvania, has an ordinance, some forty years old, which provides in part:

"That all persons canvassing for or soliciting within said Borough, orders for goods, paintings, pictures, wares, or merchandise of any kind, or persons delivering such articles under orders so obtained or solicited, shall be required to procure from the Burgess a license to transact said business and shall pay to the Treasurer of said Borough therefore the following sums according to the time for which said license shall be granted.

"For one day $1.50, for one week seven dollars ($7.00), for two weeks twelve dollars ($12.00), for three weeks twenty dollars ($20.00), provided that

the provisions of this ordinance shall not apply to persons selling by sample to manufacturers or licensed merchants or dealers doing business in said Borough of Jeannette."

Petitioners are "Jehovah's Witnesses." They went about from door to door in the City of Jeannette distributing literature and soliciting people to "purchase" certain religious books and pamphlets, all published by the *107 Watch Tower Bible Tract Society.[1] The "price" of the books was twenty-five cents each, the "price" of the pamphlets five cents each.[2] In connection with these activities, petitioners used a phonograph[3] on which they played a record expounding certain of their views on religion. None of them obtained a license under the ordinance. Before they were arrested each had made "sales" of books. There was evidence that it was their practice in making these solicitations to request a "contribution" of twenty-five cents each for the books and five cents each for the pamphlets, but to accept lesser sums or even to donate the volumes in case an interested person was without funds. In the present case, some donations of pamphlets were made when books were purchased. Petitioners were convicted and fined for violation of the ordinance. Their judgments of conviction were sustained by the Superior Court of Pennsylvania, 149 Pa. Super. 175, 27 A.2d 666, against their contention that the ordinance deprived them of the freedom of speech, press, and religion guaranteed by the First Amendment. Petitions for leave to appeal to the Supreme Court of Pennsylvania were denied. The cases are here on petitions for writs of certiorari which we granted along with the petitions for rehearing of *Jones* v. *Opelika*, 316 U.S. 584, and 108 its companion cases. *108

[1] Two religious books — Salvation and Creation — were sold. Others were offered in addition to the Bible. The Watch Tower Bible Tract Society is alleged to be a non-profit charitable corporation.

[2] Petitioners paid three cents each for the pamphlets and, if they devoted only their spare time to the work, twenty cents each for the books. Those devoting full time to the work acquired the books for five cents each. There was evidence that some of the petitioners paid the difference between the sales price and the cost of the books to their local congregations which distributed the literature.

[3] Purchased along with the record from the Watch Tower Bible Tract Society.

The First Amendment, which the Fourteenth makes applicable to the states, declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press . . ." It could hardly be denied that a tax laid specifically on the exercise of those freedoms would be unconstitutional. Yet the license tax imposed by this ordinance is, in substance, just that.

Petitioners spread their interpretations of the Bible and their religious beliefs largely through the hand distribution of literature by full or part time workers.[4] They claim to follow the example of Paul, teaching "publicly, and from house to house." Acts 20:20. They take literally the mandate of the Scriptures, "Go ye into all the world, and preach the gospel to every creature." Mark 16:15. In doing so they believe that they are obeying a commandment of God.

[4] The nature and extent of their activities throughout the world during the years 1939 and 1940 are to be found in the 1941 Yearbook of Jehovah's Witnesses, pp. 62-243.

The hand distribution of religious tracts is an age-old form of missionary evangelism — as old as the history of printing presses.[5] It has been a potent force in various religious movements down through the years.[6] This form of evangelism is utilized today on a large scale by various religious

**226**

sects whose colporteurs carry the Gospel to
109    thousands *109 upon thousands of homes and seek
through personal visitations to win adherents to
their faith.[7] It is more than preaching; it is more
than distribution of religious literature. It is a
combination of both. Its purpose is as evangelical
as the revival meeting. This form of religious
activity occupies the same high estate under the
First Amendment as do worship in the churches
and preaching from the pulpits. It has the same
claim to protection as the more orthodox and
conventional exercises of religious. It also has the
same claim as the others to the guarantees of
freedom of speech and freedom of the press.

5  Palmer, The Printing Press and the Gospel
   (1912).

6  White, The Colporteur Evangelist (1930);
   Home Evangelization (1850); Edwards,
   The Romance of the Book (1932) c. V; 12
   Biblical Repository (1844) Art. VIII; 16
   The Sunday Magazine (1887) pp. 43-47; 3
   Meliora (1861) pp. 311-319; Felice,
   Protestants of France (1853) pp. 53, 513; 3
   D'Aubigne, History of The Reformation
   (1849) pp. 103, 152, 436-437; Report of
   Colportage in Virginia, North Carolina
   South Carolina, American Tract Society
   (1855). An early type of colporteur was
   depicted by John Greenleaf Whittier in his
   legendary poem, The Vaudois Teacher.
   And see, Wylie, History of the Waldenses.

7  The General Conference of Seventh-Day
   Adventists, who filed a brief *amicus curiae*
   on the reargument of *Jones* v. *Opelika*, has
   given us the following data concerning
   their literature ministry: This denomination
   has 83 publishing houses throughout the
   world, issuing publications in over 200
   languages. Some 9,256 separate
   publications were issued in 1941. By
   printed and spoken word, the Gospel is
   carried into 412 countries in 824
   languages. 1942 Yearbook, p. 287. During
   December 1941, a total of 1,018
   colporteurs operated in North America.

They delivered during that month
$97,997.19 worth of gospel literature, and
for the whole year of 1941 a total of
$790,610.36 — an average per person of
about $65 per month. Some of these were
students and temporary workers.
Colporteurs of this denomination receive
half of their collections, from which they
must pay their traveling and living
expenses. Colporteurs are specially trained
and their qualifications equal those of
preachers. In the field, each worker is
under the supervision of a field missionary
secretary to whom a weekly report is made.
After fifteen years of continuous service,
each colporteur is entitled to the same
pension as retired ministers. And see
Howell, The Great Advent Movement
(1935), pp. 72-75.

The integrity of this conduct or behavior as a
religious practice has not been challenged. Nor do
we have presented any question as to the sincerity
of petitioners in their religious beliefs and
practices, however misguided they may be thought
to be. Moreover, we do not intimate or suggest in
respecting their sincerity that any conduct can be
made a religious rite and by the zeal of the
practitioners swept into the First Amendment.
110    *Reynolds* v. *110 United States,* 98 U.S. 145, 161-
167, and *Davis* v. *Beason,* 133 U.S. 333 denied
any such claim to the practice of polygamy and
bigamy. Other claims may well arise which
deserve the same fate. We only hold that spreading
one's religious beliefs or preaching the Gospel
through distribution of religious literature and
through personal visitations is an age-old type of
evangelism with as high a claim to constitutional
protection as the more orthodox types. The
manner in which it is practiced at times gives rise
to special problems with which the police power
of the states is competent to deal. See for example
*Cox* v. *New Hampshire,* 312 U.S. 569, and
*Chaplinsky* v. *New Hampshire,* 315 U.S. 568. But
that merely illustrates that the rights with which
we are dealing are not absolutes. *Schneider* v.
*State,* 308 U.S. 147, 160-161. We are concerned,

**227**

however, in these cases merely with one narrow issue. There is presented for decision no question whatsoever concerning punishment for any alleged unlawful acts during the solicitation. Nor is there involved here any question as to the validity of a registration system for colporteurs and other solicitors. The cases present a single issue — the constitutionality of an ordinance which as construed and applied requires religious colporteurs to pay a license tax as a condition to the pursuit of their activities.

The alleged justification for the exaction of this license tax is the fact that the religious literature is distributed with a solicitation of funds. Thus it was stated, in *Jones* v. *Opelika, supra*, p. 597, that when a religious sect uses "ordinary commercial methods of sales of articles to raise propaganda funds," it is proper for the state to charge "reasonable fees for the privilege of canvassing." Situations will arise where it will be difficult to determine whether a particular activity is religious or purely commercial. The distinction at times is vital. As we stated only the other day, in *Jamison* v. *Texas*, 318 U.S. 413, 417, "The states can prohibit the use of the streets for *111 the distribution of purely commercial leaflets, even though such leaflets may have `a civic appeal, or a moral platitude' appended. *Valentine* v. *Chrestensen*, 316 U.S. 52, 55. They may not prohibit the distribution of handbills in the pursuit of a clearly religious activity merely because the handbills invite the purchase of books for the improved understanding of the religious or because the handbills seek in a lawful fashion to promote the raising of funds for religious purposes." But the mere fact that the religious literature is "sold" by itinerant preachers rather than "donated" does not transform evangelism into a commercial enterprise. If it did, then the passing of the collection plate in church would make the church service a commercial project. The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books. The right to use the press for expressing one's views is not to be measured by the protection afforded commercial handbills. It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge. It is plain that a religious organization needs funds to remain a going concern. But an itinerant evangelist, however misguided or intolerant he may be, does not become a mere book agent by selling the Bible or religious tracts to help defray his expenses or to sustain him. Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way. As we have said, the problem of drawing the line between a purely commercial activity and a religious one will at times be difficult. On this record it plainly cannot be said that petitioners were engaged in a commercial rather than a religious venture. It is a distortion of the facts of record to describe their activities as the occupation of selling books and pamphlets. And the Pennsylvania court did not rest the judgments of conviction on that basis, though it did find *112 that petitioners "sold" the literature. The Supreme Court of Iowa in *State* v. *Mead*, 230 Iowa 1217, 300 N.W. 523, 524, described the selling activities of members of this same sect as "merely incidental and collateral" to their "main object which was to preach and publicize the doctrines of their order." And see *State* v. *Meredith*, 197 S.C. 351, 15 S.E.2d 678; *People* v. *Barber*, 289 N.Y. 378, 385-386, 46 N.E.2d 329. That accurately summarizes the present record.

We do not mean to say that religious groups and the press are free from all financial burdens of government. See *Grosjean* v. *American Press Co.*, 297 U.S. 233, 250. We have here something quite different, for example, from a tax on the income of one who engages in religious activities or a tax on property used or employed in connection with those activities. It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the

privilege of delivering a sermon. The tax imposed by the City of Jeannette is a flat license tax, the payment of which is a condition of the exercise of these constitutional privileges. The power to tax the exercise of a privilege is the power to control or suppress its enjoyment. *Magnano Co.* v. *Hamilton*, 292 U.S. 40, 44-45, and cases cited. Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance. Those who can tax the privilege of engaging in this form of missionary evangelism can close its doors to all those who do not have a full purse. Spreading religious beliefs in this ancient and honorable manner would thus be denied the needy. Those who can deprive religious groups of their colporteurs can take from them a part of the vital power of the press which has survived from the Reformation.

It is contended, however, that the fact that the license tax can suppress or control this activity is unimportant *113 if it does not do so. But that is to disregard the nature of this tax. It is a license tax — a flat tax imposed on the exercise of a privilege granted by the Bill of Rights. A state may not impose a charge for the enjoyment of a right granted by the Federal Constitution. Thus, it may not exact a license tax for the privilege of carrying on interstate commerce ( *McGoldrick* v. *Berwind-White Co.*, 309 U.S. 33, 56-58), although it may tax the property used in, or the income derived from, that commerce, so long as those taxes are not discriminatory. *Id.*, p. 47 and cases cited. A license tax applied to activities guaranteed by the First Amendment would have the same destructive effect. It is true that the First Amendment, like the commerce clause, draws no distinction between license taxes, fixed sum taxes, and other kinds of taxes. But that is no reason why we should shut our eyes to the nature of the tax and its destructive influence. The power to impose a license tax on the exercise of these freedoms is indeed as potent as the power of censorship which this Court has repeatedly struck down. *Lovell* v. *Griffin*, 303 U.S.

444; *Schneider* v. *State, supra; Cantwell* v. *Connecticut*, 310 U.S. 296, 306; *Largent* v. *Texas*, 318 U.S. 418; *Jamison* v. *Texas, supra*. It was for that reason that the dissenting opinions in *Jones* v. *Opelika, supra*, stressed the nature of this type of tax. 316 U.S. pp. 607-609, 620, 623. In that case, as in the present ones, we have something very different from a registration system under which those going from house to house are required to give their names, addresses and other marks of identification to the authorities. In all of these cases the issuance of the permit or license is dependent on the payment of a license tax. And the license tax is fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues. It is not a nominal fee *114 imposed as a regulatory measure to defray the expenses of policing the activities in question.[8] It is in no way apportioned. It is a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment. Accordingly, it restrains in advance those constitutional liberties of press and religion and inevitably tends to suppress their exercise. That is almost uniformly recognized as the inherent vice and evil of this flat license tax. As stated by the Supreme Court of Illinois in a case involving this same sect and an ordinance similar to the present one, a person cannot be compelled "to purchase, through a license fee or a license tax, the privilege freely granted by the constitution."[9] *Blue Island* v. *Kozul*, 379 Ill. 511, 519, 41 N.E.2d 515. So, it may not be said that proof is lacking that these license taxes either separately or cumulatively have restricted or are likely to restrict petitioners' religious activities. On their face they are a restriction of the free exercise of those freedoms which are protected by the First Amendment.

8    The constitutional difference between such a regulatory measure and a tax on the exercise of a federal right has long been recognized. While a state may not exact a license tax for the privilege of carrying on interstate commerce ( *McGoldrick* v.

*Berwind-White Co., supra*, pp. 56-58), it may, for example, exact a fee to defray the cost of purely local regulations in spite of the fact that those regulations incidentally affect commerce. "So long as they do not impede the free flow of commerce and are not made the subject of regulation by Congress they are not forbidden. *Clyde Mallory Lines* v. *Alabama*, 296 U.S. 261, 267, and cases cited. And see *South Carolina Highway Dept.* v. *Barnwell Bros.*, 303 U.S. 177, 185-188.

9  That is the view of most state courts which have passed on the question. *McConkey* v. *Fredericksburg*, 179 Va. 556, 19 S.E.2d 682; *State* v. *Greaves*, 112 Vt. 222, 22 A.2d 497; *People* v. *Banks*, 168 Misc. 515, 6 N.Y.S.2d 41. *Contra: Cook* v. *Harrison*, 180 Ark. 546, 21 S.W.2d 966 .

The taxes imposed by this ordinance can hardly help but be as severe and telling in their impact on the freedom *115 of the press and religion as the "taxes on knowledge" at which the First Amendment was partly aimed. *Grosjean* v. *American Press Co., supra*, pp. 244-249. They may indeed operate even more subtly. Itinerant evangelists moving throughout a state or from state to state would feel immediately the cumulative effect of such ordinances as they become fashionable. The way of the religious dissenter has long been hard. But if the formula of this type of ordinance is approved, a new device for the suppression of religious minorities will have been found. This method of disseminating religious beliefs can be crushed and closed out by the sheer weight of the toll or tribute which is exacted town by town, village by village. The spread of religious ideas through personal visitations by the literature ministry of numerous religious groups would be stopped.

The fact that the ordinance is "nondiscriminatory" is immaterial. The protection afforded by the First Amendment is not so restricted. A license tax certainly does not acquire constitutional validity because it classifies the privileges protected by the First Amendment along with the wares and merchandise of hucksters and peddlers and treats them all alike. Such equality in treatment does not save the ordinance. Freedom of press, freedom of speech, freedom of religion are in a preferred position.

It is claimed, however, that the ultimate question in determining the constitutionality of this license tax is whether the state has given something for which it can ask a return. That principle has wide applicability. *State Tax Commission* v. *Aldrich*, 316 U.S. 174, and cases cited. But it is quite irrelevant here. This tax is not a charge for the enjoyment of a privilege or benefit bestowed by the state. The privilege in question exists apart from state authority. It is guaranteed the people by the Federal Constitution.

Considerable emphasis is placed on the kind of literature which petitioners were distributing — its provocative, *116 abusive, and ill-mannered character and the assault which it makes on our established churches and the cherished faiths of many of us. See *Douglas* v. *Jeannette*, concurring opinion, *post*, p. 166. But those considerations are no justification for the license tax which the ordinance imposes. Plainly a community may not suppress, or the state tax, the dissemination of views because they are unpopular, annoying or distasteful. If that device were ever sanctioned, there would have been forged a ready instrument for the suppression of the faith which any minority cherishes but which does not happen to be in favor. That would be a complete repudiation of the philosophy of the Bill of Rights.

Jehovah's Witnesses are not "above the law." But the present ordinance is not directed to the problems with which the police power of the state is free to deal. It does not cover, and petitioners are not charged with, breaches of the peace. They are pursuing their solicitations peacefully and quietly. Petitioners, moreover, are not charged with or prosecuted for the use of language which is obscene, abusive, or which incites retaliation.

**230**

Cf. *Chaplinsky* v. *New Hampshire, supra*. Nor do we have here, as we did in *Cox* v. *New Hampshire, supra*, and *Chaplinsky* v. *New Hampshire, supra*, state regulation of the streets to protect and insure the safety, comfort, or convenience of the public. Furthermore, the present ordinance is not narrowly drawn to safeguard the people of the community in their homes against the evils of solicitations. See *Cantwell* v. *Connecticut, supra*, 306. As we have said, it is not merely a registration ordinance calling for an identification of the solicitors so as to give the authorities some basis for investigating strangers coming into the community. And the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors. See *Cox* v. *New Hampshire*, *117 supra*, pp. 576-577. Nor can the present ordinance survive if we assume that it has been construed to apply only to solicitation from house to house.[10] The ordinance is not narrowly drawn to prevent or control abuses or evils arising from that activity. Rather, it sets aside the residential areas as a prohibited zone, entry of which is denied petitioners unless the tax is paid. That restraint and one which is city-wide in scope ( *Jones* v. *Opelika*) are different only in degree. Each is an abridgment of freedom of press and a restraint on the free exercise of religion. They stand or fall together.

> 10  The Pennsylvania Superior Court stated that the ordinance has been "enforced" only to prevent petitioners from canvassing "from door to door and house to house" without a license and not to prevent them from distributing their literature on the streets. 149 Pa. Super., p. 184, 27 A.2d 670.

The judgment in *Jones* v. *Opelika* has this day been vacated. Freed from that controlling precedent, we can restore to their high, constitutional position the liberties of itinerant evangelists who disseminate their religious beliefs and the tenets of their faith through distribution of literature. The judgments are reversed and the causes are remanded to the Pennsylvania Superior Court for proceedings not inconsistent with this opinion.

*Reversed*.

The following dissenting opinions are applicable to Nos. 280, 314, and 966 (October Term, 1941), *Jones* v. *Opelika, ante*, p. 103; and to Nos. 480-487, *Murdock* v. *Pennsylvania, ante*, p. 105. See also opinion of MR. JUSTICE JACKSON, *post*, p. 166.

MR. JUSTICE REED, dissenting:

These cases present for solution the problem of the constitutionality of certain municipal ordinances levying a tax for the production of revenue on the sale of books *118 and pamphlets in the streets or from door to door. Decisions sustaining the particular ordinances were entered in the three cases first listed at the last term of this Court. In that opinion the ordinances were set out and the facts and issues stated. *Jones* v. *Opelika*, 316 U.S. 584. A rehearing has been granted. The present judgments vacate the old and invalidate the ordinances. The eight cases of this term involve canvassing from door to door only under similar ordinances, which are in the form stated in the Court's opinion. By a *per curiam* opinion of this day, the Court affirms its acceptance of the arguments presented by the dissent of last term in *Jones* v. *Opelika*. The Court states its position anew in the *Jeannette* cases.

This dissent does not deal with an objection which theoretically could be made in each case, to wit, that the licenses are so excessive in amount as to be prohibitory. This matter is not considered because that defense is not relied upon in the pleadings, the briefs or at the bar. No evidence is offered to show the amount is oppressive. An unequal tax, levied on the activities of distributors of informatory publications, would be a phase of discrimination against the freedom of speech, press or religion. Nor do we deal with

Murdock v. Pennsylvania    319 U.S. 105 (1943)

discrimination against the petitioners, as individuals or as members of the group, calling themselves Jehovah's Witnesses. There is no contention in any of these cases that such discrimination is practiced in the application of the ordinances. Obviously, an improper application by a city, which resulted in the arrest of Witnesses and failure to enforce the ordinance against other groups, such as the Adventists, would raise entirely distinct issues.

A further and important disclaimer must be made in order to focus attention sharply upon the constitutional issue. This dissent does not express, directly or by inference, any conclusion as to the constitutional rights of state or federal governments to place a privilege tax upon the *119 soliciting of a free-will contribution for religious purposes. Petitioners suggest that their books and pamphlets are not sold but are given either without price or in appreciation of the recipient's gift for the furtherance of the work of the Witnesses. The pittance sought, as well as the practice of leaving books with poor people without cost, gives strength to this argument. In our judgment, however, the plan of national distribution by the Watch Tower Bible Tract Society, with its wholesale prices of five or twenty cents per copy for books, delivered to the public by the Witnesses at twenty-five cents per copy, justifies the characterization of the transaction as a sale by all the state courts. The evidence is conclusive that the Witnesses normally approach a prospect with an offer of a book for twenty-five cents. Sometimes, apparently rarely, a book is left with a prospect without payment. The *quid pro quo* is demanded. If the profit was greater, twenty cents or even one dollar, no difference in principle would emerge. The Witness sells books to raise money for propagandizing his faith, just as other religious groups might sponsor bazaars, or peddle tickets to church suppers, or sell Bibles or prayer books for the same object. However high the purpose or noble the aims of the Witness, the transaction has been found by the state courts to be a sale under their ordinances and, though our doubt was greater than it is, the state's conclusion would influence us to follow its determination.[1]

120  *120

[1] The Court in the *Murdock* case analyzes the contention that the sales technique partakes of commercialism and says: "It is a distortion of the facts of record to describe their activities as the occupation of selling books and pamphlets. And the Pennsylvania court did not rest the judgments of conviction on that basis, though it did find that petitioners `sold' the literature." The state court, in its opinion, 149 Pa. Super. 175, 27 A.2d 666, 667, stated the applicable ordinance as forbidding sales of merchandise by canvassing without a license, and said that the evidence established its violation by selling "two books entitled `Salvation' and `Creation' respectively, and certain Page 120 leaflets or pamphlets, all published by the Watch Tower Bible and Tract Society of Brooklyn, N.Y., for which the society fixed twenty-five cents each as the price for the books and five cents each as the price of the leaflets. Defendants paid twenty cents each for the books, unless they devoted their whole time to the work, in which case they paid five cents each for the books they sold at twenty-five cents. Some of the witnesses spoke of `contributions' but the evidence justified a finding that they *sold* the books and pamphlets."

The state court then repeated with approval from one of its former decisions the statements: "The constitutional right of freedom of worship does not guarantee anybody the right to *sell* anything from house to house or in buildings, belonging to, or in the occupancy of, other persons." ". . . we do not accede to his contention on the oral argument that the federal decisions relied upon by him go so far as to rule that the constitutional guaranty of a free press forbids dealers in books and printed matter

Murdock v. Pennsylvania     319 U.S. 105 (1943)

being subjected to our State mercantile license tax or the federal income tax as to such sales, along with dealers in other merchandise." *Pittsburgh* v. *Ruffner*, 134 Pa. Super. 192, 199, 202, 4 A.2d 224. And after further discussion of selling, the conviction of the Witnesses was affirmed. It can hardly be said, we think, that the state court did not treat the Jeannette canvassers as engaged in a commercial activity or occupation at the time of their arrests.

In the opinion in *Jones* v. *Opelika*, 316 U.S. 584, on the former hearing, attention was called to the differentiation between these cases of taxation and those of forbidden censorship, prohibition or discrimination. There is no occasion to repeat what has been written so recently as to the constitutional right to tax the money-raising activities of religious or didactic groups. There are, however, other reasons, not fully developed in that opinion, that add to our conviction that the Constitution does not prohibit these general occupational taxes.

The real contention of the Witnesses is that there can be no taxation of the occupation of selling books and pamphlets because to do so would be contrary to the due process clause of the Fourteenth Amendment, which now is held to have drawn the contents of the First Amendment into the category of individual rights protected 121 *121 from state deprivation. *Gitlow* v. *New York*, 268 U.S. 652, 666; *Near* v. *Minnesota*, 283 U.S. 697, 707; *Cantwell* v. *Connecticut*, 310 U.S. 296, 303. Since the publications teach a religion which conforms to our standards of legality, it is urged that these ordinances prohibit the free exercise of religion and abridge the freedom of speech and of the press.

The First Amendment reads as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of

speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

It was one of twelve proposed on September 25, 1789, to the States by the First Congress after the adoption of the Constitution. Ten were ratified. They were intended to be and have become our Bill of Rights. By their terms, our people have a guarantee that so long as law as we know it shall prevail, they shall live protected from the tyranny of the despot or the mob. None of the provisions of our Constitution is more venerated by the people or respected by legislatures and the courts than those which proclaim for our country the freedom of religion and expression. While the interpreters of the Constitution find the purpose was to allow the widest practical scope for the exercise of religion and the dissemination of information, no jurist has ever conceived that the prohibition of interference is absolute.[2] Is subjection to nondiscriminatory, nonexcessive taxation in the distribution of religious literature, a prohibition of the exercise of religion or an 122 abridgment of the freedom of the press? *122

[2] *Whitney* v. *California*, 274 U.S. 357, 371, and the concurring opinion, 373; *Reynolds* v. *United States*, 98 U.S. 145, 166; *Cantwell* v. *Connecticut*, 310 U.S. 296, 303; *Cox* v. *New Hampshire*, 312 U.S. 569, 574, 576.

Nothing has been brought to our attention which would lead to the conclusion that the contemporary advocates of the adoption of a Bill of Rights intended such an exemption. The words of the Amendment do not support such a construction. "Free" cannot be held to be without cost but rather its meaning must accord with the freedom guaranteed. "Free" means a privilege to print or pray without permission and without accounting to authority for one's actions. In the Constitutional Convention the proposal for a Bill of Rights of any kind received scant attention.[3] In the course of the ratification of the Constitution, however, the absence of a Bill of Rights was used

vigorously by the opponents of the new government. A number of the states suggested amendments. Where these suggestions have any bearing at all upon religion or free speech, they indicate nothing as to any feeling concerning taxation either of religious bodies or their evangelism.[4] This was not because freedom of religion or free speech was not understood. It was because the subjects were looked upon from standpoints entirely distinct from taxation.[5]

123 *123

[3] Journal of the Convention, 369; II Farrand, The Records of the Federal Convention, 611, 616-8, 620. Cf. McMaster Stone, Pennsylvania and the Federal Constitution, 251-3.

[4] I Elliot's Debates on the Federal Constitution (1876) 319 *et seq*. In ratifying the Constitution the following declarations were made: *New Hampshire*, p. 326, "XI. Congress shall make no laws touching religion, or to infringe the rights of conscience." *Virginia*, p. 327, ". . . no right, of any denomination, can be cancelled, abridged, restrained, or modified, by the Congress, by the Senate or House of Representatives, acting in any capacity, by the President, or any department or officer of the United States, except in those instances in which power is given by the Constitution for those purposes; and that, among other essential rights, the liberty of conscience, and of the press, cannot be cancelled, abridged, restrained, or modified, by any authority of the United States." *New York*, p. 328, "That the freedom of the press ought not to be violated or restrained." After the submission of the amendments, *Rhode Island* ratified and declared, pp. 334, 335, "IV. That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, and not by force and violence; and therefore all men have a natural, equal, and unalienable right to the Page 123 exercise of religion according to

the dictates of conscience; and that no particular religious sect or society ought to be favored or established, by law, in preference to others. . . . XVI. That the people have a right to freedom of speech, and of writing and publishing their sentiments. That freedom of the press is one of the greatest bulwarks of liberty, and ought not to be violated."

[5] The Articles of Confederation had references to religion and free speech:

"Article III. The said States hereby severally enter into a firm league of friendship with each other, for their common defence, the security of their liberties, and their mutual and general welfare, binding themselves to assist each other, against all force offered to, or attacks made upon them, or any of them, on account of religion, sovereignty, trade, or any other pretence whatever."

"Article V. . . . Freedom of speech and debate in Congress shall not be impeached or questioned in any court, or place out of Congress, and the members of Congress shall be protected in their persons from arrests and imprisonments, during the time of their going to and from, and attendance on Congress, except for treason, felony, or breach of the peace."

The Statute of Religious Freedom was passed in Virginia in 1785. The substance was in paragraph II: "*Be it enacted by the General Assembly*, That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinion in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities." 12 Hening Statutes of Va. 86.

A number of the states' constitutions at the

Murdock v. Pennsylvania   319 U.S. 105 (1943)

time of the adoption of the Bill of Rights contained provisions as to a free press:

Georgia, Constitution of 1777, Art. LXI. "Freedom of the press Page 124 and trial by jury to remain inviolate forever." I Poore, Federal and State Constitutions 383. Maryland, Constitution of 1776, Declaration of Rights, Art. XXXVIII. "That the liberty of the press ought to be inviolably preserved." *Id.* 820.

Massachusetts, Constitution of 1780, Part First, Art. XVI. "The liberty of the press is essential to the security of freedom in a State; it ought not, therefore, to be restrained in this commonwealth." *Id.*, 959. New Hampshire, Constitution of 1784, Part 1, Art. XXII. "The Liberty of the Press is essential to the security of freedom in a state; it ought, therefore, to be inviolably preserved." II Poore, *id.*, 1282.

North Carolina, Constitution of 1776, Declaration of Rights, Art. XV. "That the freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained." *Id.*, 1410.

Pennsylvania, Constitution of 1776, Declaration of Rights, Art. XII. "That the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained." *Id.*, 1542. Virginia, Bill of Rights, 1776, § 12. "That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments." *Id.*, 1909.

The available evidence of Congressional action shows clearly that the draftsmen of the amendments had in mind the practice of religion and the right to be heard, rather than any abridgment or interference with either by taxation 124 *124 in any form.[6] The amendments were 125 proposed by *125 Mr. Madison. He was careful to explain to the Congress the meaning of the amendment on religion. The draft was commented upon by Mr. Madison when it read:

6  For example, the first amendment as it passed the House of Representatives on Monday, August 24, 1789, read as follows:

"Congress shall make no law establishing religion or prohibiting the free exercise thereof, nor shall the rights of Conscience be infringed.

"The Freedom of Speech, and of the Press, and the right of the People peaceably to assemble, and consult for their common good, and to apply to the Government for a redress of grievances, shall not be infringed." Records of the United States Senate, 1A-C2 (U.S. Nat. Archives).

Apparently when the proposed amendments were passed by the Senate on September 9, 1789, what is now the first amendment read as follows:

"Congress shall make no law establishing articles of faith, or a mode of worship, or prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition to the government for a redress of grievances." *Id.*

"no religion shall be established by law, nor shall the equal rights of conscience be infringed." 1 Annals of Congress 729.

He said that he apprehended the meaning of the words on religion to be that Congress should not establish a religion and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience. *Id.*, 730. No such specific interpretation of the amendment on freedom of expression has been found in the debates. The clearest is probably from Mr. Benson,[7] who said that

7  Egbert Benson was the first attorney general of New York, a member of the Continental Congress and of the New York Convention for ratification of the Constitution. Biographical Directory of the American Congress, 694.

**235**

Murdock v. Pennsylvania    319 U.S. 105 (1943)

"The committee who framed this report proceeded on the principle that these rights belonged to the people; they conceived them to be inherent; and all that they meant to provide against was their being infringed by the Government." *Id.*, 731-32.

There have been suggestions that the English taxes on newspapers, springing from the tax act of 10 Anne, c. 19, § CI,[8] influenced the adoption of the First Amendment.[9]  *126  These taxes were obnoxious but an examination of the sources of the suggestion is convincing that there is nothing to support it except the fact that the tax on newspapers was in existence in England and was disliked.[10] The simple answer is that, if there had been any purpose of Congress to prohibit any kind of taxes on the press, its knowledge of the abominated English taxes would have led it to ban them unequivocally.

[8] "And be it enacted by the Authority aforesaid, That there shall be raised, levied, collected and paid, to and for the Use of her Majesty, her Heirs and Successors, for and upon all Books and Papers commonly called Pamphlets, and for and upon all News Papers, or Papers containing publick News, Intelligence or Occurrences, which shall, at any Time or Times within or during the Term last mentioned, be printed in *Great Britain*, to be dispersed and made publick, and for and upon such Advertisements as are herein after mentioned, the respective Duties following; that is to say, Page 126 "For every such Pamphlet or Paper contained in Half a Sheet, or any lesser Piece of Paper, so printed, the Sum of one Half-penny Sterling.

"For every such Pamphlet or Paper (being larger than Half a Sheet, and not exceeding one whole Sheet) so printed, a Duty after the Rate of one Penny Sterling for every printed Copy thereof.

"And for every such Pamphlet or Paper, being larger than one whole Sheet, and not exceeding six Sheets in Octavo, or in a lesser Page, or not exceeding twelve Sheets in Quarto, or twenty Sheets in Folio, so printed, a Duty after the Rate of two Shillings Sterling for every Sheet of any kind of Paper which shall be contained in one printed Copy thereof.

"And for every Advertisement to be contained in the *London Gazette*, or any other printed Paper, such Paper being dispersed or made publick weekly, or oftner, the Sum of twelve Pence Sterling."

[9] Stevens, Sources of the Constitution, 221, note 2; Stewart, Lennox and the Taxes on Knowledge, 15 Scottish Hist. Rev. 322, 326; McMaster Stone, Pennsylvania and the Federal Constitution, 181; *Grosjean* v. *American Press Co.*, 297 U.S. 233, 248.

[10] Cf. Collet, Taxes on Knowledge; Chafee, Free Speech in the United States, 17, n. 33.

It is only in recent years that the freedoms of the First Amendment have been recognized as among the fundamental personal rights protected by the Fourteenth Amendment from impairment by the states.[11] Until then these liberties were not deemed to be guarded from state action by the Federal Constitution.[12] The states placed  *127  restraints upon themselves in their own constitutions in order to protect their people in the exercise of the freedoms of speech and of religion.[13] Pennsylvania may be taken as a fair example. Its constitution reads:

[11] *Gitlow* v. *New York* (1925), 268 U.S. 652, 666; *Near* v. *Minnesota*, 283 U.S. 697, 707; *Cantwell* v. *Connecticut*, 310 U.S. 296, 307.

[12] *Permoli* v. *First Municipality*, 3 How. 589, 609; *Barron* v. *Baltimore*, 7 Pet. 243, 247.

[13] For the state provisions on expression and religion, see 2 Cooley. Constitutional Limitations (8th Ed.) 876, 965; III Constitutions of the States, New York State Const. Conv. Committee 1938.

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience and no preference shall ever be given by law to any religious establishments or modes of worship." Purdon's Penna. Stat., Const., Art. I, § 3.

"No person who acknowledges the being of a God, and a future state of rewards and punishments shall, on account of his religious sentiments, be disqualified to hold any office or place of trust or profit under this Commonwealth." *Id.*, Art. I, § 4.

"The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. . . ." *Id.*, Art. I, § 7.

It will be observed that there is no suggestion of freedom from taxation, and this statement is equally true of the other state constitutional provisions. It may be concluded that neither in the state or the federal constitutions was general taxation of church or press interdicted.

Is there anything in the decisions of this Court which indicates that church or press is free from the financial *128 burdens of government? We find nothing. Religious societies depend for their exemptions from taxation upon state constitutions or general statutes, not upon the Federal Constitution. *Gibbons* v. *District of Columbia*, 116 U.S. 404. This Court has held that the chief purpose of the free press guarantee was to prevent previous restraints upon publication. *Near* v. *Minnesota*, 283 U.S. 697, 713.[14] In *Grosjean* v. *American Press Co.*, 297 U.S. 233, 250, it was said that the predominant purpose was to preserve "an untrammeled press as a vital source of public information." In that case, a gross receipts tax on advertisements in papers with a circulation of more than twenty thousand copies per week was held invalid because "a deliberate and calculated device in the guise of a tax to limit the circulation. . . ." There was this further comment:

> [14] To this Professor Chafee adds the right to criticize the Government. Free Speech in the United States (1941) 18 *et seq.* Cf. 2 Cooley's Constitutional Limitations (8th Ed.) 886.

"It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press." *Id.*, 250.

It may be said, however, that ours is a too narrow, technical and legalistic approach to the problem of state taxation of the activities of church and press; that we should look not to the expressed or historical meaning of the First Amendment but to the broad principles of free speech and free exercise of religion which pervade our national way of life. It may be that the Fourteenth Amendment guarantees these principles rather than the more definite concept expressed in the First Amendment. This would mean that as a Court, we should determine what sort of liberty it is that the due process clause of *129 the Fourteenth Amendment guarantees against state restrictions on speech and church.

But whether we give content to the literal words of the First Amendment or to principles of the liberty of the press and the church, we conclude that cities or states may levy reasonable, non-discriminatory taxes on such activities as occurred in these cases. Whatever exemptions exist from taxation arise from the prevailing law of the various states. The constitutions of Alabama and Pennsylvania, with substantial similarity to the exemption provisions

of other constitutions, forbid the taxation of lots and buildings used exclusively for religious worship. Alabama (1901), § 91; Pennsylvania (1874), Art. IX, § 1. These are the only exemptions of the press or church from taxation. We find nothing more applicable to our problem in the other constitutions. Surely this unanimity of specific state action on exemptions of religious bodies from taxes would not have occurred throughout our history, if it had been conceived that the genius of our institutions, as expressed in the First Amendment, was incompatible with the taxation of church or press.

Nor do we understand that the Court now maintains that the Federal Constitution frees press or religion of any tax except such occupational taxes as those here levied. Income taxes, ad valorem taxes, even occupational taxes are presumably valid, save only a license tax on sales of religious books. Can it be that the Constitution permits a tax on the printing presses and the gross income of a metropolitan newspaper[15] but denies the right to lay an occupational tax on the distributors of the same papers? Does the exemption apply to booksellers or distributors of magazines or only to religious publications? And, if the latter, to what distributors? Or to what *130 books? Or is this Court saying that a religious practice of book distribution is free from taxation because a state cannot prohibit the "free exercise thereof" and a newspaper is subject to the same tax even though the same Constitutional Amendment says the state cannot abridge the freedom of the press? It has never been thought before that freedom from taxation was a perquisite attaching to the privileges of the First Amendment. The National Government grants exemptions to ministers and churches because it wishes to do so, not because the Constitution compels. Internal Revenue Code, §§ 22(b)(6), 101(6), 812(d), 1004(a)(2)(B). Where camp meetings or revivals charge admissions, a federal tax would apply, if Congress had not granted freedom from the exaction. *Id.*, § 1701.

15 *Giragi* v. *Moore*, 301 U.S. 670; 48 Ariz. 33; 49 Ariz. 74.

It is urged that such a tax as this may be used readily to restrict the dissemination of ideas. This must be conceded but the possibility of misuse does not make a tax unconstitutional. No abuse is claimed here. The ordinances in some of these cases are the general occupation license type covering many businesses. In the *Jeannette* prosecutions, the ordinance involved lays the usual tax on canvassing or soliciting sales of goods, wares and merchandise. It was passed in 1898. Every power of taxation or regulation is capable of abuse. Each one, to some extent, prohibits the free exercise of religion and abridges the freedom of the press, but that is hardly a reason for denying the power. If the tax is used oppressively, the law will protect the victims of such action.

This decision forces a tax subsidy notwithstanding our accepted belief in the separation of church and state. Instead of all bearing equally the burdens of government, this Court now fastens upon the communities the entire cost of policing the sales of religious literature. That the burden may be heavy is shown by the record in the *Jeannette* cases. There are only eight prosecutions, but one hundred and four Witnesses solicited in Jeannette the day *131 of the arrests. They had been requested by the authorities to await the outcome of a test case before continuing their canvassing. The distributors of religious literature, possibly of all informatory publications, become today privileged to carry on their occupations without contributing their share to the support of the government which provides the opportunity for the exercise of their liberties.

Nor do we think it can be said, properly, that these sales of religious books are religious exercises. The opinion of the Court in the *Jeannette* cases emphasizes for the first time the argument that the sale of books and pamphlets is in itself a religious practice. The Court says the Witnesses "spread their interpretations of the Bible and their religious

beliefs largely through the hand distribution of literature by full or part time workers." "The hand distribution of religious tracts is an age-old form of missionary evangelism — as old as the history of printing presses." "It is more than preaching; it is more than distribution of religious literature. It is a combination of both. Its purpose is as evangelical as the revival meeting. This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." "Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance." "The judgment in *Jones* v. *Opelika* has this day been vacated. Freed from that controlling precedent, we can restore to their high, constitutional position the liberties of itinerant evangelists who disseminate their religious beliefs and the tenets of their faith through distribution of literature." The record shows that books entitled "Creation" and "Salvation," as well as Bibles, were offered for sale. We shall assume the first two publications, also, are religious books. Certainly there can be no 132 dissent from the statement that *132 selling religious books is an age-old practice, or that it is evangelism in the sense that the distributors hope the readers will be spiritually benefited. That does not carry us to the conviction, however, that when distribution of religious books is made at a price, the itinerant colporteur is performing a religious rite, is worshipping his Creator in his way. Many sects practice healing the sick as an evidence of their religious faith or maintain orphanages or homes for the aged or teach the young. These are, of course, in a sense, religious practices but hardly such examples of religious rites as are encompassed by the prohibition against the free exercise of religion.

And even if the distribution of religious books was a religious practice protected from regulation by the First Amendment, certainly the affixation of a price for the articles would destroy the sacred character of the transaction. The evangelist becomes also a book agent.

The rites which are protected by the First Amendment are in essence spiritual — prayer, mass, sermons, sacrament — not sales of religious goods. The card furnished each Witness to identify him as an ordained minister does not go so far as to say the sale is a rite. It states only that the Witnesses worship by exhibiting to people "the message of said gospel in printed form, such as the Bible, books, booklets and magazines, and thus afford the people the opportunity of learning of God's gracious provision for them." On the back of the card appears: "You may contribute twenty-five cents to the Lord's work and receive a copy of this beautiful book." The sale of these religious books has, we think, relation to their religious exercises, similar to the "information march," said by the Witnesses to be one of their "ways of worship" and by this Court to be subject to regulation by license in *Cox* v. *New Hampshire*, 312 U.S. 569, 572, 573, 576.

The attempted analogy in the dissenting opinion in *Jones* v. *Opelika*, 316 U.S. 584, 609, 611, which 133 now becomes *133 the decision of this Court, between the forbidden burden of a state tax for the privilege of engaging in interstate commerce and a state tax on the privilege of engaging in the distribution of religious literature is wholly irrelevant. A state tax on the privilege of engaging in interstate commerce is held invalid because the regulation of commerce between the states has been delegated to the Federal Government. This grant includes the necessary means to carry the grant into effect and forbids state burdens without Congressional consent.[16] It is not the power to tax interstate commerce which is interdicted, but the exercise of that power by an unauthorized sovereign, the individual state. Although the fostering of commerce was one of the chief purposes for organizing the present Government, that commerce may be burdened with a tax by the United States. Internal Revenue Code, § 3469.

Murdock v. Pennsylvania    319 U.S. 105 (1943)

Commerce must pay its way. It is not exempt from any type of taxation if imposed by an authorized authority. The Court now holds that the First Amendment wholly exempts the church and press from a privilege tax, presumably by the national as well as the state government.

> 16  *Brown* v. *Maryland*, 12 Wheat. 419, 445, 448; *Kentucky Whip Collar Co.* v. *Illinois Central R. Co.*, 299 U.S. 334, 350; *Gwin, White Prince, Inc.* v. *Henneford*, 305 U.S. 434, 438; *Puget Sound Co.* v. *Tax Commission*, 302 U.S. 90.

The limitations of the Constitution are not maxims of social wisdom but definite controls on the legislative process. We are dealing with power, not its abuse. This late withdrawal of the power of taxation over the distribution activities of those covered by the First Amendment fixes what seems to us an unfortunate principle of tax exemption, capable of indefinite extension. We had thought that such an exemption required a clear and certain grant. This we do not find in the language of the First and Fourteenth Amendments. We are therefore of the opinion the judgments below

134  should be affirmed. *134

MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER, and MR. JUSTICE JACKSON join in this dissent. MR. JUSTICE JACKSON has stated additional reasons for dissent in his concurrence in *Douglas* v. *Jeannette, post*, p. 166.

MR. JUSTICE FRANKFURTER, dissenting:

While I wholly agree with the views expressed by MR. JUSTICE REED, the controversy is of such a nature as to lead me to add a few words.

A tax can be a means for raising revenue, or a device for regulating conduct, or both. Challenge to the constitutional validity of a tax measure requires that it be analyzed and judged in all its aspects. We must therefore distinguish between the questions that are before us in these cases and those that are not. It is altogether incorrect to say that the question here is whether a state can limit

the free exercise of religion by imposing burdensome taxes. As the opinion of my Brother REED demonstrates, we have not here the question whether the taxes imposed in these cases are in practical operation an unjustifiable curtailment upon the petitioners' undoubted right to communicate their views to others. No claim is made that the effect of these taxes, either separately or cumulatively, has been, or is likely to be, to restrict the petitioners' religious propaganda activities in any degree. Counsel expressly disclaim any such contention. They insist on absolute immunity from any kind of monetary exaction for their occupation. Their claim is that no tax, no matter how trifling, can constitutionally be laid upon the activity of distributing religious literature, regardless of the actual effect of the tax upon such activity. That is the only ground upon which these ordinances have been attacked; that is the only question raised in or decided by the state courts; and that is the only question presented to us. No complaint is made against the size of the taxes. If an appropriate claim, indicating that the taxes were oppressive in their effect upon the

135  petitioners' *135 activities, had been made, the issues here would be very different. No such claim has been made, and it would be gratuitous to consider its merits.

Nor have we occasion to consider whether these measures are invalid on the ground that they unjustly or unreasonably discriminate against the petitioners. Counsel do not claim, as indeed they could not, that these ordinances were intended to or have been applied to discriminate against religious groups generally or Jehovah's Witnesses particularly. No claim is made that the effect of the taxes is to hinder or restrict the activities of Jehovah's Witnesses while other religious groups, perhaps older or more prosperous, can carry on theirs. This question, too, is not before us.

It cannot be said that the petitioners are constitutionally exempt from taxation merely because they may be engaged in religious activities or because such activities may constitute

an exercise of a constitutional right. It will hardly be contended, for example, that a tax upon the income of a clergyman would violate the Bill of Rights, even though the tax is ultimately borne by the members of his church. A clergyman, no less than a judge, is a citizen. And not only in time of war would neither willingly enjoy immunity from the obligations of citizenship. It is only fair that he also who preaches the word of God should share in the costs of the benefits provided by government to him as well as to the other members of the community. And so, no one would suggest that a clergyman who uses an automobile or the telephone in connection with his work thereby gains a constitutional exemption from taxes levied upon the use of automobiles or upon telephone calls. Equally alien is it to our constitutional system to suggest that the Constitution of the United States exempts church-held lands from state taxation. Plainly, a tax measure is not invalid under the federal Constitution merely because it falls upon persons

136 engaged in activities of a religious nature. \*136

Nor can a tax be invalidated merely because it falls upon activities which constitute an exercise of a constitutional right. The First Amendment of course protects the right to publish a newspaper or a magazine or a book. But the crucial question is — how much protection does the Amendment give, and against what is the right protected? It is certainly true that the protection afforded the freedom of the press by the First Amendment does not include exemption from all taxation. A tax upon newspaper publishing is not invalid simply because it falls upon the exercise of a constitutional right. Such a tax might be invalid if it invidiously singled out newspaper publishing for bearing the burdens of taxation or imposed upon them in such ways as to encroach on the essential scope of a free press. If the Court could justifiably hold that the tax measures in these cases were vulnerable on that ground, I would unreservedly agree. But the Court has not done so, and indeed could not.

The vice of the ordinances before us, the Court holds, is that they impose a special kind of tax, a "flat license tax, the payment of which is a condition of the exercise of these constitutional privileges [to engage in religious activities]." But the fact that an occupation tax is a "flat" tax certainly is not enough to condemn it. A legislature undoubtedly can tax all those who engage in an activity upon an equal basis. The Constitution certainly does not require that differentiations must be made among taxpayers upon the basis of the size of their incomes or the scope of their activities. Occupation taxes normally are flat taxes, and the Court surely does not mean to hold that a tax is bad merely because all taxpayers pursuing the very same activities and thereby demanding the same governmental services are treated alike. Nor, as I have indicated, can a tax be invalidated because the exercise of a constitutional privilege is conditioned upon its payment. It depends upon the nature of the

137 condition that \*137 is imposed, its justification, and the extent to which it hinders or restricts the exercise of the privilege.

As I read the Court's opinion, it does not hold that the taxes in the cases before us in fact do hinder or restrict the petitioners in exercising their constitutional rights. It holds that "The power to tax the exercise of a privilege is the power to control or suppress its enjoyment." This assumes that because the taxing power exerted in *Magnano Co*. v. *Hamilton*, 292 U.S. 40, the well-known oleomargarine tax case, may have had the effect of "controlling" or "suppressing" the enjoyment of a privilege and still was sustained by this Court, and because all exertions of the taxing power may have that effect, if perchance a particular exercise of the taxing power does have that effect, it would have to be sustained under our ruling in the *Magnano* case.

The power to tax, like all powers of government, legislative, executive and judicial alike, can be abused or perverted. The power to tax is the power to destroy only in the sense that those who have

power can misuse it. Mr. Justice Holmes disposed of this smooth phrase as a constitutional basis for invalidating taxes when he wrote "The power to tax is not the power to destroy while this Court sits." *Panhandle Oil Co*. v. *Knox*, 277 U.S. 218, 223. The fact that a power can be perverted does not mean that every exercise of the power is a perversion of the power. Thus, if a tax indirectly suppresses or controls the enjoyment of a constitutional privilege which a legislature cannot directly suppress or control, of course it is bad. But it is irrelevant that a tax can suppress or control if it does not. The Court holds that "Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of resources necessary for its maintenance." But this is not the same as saying that "Those who do tax the exercise of this religious practice have made its exercise so costly as to deprive it of the 138 resources necessary for its maintenance." *138

The Court could not plausibly make such an assertion because the petitioners themselves disavow any claim that the taxes imposed in these cases impair their ability to exercise their constitutional rights. We cannot invalidate the tax measures before us simply because there may be others, not now before us, which are oppressive in their effect. The Court's opinion does not deny that the ordinances involved in these cases have in no way disabled the petitioners to engage in their religious activities. It holds only that "Those who can tax the privilege of engaging in this form of missionary evangelism can close its doors to all those who do not have a full purse." I quite agree with this statement as an abstract proposition. Those who possess the power to tax might wield it in tyrannical fashion. It does not follow, however, that every exercise of the power is an act of tyranny, or that government should be impotent because it might become tyrannical. The question before us now is whether these ordinances have deprived the petitioners of their constitutional rights, not whether some other ordinances not now before us might be enacted which might deprive

them of such rights. To deny constitutional power to secular authority merely because of the possibility of its abuse is as valid as to deny the basis of spiritual authority because those in whom it is temporarily vested may misuse it.

The petitioners say they are immune as much from a flat occupation tax as from a licensing fee purporting explicitly to cover only the costs of regulation. They rightly reject any distinction between this occupation tax and such a licensing fee. There is no constitutional difference between a so-called regulatory fee and an imposition for purposes of revenue. The state exacts revenue to maintain the costs of government as an entirety. For certain purposes and at certain times a legislature may earmark exactions to cover the costs of specific governmental services. In most instances the revenues of the state are tapped from 139 multitudinous sources for a *139 common fund out of which the costs of government are paid. As a matter of public finance, it is often impossible to determine with nicety the governmental expenditures attributable to particular activities. But, in any event, whether government collects revenue for the costs of its services through an earmarked fund, or whether an approximation of the cost of regulation goes into the general revenues of government out of which all expenses are borne, is a matter of legislative discretion and not of constitutional distinction. Just so long as an occupation tax is not used as a cover for discrimination against a constitutionally protected right or as an unjustifiable burden upon it, from the point of view of the Constitution of the United States it can make no difference whether such a money exaction for governmental benefits is labeled a regulatory fee or a revenue measure.

It is strenuously urged that the Constitution denies a city the right to control the expression of men's minds and the right of men to win others to their views. But the Court is not divided on this proposition. No one disputes it. All members of the Court are equally familiar with the history that led to the adoption of the Bill of Rights and are

**242**

Murdock v. Pennsylvania    319 U.S. 105 (1943)

equally zealous to enforce the constitutional protection of the free play of the human spirit. Escape from the real issue before us cannot be found in such generalities. The real issue here is not whether a city may charge for the dissemination of ideas but whether the states have power to require those who need additional facilities to help bear the cost of furnishing such facilities. Street hawkers make demands upon municipalities that involve the expenditure of dollars and cents, whether they hawk printed matter or other things. As the facts in these cases show, the cost of maintaining the peace, the additional demands upon governmental facilities for assuring security, involve outlays which have to be met. To say that the Constitution forbids the states to obtain the necessary revenue from the 140 whole of a class that enjoys these benefits *140 and facilities, when in fact no discrimination is suggested as between purveyors of printed matter and purveyors of other things, and the exaction is not claimed to be actually burdensome, is to say that the Constitution requires not that the dissemination of ideas in the interest of religion shall be free but that it shall be subsidized by the state. Such a claim offends the most important of all aspects of religious freedom in this country, namely, that of the separation of church and state.

The ultimate question in determining the constitutionality of a tax measure is — has the state given something for which it can ask a return? There can be no doubt that these petitioners, like all who use the streets, have received the benefits of government. Peace is maintained, traffic is regulated, health is safeguarded — these are only some of the many incidents of municipal administration. To secure them costs money, and a state's source of money is its taxing power. There is nothing in the Constitution which exempts persons engaged in religious activities from sharing equally in the costs of benefits to all, including themselves, provided by government.

I cannot say, therefore, that in these cases the community has demanded a return for that which it did not give. Nor am I called upon to say that the state has demanded unjustifiably more than the value of what it gave, nor that its demand in fact cramps activities pursued to promote religious beliefs. No such claim was made at the bar, and there is no evidence in the records to substantiate any such claim if it had been made. Under these circumstances, therefore, I am of opinion that the ordinances in these cases must stand.

MR. JUSTICE JACKSON joins in this dissent.
141  *141



**243**